John W. Berry (JB-8725)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022
Telephone: (212) 872-8075

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**JUDGE BUCHWALD**

**07 CV 10394**

-------------------------------------------------

GCCFC 2006-GG7 WESTHEIMER
MALL, LLC,

§
§
§
§

Civil Action No. _____

§
§

                         Plaintiff,

§
§

                         v.

§

**COMPLAINT**

EDWARD H. OKUN,

§
§
§

                         Defendant.

§
§
§

-------------------------------------------------

RECEIVED
NOV 16 2007
U.S. ... S.D.N.Y.
CASHIERS

Plaintiff GCCFC 2006-GG7 Westheimer Mall, LLC, as successor in interest to

LaSalle Bank National Association, in its capacity as Trustee for the Registered Holders

of Greenwich Capital Commercial Funding Corp., Commercial Mortgagee Trust 2006-

GG7, Commercial Mortgage Pass-Through Certificates, Series 2006-GG7 ("Lender"), by

and through its undersigned counsel, Akin Gump Strauss Hauer & Feld LLP, for its

complaint against Defendant Edward H. Okun ("Okun"), alleges as follows:

**NATURE OF THE ACTION**

1.    This is an action for breach of a guaranty of payment executed by

Defendant Okun as security for an $86,000,000.00 loan for a real estate development in

Houston, Texas, generally referred to as the West Oaks Mall, as evidenced by the Loan

1

Agreement, Note, Deed of Trust, Guaranty, and other related Loan Documents, all of which are defined and more fully described herein.

2.    Pursuant to the terms of the Guaranty, Okun promised to pay the indebtedness upon the occurrence of certain events, including a voluntary bankruptcy filing or other similar event by any of Okun's borrowing entities.

3.    On October 2, 2007, Defendant Okun's borrowing entities each filed separate voluntary petitions for bankruptcy protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia.  Plaintiff files this lawsuit against Edward H. Okun, individually, and seeks to enforce the terms of the Guaranty, hold Okun liable for the indebtedness, and to recover all damages resulting from Defendant's failure to comply with his guarantee obligation.

## PARTIES

4.    Plaintiff GCCFC 2006-GG7 Westheimer Mall, LLC ("Westheimer") is a Texas limited liability corporation whose sole member is a trust, identified as LaSalle Bank National Association, as trustee for the registered holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2006-GG7, Commercial Mortgage Pass-Through Certificates, Series 2006-GG7.  LaSalle Bank National Association, as trustee, maintains a trustee's customary powers to hold, manage, and dispose of trust assets for the benefit of the trust beneficiaries.  LaSalle Bank National Association is a banking association with its main office in Chicago, Illinois.

5.    Defendant Okun is an individual who is a citizen of the State of Florida and resides and has domicile in Miami Beach, Florida, and may be served with process at 394 S. Hibiscus Drive, Miami Beach, Florida, 33139-5134.

## JURISDICTION AND VENUE

6.    The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) based on diversity of citizenship. Complete diversity exists because Plaintiff Lender and Defendant Okun are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

7.    The Court has personal jurisdiction over Defendant Okun under the Guaranty at issue herein, pursuant to which the Defendant irrevocably consented to the exercise of jurisdiction over him in any state or federal court in the State of New York, for all controversies which shall arise under or in relation to this Guaranty.

8.    Venue properly lies in this Court pursuant to 28 U.S.C. § 1391 because, among other things, Defendant Okun is subject to personal jurisdiction in this District. Additionally, under the Guaranty at issue herein, Defendant waived any and all objections to venue in this District.

9.    All conditions precedent to instituting this action have been performed or have occurred.

## FACTS

10.    Defendant Okun is a real estate developer who helped direct a refinance of a shopping mall in Harris County, Texas, commonly referred to as the "West Oaks Mall," located at 1000 West Oaks Mall, Houston, Texas, 77082, and more particularly described in Exhibit A to the Loan Agreement and other Loan Documents (the "Property"). In order to obtain the necessary refinancing for the loan on the Property, Okun created multiple borrowing entities to act as the borrower under the Loan Documents.

11.    The borrowing entities included: (a) IPofA West Oaks Mall, LP ("the Owner Borrower"); (b) IPofA West Oaks Master LeaseCo, LP ("the Master Tenant Borrower"); and (c) IPofA West Oaks Mall LeaseCo LP ("the Master Subtenant Borrower") (collectively referred to herein, and in the Loan Documents, as the "Borrower").

12.    Greenwich Capital Financial Products, Inc. was the original lender under the Loan Documents ("Original Lender").

13.    Borrower entered in to a Loan and Security Agreement, dated June 22, 2006, which fully explained the organizational structure of Borrower, including Okun's ownership and control of each of the aforementioned borrowing entities, in addition to Investment Properties of America, LLC (the "Loan Agreement"), which is attached hereto as Exhibit A and incorporated herein for all purposes. *See* Loan Agreement § 4.1(C) at 34 and Schedule 4.1(C) attached thereto.

14.    In connection with the purchase of the Property, the Original Lender loaned the Borrower $86,000,000.00 on or about June 22, 2006, and the Borrower entered into a Promissory Note, dated June 22, 2006, in the principal amount of $86,000,000.00 (the "Note"), and a Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, also dated June 22, 2006 (the "Deed of Trust"). The Note is attached hereto as Exhibit B and incorporated herein for all purposes, and the Deed of Trust is attached hereto as Exhibit C and incorporated herein for all purposes.

4

15.    Also in connection with the purchase of the Property, Okun entered into an Exceptions to Non-Recourse Guaranty, dated June 22, 2006 (the "Guaranty"). The Guaranty is attached hereto as Exhibit D and incorporated herein for all purposes.

16.    The Loan Documents were assigned from Original Lender to LaSalle Bank National Association, in its capacity as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgagee Trust 2006-GG7, Commercial Mortgage Pass-Through Certificates, Series 2006-GG7 ("LaSalle Bank") by an Assignment of Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated June 22, 2006 (the "LaSalle Bank Assignment"). The LaSalle Assignment is attached hereto as Exhibit E and incorporated herein for all purposes.

17.    LaSalle Bank assigned the Loan Documents to Plaintiff GCCFC 2006-GG7 Westheimer Mall, LLC by an Assignment of Deed of Trust and Other Loan Documents, dated August 9, 2007 (the "Westheimer Assignment"). The Westheimer Assignment is attached hereto as Exhibit F and incorporated herein for all purposes.

18.    Plaintiff's ownership of the Loan Documents and all claims alleged in this lawsuit are by virtue of a lawful assignment of all the Loan Documents and claims (both in tort and in contract) by its predecessors in interest, including, but not limited to Greenwich Capital Financial Products, Inc., and LaSalle Bank National Association, in its capacity as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgagee Trust 2006-GG7, Commercial Mortgage Pass-Through Certificates, Series 2006-GG7. As a result, Plaintiff is the owner and holder of

the Loan Documents, has the rights to enforce them, and is the owner of all claims alleged herein.

## DEFENDANT'S PROMISES UNDER THE GUARANTY

19.     In the Guaranty, Defendant Okun acknowledged that he derived substantial benefits from the Lender making the loan to Borrower. *See* Exhibit D, Guaranty at 1.

20.     Pursuant to the Guaranty, in the event of a bankruptcy filing by or against Borrower under the Bankruptcy Code, Defendant Okun agreed to personally pay the $86,000,000.00 loan and all other obligations, liabilities and indebtedness of every nature of Borrower, including the principal amount of all debts, claims and indebtedness, accrued and unpaid interest, and all fees, costs and expenses (including, without limitation, attorneys' fees) suffered or incurred by Lender resulting from the filing of a proceeding under the Bankruptcy Code by or against Borrower, in addition to all other amounts owing, due or payable under the Loan Documents (the "Indebtedness"). *See* Exhibit D, Guaranty §§ 1 and 2, at 2-4; *see also* Exhibit A, Loan Agreement § 12.2(II), at 108-110.

21.     Defendant Okun promised to fulfill these terms and make payment of the Indebtedness, without demand, notice, protest, or presentment to either Borrower or Guarantor. *See* Exhibit D, Guaranty §§ 3-8, at 4-6.

## DEFAULTS

22.     Borrower is and has been in default of its obligations under the Loan Documents. Specifically, Borrower defaulted on its obligations under the Note by failing

to make its monthly payment beginning in June 2007 (the "Payment Default") and all subsequent monthly payments.

23.    In addition to the Payment Default, Borrower is and has been in non-monetary default pursuant to the Loan Documents including, but not limited to:

- Borrower's failure to set up and implement the cash management system and lockbox arrangement in the manner provided in the Loan Documents, as well as continuing to implement controls over disbursements from the lockbox for operating expenses;

- Borrower's failure to pay all other charges pursuant to the Loan Documents including, but not limited to, the deposit required by Section 6.9 of the Loan Agreement;

- Borrower's failure to fund any applicable reserves to address all deferred maintenance issues at the Property;

- Borrower's failure Terminate that certain Sub-Management and Leasing Agreement dated December 28, 2006, by and between IPofA West Oaks Mall LeaseCo, LP and Boardwalk Management Company, Inc., which was entered into without Holder's prior knowledge or consent in violation of the Loan Documents;

- Borrower's failure to provide information on all remaining due diligence items requested, including but not limited to, financial information, property records, insurance information, and such other information as it has requested; and

- Borrower's failure to provide Servicer copies of all documents relating to the workout financing, including, without limitation, all loan agreements, security agreements, and, if applicable, pledge documents involving the Property.

24.    As a result, a demand for payment, notice of default and notice of acceleration was made to Borrower and Defendant Okun. Specifically, on July 27, 2007, the Lender sent Borrower and Defendant Okun a certified letter demanding payment and providing notice of intent to accelerate (the "Demand Letter"). A true and correct copy of the Demand Letter from Mark Patterson, Esq. of the law firm of Akin Gump Strauss Hauer & Feld LLP, on behalf of LaSalle Bank National Association, in its capacity as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp.,

Commercial Mortgage Trust 2006-GG7, Commercial Mortgage Pass-Through Certificats, Series 2006-GG7, acting by and through its Special Servicer LNR Partners, Inc., and its Master Servicer, Midland Loan Services, Inc. is attached hereto as Exhibit G and incorporated herein for all purposes.

25.    Borrower failed and refused to cure the defaults enumerated in the Demand Letter, and on August 13, 2007, Lender sent Borrower and Defendant Okun a certified letter accelerating the debt and providing notice of foreclosure sale (the "Acceleration Letter"). A true and correct copy of the Acceleration Letter from Mark Patterson, Esq. of the law firm of Akin Gump Strauss Hauer & Feld LLP, on behalf of GCCFC 2006-GG7 Westheimer Mall, LLC, a Texas limited liability company, acting by and through, acting by and through the Servicer its Special Servicer LNR Partners, Inc., and its Master Servicer, Midland Loan Services, Inc. is attached hereto as Exhibit H and incorporated herein for all purposes.

26.    After Borrower failed and refused to cure the defaults enumerated in the Acceleration Letter, on September 10, 2007, Lender sent Borrower and Defendant Okun a certified letter providing notice of foreclosure sale of the Property, scheduled for October 2, 2007 (the "Foreclosure Letter"). The Foreclosure Letter is attached hereto as Exhibit I and incorporated herein for all purposes.

27.    In addition to the Payment Default and Non-Monetary Defaults, and in response to the Demand Letter, Acceleration Letter and Foreclosure Letter, and in violation of the Forbearance Letter Agreement, on October 2, 2007, Defendant Okun's borrowing entities – Owner Borrower, Master Tenant Borrower, and Master Subtenant Borrower – each instituted voluntary proceedings under Chapter 11 of the Bankruptcy

Code by filing petitions in the United States Bankruptcy Court for the Eastern District of Virginia ("Borrower Bankruptcy"). Copies of the Borrower Bankruptcy filings/petitions are attached hereto as Exhibits J, K, and L, and incorporated herein for all purposes.

28.    The Borrower Bankruptcy filings triggered Defendant Okun's personal responsibility and liability to pay the Indebtedness due and owing pursuant to the Loan Documents. *See* Guaranty ¶ 2(a). Specifically, Section 2(a) provides:

2.    Guarantor hereby absolutely, unconditionally and irrevocably guarantees to lender the full and prompt payment when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, and the full and prompt performance when due, of all of the following:

(a)    The Indebtedness in the event of (i) a voluntary bankruptcy filing or other similar event by any Borrower; (ii) any Involuntary Borrower Party Bankrutpcy which is solicited, procured, consented to or acquiesced in by any Borrower Party or any Affiliate of any of them, except for any such action brought by Lender as set forth in clause (iii) below; (iii) subsequent to the commencement of any bankruptcy or similar proceeding with respect to any Borrower, any involuntary bankruptcy proceeding is brought by Lender against one or more of the Borrower(s) (which may include any or all of Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower) and any Borrower Party or any Affiliate of any of them files any motion contesting the same; (iv) any Borrower Party or any Affiliate of any of them contests or in any way challenges, directly or indirectly, the enforceability of any of the Master Lease or Master Sublease or the characterization of the interests established thereby as other than the lease and sublease structure described therein; (v) in the absence of Lender's prior written consent, such Borrower enters into or consents to any termination of the Management Agreement; (vi) any Borrower fails to enter into any workout plan or modification of the Loan upon the occurrence of an Event of Default that has been approved by SMT Borrowers the SMT Relative Percentages of which aggregate to 51% of more at the time of such Event of Default; (vii) breach of Article IX of the Loan Agreement or Article XI of the Loan Agreement; or (viii) the failure of Borrower to pay to Lender the first regularly scheduled installment of principal and interest on the Loan on the First Payment Date.

29.    Defendant Okun has failed to pay the outstanding balance of the Loan, in violation of his responsibilities under the Guaranty.

## IV. CLAIMS

### COUNT ONE:  Breach of Guaranty

30.    Plaintiff hereby incorporates the foregoing paragraphs by reference.

31.    Defendant Okun owned and controlled Borrower.  Okun is also guarantor and obligor of the Indebtedness under the Loan Documents and all Obligations defined therein, including all costs and expenses, reasonable fees and out of pocket expenses of attorneys and expert witnesses, incurred by Plaintiff in enforcing its rights and collecting any amounts due under the Guaranty, as a result of a voluntary bankruptcy filing or other similar event by any Borrower.

32.    The Borrower voluntarily filed for bankruptcy protection on October 2, 2007 in the United States Bankruptcy Court for the Eastern District of Virginia, triggering the provisions of, and Defendant's liability under, the Guaranty.

33.    Plaintiff is entitled to recover from Defendant Okun, as guarantor, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest, and all fees, costs and expenses (including, without limitation, attorneys' fees) incurred by Plaintiff, in addition to interest on such sums, as contemplated in the Guaranty.  Such damages exceed the minimum jurisdictional limits of this Court.

34.    Additionally, Plaintiff has retained the undersigned attorneys to prosecute its claims in this action.  Plaintiff is entitled to recover its reasonable attorneys' fees and expenses in this action pursuant to the Guaranty, other Loan Documents, and other applicable law.

## V. PRAYER FOR RELIEF

35.    WHEREFORE, Plaintiff respectfully requests the following relief:

A.    A judgment against Edward H. Okun in the full amount of the outstanding Indebtedness under the Loan Documents and all other Obligations, as defined therein, which exceeds the minimum jurisdictional limits of this Court;

B.    All costs and expenses, reasonable fees and out of pocket expenses of attorneys and expert witnesses, which Plaintiff has incurred and may in the future incur in pursuing this action in the trial court and, if applicable, in any appeal;

C.    Pre-judgment and post-judgment interest at the maximum rate allowable by law;

D. Such other and further relief, in law and equity, to which Plaintiff may be justly entitled.

Dated:  New York, New York
        November 16, 2007                Respectfully submitted,

                                    AKIN GUMP STRAUSS HAUER & FELD, L.L.P.

                                    _____
                                    John W. Berry (JB-8725)
                                    590 Madison Avenue
                                    New York, New York  10022
                                    (212) 872-8075 (telephone)
                                    (212) 872-7512 (facsimile)

                                    M. Scott Barnard
                                    Carl Cecere
                                    1700 Pacific Avenue, Suite 4100
                                    Dallas, Texas 75201
                                    (214) 969-2800 (telephone)
                                    (214) 969-4343 (facsimilie)

                                    *Attorneys for Plaintiff GCCFC 2006-GG7*
                                    *Westheimer Mall, LLC*

# EXHIBIT A

LOAN AND SECURITY AGREEMENT

Dated as of June 22, 2006

between

**IPofA WEST OAKS MALL, LP, IPofA WEST OAKS MASTER LEASECO, LP, IPofA WEST OAKS MALL LEASECO, LP and various SMT BORROWERS who join this Loan and Security Agreement from time to time,**
**as Borrower**

and

**GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.,**
**as Lender**

# Table of Contents

Page

## ARTICLE I
## DEFINITIONS

| | | |
|---|---|---|
| Section 1.1 | Certain Defined Terms | 1 |
| Section 1.2 | Accounting Terms. | 21 |
| Section 1.3 | Other Definitional Provisions. | 21 |

## ARTICLE II
## TERMS OF THE LOAN .......................................................................... 22

| | | |
|---|---|---|
| Section 2.1 | Loan. | 22 |
| Section 2.2 | Interest. | 22 |
| Section 2.3 | Defeasance. | 24 |
| Section 2.4 | Payments. | 26 |
| Section 2.5 | Maturity | 27 |
| Section 2.6 | Prepayment. | 27 |
| Section 2.7 | Outstanding Balance | 28 |
| Section 2.8 | Taxes. | 28 |
| Section 2.9 | Reasonableness of Charges | 29 |

## ARTICLE III
## CONDITIONS TO LOAN ....................................................................... 29

| | | |
|---|---|---|
| Section 3.1 | Conditions to Funding of the Loan on the Closing Date | 29 |

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES ......................................... 33

| | | |
|---|---|---|
| Section 4.1 | Organization, Powers, Capitalization, Good Standing, Business. | 34 |
| Section 4.2 | Authorization of Borrowing, etc. | 34 |
| Section 4.3 | Financial Statements. | 35 |
| Section 4.4 | Indebtedness and Contingent Obligations | 35 |
| Section 4.5 | Title to Property | 35 |
| Section 4.6 | Zoning; Compliance with Laws | 36 |
| Section 4.7 | Leases; Agreements. | 36 |
| Section 4.8 | Condition of Property | 37 |
| Section 4.9 | Litigation; Adverse Facts. | 38 |
| Section 4.10 | Payment of Taxes | 38 |
| Section 4.11 | Adverse Contracts. | 38 |
| Section 4.12 | Performance of Agreements | 38 |

## Table of Contents
### (continued)

| | | Page |
|---|---|---|
| Section 4.13 | Governmental Regulation | 38 |
| Section 4.14 | Employee Benefit Plans | 39 |
| Section 4.15 | Broker's Fees | 39 |
| Section 4.16 | Environmental Compliance | 39 |
| Section 4.17 | Solvency | 40 |
| Section 4.18 | Disclosure | 40 |
| Section 4.19 | Use of Proceeds and Margin Security | 40 |
| Section 4.20 | Insurance | 40 |
| Section 4.21 | Separate Tax Lots | 40 |
| Section 4.22 | Investments | 41 |
| Section 4.23 | Bankruptcy | 41 |
| Section 4.24 | Defaults | 41 |
| Section 4.25 | No Plan Assets; Compliance with Plans | 41 |
| Section 4.26 | No Prohibited Transaction | 41 |
| Section 4.27 | Not Foreign Person | 41 |
| Section 4.28 | No Collective Bargaining Agreements | 42 |
| Section 4.29 | Compliance | 42 |
| Section 4.30 | Intellectual Property | 42 |
| Section 4.31 | Pre-Closing Date Activities | 42 |
| Section 4.32 | Mortgage and Other Liens | 42 |
| Section 4.33 | Management Agreement | 42 |
| Section 4.34 | No Prohibited Persons | 42 |

## ARTICLE V
## COVENANTS OF BORROWER

| | | |
|---|---|---|
| COVENANTS OF BORROWER | | 43 |
| Section 5.1 | Financial Statements and Other Reports | 43 |
| Section 5.2 | Existence; Qualification | 46 |
| Section 5.3 | Payment of Impositions and Claims | 46 |
| Section 5.4 | Maintenance of Insurance | 47 |
| Section 5.5 | Maintenance of the Property; Alterations; Casualty or Taking | 49 |
| Section 5.6 | Inspection | 53 |
| Section 5.7 | Environmental Compliance | 53 |
| Section 5.8 | Environmental Disclosure | 55 |
| Section 5.9 | Compliance with Laws and Contractual Obligations | 55 |
| Section 5.10 | Further Assurances | 56 |
| Section 5.11 | Performance of Agreements and Leases | 56 |
| Section 5.12 | Leases | 56 |
| Section 5.13 | Management | 58 |
| Section 5.14 | Material Agreements | 59 |
| Section 5.15 | Certain VCOC Provisions | 59 |
| Section 5.16 | Estoppel Certificates | 60 |

Table of Contents
(continued)

| | | Page |
|---|---|---|
| Section 5.17 | Indebtedness | 60 |
| Section 5.18 | Liens and Related Matters | 60 |
| Section 5.19 | Contingent Obligations | 60 |
| Section 5.20 | Restriction on Fundamental Changes | 60 |
| Section 5.21 | Transactions with Related Persons | 61 |
| Section 5.22 | ERISA | 61 |
| Section 5.23 | Lender's Expenses | 62 |
| Section 5.24 | Environmental Matters; Inspection. | 63 |
| Section 5.25 | Environmental Claims. | 63 |
| Section 5.26 | Environmental Indemnification | 64 |
| Section 5.27 | Operation of Property | 64 |
| Section 5.28 | Taxes on Security | 65 |
| Section 5.29 | Cooperate in Legal Proceedings | 65 |
| Section 5.30 | Insurance Benefits. | 66 |
| Section 5.31 | Tenant Estoppels. | 66 |
| Section 5.32 | Prohibited Persons | 66 |

ARTICLE VI

RESERVES ........................................................................................ 68

| Section 6.1 | Security Interest in Reserves; Other Matters Pertaining to Reserves. | 68 |
|---|---|---|
| Section 6.2 | Funds Deposited with Lender. | 69 |
| Section 6.3 | Impositions and Insurance Reserve | 69 |
| Section 6.4 | Replacement Reserve | 70 |
| Section 6.5 | Leasing Reserve. | 70 |
| Section 6.6 | Security Deposits; Lease Recoveries. | 71 |
| Section 6.7 | Conditions to Disbursements from the Replacement Reserve and Leasing Reserve; Performance of Work. | 72 |

ARTICLE VII
CLEARING ACCOUNT; DEPOSIT ACCOUNT; CASH MANAGEMENT ........................... 77

| Section 7.1 | Establishment of Clearing Account and Deposit Account. | 77 |
|---|---|---|
| Section 7.2 | Deposit of Receipts into the Clearing Account | 78 |
| Section 7.3 | Application of Funds in Accounts. | 79 |
| Section 7.4 | Budget Approvals. | 82 |
| Section 7.5 | Sole Dominion and Control | 82 |
| Section 7.6 | Pledge of Accounts. | 82 |
| Section 7.7 | Lender Appointed Attorney-In-Fact | 84 |

<u>Table of Contents</u>
(continued)

<u>Page</u>

### ARTICLE VIII
### DEFAULT, RIGHTS AND REMEDIES ................................................................................84

Section 8.1   Event of Default................................................................................84
Section 8.2   Acceleration and Remedies. .........................................................84
Section 8.3   Performance by Lender. ................................................................87
................................................................................88

### ARTICLE IX
### SINGLE-PURPOSE, BANKRUPTCY-REMOTE REPRESENTATIONS,
### WARRANTIES AND COVENANTS .............................................................................89

Section 9.1   Applicable to Borrower. ................................................................89

### ARTICLE X
### RESTRUCTURING LOAN, SECONDARY MARKET TRANSACTIONS .....................94

Section 10.1   Secondary Market Transactions Generally................................94
Section 10.2   Cooperation; Limitations ................................................................95
Section 10.3   Information ................................................................................95
Section 10.4   Additional Provisions ................................................................96

### ARTICLE XI
### RESTRICTIONS ON LIENS AND TRANSFERS..........................................................97

Section 11.1   Restrictions on Transfer and Encumbrance................................97
Section 11.2   Permitted Transfers of Beneficial Interests in Borrower................97
Section 11.3   Assumability ................................................................................99

### ARTICLE XII
### RECOURSE; LIMITATIONS ON RECOURSE..........................................................106

Section 12.1   Limitations on Recourse. ................................................................106
Section 12.2   Recourse to Primary Borrower Parties and Guarantor. ................106
Section 12.3   Miscellaneous ................................................................................110

### ARTICLE XIII
### MISCELLANEOUS ................................................................................110

Section 13.1   Expenses and Attorneys' Fees................................................110
Section 13.2   Indemnity ................................................................................110

iv

Table of Contents
(continued)

| | | Page |
|---|---|---|
| Section 13.3 | Amendments and Waivers | 111 |
| Section 13.4 | Retention of Borrower's Documents | 111 |
| Section 13.5 | Notices | 111 |
| Section 13.6 | Survival of Warranties and Certain Agreements | 112 |
| Section 13.7 | Failure or Indulgence Not Waiver; Remedies Cumulative | 113 |
| Section 13.8 | Marshaling; Payments Set Aside | 113 |
| Section 13.9 | Severability | 113 |
| Section 13.10 | Headings | 113 |
| Section 13.11 | APPLICABLE LAW | 113 |
| Section 13.12 | Successors and Assigns | 114 |
| Section 13.13 | Sophisticated Parties, Reasonable Terms, No Fiduciary Relationship | 114 |
| Section 13.14 | Reasonableness of Determinations | 114 |
| Section 13.15 | No Duty | 114 |
| Section 13.16 | Entire Agreement | 115 |
| Section 13.17 | Construction; Supremacy of Loan Agreement | 115 |
| Section 13.18 | Consent to Jurisdiction | 115 |
| Section 13.19 | Waiver of Jury Trial | 115 |
| Section 13.20 | Counterparts; Effectiveness | 116 |
| Section 13.21 | Servicer | 116 |
| Section 13.22 | Waiver of Notice | 117 |
| Section 13.23 | Offsets, Counterclaims and Defenses | 117 |
| Section 13.24 | Waiver of Counterclaim | 117 |
| Section 13.25 | Brokers and Financial Advisors | 117 |

# LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Loan Agreement") is dated as of June 22, 2006, and entered into by and between IPofA WEST OAKS MALL, LP, a Texas limited partnership ("Owner Borrower"), IPofA WEST OAKS MASTER LEASECO, LP, a Texas limited partnership ("Master Tenant Borrower") and IPofA WEST OAKS MALL LEASECO, LP, a Texas limited partnership ("Master Subtenant Borrower"; Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower, together with each SMT Borrower (as defined below), are collectively referred to herein as "Borrower"; references herein to "Borrower" shall mean each Person comprising Borrower, and also all of them collectively, jointly and severally); and GREENWICH CAPITAL FINANCIAL PRODUCTS, INC., a Delaware corporation (together with its successors and assigns, whether one or more, "Lender").

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, Borrower and Lender agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1    Certain Defined Terms.**  The terms defined below are used in this Loan Agreement as so defined.  Terms defined in the preamble to this Loan Agreement are used in this Loan Agreement as so defined.

"Account Banks" has the meaning set forth in Section 7.1.

"Account Collateral" means all of Borrower's right, title and interest in and to the Accounts, the Reserves, all monies and amounts which may from time to time be on deposit therein, all monies, checks, notes, instruments, documents, deposits, and credits from time to time in the possession of Lender representing or evidencing such Accounts and Reserves and all earnings and investments held therein and proceeds thereof, including, but not limited to, the Account Collateral specified in Section 7.6(A) hereof.

"Accounts" means, collectively, the Clearing Account, the Deposit Account, the Sub-Accounts thereof, and any other accounts pledged to Lender pursuant to this Loan Agreement or any other Loan Document.

"Adjusted Net Cash Flow" for any twelve month calculation period means the excess of (a) base rents and monthly recoveries under bona fide Leases at the Property with tenants in occupancy, open for business and paying rent at the end of such twelve month period and thereafter through the date of calculation of Adjusted Net Cash Flow over (b) Operating Expenses over such twelve month calculation period, in each case adjusted to reflect Lender's determination of (i) a vacancy factor equal to the greater of (A) the actual vacancy rate at the Property, and (B) 5% of the rentable area of the Property; (ii) a base management fee equal to the greater of (A) the actual base management for such period and (B) 4% of gross revenues for such period; (iii) subtraction of (A) a reserve for Capital Expenditures equal to $0.20 per rentable square foot at the Property per annum (regardless of whether a reserve therefor is required hereunder or the amount of such reserve), and (B) a leasing reserve equal to $1.00 per rentable

square foot at the Property space per annum (regardless of whether a reserve therefor is required hereunder or the amount of such reserve); (iv) exclusion of (X) amounts representing non-recurring items and (Y) amounts received from tenants not currently paying rent, from tenants affiliated with any Borrower Parties, and from tenants in default or in bankruptcy; and (v) adjustment of Operating Expenses to reflect the higher of actual Operating Expenses for such period and historical annualized Operating Expenses and historical operating levels at the Property.

"Affiliate" means in relation to any Person, any other Person: (i) directly or indirectly controlling, controlled by, or under common control with, the first Person; (ii) directly or indirectly owning or holding five percent (5%) or more of any equity interest in the first Person; or (iii) five percent (5%) or more of whose voting stock or other equity interest is directly or indirectly owned or held by the first Person. In addition, the Affiliates of each Borrower Party include, without limitation, all other Borrower Parties, irrespective of whether they now or hereafter satisfy the foregoing criteria. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Where expressions such as "[name of party] or any Affiliate" are used, the same shall refer to the named party and any Affiliate of the named party.

"Approved Accounting Principles" shall mean consistently applied accounting principles on the accounting basis used for federal income tax purposes using the accrual accounting method.

"Approved Architect" has the meaning set forth in Section 5.5.

"Approved Bank" shall mean a bank, the long term unsecured debt obligations of which are rated at least "AA" by S&P and the equivalent by Fitch and Moody's (unless Lender approves in writing a financial institution other than a bank or a lower rating, in each case in Lender's sole and absolute discretion).

"Approved Operating Budget" has the meaning set forth in Section 7.4.

"Approved Capital Expenditures" has the meaning set forth in Section 6.5.

"Approved Expenditures" has the meaning set forth in Section 6.6.

"Approved Leasing Costs" has the meaning set forth in Section 6.5.

"Assignment of Leases" means the Assignment of Leases and Rents of even date herewith from Borrower to Lender, constituting an assignment of the Leases and proceeds therefrom as Collateral for the Loan, as same may be amended or modified from time to time.

"Assignment of Management Agreement" means that certain Conditional Assignment of Management Agreement of even date herewith executed by Borrower and current Manager, constituting an assignment of the Management Agreement as Collateral for the Loan, as same may be amended or modified from time to time.

2

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time, and all rules and regulations promulgated thereunder.

"Base Master Sublease" shall mean that certain Master Sublease Agreement dated as of June 22, 2006, by and between Master Tenant Borrower and Master Subtenant Borrower, pursuant to which Master Tenant Borrower has subleased the Master Units to Master Tenant Borrower, as the same may be amended and modified from time to time (i) pursuant to the SMT Master Sublease executed by the applicable SMT Borrower, Master Subtenant Borrower and Master Tenant Borrower in connection with each SMT Borrower Transfer to remove the applicable SMT Units from the premises demised to Master Subtenant Borrower under the Base Master Sublease, and (ii) otherwise as Lender may approve in writing.

"Borrower" has the meaning set forth in the preamble.

"Borrowers' Designee" means Master Subtenant Borrower.

"Borrower Party" and "Borrower Parties" mean, individually or collectively, each Borrower, each General Partner, each Limited Partner, Guarantor and each SMT Guarantor.

"Business Day" means any day excluding (i) Saturday, (ii) Sunday, (iii) any day which is a legal holiday under the laws of the State of New York, and (iv) any day on which banking institutions located in such state are generally not open for the conduct of regular business.

"Calendar Quarter" means each of the four periods of three consecutive months each from January 1 – March 31, April 1 – June 30, July 1 – September 30 and October 1 – December 31, respectively.

"Capital Expenditures" means expenditures for capital improvements, furnishings, fixtures and equipment (whether paid in cash or property or accrued as liabilities) made by Borrower that, in conformity with GAAP, are required to be included in the property, plant, or equipment, or similar fixed asset account or otherwise capitalized.

"Capital Expenditure Budget" means Borrower's budget for Capital Expenditures for the Property, the costs of which are to be paid from the Replacement Reserve, which budget has been approved by Lender as and to the extent required hereunder.

"Claims" has the meaning set forth in Section 5.3.

"Clearing Account" has the meaning set forth in Section 7.1

"Clearing Account Agreement" means the written agreement(s) among Borrower, Lender and the holder(s) of the Clearing Account with respect to the maintenance and control thereof.

"Clearing Account Bank" means Wachovia Bank, National Association, a national banking association, or any successor financial institution appointed by Lender pursuant hereto or pursuant to the Clearing Account Agreement.

"Closing" means the funding of the Loan contemplated by this Loan Agreement.

"<u>Closing Date</u>" means the date on which the Closing occurs.

"<u>Collateral</u>" means rights, interests, and property of every kind, real and personal, tangible and intangible, which is granted, pledged, liened, or encumbered as security for the Loan or any of the other Obligations under this Loan Agreement, the Mortgage or other Loan Documents, including without limitation the Property, the Improvements, the Rents and the Accounts and all Account Collateral.

"<u>Compliance Certificate</u>" has the meaning set forth in Section 5.1.

"<u>Condemnation Proceeds</u>" means, in the event of a Taking with respect to the Property, the proceeds in respect of such Taking.

"<u>Contingent Obligation</u>", as applied to any Person, means any direct or indirect liability, contingent or otherwise, of that Person: (A) with respect to any indebtedness, lease, dividend or other obligation of another if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (B) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (C) under any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement or other similar agreement or arrangement designed to protect against fluctuations in interest rates; or (D) under any foreign exchange contract, currency swap agreement or other similar agreement or arrangement designed to protect that Person against fluctuations in currency values. Contingent Obligations shall include (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement, and (iii) any liability of such Person for the obligations of another through any agreement to purchase, repurchase or otherwise acquire such obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another. For purposes of this definition, the amount of any Contingent Obligation at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"<u>Contractual Obligation</u>", as applied to any Person, means any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject including, without limitation, the Loan Documents.

"<u>Debt Service Coverage Ratio</u>" shall mean, for any trailing twelve (12) month period measured as of the end of any Calendar Quarter, the ratio of (i) Adjusted Net Cash Flow for such twelve (12) month period to (ii) an adjusted annualized debt service base amount equal to $6,619,378.

4

"Debt Service Sub-Account" has the meaning set forth in Section 7.1.

"Default" means any breach or default under any of the Loan Documents, whether or not the same is an Event of Default, and also any condition or event that, after notice or lapse of time or both, would constitute an Event of Default if that condition or event were not cured or removed within any applicable grace or cure period.

"Default Rate" has the meaning set forth in Section 2.2.

"Defeasance" shall have the meaning set forth in Section 2.3.

"Defeasance Collateral" shall mean U.S. Obligations, which provide payments (i) on or prior to, but as close as possible to, all Payment Dates and other scheduled payment dates, if any, under the Note after the Defeasance Date and up to and including the Scheduled Maturity Date, and (ii) in amounts equal to or greater than the respective Scheduled Defeasance Payments related to such Payment Dates.

"Defeasance Collateral Account" has the meaning set forth in Section 2.3.

"Defeasance Date" has the meaning set forth in Section 2.3.

"Deposit Account" has the meaning set forth in Section 7.1.

"Deposit Account Agreement" means the written agreement(s) among Borrower, Lender and the holder(s) of the Deposit Account with respect to the maintenance and control thereof.

"Deposit Account Bank" means Wachovia Bank, National Association, a national banking association, or any successor financial institution appointed by Lender pursuant hereto or pursuant to the Deposit Account Agreement.

"Documents" means all "documents" as defined in the UCC or other receipts covering, evidencing or representing goods now owned or hereafter acquired by Borrower.

"Dollars" and the sign "$" mean the lawful money of the United States of America.

"Eligible Account" shall mean a separate and identifiable account from all other funds held by the holding institution, which account is either (i) an account maintained with an Eligible Bank or (ii) a segregated trust account maintained by a corporate trust department of a federal depository institution or a state chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations § 9.10(B), which has corporate trust powers and is acting in its fiduciary capacity and in either case having combined capital and surplus of at least $100,000,000 or otherwise acceptable to the Rating Agencies and subject to supervision or examination by federal and state authority. An Eligible Account shall not be evidenced by a certificate of deposit, passbook or other instrument.

"Eligible Bank" shall mean a bank that (i) satisfies the Rating Criteria and (ii) insures the deposits hereunder through the Federal Deposit Insurance Corporation.

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including any Multiemployer Plan) (i) which is maintained for employees of Borrower or any ERISA Affiliate, (ii) which has at any time within the preceding six (6) years been maintained for the employees of Borrower or any current or former ERISA Affiliate or (iii) for which Borrower or any ERISA Affiliate has any liability, including contingent liability.

"Environmental Claims" has the meaning set forth in Section 4.16.

"Environmental Indemnity" means the Environmental Indemnity Agreement of even date herewith from Borrower and Guarantor (together with any permitted substitute or replacement indemnitor thereof executing any replacement indemnity in accordance with this Loan Agreement in connection with a transfer permitted under Article XI hereof, if under Article XI such transfer provides for a substitute indemnitor) to Lender, as same may be amended or modified from time to time.

"Environmental Laws" means any federal, state, or local law, ordinance or regulation or any court judgment or order of any federal, state or local agency or regulatory body applicable to Borrower or to the Property relating to industrial hygiene or to environmental or unsafe conditions including, but not limited to, those relating to the generation, manufacture, storage, handling, transportation, disposal, release, emission or discharge of Hazardous Material, those in connection with the construction, fuel supply, power generation and transmission, waste disposal or any other operations or processes relating to the Property, and those relating to the atmosphere, soil, surface and ground water, wetlands, stream sediments and vegetation on, under, in or about the Property. "Environmental Laws" also shall include, but not be limited to, the Comprehensive Environmental Response, Compensation and Liability Act, the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act and the Occupational Safety and Health Act, and all regulations adopted in respect to the foregoing laws.

"Environmental Report" means that certain environmental assessment report dated April 10, 2006 and prepared by EBI Consulting as EBI Project No. 11061274.

"EO13224" has the meaning set forth in Section 4.34.

"ERISA" means the Employee Retirement Income Security Act of 1974, and all rules and regulations promulgated thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and, as of the relevant date, any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" means each Borrower, and any corporation, trade or business that is, along with any Borrower or any General Partner, a member of a controlled group of corporations or a controlled group of trades or businesses, as described in Section 414 of the Internal Revenue Code of 1986, as amended, or Section 4001 of ERISA.

"Event of Default" has the meaning set forth in Section 8.1.

6

"Excess Interest" has the meaning set forth in Section 2.2.

"Financial Statements" means (i) statements of operations and retained earnings, statements of cash flow, and balance sheets and (ii) such other financial reports as the subject entity shall routinely and regularly prepare.

"Financing Statements" means the Uniform Commercial Code Financing Statements naming the applicable Borrower Parties as debtor, and Lender as secured party, required under applicable state law to perfect the security interests created hereunder or under the other Loan Documents.

"First Open Payment Date" is the Payment Date which is in the second month preceding the month in which the Scheduled Maturity Date occurs. For example, if the Scheduled Maturity Date is March 1, 2011, the First Open Payment Date is the Payment Date in the month of January, 2011.

"First Payment Date" has the meaning set forth in Section 2.4.

"Fitch" means Fitch, Inc. and its successors.

"GAAP" means generally accepted accounting principles as in effect in the United States of America from time to time.

"General Partner" means each of the GP Owner, GP Master Tenant and GP Master Subtenant.

"GP Master Subtenant" means IPofA WOM LeaseCo GP, LLC, a Delaware limited liability company, the general partner of Master Subtenant Borrower.

"GP Master Tenant" means IPofA WOM MLC GP, LLC, a Delaware limited liability company, the general partner of Master Tenant Borrower.

"GP Owner" means IPofA West Oaks Mall GP, LLC, a Delaware limited liability company, the general partner of Owner Borrower.

"Governmental Authority" means, with respect to any Person, any federal or state government or other political subdivision thereof and any entity, including any regulatory or administrative authority or court, exercising executive, legislative, judicial, regulatory or administrative or quasi-administrative functions of or pertaining to government, and any arbitration board or tribunal in each case having jurisdiction over such applicable Person or such Person's property, and any stock exchange on which shares of capital stock of such Person are listed or admitted for trading.

"Guaranty" means the Exceptions to Non-Recourse Guaranty of even date herewith executed by Guarantor in favor of Lender, as same may be amended or modified from time to time.

"Guarantor" means, individually and collectively, Edward H. Okun, and any permitted substitute guarantor or indemnitor executing any replacement Guaranty in accordance with this Loan Agreement in connection with a transfer permitted under Article XI hereof, if under Article XI such transfer provides for a substitute guarantor or indemnitor.

"Hazardous Material" means all or any of the following: (i) substances, materials, compounds, wastes, products, emissions and vapors that are defined or listed in, regulated by, or otherwise classified pursuant to, any applicable Environmental Laws, including any so defined, listed, regulated or classified as "hazardous substances", "hazardous materials", "hazardous wastes", "toxic substances", "pollutants", "contaminants", or any other formulation intended to regulate, define, list or classify substances by reason of deleterious, harmful or dangerous properties; (ii) waste oil, oil, petroleum or petroleum derived substances, natural gas, natural gas liquids or synthetic gas and drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal resources; (iii) any flammable substances or explosives or any radioactive materials; (iv) fungus, mold, mildew or other biological agents the presence of which may adversely affect the health of individuals or other animals or materially adversely affect the value or utility of the Property, (v) asbestos in any form; (vi) electrical or hydraulic equipment which contains any oil or dielectric fluid containing polychlorinated biphenyls; (vii) radon; or (viii) urea formaldehyde.

"Impositions" means all taxes (including, without limitation, all real estate, ad valorem, excise and sales (including those imposed on lease rentals), use, single business, gross receipts, value added, intangible transaction privilege, privilege, license or similar taxes), assessments, ground rents, water, sewer or other rents and charges, excises, levies, fees (including, without limitation, license, permit, inspection, authorization and similar fees), and all other governmental charges, in each case whether general or special, ordinary or extraordinary, foreseen or unforeseen, of every character in respect of Borrower, the Collateral, and the Property (including all interest and penalties thereon), which at any time prior to, during or in respect of the term hereof may be assessed or imposed on or in respect of or be a lien upon (i) Borrower (including, without limitation, all income, franchise, single business, excise or other taxes imposed on Borrower, for the privilege of doing business in any jurisdiction) or Lender or (ii) the Property, or any other Collateral or any part thereof. Nothing contained in this Agreement shall be construed to require Borrower to pay (and Impositions shall not include) any tax, assessment, levy or charge imposed on Lender, in the nature of a franchise, capital levy, estate, inheritance, succession, income or net revenue tax.

"Impositions and Insurance Reserve" means the reserve established pursuant to Section 6.3.

"Impositions and Insurance Reserve Sub-Account" has the meaning set forth in Section 7.1.

"Improvements" means all buildings, structures and improvements of every kind and nature existing and to be constructed upon the land which comprises any portion of the Property.

"Indebtedness" or "indebtedness", as applied to any Person, means: (A) all indebtedness for borrowed money; (B) that portion of obligations with respect to leases that is properly

8

classified as a liability on a balance sheet in conformity with GAAP (excluding any prepaid rents and security deposits under Leases); (C) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (D) any obligation owed for all or any part of the deferred purchase price of property or services if the purchase price is due more than thirty (30) days from the date the obligation is incurred or is evidenced by a note or similar written instrument; and (E) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person.

"Indemnified Liabilities" has the meaning set forth in Section 13.2.

"Independent Director" has the meaning set forth in Section 9.1.

"Initial SMT Borrower Transfer" has the meaning set forth in Section 11.4.

"Insurance Premiums" means the annual insurance premiums for the insurance policies required to be maintained by Borrower with respect to the Property under Section 5.4.

"Intellectual Property" means all of Borrower's right, title and interest, whether now owned or hereafter acquired, in, to and under the trademark licenses, trademarks, rights in intellectual property, trade names, service marks and copyrights, copyright licenses, patents, patent licenses or the license to use intellectual property such as computer software owned or licensed by Borrower or other proprietary business information relating to Borrower's policies, procedures, manuals and trade secrets.

"Interest" means interest accrued or accruing on the Loan.

"Interest Rate" shall mean a rate per annum of 7.44%.

"Involuntary Borrower Party Bankruptcy" means any involuntary case under the Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, in which any Borrower, any General Partner, Guarantor or any SMT Guarantor is a debtor or all or any portion of the Property is property of the estate therein.

"IRC" means the Internal Revenue Code of 1986, and any rule or regulation promulgated thereunder from time to time, in each case as amended.

"IRS" means the Internal Revenue Service or any successor thereto.

"JC Penney Supplemental Agreement" has the meaning set forth in Section 5.33.

"Lease" means any lease, tenancy, license, sublease, assignment and/or other rental or occupancy agreement (including, without limitation, any and all guarantees of any of the foregoing) heretofore or hereafter entered into affecting the use, enjoyment or occupancy of the Property or any portion thereof, including any extensions, renewals, modifications or amendments thereof; provided, the term "Lease" shall not include the Master Lease or the Master Sublease (but shall include subleases thereunder).

9

"Lease Recovery" has the meaning set forth in Section 6.6.

"Lease Recovery Amount" has the meaning set forth in Section 6.6.

"Lease Recovery Sub-Account" has the meaning set forth in Section 7.1.

"Lease Recovery Space" has the meaning set forth in Section 6.6.

"Leasing Reserve" has the meaning set forth in Section 6.5.

"Leasing Reserve Sub-Account" has the meaning set forth in Section 7.1.

"Legal Requirements" shall mean, with respect to Borrower and the Property, all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of governmental authorities affecting Borrower or the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Americans with Disabilities Act of 1990, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof, or (ii) in any way limit the use and enjoyment thereof.

"Lender" is defined in the preamble.

"Lien" means any lien, mortgage, pledge, security interest, charge or encumbrance of any kind, whether voluntary or involuntary, (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest).

"Limited Partner" means each of LP Owner, LP Master Tenant and LP Master Subtenant.

"LP Master Subtenant" means IPofA WOM LeaseCo LP, LLC, a Delaware limited liability company, the limited partner of Master Subtenant Borrower.

"LP Master Tenant" means IPofA WOM MLC LP, LLC, a Delaware limited liability company, the limited partner of Master Tenant Borrower.

"LP Owner" means IPofA West Oaks Mall, LP, LLC, a Delaware limited liability company, the limited partner of Owner Borrower.

"Loan" has the meaning set forth in Section 2.1.

"Loan Agreement" means this Loan and Security Agreement, as same may be amended or modified from time to time (including all schedules, exhibits, annexes and appendices hereto).

"Loan Documents" means this Loan Agreement, the Note, the Mortgage, the Assignment of Leases, the Assignment of Management Agreement, the Guaranty, each SMT Guaranty, the

Clearing Account Agreement, the Deposit Account Agreement, the Environmental Indemnity, the Subordination Agreement, the Financing Statements, and any and all other documents and agreements accepted by Lender for the purposes of evidencing and/or securing the Loan and any certificates delivered in connection with the Loan.

"Major Lease" means for the Property any Lease demising (together with all other Leases to the same tenant or any Affiliate thereof) more than 10,000 square feet at the Property.

"Management Agreement" means the management agreement for the Property in effect on the date hereof between Borrower and the current Manager and any management agreement which may hereafter be entered into in accordance with the terms and conditions hereof, pursuant to which any subsequent Manager may hereafter manage the Property.

"Manager" means, collectively, the Person(s) (approved by Lender in accordance with the terms and conditions hereof) that may hereafter be charged with management of the Property pursuant to a Management Agreement.

"Master Lease" means, collectively, (i) the Prime Master Lease between Owner Borrower and Master Tenant Borrower, demising all the Master Units, and (ii) each and every SMT Master Lease, in each case as the same may be amended or modified from time to time with the prior written consent of Lender.

"Master Unit(s)" shall mean, individually, each Master Unit as defined and referred to in the definition of Master Unit Outline below, and collectively all of them, comprising a total of the Master Unit Total.

"Master Unit Outline" means the map or drawing (which may be based upon a survey of the Property) to be prepared by Borrower, subject to Lender's reasonable approval, that depicts the retail buildings on the Property with a grid overlay dividing the buildings into individual separate distinct portions (not separately surveyed, as an outline drawing is intended), each of approximately equivalent size, each of which shall constitute a "Master Unit" hereunder; the current approximate size of each Master Unit would be 100 square feet, although Borrower may use a different size resulting in a greater or lesser number of Master Units.

"Master Unit Total" shall mean the total number of Master Units established by the Master Unit Outline.

"Master Sublease" means, collectively, (i) the Base Master Sublease between Master Tenant Borrower and Master Subtenant Borrower, initially demising all the Master Units, which Base Master Sublease shall, as SMT Borrower Transfers occur, exclude the SMT Units subleased by each SMT Borrower from Master Tenant Borrower, and in turn sub-subleased by each SMT Borrower to Master Subtenant Borrower, pursuant to the SMT Master Sublease executed by such SMT Borrower, Master Subtenant Borrower and Master Tenant Borrower, and (ii) each and every SMT Master Sublease, in each case as the same may be amended or modified from time to time with the prior written consent of Lender.

"Master Subtenant Borrower" has the meaning set forth in the preamble.

11

"Master Tenant Borrower" has the meaning set forth in the preamble.

"Material Adverse Effect" means (A) a material adverse effect upon the business, operations, properties, assets or condition (financial or otherwise) of Borrower or any other Borrower Party with respect to such party taken as a whole, or (B) the material impairment of the ability of Borrower or any other Borrower Party to perform its material obligations under any Loan Documents, or (C) the impairment of the ability of Lender to enforce or collect any of the Obligations. In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event does not of itself have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then occurring events and existing conditions would result in a Material Adverse Effect.

"Material Alteration" means any improvement or alteration affecting structural elements of the Property the cost of which exceeds $1,000,000.00; provided, however, that in no event shall alterations performed as part of a Restoration constitute a Material Alteration.

"Maturity Date" shall mean the Scheduled Maturity Date, or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such Scheduled Maturity Date, by acceleration, or otherwise.

"Maximum Rate" has the meaning set forth in Section 2.2(D).

"Minimum DSCR Threshold" means, as measured at the end of any Calendar Quarter, (i) from the Closing Date to and including the Calendar Quarter ending June 30, 2007, a Debt Service Coverage Ratio of 1.00:1.00, (ii) from and including the Calendar Quarter ending September 30, 2007 through and including the Calendar Quarter ending June 30, 2008, a Debt Service Coverage Ratio of 1.10:1.00, and (ii) for the Calendar Quarter ending December 31, 2008 and for each Calendar Quarter thereafter, a Debt Service Coverage Ratio of 1.15:1.00.

"Moody's" means Moody's Investors Services, Inc. and its successors.

"Monthly Debt Service Payment" has the meaning set forth in Section 2.4(A).

"Monthly Debt Service Payment Amount" means, for any Payment Date, the monthly interest and principal payment for such Payment Date set forth on Schedule I.

"Mortgage" means that certain Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of even date herewith from Borrower to Lender, constituting a Lien on the Improvements and the Property as Collateral for the Loan as same may be modified or amended from time to time.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 3(37) or Section 4001(a)(3) of ERISA to which Borrower or any ERISA Affiliate is making, or is accruing an obligation to make, contributions or has made, or been obligated to make, contributions within the preceding six (6) years, or for which Borrower or any ERISA Affiliate has any liability, including contingent liability.

"New Payment Date" has the meaning set forth in Section 2.4(A).

"Note" means that certain Promissory Note dated of even date herewith, made by Borrower to Lender evidencing Loan, as amended, modified, restated or split, and any replacement notes therefor.

"O & M Program" has the meaning set forth in Section 5.7(D).

"Obligations" means the Loan and all other obligations, liabilities and indebtedness of every nature of Borrower from time to time owed to Lender under the Loan Documents, including the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and/or from time to time hereafter owing, due or payable under the Loan Documents whether before or after the filing of a proceeding under the Bankruptcy Code by or against Borrower.

"Operating Account" means Borrower's operating account(s) established for the purposes of holding and managing Borrower's funds from time to time, but not the Clearing Account, the Deposit Account or any Sub-Accounts thereof.

"Operating Budget" means Borrower's budget setting forth Borrower's best estimate, after due consideration, of all revenue, costs, expenses and Operating Expenses for the Property, for the Property which budget has been reasonably approved by Lender if and to the extent required hereunder.

"Operating Expenses" means all costs and expenses accrued in accordance with GAAP relating to the operation, maintenance, repair, use and management of the Property, including, without limitation, utilities, repairs and maintenance, insurance, property taxes and assessments, advertising expenses, payroll and related taxes, equipment lease payments and actual management fees, provided, however, such costs and expenses shall be subject to reasonable adjustment by Lender to normalize such costs and expenses, but excluding (i) principal, interest and other payments made by Borrower under the Loan Documents, (ii) rent payments to the Property Owner, Master Tenant and SMT Borrowers, as applicable, under the Master Lease or Sublease, and (iv) depreciation and amortization.

"Operating Expenses Sub-Account" has the meaning set forth in Section 7.1.

"Owner Borrower" has the meaning set forth in the preamble.

"Payment Date" has the meaning set forth in Section 2.4.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to the provisions of Part 3 of Title I of ERISA, Title IV of ERISA or Section 412 of the IRC and (i) which is maintained for employees of Borrower, or any of its ERISA Affiliates, (ii) which has at any time within the preceding six (6) years been maintained for the employees of Borrower or any of its current or former ERISA Affiliates, or (iii) for which Borrower or any ERISA Affiliate has any liability, including contingent liability.

13

"Permitted Encumbrances" means (i) the Mortgage and the other Liens of the Loan Documents in favor of Lender; (ii) the items shown in Schedule B to the Title Policy as of Closing; (iii) future liens for property taxes and assessments not then delinquent; (iv) Liens for Impositions not yet due and payable or Liens arising after the date hereof which are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted in accordance with Section 5.3(B) hereof; (v) in the case of Liens arising after the date hereof, statutory Liens of carriers, warehousemen, mechanics, materialmen and other similar Liens arising by operation of law, which are incurred in the ordinary course of business and discharged by Borrower by payment, bonding or otherwise within thirty (30) days after the filing thereof or which are being contested in good faith in accordance with Section 5.3(B) hereof; (vi) rights of existing and future tenants, as tenants only, pursuant to the Leases; and (vii) any other Lien to which Lender may expressly consent in writing.

"Permitted Investments" means any one or more of the following obligations or securities acquired at a purchase price of not greater than par (unless Borrower deposits into the applicable Sub-Account cash in the amount by which the purchase price exceeds par), including those issued by any Servicer, the trustee under any Securitization or any of their respective Affiliates, payable on demand or having a maturity date not later than the Business Day immediately prior to the date on which the invested sums are required for payment of an obligation for which the related Sub-Account was created and meeting one of the appropriate standards set forth below:

(i)    obligations of, or obligations fully guaranteed as to payment of principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States of America including, without limitation, obligations of: the U.S. Treasury (all direct or fully guaranteed obligations), the Farmers Home Administration (certificates of beneficial ownership), the General Services Administration (participation certificates), the U.S. Maritime Administration (guaranteed Title XI financing), the Small Business Administration (guaranteed participation certificates and guaranteed pool certificates), the U.S. Department of Housing and Urban Development (local authority bonds) and the Washington Metropolitan Area Transit Authority (guaranteed transit bonds); *provided, however*, that the investments described in this clause (i) must (A) have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) not be subject to liquidation prior to their maturity;

(ii)    Federal Housing Administration debentures;

(iii)    obligations of the following United States government sponsored agencies: Federal Home Loan Mortgage Corp. (debt obligations), the Farm Credit System (consolidated systemwide bonds and notes), the Federal Home Loan Banks (consolidated debt obligations), the Federal National Mortgage Association (debt obligations), the Student Loan Marketing Association (debt obligations), the Financing Corp. (debt obligations), and the Resolution Funding Corp. (debt obligations); *provided, however*, that the investments described in this clause (iii) must (A) have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have an "r" highlighter affixed to their

14

rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) not be subject to liquidation prior to their maturity;

(iv)    federal funds, unsecured certificates of deposit, time deposits, bankers' acceptances and repurchase agreements with maturities of not more than 365 days of any bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial or, if higher, then current ratings assigned to any class of certificates or other securities issued in connection with any Securitization backed in whole or in part by the Loan (collectively the "Certificates") *provided, however,* that the investments described in this clause (iv) must (A) have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) not be subject to liquidation prior to their maturity;

(v)    fully Federal Deposit Insurance Corporation-insured demand and time deposits in, or certificates of deposit of, or bankers' acceptances issued by, any bank or trust company, savings and loan association or savings bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term category and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial or, if higher, then current ratings assigned to any class of Certificates); *provided, however,* that the investments described in this clause (v) must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have a "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) not be subject to liquidation prior to their maturity;

(vi)    debt obligations with maturities of not more than 365 days and at all times rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investments would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial or, if higher, then current ratings assigned to the Certificates) in its highest long-term unsecured debt rating category; *provided, however,* that the investments described in this clause (vi) must (A) have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) not be subject to liquidation prior to their maturity;

(vii)    commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more

15

than one year after the date of issuance thereof) with maturities of not more than 365 days and that at all times is rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial or, if higher, then current ratings assigned to any class of Certificates) in its highest short-term unsecured debt rating; *provided, however,* that the investments described in this clause (vii) must (A) have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have a "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) not be subject to liquidation prior to their maturity;

(viii) units of taxable money market funds, which funds are regulated investment companies, seek to maintain a constant net asset value per share and have the highest rating from each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial or, if higher, then current ratings assigned to any class of Certificates) for money market funds or mutual funds; and

(ix) any other security, obligation or investment which has been approved as a Permitted Investment in writing by (a) Lender and (b) each Rating Agency, as evidenced by a written confirmation that the designation of such security, obligation or investment as a Permitted Investment will not, in and of itself, result in a downgrade, qualification or withdrawal of the initial or, if higher, then current ratings assigned to any class of Certificates by such Rating Agency;

*provided, however,* that such instrument continues to qualify as a "cash flow investment" pursuant to Code Section 860G(a)(6) earning a passive return in the nature of interest and no obligation or security shall be a Permitted Investment if (A) such obligation or security evidences a right to receive only interest payments or (B) the right to receive principal and interest payments on such obligation or security are derived from an underlying investment that provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.

"Person" means and includes natural persons, corporations, limited liability companies, limited partnerships, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof and their respective permitted successors and assigns (or in the case of a governmental Person, the successor functional equivalent of such Person).

"Pre-Existing Condition" has the meaning set forth in Section 5.5.

"Prepayment Consideration" has the meaning set forth in Section 2.6(C).

"Prime Master Lease" shall mean that certain Master Lease Agreement, dated as of June 22, 2006, by and between Owner Borrower and Master Tenant Borrower, pursuant to which Owner Borrower has leased the Master Units to Master Tenant Borrower, as the same may be amended and modified from time to time with the prior written consent of Lender.

"Principal Balance" means the outstanding principal balance of the Loan from time to time.

"Proceeds" shall have the meaning given in the UCC and, in any event, shall include, without limitation, all proceeds, products, offspring, rents, profits or receipts, in whatever form, arising from the Collateral.

"Prohibited Transaction" shall mean a prohibited transaction as described under Section 406 of ERISA or Section 4975 of the IRC which is not the subject of a statutory exemption under Section 408(b) of ERISA or an administrative exemption granted pursuant to Section 408(a) of ERISA.

"Property" means the property (including land and Improvements) listed on Schedule A attached hereto, which serves as Collateral for the Loan and which shall be encumbered by and are more particularly described in the Mortgage as the "Mortgaged Property" (as defined in the Mortgage).

"Rating Agency" shall mean any of S&P, Moody's, Fitch, any successors thereto, or any other nationally-recognized statistical rating organization designated by Lender in its sole discretion.

"Rating Confirmation" with respect to the transaction or matter in question, shall mean: (i) if all or any portion of the Loan, by itself or together with other loans, has been the subject of a Securitization, then each applicable Rating Agency shall have confirmed in writing that such transaction or matter shall not result in a downgrade, qualification, or withdrawal of any rating then in effect for any class of certificates or other securities issued in connection with such Securitization; and (ii) if the Loan or any portion thereof has not been the subject of a Securitization, (a) the applicable Rating Agency shall have confirmed in writing that such transaction or matter shall not result in a downgrade, qualification, or withdrawal of any shadow rating or other rating provided to the Loan or any portion thereof not the subject of a Securitization, and (b) Lender shall have determined in its reasonable discretion (taking into consideration such factors as Lender may determine, including the attributes of the loan pool in which the Loan might reasonably be expected to be securitized) that no rating for any certificate or other securities that would be issued in connection with Securitization of such portion of the Loan would be downgraded, qualified, or withheld by reason of such transaction or matter.

"Rating Criteria" with respect to any Person, shall mean that (i) the short-term unsecured debt obligations of such Person are rated at least "A-1" by S&P, "P-1" by Moody's and "F-1" by Fitch, if deposits are held by such Person for a period of less than one month, or (ii) the long-term unsecured debt obligations of such Person are rated at least "AA-" by S&P, "Aa3" by Moody's and "AA-" by Fitch, if deposits are held by such Person for a period of one month or more.

"REA" means that certain Easement, Restriction and Operating Agreement dated July 26, 1982 by and among Federated Stores Realty, Inc., Federated Department Stores, Inc., Beverly Properties, Inc., and Adcor Realty Corporation, as amended by the First Amendment to Easement, Restriction and Operating Agreement West Oaks Mall dated January 2, 1991 by and among West Oaks Associates, Ltd. The May Department Stores Company, J.C. Penney Company, Mervyn's, Dillard Department Stores, Inc., and Construction Developers Incorporated and amended by various Supplemental Agreements entered into from time to time, as the same may be further amended or modified from time to time with the prior written consent of Lender.

"Receipts" means all revenues, receipts and other payments of every kind arising from ownership or operation of the Property and received by Borrower or an Affiliate of Borrower, including, without limitation, all warrants, stock options, or equity interests in any tenant, licensee or other Person occupying space at, or providing services related to or for the benefit of, the Property received by Borrower or an Affiliate of Borrower in lieu of rent or other payment.

"Related Person" means in relation to any Person, any other Person that is (i) an Affiliate of the first Person; (ii) the sibling of the first Person or of the Affiliate; (iii) the then-current and former spouses of the first Person or of the Affiliate; (iv) a Person that shares or has shared a residence with the first Person or with the Affiliate; (v) the ancestor or descendant of the first Person or of any other Person described in this items (i) through (iv) above; or (vi) any other Person that, by reason of familial, economic, social or other relationship, would reasonably be expected to favor the first Person or to act as requested by the first Person. Where expressions such as "[name of party] or any Related Person" are used, the same shall refer to the named party and any Related Person of the named party.

"Release Date" shall mean the earlier of (i) the Payment Date in July, 2009, or (ii) the date that is two (2) years from the "start up day" (within the meaning of Section 860G(a)(9) of the IRC) of the REMIC Trust established in connection with the final Securitization involving the Loan.

"Rent Roll" has the meaning set forth in Section 3.1.

"Rents" has the meaning set forth in the Granting Clauses of the Mortgage.

"Replacement Reserve" means the reserve established pursuant to Section 6.4.

"Replacement Reserve Sub-Account" has the meaning set forth in Section 7.1.

"Reserves" means the reserves held by or on behalf of Lender pursuant to this Loan Agreement or other Loan Documents, including without limitation, the reserves established pursuant to Article VI.

"Reserve Sub-Accounts" has the meaning set forth in Section 7.1.

"Restoration" has the meaning set forth in Section 5.5.

"Restoration Threshold" means an amount equal to $1,000,000.

18

"S&P" shall mean Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc and its successors.

"Scheduled Defeasance Payments" shall mean scheduled payments of interest and principal under the Note for all Payment Dates occurring after the Defeasance Date and up to and including the Scheduled Maturity Date (including the outstanding Principal Balance of the Loan as of the Scheduled Maturity Date), and all payments required after the Defeasance Date, if any, under the Loan Documents for servicing fees, and other similar charges.

"Scheduled Maturity Date" shall mean July 6, 2013.

"Secondary Market Transaction" has the meaning set forth in Section 10.1.

"Securities" (whether or not capitalized) means any stock, shares, voting trust certificates, bonds, debentures, options, warrants, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"Securitization" means a public or private rated offering of securities representing direct or indirect interests in one or more mortgage loans or the right to receive income therefrom.

"Security Agreement" shall mean a security agreement in form and substance that would be satisfactory to a prudent lender pursuant to which Borrower grants Lender a perfected, first priority security interest in the Defeasance Collateral Account and the Defeasance Collateral.

"Security Deposits" shall mean all security (whether cash, letter of credit or otherwise) given to Borrower or any agent or Person acting on behalf of Borrower in connection with the Leases.

"Servicer" means a servicer selected by Lender from time to time in its sole discretion to service the Loan.

"SMT Borrower" has the meaning set forth in Section 11.4.

"SMT Borrower Transfer" has the meaning set forth in Section 11.4.

"SMT Guarantor" has the meaning set forth in Section 11.4.

"SMT Owner" has the meaning set forth in Section 11.4.

"SMT Master Lease" shall mean, with respect to each SMT Borrower, the sublease (substantially in the form of Schedule 11.4(d)) from Master Tenant Borrower to such SMT Borrower of the related SMT Units leased by such SMT Borrower pursuant thereto.

"SMT Master Sublease" shall mean, with respect to each SMT Borrower, the sub-sublease (substantially in the form of Schedule 11.4(f)) from such SMT Borrower to Master

Subtenant Borrower of the related SMT Units leased by such SMT Borrower pursuant to its SMT Master Lease.

"SMT Relative Percentage" shall mean, with respect to each SMT Borrower, the fraction (expressed as a percentage, i.e., $1/10^{th}$ = 10%) having as its numerator the SMT Units of such SMT Borrower and its denominator the total Master Units then leased to SMT Borrowers.

"SMT Unit Percentage" shall mean, with respect to each SMT Borrower, the fraction (expressed as a percentage, i.e., $1/50^{th}$ = 2%) having as its numerator the SMT Units of such SMT Borrower and its denominator the Total Master Units.

"SMT Units" shall mean, with respect to each SMT Borrower, the Master Units leased by such SMT Borrower from Owner Borrower under its SMT Master Lease.

"Sub-Accounts" has the meaning set forth in Section 7.1.

"Sublease Reserve" has the meaning set forth in Section 6.8.

"Subordination Agreement" means that certain Subordination Agreement by and among Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower in favor of Lender dated as of the date hereof.

"Subsequent SMT Borrower Transfer" has the meaning set forth in Section 11.4.

"Substitute SMT Guarantor" has the meaning set forth in Section 11.4.

"Substitute SMT Owner" has the meaning set forth in Section 11.4.

"Successor Borrower" has the meaning set forth in Section 2.3.

"Supplemental Leasing Reserve" has the meaning set forth in Section 6.9.

"Supplemental Leasing Reserve Condition" shall exist in the event the Debt Service Coverage Ratio, as measured by Lender as of the end of any Calendar Quarter, is less than the Minimum DSCR Threshold.

"Supplemental Leasing Reserve Cure" has the meaning set forth in Section 7.3(B).

"Supplemental Leasing Reserve Deficiency" has the meaning set forth in Section 6.9.

"Supplemental Leasing Reserve Sub-Account" has the meaning set forth in Section 7.1.

"Survey" has the meaning set forth in Section 3.1(H).

"Taking" means a taking or voluntary conveyance during the term hereof of all or part of the Property, or any interest therein or right accruing thereto or use thereof, as the result of, or in settlement of, any condemnation or other eminent domain proceeding by any Governmental Authority affecting the Property or any portion thereof whether or not the same shall have actually been commenced.

"Tax Liabilities" has the meaning given to such term in Section 2.8.

"Title Company" means LandAmerica Lawyers Title Company, or such other national title insurance company as may be reasonably acceptable to Lender.

"Title Policy" means a mortgagee's policy or policies of title insurance pertaining to the Mortgage issued to Lender in connection with the Closing meeting the requirements of Section 3.1(F).

"Transfer and Assumption" and "Transferee Borrower" have the respective meanings set forth in Section 11.3.

"TRIA" means the Terrorism Risk Insurance Act of 2002, and any modification, supplement or replacement thereof.

"UCC" means the New York Uniform Commercial Code, as amended from time to time.

"U.S. Obligations" shall mean securities that are (i) direct obligations of the United States of America for the full and timely payment of which its full faith and credit is pledged or (ii) obligations of an entity controlled or supervised by and acting as an agency or instrumentality and guaranteed as a full faith and credit obligation which shall be fully and timely paid by the United States of America, which in either case are not callable or redeemable at the option of the issuer thereof (including a depository receipt issued by a bank (as defined in Section 3(a)(2) of the United States Securities Act)) as custodian with respect to any such U.S. Obligations or a specific payment of principal of or interest on any such U.S. Obligations held by such custodian for the account of the holder of such depository receipt; provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the securities or the specific payment of principal of or interest on the securities evidenced by such depository receipt.

"Work" has the meaning set forth in Section 6.7.

"Work Reserves" has the meaning set forth in Section 6.7.

**Section 1.2    Accounting Terms.**

Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to such terms in conformity with GAAP.

**Section 1.3    Other Definitional Provisions.**

References to "Articles", "Sections", "Subsections", "Exhibits" and "Schedules" shall be to Articles, Sections, Subsections, Exhibits and Schedules, respectively, of this Loan Agreement unless otherwise specifically provided. Any of the terms defined in Section 1.1 may, unless the context otherwise requires, be used in the singular or the plural depending on the reference. In this Loan Agreement, "hereof", "herein", "hereto", "hereunder" and the like mean and refer to this Loan Agreement as a whole and not merely to the specific article, section, subsection,

paragraph or clause in which the respective word appears; words importing any gender include the other genders; references to "<u>writing</u>" include printing, typing, lithography and other means of reproducing words in a tangible visible form; the words "<u>including</u>", "<u>includes</u>" and "<u>include</u>" shall be deemed to be followed by the words "without limitation"; and any reference to any statute or regulation may include any amendments of same and any successor statutes and regulations. Further, (i) any reference to any agreement or other document shall include subsequent amendments, assignments, and other modifications thereto, and (ii) any reference to any Person may include such Person's respective permitted successors and assigns or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons.

## ARTICLE II
## TERMS OF THE LOAN

**Section 2.1    Loan.**

..(A)    **Loan.**  Subject to the terms and conditions of this Loan Agreement and in reliance upon the representations and warranties of Borrower contained herein, Lender agrees to lend to Borrower, and Borrower agrees to borrow from Lender, the Loan in the aggregate amount of $86,000,000.00 (such loan and the obligation of Borrower to repay the same together with all interest and other amounts from time to time owing hereunder are referred to collectively herein as the "<u>Loan</u>"). Borrower's obligation to pay the principal of and interest on the Loan (including late charges, Default Rate interest, and the Prepayment Consideration, if any), shall be evidenced by this Loan Agreement and by the Note, duly executed and delivered by Borrower. The Note shall be payable as to principal, interest, late charges, Default Rate interest and Prepayment Consideration, if any, as specified in this Loan Agreement, with a final maturity on the Maturity Date. Borrower shall pay all outstanding Obligations on the Maturity Date.

(B)    **Note.** On the Closing Date, Borrower shall execute and deliver to Lender the Note, made by Borrower to the order of Lender, in the aggregate original principal amount of $86,000,000.00.

(C)    **Use of Proceeds.**  The proceeds of the Loan funded at Closing shall be used to (i) repay any existing indebtedness secured by any mortgage encumbering all or any part of the Property; (ii) pay all recording fees and taxes, title insurance premiums, the reasonable costs and expenses incurred by Lender, including the legal fees and expenses of counsel to Lender, and other costs and expenses approved by Lender (which approval will not be unreasonably withheld) related to the Loan and (iii) establish the Reserves required hereunder. The remaining proceeds of the Loan, if any, shall be disbursed to Borrower; provided, however, that any and all such remaining proceeds of the Loan will be used for commercial purposes only and will not be used for personal, family, agricultural or household use.

**Section 2.2    Interest.**

(A)    **Rate of Interest.** The outstanding principal balance of the Loan shall bear interest at a rate per annum equal to the Interest Rate.

(B)    **Default Rate.** Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default and in any event from and after the Maturity Date of the

Loan, the Principal Balance of the Loan and all other outstanding Obligations shall bear interest until paid in full at a rate per annum that is five percent (5.0%) in excess of the Interest Rate otherwise applicable under this Loan Agreement and the Note (the "Default Rate").

(C)    **Computation of Interest**. Interest on the Loan and all other Obligations owing to Lender shall be computed on the basis of a 360-day year, and shall be charged for the actual number of days elapsed during any month or other accrual period. Interest shall be payable in arrears (except as provided in the first sentence of Section 2.4(A) hereof).

(D)    **Interest Laws**.  Notwithstanding any provision to the contrary contained in this Loan Agreement or the other Loan Documents, Borrower shall not be required to pay, and Lender shall not be permitted to collect, any amount of interest in excess of the  maximum amount of interest permitted by law ("Excess Interest").  If any Excess Interest is provided for or determined by a court of competent jurisdiction to have been provided for in this Loan Agreement or in any of the other Loan Documents, then in such event: (1) the provisions of this Section and the "Savings Clause" of Article 4 of the Note shall govern and control; (2) Borrower shall not be obligated to pay any Excess Interest; (3) any Excess Interest that Lender may have received hereunder shall be, at Lender's option, (a) applied as a credit against either or both of the Principal Balance of the Loan or accrued and unpaid interest thereunder (not to exceed the maximum amount permitted by law), (b) refunded to the payor thereof, or (c) any combination of the foregoing; (4) the interest rate(s) provided for herein shall be automatically reduced to the maximum lawful rate allowed from time to time under applicable law (the "Maximum Rate"), and this Loan Agreement and the other Loan Documents shall be deemed to have been and shall be, reformed and modified to reflect such reduction; and (5) Borrower shall not have any action against Lender for any damages arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if for any period of time interest on any Obligation is calculated at the Maximum Rate rather than the applicable rate under this Loan Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on such Obligations shall, to the extent permitted by law, remain at the Maximum Rate until Lender shall have received or accrued the amount of interest which Lender would have received or accrued during such period on Obligations had the rate of interest not been limited to the Maximum Rate during such period.  If the Default Rate shall be finally determined to be unlawful, then the applicable Interest Rate shall be applicable during any time when the Default Rate would have been applicable hereunder, provided however that if the Maximum Rate is greater or lesser than the applicable Interest Rate, then the foregoing provisions of this paragraph shall apply.

(E)    **Late Charges**.  If any payment of principal, interest or other sums shall not be made to Lender on the date the same is due hereunder or under any of the other Loan Documents, then Borrower shall pay to Lender, in addition to all sums otherwise due and payable, a late fee in an amount equal to five percent (5.0%) of such principal, interest or other sums due hereunder or under any other Loan Document (or, in the case of a partial payment, the unpaid portion thereof), such late charge to be immediately due and payable without demand by Lender.

(F)    **Additional Administrative Fee**.  In addition to the Default Rate provided for above, upon failure of any Borrower Party to deliver any of the financial statements, reports or other information required to be delivered to Lender as provided in Section 5.1 hereof upon their

23

due dates, if any such failure shall continue for five (5) Business Days following notice thereof from Lender, Borrower shall pay to Lender together with the scheduled monthly payments of principal and interest on the Loan, for each month or portion thereof that any such financial statement, report or other information remains undelivered, an administrative fee in the amount of $7,500. Borrower agrees that such administrative fee (i) is a fair and reasonable fee necessary to compensate Lender for its additional administrative costs under the circumstances, (ii) is not a penalty and (iii) is necessary to compensate Lender for increased costs and obligations to third parties in connection with the planned Securitization of the Loan.

**Section 2.3      Defeasance.**

(A)      **Defeasance**.  (i)  Borrower shall have the right at any time after the Release Date and prior to the First Open Payment Date to obtain a release of the Lien of the Mortgage encumbering the Property (a "Defeasance") upon satisfaction of the following conditions:

(a) Borrower shall provide Lender at least thirty (30) days' prior written notice (or such shorter period of time if permitted by Lender in its sole discretion) specifying a date (the "Defeasance Date") on which Borrower shall have satisfied the conditions in this Section 2.3(A) and on which it shall effect the Defeasance;

(b) Borrower shall pay to Lender (A) all payments of interest due on the Loan to and including the Defeasance Date and (B) all other sums then due under the Note, this Loan Agreement, the Mortgage and the other Loan Documents;

(c) Borrower shall irrevocably deposit the Defeasance Collateral into the Defeasance Collateral Account and otherwise comply with the provisions of Sections 2.3(B) and (C) hereof;

(d) Borrower shall execute and deliver to Lender a Security Agreement in respect of the Defeasance Collateral Account and the Defeasance Collateral;

(e) Borrower shall deliver to Lender an opinion of counsel for Borrower that is customary in commercial lending transactions and subject only to normal qualifications, assumptions and exceptions opining, among other things, that (v) Lender has a legal and valid perfected first priority security interest in the Defeasance Collateral Account and the Defeasance Collateral, (w) if a Securitization has occurred, the REMIC Trust formed pursuant to such Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of the defeasance pursuant to this Section 2.3(A), (x) a defeasance pursuant to this Section 2.3(A) will not result in a deemed exchange for purposes of the Code and will not adversely affect the status of the Note as indebtedness for federal income tax purposes, (y) delivery of the Defeasance Collateral and the grant of a security interest therein to Lender shall not constitute an avoidable preference under Section 547 of the Bankruptcy Code or applicable state law and (z) if and to the extent required by the Rating Agencies, a non-consolidation opinion with respect to the Successor Borrower;

24

(f) Borrower shall deliver to Lender a confirmation in writing from the applicable Rating Agencies to the effect that the release of the Property from the Lien of the Mortgage as contemplated by this Section 2.3(A) and the substitution of the Defeasance Collateral will not result in a downgrading, withdrawal or qualification of the respective ratings in effect immediately prior to such defeasance for the Certificates issued in connection with the Securitization which are then outstanding;

(g) Borrower shall deliver an officer's certificate certifying that the requirements set forth in this Section 2.3(A) have been satisfied;

(h) Borrower shall deliver a certificate of a nationally recognized public accounting firm reasonably acceptable to Lender certifying that the Defeasance Collateral will generate monthly amounts equal to or greater than the Scheduled Defeasance Payments;

(i) Borrower shall deliver such other certificates, opinions, documents and instruments as Lender may reasonably request; and

(j) Borrower shall pay all costs and expenses of Lender incurred in connection with the defeasance, including Lender's reasonable attorneys' fees and expenses and Rating Agency fees and expenses.

(ii) If a Defeasance occurs and all of the requirements of this Section 2.3 have been satisfied, Lender shall execute any and all documents required to release the Property from the Lien of the Mortgage and the Assignment of Leases and the Defeasance Collateral, pledged pursuant to the Security Agreement, shall be the sole source of collateral securing the Note. In connection with the release of the Lien, Borrower shall submit to Lender, not less than thirty (30) days prior to the Defeasance Date (or such shorter time as permitted by Lender in its sole discretion), a release of Lien (and related Loan Documents) for execution by Lender. Such release shall be in a form appropriate in the jurisdiction in which the Property is located and contain standard provisions protecting the rights of a releasing lender. In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release. Borrower shall pay all costs, taxes and expenses associated with the release of the Lien of the Mortgage and the Assignment of Leases, including Lender's reasonable attorneys' fees. Except as set forth in this Section 2.3(A), no repayment, prepayment or defeasance of all or any portion of the Note shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Mortgage on the Property.

(B)    **Defeasance Collateral Account.** On or before the date on which Borrower delivers the Defeasance Collateral, Borrower or Successor Borrower (as applicable) shall open at any Eligible Bank the defeasance collateral account (the "Defeasance Collateral Account") which shall at all times be an Eligible Account. The Defeasance Collateral Account shall contain only (i) Defeasance Collateral and (ii) cash from interest and principal paid on the Defeasance Collateral. All cash from interest and principal payments paid on the Defeasance Collateral shall be paid over to Lender on each Payment Date and applied to the monthly installments of principal and interest on the Loan and, upon Maturity, to accrued interest and the Principal

Balance of the Loan. Borrower shall cause the Eligible Bank at which the Defeasance Collateral is deposited to enter an agreement with Borrower and Lender, satisfactory to Lender in its sole discretion, pursuant to which such Eligible Bank shall agree to hold and distribute the Defeasance Collateral in accordance with this Loan Agreement. Borrower (or Successor Borrower, as applicable) shall be the owner of the Defeasance Collateral Account and shall report all income accrued on Defeasance Collateral for federal, state and local income tax purposes in its income tax return. Borrower shall prepay all costs and expenses associated with opening and maintaining the Defeasance Collateral Account. Lender shall not in any way be liable by reason of any insufficiency in the Defeasance Collateral Account.

(C)    **Successor Borrower.** In connection with a Defeasance under this Section 2.3, Borrower shall, if required by the Rating Agencies or if Borrower so elects or Lender requires, establish or designate a successor entity (the "Successor Borrower") which shall be a single purpose bankruptcy remote entity and which shall be approved by the Rating Agencies. Any such Successor Borrower may, at Borrower's option, be an Affiliate of Borrower unless the Rating Agencies or Lender shall require otherwise. Borrower shall transfer and assign all obligations, rights and duties under and to the Note, together with the Defeasance Collateral, to such Successor Borrower. Such Successor Borrower shall assume the obligations under the Note and the Security Agreement. Borrower shall pay $1,000 to any such Successor Borrower as consideration for assuming the obligations under the Note and the Security Agreement. Borrower shall pay all reasonable costs and expenses incurred by Lender, including Lender's attorney's fees and expenses incurred in connection therewith, and all fees, expenses and other charges of the Rating Agencies.

**Section 2.4    Payments.**

(A)    **Payments of Interest and Principal.** Borrower shall make a payment to Lender of interest only on the Closing Date for the period from the Closing Date through July 5, 2006. Commencing on August 6, 2006 (the "First Payment Date") and on the sixth (6th) day of each calendar month thereafter (each, with the First Payment Date, a "Payment Date"), Borrower shall make monthly payments of principal and interest in the amount of the Monthly Debt Service Payment Amount set forth on Schedule I attached hereto (each, a "Monthly Debt Service Payment"). Prior to the occurrence of an Event of Default, all Monthly Debt Service Payments shall be applied first, to accrued and unpaid interest on the Loan and the balance to the payment of principal on the Loan. During the continuance of an Event of Default, Borrower irrevocably waives the right to direct the application of any and all payments at any time hereafter received by Lender from or on behalf of Borrower, and Borrower irrevocably agrees that Lender shall have the continuing exclusive right to apply any and all such payments against the then due and owing obligations of Borrower in such order of priority as Lender may deem advisable. Notwithstanding anything contained herein to the contrary, Lender shall have the right, to be exercised not more than once during the term of the Loan, to change the Payment Date to a date other than the sixth (6th) day of each month (a "New Payment Date"), on ten (10) days prior written notice to Borrower, in which case (i) interest shall be paid on the date the New Payment Date first occurs for the period beginning on the sixth (6th) day of the calendar month in which the New Payment Date first occurs to the New Payment Date, and on each New Payment Date thereafter for a monthly equivalent period from the last New Payment Date to the current New Payment Date designated by Lender at the time the New Payment Date is designated, and (ii)

Lender may designate, at the time the New Payment Date is designated, an extension of the Scheduled Maturity Date to the New Payment Date occurring in the month in which the original Scheduled Maturity Date occurs.

(B)    **Date and Time of Payment**.  Borrower shall receive credit for payments on the Loan which are transferred to the account of Lender as provided below (i) on the day that such funds are received by Lender if such receipt occurs by 1:00 p.m. (New York time) on such day, or (ii) on the next succeeding Business Day after such funds are received by Lender if such receipt occurs after 1:00 p.m. (New York time).  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the payment may be made on the next succeeding Business Day.

(C)    **Manner of Payment**.  Borrower promises to pay all of the Obligations relating to the Loan as such amounts become due or are declared due pursuant to the terms of this Loan Agreement.  All payments by Borrower on the Loan shall be made without deduction, defense, set off or counterclaim and in immediately available funds delivered to Lender by wire transfer to such accounts at such banks as Lender may from time to time designate.

**Section 2.5.    Maturity.**  To the extent not sooner due and payable in accordance with the Loan Documents, the then outstanding principal balance of the Loan, all accrued and unpaid interest thereon, and all other sums then owing to Lender hereunder and under the Note, the Mortgage and the other Loan Documents, shall be due and payable on the Maturity Date, which shall, subject to earlier acceleration hereunder, be the Scheduled Maturity Date.

**Section 2.6    Prepayment.**

(A)    **Limitation on Prepayment; Prepayment Consideration Due on Acceleration**. Borrower shall have no right to prepay the Loan in whole or part at any time, except as expressly set forth in this provision. Commencing on the First Open Payment Date, Borrower may prepay the Loan in whole, but not in part, without payment of Prepayment Consideration, provided that (i) Borrower shall provide to Lender not less than thirty (30) days' prior written notice of such prepayment, (ii) together with such prepayment Borrower also shall pay all accrued and unpaid interest and all other Obligations and (iii) if such prepayment occurs on any day other than a Payment Date, then together therewith Borrower also shall pay to Lender the amount of interest that would have accrued on the amount being prepaid from and including the date of such prepayment to the next Payment Date. Borrower shall not be required to pay any Prepayment Consideration with respect to an application of insurance proceeds or condemnation awards by Lender pursuant to the Loan Agreement or Mortgage in the absence of an Event of Default.

(B)    **Prepayment Consideration Due**.  Except as otherwise expressly provided in this Loan Agreement, if the Maturity Date shall be accelerated to a date prior to the Scheduled Maturity Date, or if any prepayment of all or any portion of the Principal Balance hereunder occurs, whether in connection with Lender's acceleration of the unpaid Principal Balance of the Loan or in any other circumstances whatsoever, or if the Mortgage is satisfied or released by foreclosure (whether by power of sale or judicial proceeding), deed in lieu of foreclosure or by any other means, then the Prepayment Consideration shall become immediately due and owing and Borrower shall forthwith pay the Prepayment Consideration to Lender. The foregoing shall

not create any right of prepayment. Borrower shall have no right whatsoever to prepay all or any portion of the principal balance of the Note, except as set forth in Section 2.6(A).

    (C)    <u>Definitions</u>. The following terms shall have the meanings indicated:

    The "<u>Prepayment Consideration</u>" shall be the amount equal to the greater of (i) four percent (4%) of the Loan balance at the time of prepayment or the earlier date upon which the Prepayment Consideration becomes due and owing, or (ii) the sum of two percent (2%) of the Loan balance at the time upon which the Prepayment Consideration becomes due and owing, plus the excess, if any, of (A) the amount of the monthly interest which would otherwise be payable on the principal balance being prepaid or otherwise becoming due from the date of prepayment or the earlier date upon which the Prepayment Consideration becomes due and owing; over (B) the amount of the monthly interest Lender would earn if the principal balance being prepaid were reinvested for the period from the date upon which the Prepayment Consideration becomes due and owing to and including the Scheduled Maturity Date at the Treasury Rate (as hereinafter defined), such difference to be discounted to present value at the Treasury Rate.

    The "<u>Treasury Rate</u>" shall be the annualized yield on securities issued by the United States Treasury having a maturity corresponding to the remaining term to the Scheduled Maturity Date of this Loan Agreement, as quoted in <u>Federal Reserve Statistical Release [H. 15(519)]</u> under the heading "U.S. Government Securities - Treasury Constant Maturities" for the Treasury Rate Determination Date (as defined below), converted to a monthly equivalent yield. If yields for such securities of such maturity are not shown in such publication, then the Treasury Rate shall be determined by Lender by linear interpolation between the yields of securities of the next longer and next shorter maturities. If said Federal Reserve Statistical Release or any other information necessary for determination of the Treasury Rate in accordance with the foregoing is no longer published or is otherwise unavailable, then the Treasury Rate shall be reasonably determined by Lender based on comparable data.

    The term "<u>Treasury Rate Determination Date</u>" shall mean the date which is five (5) Business Days prior to the scheduled prepayment date or the earlier date upon which the Prepayment Consideration becomes due and owing. Lender shall notify Borrower of the amount and the basis of determination of the required Prepayment Consideration.

**Section 2.7**    <u>**Outstanding Balance**</u>.  The balance on Lender's books and records shall be presumptive evidence (absent manifest error) of the amounts owing to Lender by Borrower; provided that any failure to record any transaction affecting such balance or any error in so recording shall not limit or otherwise affect Borrower's obligation to pay the Obligations.

**Section 2.8**    <u>**Taxes**</u>.  Any and all payments or reimbursements made hereunder or under the Note shall be made free and clear of and without deduction for any and all taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto arising out of or in connection with the transactions contemplated by the Loan Documents (all such taxes, levies, imposts, deductions, charges or withholdings and all liabilities with respect thereto excluding taxes imposed on net income in accordance with the following sentence are referred to herein as "<u>Tax Liabilities</u>").  Notwithstanding the foregoing, Borrower shall not be liable for taxes

imposed on the net income of Lender by the jurisdiction under the laws of which Lender is organized or doing business or any political subdivision thereof and taxes imposed on its net income by the jurisdiction of Lender's applicable lending office or any political subdivision thereof or federal income taxes imposed on Lender's net income. If Borrower shall be required by law to deduct any such Tax Liabilities (or amounts in estimation or reimbursement for the same) from or in respect of any sum payable hereunder to Lender, then the sum payable hereunder shall be increased as may be necessary so that, after making all required deductions, Lender receives an amount equal to the sum it would have received had no such deductions been made.

**Section 2.9    Reasonableness of Charges.**  Borrower agrees that (i) the actual costs and damages that Lender would suffer by reason of an Event of Default (exclusive of the attorneys' fees and other costs incurred in connection with enforcement of Lender's rights under the Loan Documents) or a prepayment would be difficult and needlessly expensive to calculate and establish, and (ii) the amounts of the Default Rate, the late charges, and the Prepayment Consideration are reasonable, taking into consideration the circumstances known to the parties at this time, and (iii) such Default Rate and late charges and Lender's reasonable attorneys' fees and other costs and expenses incurred in connection with enforcement of Lender's rights under the Loan Documents shall be due and payable as provided herein, and (iv) such Default Rate, late charges, Prepayment Consideration, and the obligation to pay Lender's reasonable attorneys' fees and other enforcement costs do not, individually or collectively, constitute a penalty.

## ARTICLE III
## CONDITIONS TO LOAN

**Section 3.1    Conditions to Funding of the Loan on the Closing Date.**  The obligations of Lender to fund the Loan are subject to the prior or concurrent satisfaction or waiver of the conditions set forth below, and to satisfaction of any other conditions specified herein or elsewhere in the Loan Documents. Where in this Section any documents, instruments or information are to be delivered to Lender, then the condition shall not be satisfied unless the same shall be in form and substance reasonably satisfactory to Lender.

(A)    **Loan Documents.**  On or before the Closing Date, Borrower shall execute and deliver and cause to be executed and delivered to Lender all of the Loan Documents, each, unless otherwise noted, of even date herewith, duly executed, in form and substance reasonably satisfactory to Lender and in quantities designated by Lender (except for the Note, of which only one shall be signed), which Loan Documents shall become effective upon the Closing.

(B)    **Origination Fees and Deposits.**  At the Closing and retained from the proceeds of the Loan, Lender shall have received its origination fee, if any, as set forth on the closing statement for the Loan, and the deposits required herein, including without limitation, the initial deposits into the Reserves and Accounts, shall have been made (and at Lender's option, the same may be made from the proceeds of the Loan).

(C)    **Performance of Agreements, Truth of Representations and Warranties.**  Each Borrower Party and all other Persons executing any agreement on behalf of any Borrower Party shall have performed in all material respects all agreements which this Loan Agreement

29

provides shall be performed on or before the Closing Date. The representations and warranties contained herein and in the other Loan Documents shall be true, correct and complete in all material respects on and as of the Closing Date.

(D) **Closing Certificate.** On or before the Closing Date, Lender shall have received certificates of even date herewith executed on behalf of Borrower by the chief financial officer (or similar officer of Borrower) truly and correctly stating that: (i) on such date, no Default or Event of Default has occurred and is continuing; (ii) no material adverse change in the financial condition or operations of the business of Borrower, any General Partner, any Guarantor, any principal of Borrower, the Property or any tenant under a Major Lease at the Property and no material adverse change in the projected cash flow of Borrower or the Property has occurred since the delivery to Lender of any financial statements, budgets, proformas, or similar materials (or if there has been any change, specifying such change in detail), and that such materials delivered to Lender are true and materially complete and fairly represent the financial condition of Borrower, each General Partner, Guarantor and principal of Borrower and the cash flow of the Property; and (iii) there are no material adverse facts or conditions concerning the Property, Guarantor and principals of Borrower or any Borrower Party that have not been disclosed to Lender.

(E) **Opinions of Counsel.** On or before the Closing Date, Lender shall have received from legal counsel for each Borrower Party reasonably satisfactory to Lender, such counsel's written opinion as to such matters as Lender shall reasonably request, including opinions to the effect that (i) each of the Borrower Parties is duly formed, validly existing, and in good standing in its state of organization and, in the case of Borrower, in the state where the Property is located, (ii) this Loan Agreement and the Loan Documents have been duly authorized, executed and delivered and are enforceable in accordance with their terms subject to customary qualifications for bankruptcy and general equitable principles; (iii) Borrower would not be consolidated in bankruptcies of its related General Partner, Manager and certain other Affiliates of Borrower specified by Lender, and (iv) true lease and subordination opinions respecting the Master Lease and the Master Sublease. Also on or before the Closing Date, Lender shall have received an opinion of Borrower's local counsel in the state where the Property is located as to the enforceability of the Loan Documents and such other matters as Lender may reasonably request. In addition, Lender shall have received a copy of an opinion given to Investment Properties of America, LLC respecting the qualification of SMT Master Lease interests for 1031 tax free exchange treatment.

(F) **Title Policy.** On or before the Closing Date, Lender shall have received and approved the *pro forma* Title Policy for the Property, and as of the Closing, the Title Company shall be irrevocably committed and prepared immediately to issue the Title Policy. The Title Policy shall be in form and substance reasonably satisfactory to Lender. Without limitation, Lender may reasonably require that the Title Policy be issued on the 1992 ALTA form, or on such other promulgated form required under applicable law, by the Title Company, together with such reinsurance and direct access agreements as Lender may reasonably require, insuring that the Mortgage is a valid first and prior enforceable lien on the Property (including any easements appurtenant thereto) subject only to such exceptions to coverage as are acceptable to Lender. The Title Policy shall contain such endorsements as Lender may reasonably require (to the extent available in the state where the Property is located) in form reasonably acceptable to Lender,

including, if permitted under Texas law, deletion of the creditors' rights exception and affirmative endorsement coverage for creditors' rights risks.

(G)    <u>Survey</u>.  Lender shall have received a survey of the Property, certified to Lender and its successors, assigns and designees and to the Title Company by a surveyor reasonably satisfactory to Lender (the "<u>Survey</u>").  The Survey shall contain the minimum detail for land surveys as most recently adopted by ALTA/ASCM, shall comply with Lender's survey requirements and shall contain Lender's standard form certification.  The Survey shall show no state of facts or conditions reasonably objectionable to Lender.

(H)    <u>Zoning</u>.  On or before the Closing Date, Lender shall have received evidence reasonably satisfactory to Lender as to the zoning and subdivision compliance of the Property, to the extent applicable to the Property.

(I)    <u>Certificates of Formation and Good Standing</u>.  On or before the Closing Date, Lender shall have received copies of the organizational documents and filings of each Borrower Party, together with good standing certificates (or similar documentation) (including verification of tax status if available) from the state of its formation, from the state in which its principal place of business is located, and from all states in which the laws thereof require such Person to be qualified and/or licensed to do business (including without limitation, the state in which the Property is located for Borrower).  Each such certificate shall be dated not more than thirty (3 0) days prior to the Closing Date, as applicable, and certified by the applicable Secretary of State or other authorized governmental entity.  In addition, on or before the Closing Date the secretary or corresponding officer of each Borrower Party, or the secretary or corresponding officer of the partner, trustee, or other Person as required by such Borrower Party's organizational documents (as the case may be, the "<u>Borrower Party Secretary</u>") shall have delivered to Lender a certificate stating that the copies of the organizational documents as delivered to Lender are true and complete and are in full force and effect, and that the same have not been amended except by such amendments as have been so delivered to Lender.

(J)    <u>Certificates of Incumbency and Resolutions</u>.  On or before the Closing Date, Lender shall have received certificates of incumbency and resolutions of each Borrower Party and its constituents as requested by Lender, approving and authorizing the Loan and the execution, delivery and performance of the Loan Documents, certified as of the Closing Date by the Borrower Party Secretary as being in full force and effect without modification or amendment.

(K)    <u>Financial Statements</u>.  On or before the Closing Date, Lender shall have received such financial statements and other financial information as shall be satisfactory to Lender for each Borrower Party and for the Property.  All such financial statements shall be certified to Lender by the applicable Borrower Party (through its chief executive officer or chief financial officer), which certification shall be in form and substance reasonably satisfactory to Lender.

(L)    <u>Agreements</u>.  On or before the Closing Date, Lender shall have received copies of all material operating agreements, service contracts and equipment leases, if any, relating to Borrower's ownership and operation of the Property.

(M)    **Management Agreement**.  On or before the Closing Date, Lender shall have received copies of the existing Management Agreement and any leasing brokerage agreements pertaining to the Property and the Assignment of Management Agreement, duly executed by current Manager and Borrower.

(N)    **Operating and Capital Expenditure Budgets**.  On or before the Closing Date, Lender shall have received and reasonably approved the Operating Budget and Capital Expenditure Budget for the Property for the remainder of the current calendar year, which Operating Budget and Capital Expenditure Budget are attached hereto as Schedule 3.1(N).

(O)    **Rent Rolls, Leases, Estoppels**.  Prior to the Closing, Lender shall have received from Borrower a certified copy of the current rent roll (the "Rent Roll") for the Property in form and substance reasonably satisfactory to Lender.  The Rent Roll shall constitute a true, correct, and complete list of each and every Lease for the Property, together with all extensions, modifications and amendments thereof, and shall accurately and completely disclose all annual and monthly rents payable by all tenants, including all percentage rents, if any, expiration dates of the Leases, and the amount of any Security Deposit being held by Borrower under each Lease, if any.  Also prior to the Closing, Lender shall have received true and complete copies of the Leases, and tenant estoppel certificates on Lender's form (or other form acceptable to Lender) duly executed by each tenant at the Property (excluding any tenants under Leases relating to specialty kiosks) and subordination, non-disturbance and attornment agreements on Lender's form (or other form acceptable to Lender) duly executed by Borrower and such tenants as Lender may require.

(P)    **Licenses, Permits and Approvals**.  On or before Closing Date, Lender shall have received copies of the final, unconditional certificates of occupancy issued with respect to the Property, together with all other applicable licenses, permits and approvals required for Borrower to own, use, occupy, operate and maintain the Property.

(Q)    **Insurance Policies and Endorsements**.  On or before the Closing Date, Lender shall have received copies of insurance policies required to be maintained under this Loan Agreement and the other Loan Documents and certificates of insurance dated not more than twenty (20) days prior to the Closing Date, evidencing such insurance coverages, together with endorsements reasonably satisfactory to Lender naming Lender as an additional insured and loss payee, as required by Lender, under such policies.  In addition, as to any insurance matters arising under Environmental Laws or pertaining to any environmental insurance that Borrower maintains with respect to the Property, the same shall be endorsed to Lender as required by Lender.

(R)    **Environmental Assessment**.  Lender shall have received and approved an Environmental Report relating to the Property, together with a letter from the preparer thereof entitling Lender and its successors and assigns to rely upon said Environmental Report (if same is not addressed to Lender).

(S)    **Property Condition Reports**.  On or before the Closing Date, Lender shall have received a property condition report for the Property addressed to Lender and its successors and assigns, which shall be prepared by an engineer or other consultant reasonably satisfactory to

Lender and otherwise shall be in form and substance reasonably satisfactory to Lender in its sole discretion (the "Property Condition Report"). Such Property Condition Report shall set forth any items of deferred maintenance at the Property.

(T) **Appraisals**. On or before the Closing Date, Lender shall have received an independent appraisal of the Property from a state certified appraiser engaged by Lender, which indicates a fair market value of the Property which would reflect a loan-to-value ratio for the Loan acceptable to Lender, and is otherwise reasonably satisfactory to Lender in its sole discretion in all respects. Each such appraisal shall conform in all respects to the criteria for appraisals set forth in the Financial Institutions Reform and Recovery Act of 1989 and the regulations promulgated thereunder (as if Lender were an institution under the jurisdiction thereof) and the Uniform Standards of Professional Appraisal Practices of the Appraisal Foundation.

(U) **Searches**. Prior to the Closing Date, Lender shall have received certified copies of Uniform Commercial Code, judgment, tax lien, bankruptcy and litigation search reports with respect to all Borrower Parties reasonably satisfactory to Lender, all dated not more than thirty (30) days prior to the Closing Date.

(V) **Documentation Regarding Application of Proceeds**. Prior to the Closing Date, Lender shall have received payoff demand letters and wiring instructions from each lender or other obligee of any existing indebtedness which is required to be repaid pursuant to this Loan Agreement and by Borrower regarding the application of any remaining available proceeds of the Loan.

(W) **Master Lease/Master Sublease**. Lender shall have received true and correct copies of the Master Lease and the Master Sublease, together with a fully executed Subordination Agreement and a recordable memorandum of the Master Lease and recordable memorandum of the Master Sublease, each in form and substance reasonably acceptable to Lender.

(X) **Legal Fees; Closing Expenses**. Borrower shall have paid any and all reasonable legal fees and expenses of counsel to Lender, together with all recording fees and taxes, title insurance premiums, appraisal reports, environmental inspection reports, Property Condition Report(s), Lender's site inspection and processing fee, and other reasonable costs and expenses related to the Closing.

(Y) **Other Review**. Lender shall have completed all other review of Borrower, the Borrower Parties, the Property, and such other items as it reasonably determines relevant; and shall have determined based upon such review to fund the Loan. Borrower Parties shall have satisfied such other reasonable criteria as Lender may reasonably specify.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES**

In order to induce Lender to enter into this Loan Agreement and to make the Loan, Borrower represents and warrants to Lender that the statements set forth in this Article IV, after

giving effect to the Closing, will be, true, correct and complete in all material respects as of the Closing Date.

## Section 4.1    Organization, Powers, Capitalization, Good Standing, Business.

(A)    **Organization and Powers.**    Owner Borrower is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Texas. Master Tenant Borrower is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Texas. Master Subtenant Borrower is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Texas. Each General Partner is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware. Each Borrower Party has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and proposed to be conducted, and to enter into each Loan Document to which it is a party and to perform the terms thereof.

(B)    **Qualification.**    Borrower and each General Partner are each duly qualified and in good standing in the state where the Property is located. In addition, each Borrower Party is duly qualified and in good standing in each state where necessary to carry on its present business and operations.

(C)    **Organization.**    The organizational chart set forth as <u>Schedule 4.1(C)</u> accurately sets forth the direct and indirect ownership structure of Borrower. IPofA Fund Manager, LLC (shown as the Manager of Investment Properties of America, LLC on such <u>Schedule 4.1(C)</u>) is wholly owned by Investment Properties of America, LLC, and Investment Properties of America, LLC (shown on such <u>Schedule 4.1(C)</u> as the owner of all of the ownership interests in each general partner and limited partner of each of Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower) is wholly owned and controlled by Edward Okun.

## Section 4.2    Authorization of Borrowing, etc.

(A)    **Authorization of Borrowing.**    Borrower has the power and authority to incur the Indebtedness evidenced by the Note. The execution, delivery and performance by each Borrower Party of each of the Loan Documents to which it is a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary limited liability company, partnership, trust, corporate or other action, as the case may be.

(B)    **No Conflict.**    The execution, delivery and performance by each Borrower Party of the Loan Documents to which it is a party and the consummation of the transactions contemplated thereby do not and will not: (1) violate (x) any provision of law applicable to any Borrower Party; (y) the partnership agreement, certificate of limited partnership, certificate of incorporation, bylaws, declaration of trust, certificate of organization, operating agreement or other organizational documents, as the case may be, of each Borrower Party; or (z) any order, judgment or decree of any court or other agency of government binding on any Borrower Party or any of its Affiliates; (2) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of any Borrower Party or any of its Affiliates; (3) result in or require the creation or imposition of any material Lien (other than

34

the Lien of the Loan Documents) upon the Property or assets of any Borrower Party or any of its Affiliates; or (4) require any approval or consent of any Person under any Contractual Obligation of any Borrower Party.

(C) **Governmental Consents**. The execution, delivery and performance by each Borrower Party of the Loan Documents to which it is a party, and the consummation of the transactions contemplated thereby do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body except for the recording of the Mortgage and filings and recordings required in connection with the creation or perfection of any other security interests with respect to the Collateral granted under this Loan Agreement or any of the other Loan Documents.

(D) **Binding Obligations**. This Loan Agreement is, and the Loan Documents, including the Note, when executed and delivered will be, the legally valid and binding obligations of each Borrower Party, as applicable, enforceable against the Borrower Parties, as applicable, in accordance with their respective terms, subject to bankruptcy, insolvency, moratorium, reorganization and other similar laws affecting creditor's rights generally. No Borrower Party has any defense or offset to any of its obligations under the Loan Documents. No Borrower Party has any claim against Lender or any Affiliate of Lender.

**Section 4.3    Financial Statements.** All financial statements concerning Borrower, its Affiliates, each General Partner, Guarantor and the Property which have been or will hereafter be furnished by or on behalf of Borrower to Lender pursuant to this Loan Agreement have been or will be prepared in accordance with Approved Accounting Principles consistently applied (except as disclosed therein) and do (or will, as to those statements that are not yet due) present fairly the financial condition of the Persons covered thereby as at the dates thereof and the results of their operations for the periods then ended. Since the date of the most recent financial statements of Borrower, each General Partner, Guarantor and the Property delivered to Lender, there has been no material adverse change in the financial condition, operations or business of the Borrower Parties or the Property from that set forth in said financial statements.

**Section 4.4    Indebtedness and Contingent Obligations.** As of the Closing, no Borrower or General Partner has any Indebtedness or Contingent Obligations other than the Obligations and any other Indebtedness expressly permitted under Section 5.17 of this Loan Agreement.

**Section 4.5    Title to Property.** Owner Borrower has good marketable and insurable fee simple title to the Property, free and clear of all Liens except for Permitted Encumbrances. Master Tenant Borrower and Master Subtenant Borrower each has a good marketable and insurable leasehold interest in the Property, free and clear of all Liens except for Permitted Encumbrances. Borrower owns and will own at all times all personal property relating to the Property other than personal property which is leased by Borrower (as to which Borrower has valid leasehold title) or owned by tenants of the Property and not used or necessary for the operation of the Property), subject only to Permitted Encumbrances. There are no pending proceedings in condemnation or eminent domain affecting the Property, and to the knowledge of Borrower, none is threatened. To Borrower's knowledge, no Person has any option or other right to purchase all or any portion of the Property or any interest therein. To Borrower's knowledge, there are no mechanic's, materialman's or other similar liens or claims which have been filed for

work, labor or materials affecting the Property which are or may be liens prior to, or equal or coordinate with, the lien of the Mortgage. None of the Permitted Encumbrances, individually or in the aggregate, have or would have a Material Adverse Effect.

**Section 4.6     Zoning; Compliance with Laws.**     The Property (to the extent located in a jurisdiction that has zoning laws) is zoned for office, retail and commercial use, which zoning designation is unconditional, in full force and effect, and is beyond all applicable appeal periods. The Property and the use thereof complies in all material respects with all applicable zoning, subdivision and land use laws, regulations and ordinances, all applicable health, fire, building codes, parking laws and all other laws, statutes, codes, ordinances, rules and regulations applicable to the Property, including without limitation the Americans with Disabilities Act. To Borrower's knowledge, there are no illegal activities relating to controlled substances on the Property. To Borrower's knowledge, all certificates of occupancy or the equivalent, and all other required permits, licenses and certificates for the lawful use and operation of the Property have been obtained and are current and in full force and effect. In the event that all or any part of the Improvements located on the Property are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits, other than customary demolition, building and other construction related permits. No legal proceedings are pending or, to the knowledge of Borrower, threatened with respect to the zoning of the Property. Except for the Permitted Encumbrances, neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any real estate other than the Property. No tract map, parcel map, condominium plan, condominium declaration, or plat of subdivision will be recorded by Borrower with respect to the Property without Lender's prior written consent

**Section 4.7     Leases; Agreements.**

(A)     **Leases; Agreements.**     Borrower has delivered to Lender true, complete and fully executed copies of all (i) Leases and (ii) material contracts and agreements affecting the operation and management of the Property, including, without limitation, the existing Management Agreement, any leasing brokerage agreement and any service and maintenance contracts and such Leases, contracts and agreements have not been modified or amended except pursuant to amendments or modifications delivered to Lender. Except for the rights of the current Manager pursuant to the existing Management Agreement, no Person has any right or obligation to manage the Property or to receive compensation in connection with such management. Except for the parties to any leasing brokerage agreement that has been delivered to Lender, no Person has any right or obligation to lease or solicit tenants for the Property, or to receive compensation in connection with such leasing.

(B)     **Rent Roll; Disclosure.**     A true and correct copy of the Rent Roll has been provided to Lender and except for the Leases described in the Rent Roll the Property is not subject to any Leases. Except as specified in the Rent Roll: (i) the Leases are in full force and effect; (ii) neither Borrower nor any Affiliate of Borrower, has given any notice of default to any tenant under any Lease which remains uncured; (iii) no tenant has asserted in writing any rights of set off, claims or defenses under any Lease and no tenant has any such rights of set off, claim or defense to the enforcement of any Lease except as expressly set forth in the Leases; (iv) no

tenant is in arrears in the payment of rent, additional rent or any other material charges due under any Lease, or, to the knowledge of Borrower, is in default in the performance of any other obligations under the applicable Lease; (v) Borrower has completed all work or alterations required to be completed by the landlord or lessor under each Lease as of the date hereof, and all of the other obligations of landlord or lessor under the Leases required to be completed as of the date hereof, have been performed; (vi) there are no rent concessions (whether in form of cash contributions, work agreements, assumption of an existing tenant's other obligations, or otherwise) or extensions of time whatsoever not reflected in the Rent Roll; (vii) no tenant has an option to terminate its respective Lease and (viii) to Borrower's knowledge, no bankruptcy or insolvency proceeding has been commenced (and is continuing) by or against any tenant under any Lease. The Security Deposits held by Lender with respect to each Lease is as set forth on the Rent Roll.

(C)    **Lease Issues**. Except as disclosed on Schedule 4.7 attached hereto and made a part hereof (none of which disclosed proceedings could reasonably be foreseen to have a Material Adverse Effect), there are no legal proceedings commenced (or, to Borrower's knowledge, threatened) against any Borrower, any General Partner or any Affiliate thereof by any tenant or former tenant. No rental in excess of one month's rent has been prepaid under any of the Leases (except for Security Deposits and estimated additional rent amounts paid on account of operating expenses, taxes and other expense escalations or pass-throughs). To Borrower's knowledge, each of the Leases is valid and binding on the parties thereto in accordance with its terms.

(D)    **No Residential Units**. There are no residential units in the Property. To Borrower's knowledge, no person occupies any part of the Property for dwelling purposes.

**Section 4.8    Condition of Property**. Except as set forth in the Property Condition Report for the Property delivered to Lender, all Improvements at the Property including, without limitation, the roof and all structural components, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior doors, parking facilities, sidewalks and landscaping are in good condition and repair. To Borrower's knowledge, there is no latent or patent structural or other material defect or deficiency in the Property. City water supply, storm and sanitary sewers, and electrical, gas and telephone facilities are available to the Property within the boundary lines of the Property, are fully connected to the Improvements and are fully operational, meet the reasonable needs of the Property as now used or presently contemplated to be used, and no other utility facilities are necessary to meet the reasonable needs of the Property as now used or presently contemplated. To Borrower's knowledge, the design and as-built conditions of the Property are such that surface and storm water does not accumulate on the Property (except in facilities specifically designed for the same) and does not drain from the Property across land of adjacent property owners except pursuant to easements benefiting the Property which are specified in and insured under the Title Policy. No part of the Property is within a flood plain and, except for the Permitted Encumbrances, none of the Improvements create encroachment over, across or upon the Property's boundary lines, rights of way or easements, and no building or other improvements on adjoining land create such an encroachment. Access to the Property for the current and contemplated uses thereof is provided by means of dedicated, public roads and streets which are physically and legally open for use by the public. To Borrower's knowledge, any liquid or solid waste disposal, septic or sewer system

located at the Property is in good and safe condition and repair and in compliance with all applicable law. To Borrower's knowledge, the Property is in compliance in all material respects with all laws, governmental regulations and requirements including, but not limited to, matters of sanitation, health, fire and other hazards.

**Section 4.9     Litigation; Adverse Facts.** There are no judgments outstanding against any Borrower Party, or affecting the Property or any property of any Borrower Party, nor is there any action, charge, claim, demand, suit, proceeding, petition, governmental investigation or arbitration now pending or, to Borrower's knowledge after due inquiry, threatened against any Borrower or Borrower GP or affecting the Property, except as disclosed on Schedule 4.7 attached hereto and made a part hereof (none of which disclosed proceedings could reasonably be foreseen to have a Material Adverse Effect), nor is there any action, charge, claim, demand, suit, proceeding, petition, governmental investigation or arbitration now pending or, to Borrower's knowledge after due inquiry, threatened against Guarantor that could reasonably be foreseen to have a Material Adverse Effect.

**Section 4.10     Payment of Taxes.** All federal, state and local tax returns and reports of each Borrower Party required to be filed have been timely filed, and all taxes, assessments, fees and other governmental charges (including any payments in lieu of taxes) upon such Person and upon its properties, assets, income and franchises which are due and payable have been paid when due and payable, except for those taxes which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established. Except as otherwise disclosed in writing to Lender, there is not presently pending (and to Borrower's knowledge, there is not contemplated) any special assessment against the Property or any part thereof. No tax liens have been filed and to the knowledge of Borrower Parties, no claims are being asserted with respect to any such taxes. The charges, accruals and reserves on the books of Borrower Parties in respect of any taxes or other governmental charges are in accordance with GAAP.

**Section 4.11     Adverse Contracts.** Except for the Loan Documents, none of the Borrower Parties is a party to or bound by, nor is any property of such Person subject to or bound by, any contract or other agreement which restricts such Person's ability to conduct its business in the ordinary course or, either individually or in the aggregate, has or would have a Material Adverse Effect.

**Section 4.12     Performance of Agreements.** To Borrower's knowledge, no Borrower Party is in default in the performance, observance or fulfillment of any of the material obligations, covenants or conditions contained in any Contractual Obligation of any such Person beyond any applicable notice and cure period, and no condition exists that, with the giving of notice or the lapse of time or both, would constitute such a default or has or would have a Material Adverse Effect.

**Section 4.13     Governmental Regulation.** No Borrower Party is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act or the Investment Company Act of 1940 or to any federal or state statute or regulation limiting its ability to incur indebtedness for borrowed money.

38

**Section 4.14    Employee Benefit Plans.**  No Borrower Party maintains or contributes to, or has any obligation (including a contingent obligation) under, any Employee Benefit Plans.

**Section 4.15    Broker's Fees.**  No broker's or finder's fee, commission or similar compensation will be payable by or pursuant to any contract or other obligation of any Borrower Party with respect to the making of the Loan or any of the other transactions contemplated hereby or by any of the Loan Documents.  Borrower shall indemnify, save harmless and defend Lender from and against all claims for brokers' or finders' fees and commissions in connection with the Loan, with such indemnity to include Lender's cost for reasonable attorneys' fees.

**Section 4.16.    Environmental Compliance.**

(A)    **No Environmental Claims.**    There are no claims, liabilities, investigations, litigation, administrative proceedings, pending or, to Borrower's knowledge, threatened, or judgments, liens or orders relating to any Hazardous Materials (collectively, "Environmental Claims") asserted or, to Borrower's knowledge, threatened against Borrower or relating to the Property.  Except as disclosed in the Environmental Report delivered to Lender prior to Closing, none of the Borrower Parties nor, to Borrower's knowledge, any other Person has caused or permitted any Hazardous Material to be used, generated, reclaimed, transported, released, treated, stored or disposed of in a manner which could form the basis for an Environmental Claim against Borrower or relating to the Property.  There have been no environmental investigations, studies, audits, reviews or other analyses conducted by or that are in the possession of any Borrower Party or any of their Affiliates in relation to the Property which have not been made available to Lender.  Additionally, but without limitation of the foregoing, no liens are presently recorded with the appropriate land records under or pursuant to any Environmental Law with respect to the Property and no Governmental Authority has been taking or is in the process of taking any action that could subject the Property to Liens under any Environmental Law.

(B)    **Storage of Hazardous Materials.**    Except as disclosed in the Environmental Report delivered to Lender prior to Closing, and except for materials customarily used or stored in connection with operation and management of properties similar to the Property, which materials at the Property exist only in reasonable quantities and are stored, contained, transported, used, released, and disposed of reasonably and without violation of any Environmental Laws, to Borrower's knowledge, no Hazardous Materials are or were stored or otherwise located, and no underground storage tanks or surface impoundments are or were located, on the Property, or to Borrower's knowledge, on adjacent parcels of real property, and no part of the property, or to Borrower's knowledge no part of such adjacent parcels of real property, including the groundwater located therein or thereunder, is presently contaminated by Hazardous Materials.    Except as disclosed in the Environmental Report, to Borrower's knowledge, the Property is not listed by any Governmental Authority as containing any Hazardous Materials.    There is not present at, on, in or under the Property, PCB-containing equipment, asbestos or asbestos containing materials, underground storage tanks or surface impoundments for Hazardous Substances, lead in drinking water (except in concentrations that comply with all Environmental Laws), or lead based paint.

(C)    **Compliance with Environmental Laws.**    Except as may be set forth in the Environmental Report, Borrower has been and is currently in compliance in all material respects with all applicable Environmental Laws, including obtaining and maintaining in effect all permits, licenses or other authorizations required by applicable Environmental Laws.

**Section 4.17    Solvency.**    Borrower (a) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair market value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and Contingent Obligations. The fair market value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its Contingent Obligations on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believes that it will, incur Indebtedness and liabilities (including Contingent Obligations and other commitments) beyond its ability to pay such Indebtedness and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

**Section 4.18    Disclosure.**    No financial statements, Loan Document or any other document, certificate or written statement furnished to Lender by any Borrower Party and, to Borrower's knowledge, no document or statement furnished by any third party on behalf of any Borrower Party, for use in connection with the Loan contains any untrue representation, warranty or statement of a material fact, and none omits or will omit to state a material fact necessary in order to make the statements contained herein or therein not misleading. There is no material fact known to Borrower that has had or will have a Material Adverse Effect and that has not been disclosed in writing to Lender by Borrower.

**Section 4.19    Use of Proceeds and Margin Security.**    Borrower shall use the proceeds of the Loan only for the purposes set forth herein and consistent with all applicable laws, statutes, rules and regulations. No portion of the proceeds of the Loan shall be used by Borrower or any Person in any manner that might cause the borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X or any other regulation of the Board of Governors of the Federal Reserve System.

**Section 4.20    Insurance.**    Borrower has in effect all of the policies of insurance required in Section 5.4 hereof, and no notice of cancellation has been received with respect to such policies, and, to Borrower's knowledge after due inquiry, Borrower is in compliance with all conditions contained in such policies.

**Section 4.21    Separate Tax Lots.**    The Property is comprised of one (1) or more parcels which constitute separate tax lots. No part of the Property is included or assessed under or as part of another tax lot or parcel, and no part of any other property is included or assessed under or as part of the tax lots or parcels comprising the Property.

40

**Section 4.22    Investments.** No Borrower nor any General Partner has any (i) direct or indirect interest in, including without limitation stock, partnership interest or other securities of, any other Person (other than GP Owner's partnership interest in Owner Borrower, GP Master Tenant's partnership interest in Master Tenant Borrower and GP Master Subtenant's partnership interest in Master Subtenant), or (ii) direct or indirect loan, advance or capital contribution made to any other Person, including all indebtedness and accounts receivable from that other Person.

**Section 4.23    Bankruptcy.** No Borrower Party is or has been a debtor, and no property of any of them (including the Property) is property of the estate, in any voluntary or involuntary case under the Bankruptcy Code or under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect. No Borrower Party and no property of any of them is or has been under the possession or control of a receiver, trustee or other custodian. No Borrower Party has made any assignment for the benefit of creditors. No such assignment or bankruptcy or similar case or proceeding is now contemplated.

**Section 4.24    Defaults.** No Default or Event of Default exists and no event has occurred which with the passage of time or the giving of notice, or both, would be or become a Default or Event of Default.

**Section 4.25    No Plan Assets; Compliance with Plans.** Borrower is not and will not be (i) an employee benefit plan as defined in Section 3(3) of ERISA which is subject to ERISA, (ii) a plan as defined in Section 4975(e)(1) of the IRC which is subject to Section 4975 of the IRC, or (iii) an entity whose underlying assets constitute "plan assets" of any such employee benefit plan or plan for purposes of Title I of ERISA or Section 4975 of the IRC. Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA and transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with obligations with respect to governmental plans. Borrower and each of the other ERISA Affiliates have made, and shall continue to make, all required contributions to all employee benefit plans, if any, that Borrower and each of the other ERISA Affiliates maintain or contribute to, within the time periods required by the applicable provisions of ERISA and any other federal or state law, and Borrower and each of the other ERISA Affiliates have no knowledge of any material liability which has been incurred by any thereof which remains unsatisfied for any taxes or penalties with respect to any employee benefit plan or any multi-employer plan. Each such employee benefit plan (other than any multi-employer plan) has been administered in compliance with its terms and the applicable provisions of ERISA and any other federal or state law.

**Section 4.26    No Prohibited Transaction.** The execution, delivery and performance of this Loan Agreement, the Note, the Mortgage and the other Loan Documents do not constitute a Prohibited Transaction, assuming solely for this purpose that Lender is a party in interest as defined in Section 3(14) of ERISA ("Party In Interest") or a disqualified person as defined in Section 4975(e)(2) of the IRC ("Disqualified Person") with respect to an employee benefit plan, if any, which has directly or indirectly invested in any Borrower or any General Partner.

**Section 4.27    Not Foreign Person.** No Borrower Party is a "foreign person" within the meaning of Section 1445(f)(3) of the IRC.

41

**Section 4.28    No Collective Bargaining Agreements.**  No Borrower Party is a party to any collective bargaining agreement.

**Section 4.29    Compliance.** To Borrower's knowledge, each Borrower and General Partner is in compliance in all material respects with all applicable Legal Requirements. No Borrower Party is in material default or violation of any order, writ, injunction, decree or demand of any Governmental Authority.

**Section 4.30    Intellectual Property.** All material Intellectual Property that Borrower owns or has pending, or under which it is licensed, are in good standing and uncontested. There is no right under any Intellectual Property necessary to the business of Borrower as presently conducted or as Borrower contemplates conducting its business. Borrower has not infringed, is not infringing, and has not received notice of infringement with respect to asserted Intellectual Property of others. There is no infringement by others of material Intellectual Property of Borrower.

**Section 4.31    Pre-Closing Date Activities.** Borrower has not conducted any business or other activity on or prior to the Closing Date, other than in connection with the acquisition and operation of the Property.

**Section 4.32    Mortgage and Other Liens.** The Mortgage creates a valid and enforceable first priority Lien on the Property described therein, as security for the repayment of the Obligations, subject only to the Permitted Encumbrances applicable to the Property. Each Loan Document purporting to grant, transfer, assign or otherwise create a Lien as security for the Loan establishes and creates a valid, subsisting and enforceable Lien on and a security interest in, or claim to, the rights and property described therein. All property covered by any Loan Document purporting to grant, transfer, assign or otherwise create a Lien as security for the Loan is subject to a UCC financing statement filed and/or recorded, as appropriate (or irrevocably delivered to an agent for such recordation or filing) in all places necessary to perfect a valid first priority Lien with respect to the rights and property that are the subject of such Loan Document to the extent governed by the UCC.

**Section 4.33    Management Agreement.** The Management Agreement is in full force and effect. There is no default, breach or violation existing thereunder by any party thereto and no event (other than payments due but not yet delinquent) which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach or violation by any party thereunder.

**Section 4.34    No Prohibited Persons.** Neither Borrower, nor any other Borrower Party, nor any of their respective officers, directors, partners, members, Affiliates or, to the knowledge of Borrower, shareholders is an entity or person: (i) that is listed in the Annex to, or is otherwise subject to the provisions of Executive Order 13224 issued on September 24, 2001 ("EO13224"); (ii) whose name appears on the United States Treasury Department's Office of Foreign Assets Control ("OFAC") most current list of "Specifically Designated National and Blocked Persons" (which list may be published from time to time in various mediums including, but not limited to, the OFAC website, http:www.treas.gov/ofac/t1 1sdn.pdf); (iii) who commits, threatens to commit or supports "terrorism", as that term is defined in EO13224; or (iv) who is otherwise affiliated

with any entity or person listed above (any and all parties or persons described in clauses (i) through (iv) above are herein referred to as a "Prohibited Person").

**Section 4.35** **Master Lease and Master Sublease.** Borrower has delivered to Lender a true, correct and complete copy of the Master Lease and Master Sublease. Each of the Master Lease and Master Sublease is in full force and effect and has not been modified, amended supplemented or assigned except as specified in the Subordination Agreement executed by Borrower and delivered to Lender prior to the date hereof. There are no defaults under the Master Lease or Master Sublease on the part of any Borrower, and no event has occurred, which with the passage of time, the giving of notice, or both, would constitute a default under the Master Lease or Master Sublease on the part of any Borrower. Master Tenant Borrower is the sole tenant and holder of a good, valid and marketable leasehold estate under the Master Lease, Master Subtenant Borrower is the sole sub-tenant and holder of a good, valid and marketable leasehold estate under the Master Sublease and the interests of the Master Subtenant Borrower, as subtenant, and the Master Tenant Borrower, as sub-landlord, under the Master Sublease, and the interest of Owner Borrower, as landlord, and Master Tenant Borrower, as tenant, under the Master Sublease have not been assigned except to Lender as additional collateral security for the Loan. All rents, additional rents and other sums due and payable under the Master Sublease have been paid in full through the Closing Date. No Borrower has commenced any action or given or received any notice for the purpose of terminating the Master Lease or the Master Sublease.

## ARTICLE V
## COVENANTS OF BORROWER

Borrower covenants and agrees that until payment in full of the Loan, all accrued and unpaid interest and all other Obligations, unless Lender shall otherwise give its prior written consent, such Person shall perform and comply with, or cause the performance and compliance of the applicable Borrower Parties with, all covenants in this Article V.

**Section 5.1** **Financial Statements and Other Reports.**

    (A)    **Financial Statements.**

            (i)    **Annual Reporting.** Within one hundred twenty (120) days after the end of each calendar year, Borrower shall provide or cause to be provided true and complete copies of Owner Borrower's, Master Subtenant Borrower's and Guarantor's Financial Statements for such year to Lender. All such Financial Statements shall be audited by a reputable, national or regional independent certified public accountants reasonably acceptable to Lender, and accompanied by a certificate of such audit executed by such accounting firm in customary form, subject only to such exceptions as shall be reasonably approved in writing by Lender. The annual Financial Statements for Owner Borrower, Master Subtenant Borrower and Guarantor shall each be accompanied by a certification executed by or on behalf of such Owner Borrower, Master Subtenant Borrower and Guarantor, as applicable, satisfying the criteria set forth below. The annual Financial Statements of Owner Borrower and Master Subtenant Borrower shall also be accompanied by a Compliance Certificate (as defined below).

43

(ii)    **Quarterly Reporting - Borrower**.  Within forty-five (45) days after the end of each Calendar Quarter, Borrower shall provide or cause to be provided true and complete copies of Owner Borrower's and Master Subtenant Borrower's Financial Statements for such quarter to Lender, together with a certification executed by or on behalf of such Owner Borrower and Master Tenant Borrower in accordance with the criteria set forth below.  The quarterly Financial Statements of Owner Borrower and Master Tenant Borrower also shall be accompanied by a Compliance Certificate (as defined below).

(iii)    **Debt Service Coverage Ratio**.  Within thirty (30) days after the end of each Calendar Quarter, Borrower shall provide or cause to be provided to Lender Borrower's calculation of the Debt Service Coverage Ratio for the twelve month period ending at the end of such Calendar Quarter, together with Borrower's method of calculation and such detail and background information as Lender shall reasonably require and a certification executed on behalf of Borrower by Borrower's Designee in accordance with the criteria set forth below.

(iv)    **Leasing Reports**.  Within thirty (30) days after the end of each calendar month, Borrower shall provide or cause to be provided to Lender a certified (on behalf of Borrower by Borrower's Designee) Rent Roll, rental status report and a schedule of Security Deposits held under Leases, in form and substance reasonably acceptable to Lender.

(v)    **Monthly Reporting**.  Within thirty (30) days after the end of each calendar month, Borrower shall provide or cause to be provided to Lender (a) accrual basis operating statements, together with a statement of cash flow, for the Property, each in a form reasonably satisfactory to Lender, (1) for such month, (2) for the year to date with a comparison and reconciliation with the Operating Budget and Capital Expenditures Budget indicating all variances between budgeted and actual amounts on a line item basis, and (3) for the 12 month period ended as of the end of such calendar month, together with (b) a certification executed on behalf of Borrower by Borrowers' Designee in accordance with the criteria set forth below.

(vi)    **Additional Reporting**.  In addition to the foregoing, Borrower shall promptly provide to Lender, and cause each other Borrower Party to promptly provide to Lender, such further documents and information concerning its operations, properties, ownership, and finances as Lender shall from time to time reasonably request.

(vii)    **GAAP**.  Borrower will maintain systems of accounting established and administered in accordance with sound business practices and sufficient in all respects to permit preparation of Financial Statements in conformity with GAAP.  All Financial Statements shall be prepared in accordance with Approved Accounting Principles.

(viii)    **Certifications of Financial Statements and Other Documents, Compliance Certificate**.  Together with the Financial Statements and other documents and information provided to Lender by or on behalf of any Borrower Party under this Section, such Borrower Party also shall deliver to Lender a certification in form and substance reasonably satisfactory to Lender, executed by or on behalf of such Borrower Party stating that, to such Borrower Party's knowledge, such Financial Statements, documents, and information are true and complete in all material respects and do not omit to state any material information without which the same might reasonably be misleading.  In addition, where this Loan Agreement

44

requires a "Compliance Certificate", the Borrower Party required to submit the same shall deliver a certificate duly executed by or on behalf of such Borrower Party, in form and substance reasonably satisfactory to Lender, stating that there does not exist any Default or Event of Default under the Loan Documents (or if any exists, specifying the same in detail).

(ix)    **Fiscal Year**.  Borrower represents that its fiscal year ends on December 31, and agrees that it shall not change its fiscal year.

(B)    **Accountants' Reports**.  Promptly upon receipt thereof, Owner Borrower and Master Subtenant Borrower shall deliver copies of all significant reports submitted by independent public accountants in connection with each annual, interim or special audit of the Financial Statements or other affairs of such Borrower Party made by such accountants, including the comment letter submitted by such accountants to management in connection with the annual audit.

(C)    **Tax Returns**.  Within thirty (30) days after filing the same, Owner Borrower and Master Subtenant Borrower shall deliver to Lender a copy of its Federal income tax returns (or the return of the applicable Person into which such Borrower Party's Federal income tax return is consolidated) certified by or on behalf of such Borrower Party to be true and correct.

(D)    **Material Notices**.

(i)    Borrowers' Designee (on behalf of Borrower) shall promptly deliver, or cause to be delivered to Lender, copies of all notices of default given or received by any Borrower Party with respect to noncompliance related to any material Indebtedness of any Borrower Party.

(ii)    Borrowers' Designee (on behalf of Borrower) shall promptly deliver to Lender copies of any and all material notices (including without limitation any notice alleging any default or breach) received by any Borrower from any manager, franchisors, licensors or tenants for or pertaining to the Property.

(E)    **Events of Default, etc**.  Promptly upon any Borrower obtaining knowledge of any of the following events or conditions, such Borrower shall deliver a certificate executed by or on its behalf specifying the nature and period of existence of such condition or event and what action such Borrower or any Affiliate thereof has taken, is taking and proposes to take with respect thereto: (i) any condition or event that constitutes an Event of Default or Default; (ii) any Material Adverse Effect; or (iii) any actual or alleged breach or default or assertion of (or written threat to assert) remedies under any Management Agreement.

(F)    **Litigation**.  Promptly upon any Borrower's obtaining knowledge of (1) the institution, or threat thereof, of any action, suit, proceeding, governmental investigation or arbitration against or affecting any Borrower, any General Partner, Guarantor, any SMT Guarantor or the Property not previously disclosed in writing by Borrower to Lender, or (2) any material development in any action, suit, proceeding, governmental investigation or arbitration at any time pending against or affecting any Borrower, any General Partner, Guarantor, any SMT Guarantor or the Property, such Borrower will give notice thereof to Lender and provide such

other information as may be reasonably available to enable Lender and its counsel to evaluate such matter.

(G)  **Insurance.**  Within the thirty (30) day period prior to the end of each insurance policy period of Borrower, Borrowers' Designee (on behalf of Borrower) will deliver binders and certificates of insurance evidencing the annual renewal of any existing coverages (or copies of any new insurance policies not previously delivered to Lender), reports, and/or other information (all in form and substance reasonably satisfactory to Lender), (i) outlining all material insurance coverage maintained as of the date thereof by Borrower and all material insurance coverage planned to be maintained by Borrower in the subsequent insurance policy period, and (ii) evidencing payment in full of the premiums for such insurance policies.

(H)  **Other Information.**  With reasonable promptness, Borrowers' Designee (on behalf of Borrower) will deliver such other information and data with respect to any of the Borrower Parties, Borrower's Affiliates or the Property as from time to time may be reasonably requested by Lender.

**Section 5.2  Existence; Qualification.**  Borrower will at all times preserve and keep in full force and effect its limited partnership existence, and all rights and franchises material to its business, including its qualification to do business in each state where it is required by law to so qualify.  Borrower will cause each General Partner to at all times preserve and keep in full force and effect its existence as a limited liability company and all rights and franchises material to its business, including its qualification to do business in each state where it is required by law to so qualify.  Without limitation of the foregoing, Borrower shall and, shall cause each General Partner to be, at all times be qualified to do business in the state where the Property is located.

**Section 5.3  Payment of Impositions and Claims.**

(A)  Subject to Borrower's contest rights set forth in subsection (B) below, Borrower will pay when due (i) all Impositions; (ii) all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets (hereinafter referred to as the "Claims"); and (iii) all federal, state and local income taxes, sales taxes, excise taxes and all other taxes and assessments of Borrower on its business, income or assets; in each instance before any penalty or fine is incurred with respect thereto.

(B)  Borrower shall not be required to pay, discharge or remove any Imposition or Claim so long as Borrower contests in good faith such Imposition or Claim or the validity, applicability or amount thereof by an appropriate legal proceeding which operates to prevent the collection of such amounts and the sale of the applicable Property or any portion thereof, so long as: (i) no Event of Default shall have occurred and be continuing; (ii) prior to the date on which such Imposition or Claim would otherwise have become delinquent, Borrower shall have given Lender prior written notice of its intent to contest said Imposition or Claim; (iii) prior to the date on which such Imposition or Claim would otherwise have become delinquent, Borrower shall have deposited with Lender (or with a court of competent jurisdiction or other appropriate body approved by Lender) such additional amounts as are necessary to keep on deposit at all times, an amount equal to at least one hundred fifty percent (150%) (or such higher amount as may be

required by applicable law) of the total of (x) the balance of such Imposition or Claim then remaining unpaid, and (y) all interest, penalties, costs and charges accrued or accumulated thereon, together with such other security as may be required in the proceeding, or as may be required by Lender, to insure the payment of any such Imposition or Claim and all interest and penalties thereon; (iv) no risk of sale, forfeiture or loss of any interest in the Property or any part thereof arises, in Lender's judgment, during the pendency of such contest; (v) such contest does not, in Lender's determination, have a Material Adverse Effect; (vi) such contest is based on *bona fide*, material, and reasonable claims or defenses; (vii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; and (viii) Borrower shall have obtained such endorsements to the Title Policy with respect to such Imposition or Claim as Lender may reasonably require. Any such contest shall be prosecuted with due diligence, and Borrower shall promptly pay the amount of such Imposition or Claim as finally determined, together with all interest and penalties payable in connection therewith. Lender shall have full power and authority, but no obligation, to apply any amount deposited with Lender under this subsection to the payment of any unpaid Imposition or Claim to prevent the sale or forfeiture of the Property for non-payment thereof, if Lender reasonably believes that such sale or forfeiture is threatened. Any surplus retained by Lender after payment of the Imposition or Claim for which a deposit was made shall be promptly repaid to Borrower unless an Event of Default shall have occurred, and is continuing, in which case said surplus may be retained by Lender to be applied to the Obligations. Notwithstanding any provision of this Section 5.3 to the contrary, Borrower shall pay any Imposition or Claim which it might otherwise be entitled to contest if an Event of Default shall occur, or if, in the reasonable determination of Lender, the Property is in jeopardy or in danger of being forfeited or foreclosed. If Borrower refuses to pay any such Imposition or Claim, upon five (5) Business Days' prior written notice, Lender may (but shall not be obligated to) make such payment and Borrower shall reimburse Lender on demand for all such advances.

**Section 5.4   Maintenance of Insurance**. Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, public liability, fire and extended coverage and property damage, rent loss or business interruption and other types of insurance with respect to its business and the Property (including all Improvements now existing or hereafter erected thereon) against all losses, hazards, casualties, liabilities and contingencies as customarily carried or maintained by Persons of established reputation engaged in similar businesses and as Lender shall reasonably require. Without limitation of the foregoing, Borrower shall maintain or cause to be maintained policies of insurance with respect to the Property in the following amounts and covering the following risks:

(i)   Property damage insurance covering loss or damage to the Property caused by fire, lightning, hail, hurricane, windstorm, tidal wave, explosion, "acts of terrorism" (as defined in the TRIA), vandalism, malicious mischief, and such other losses, hazards, casualties, liabilities and contingencies as are normally and usually covered by fire, extended coverage and all risk policies in effect where the Property is located endorsed to include all of the extended coverage perils and other broad form perils, including the standard "all risks" clauses, with such endorsements as Lender may from time to time reasonably require including, without limitation, building ordinance and law (including demolition costs and increased cost of

47

construction coverage), lightning, hurricane, windstorm, tidal wave, civil commotion, "acts of terrorism" (as defined in the TRIA), hail, riot, strike, water damage, sprinkler leakage, collapse and malicious mischief. Such policy shall be in an amount not less than that necessary to comply with any coinsurance percentage stipulated in the policy, but not less than 100% of the full replacement cost of all Improvements at the Property (without any deduction for depreciation), and shall contain a replacement cost and agreed amount endorsement in an amount not less than the outstanding principal amount of the Loan. The deductible under such policy shall not exceed an amount customarily required by institutional lenders for similar properties in the general vicinity of the Property, but in no event in excess of $25,000, or such other amount as is approved by Lender from time to time. In addition to and without limiting the foregoing, the property insurance required under this Section 5.4(i), and the property insurance and business interruption and rent loss insurance required under Sections 5.4(v) and (vi) below shall be required to cover perils of terrorism and "acts of terrorism" (as defined in the TRIA).

(ii)    Broad form boiler and machinery insurance in an amount equal to the full replacement cost of the Improvements at such Property (without any deduction for depreciation) in which the boiler or similar vessel is located, and including coverage against loss or damage from (1) leakage of sprinkler systems and (2) damage, breakdown or explosion of steam boilers, electrical machinery and equipment, air conditioning, refrigeration, pressure vessels or similar apparatus and mechanical objects now or hereafter installed at the Property.

(iii)    If the Property is located in area prone to geological phenomena, including, but not limited to, sinkholes, mine subsidence, tidal waves or earthquakes, insurance covering such risks in an amount not less than 100% of the full replacement cost of the Improvements at the Property without any deduction for depreciation, with a maximum permissible deductible of $25,000, or such other amount as is approved by Lender from time to time.

(iv)    Flood insurance if the Property is located, in whole or in part, in an area now or hereafter designated as "flood prone" or a "special flood hazard area" (as defined under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994 (as each may be amended, or any successor law, collectively, the "Flood Insurance Acts")). Such policy shall be in an amount equal to 100% of the full replacement cost of the Improvements at the Property, or such other amount as is approved by Lender from time to time, and shall have a maximum permissible deductible equal to an amount customarily required by institutional lenders for similar properties in the general vicinity of the Property, but in no event in excess of $25,000, or such other amount as is approved by Lender from time to time.

(v)    Business interruption or rent loss insurance in an amount equal to the gross income or rentals from the Property for an indemnity period of twenty-four (24) months with a 120 day extended period of indemnity, such amount being adjusted annually. Lender shall be named as loss payee under such insurance.

(vi)    During any period of reconstruction, renovation or alteration of the Property, a complete value, "All Risks" Builders Risk form or "Course of Construction" insurance policy in non-reporting form and in an amount reasonably satisfactory to Lender.

(vii)    Commercial General Liability insurance covering claims for bodily injury, death or property damage occurring upon, in or about the Property in an amount not less than $1,000,000 per occurrence and $2,000,000 in the aggregate with no deductible of self insurance retention, and an umbrella liability policy in the amount of $30,000,000.

(viii)    If required by applicable state laws, worker's compensation or employer's liability insurance in accordance with such laws.

(ix)    Such other insurance and endorsements, if any, with respect to the Property and the operation thereof as Lender may reasonably require from time to time, provided same are customarily required by institutional lenders for similar properties in the general vicinity of the Property, or which are otherwise required by the Loan Documents.

Each carrier providing any insurance, or portion thereof, required by this Section shall be licensed to do business in the jurisdiction in which the Property is located, and shall have a claims paying ability rating by S&P of not less than "A," by Moody's of not less than "Aa2" and by Fitch of not less than "A," and an A.M. Best Company, Inc. rating of not less than A and financial size category of not less than X. Except as otherwise expressly set forth in this Loan Agreement, Borrower shall cause all insurance (except general public liability and excess liability, as to which Lender shall be named as additional insured, and workers' compensation insurance) carried in accordance with this Section to be payable to Lender as a mortgagee and loss payee and not as a coinsured, and, in the case of all policies of insurance carried by each lessee, for the benefit of Borrower, if any, to cause all such policies to be payable to Lender as Lender's interest may appear.

All insurance policies and renewals thereof (i) shall be in a form reasonably acceptable to Lender, (ii) shall provide for a term of not less than one year, (iii) shall provide by way of endorsement, rider or otherwise that such insurance policy shall not be canceled, endorsed, altered, or reissued to effect a change in coverage unless such insurer shall have first given Lender thirty (30) days prior written notice thereof, (iv) shall include a standard non-contributory mortgagee endorsement or its equivalent in favor of and in form acceptable to Lender, (v) shall provide for claims to be made on an occurrence basis, (vi) shall contain an agreed value clause updated annually (if the amount of coverage under such policy is based upon the replacement cost of the Property) and (vii) shall designate Lender as "mortgagee and loss payee" (except general public liability and excess liability, as to which Lender shall be named as additional insured). All property damage insurance policies (except for flood and earthquake policies) must automatically reinstate after each loss.

## Section 5.5    Maintenance of the Property; Alterations; Casualty or Taking.

(A)    Maintenance of the Property; Alterations. Borrower will maintain the Property or cause the Property to be maintained in good repair, working order and condition, and will make or cause to be made all appropriate repairs, renewals and replacements thereof. Without limitation of the foregoing, Borrower will operate and maintain the Property substantially in accordance with the applicable Operating Budget and Capital Expenditure Budget. In addition, unless Lender consents otherwise, Borrower shall cause all items in the Capital Expenditure Budget to be performed and completed in substantially in accordance with such plan. All work

49

required or permitted under this Loan Agreement shall be performed in a good and workmanlike manner and in compliance with all applicable laws. So long as no Event of Default has occurred and is continuing, Borrower may, without Lender's consent, perform alterations to the Property which (i) do not constitute a Material Alteration, (ii) do not adversely affect Borrower's financial condition or the value or net operating income of the Property, and (iii) are in the ordinary course of Borrower's business. Borrower shall not perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld for Material Alterations which are required by Legal Requirements; provided, however, that Lender may, in its sole and absolute discretion, withhold consent to any Material Alteration which Lender determines may result in a decrease of net operating income from the Property. Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deposit cash with Lender for payment of the cost of such Material Alteration in an amount equal to 115% of the cost of the Material Alteration as estimated by Lender; provided, however, that in the event that such Material Alterations consist solely of tenant improvement work, there are sufficient funds contained in the Leasing Reserve, and the conditions for disbursement from the Leasing Reserve set forth in Section 6.5 hereof have been satisfied, then Lender shall not require the foregoing deposit. Upon substantial completion of the Material Alteration, Borrower shall provide evidence reasonably satisfactory to Lender that (i) the Material Alteration was constructed in accordance with all applicable laws and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld or delayed), (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of lien and (iii) all material licenses necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of tenant improvement work) have been issued. Borrower shall reimburse Lender upon demand for all reasonable out-of-pocket costs and expenses (including the reasonable fees of any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.5(A).

(B)    Casualty or Taking. In the event of casualty or loss or a Taking at the Property, Borrower shall give immediate written notice of the same to the insurance carrier and to Lender and shall promptly commence and diligently prosecute to completion, in accordance with the terms hereof, all Legal Requirements, the repair and restoration of the Property as nearly as possible to the Pre-Existing Condition (hereinafter defined) (a "Restoration"). Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance or Condemnation Proceeds. Borrower hereby authorizes and empowers Lender (a) to make proof of loss, to adjust and compromise or settle any claim under insurance policies, including without limitation business interruption or rent loss insurance, or in connection with a Taking, (b) to appear in and prosecute any action arising from any insurance policies or Taking, (c) to collect and receive insurance proceeds and Condemnation Proceeds, and (d) to deduct therefrom Lender's expenses incurred in the collection of such proceeds; provided however, that nothing contained in this Section shall require Lender to incur any expense or take any action hereunder. Borrower further authorizes Lender, at Lender's option, (i) to hold the balance of such proceeds to be used to pay for the cost of Restoration of the Property or (ii) subject to Section 5.5(C), to apply such proceeds to payment of the Obligations whether or not then due, in any order, and, provided that no Event of Default has occurred and is continuing, upon any such application of

50

insurance proceeds or Condemnation Proceeds to the Obligations pursuant to the foregoing, no Prepayment Consideration shall be due and payable. Notwithstanding the foregoing, in the event of a casualty or Taking where the loss does not exceed the Restoration Threshold for the Property and the Taking, in Lender's reasonable judgment, has no material impact on the remainder of the Property, Borrower may settle and adjust such claim; provided that (a) no Event of Default has occurred and is continuing and (b) such adjustment and the Restoration are carried out in a commercially reasonable and timely manner, and further provided that Lender's reasonable consent shall be required for the adjustment or settlement by Borrower of any claim the settlement or adjustment of which may reasonably be anticipated to result in proceeds in excess of $100,000.

(C)    Proceeds Application to Restoration.  Lender shall not exercise Lender's option to apply insurance proceeds or Condemnation Proceeds to payment of the Obligations and Lender shall make the proceeds available for Restoration if all of the following conditions are met: (i) no Event of Default then exists; (ii) Lender reasonably determines that there will be sufficient funds to complete the Restoration of the Property to at least the Pre-Existing Condition and to timely make all payments due under the Loan Documents during the Restoration of the Property; (iii) Lender reasonably determines that the fair market value of the Property after Restoration will not be less than the fair market value of the Property prior to the occurrence of the loss or casualty to the Property or the Taking, and that the rental income of the Property, after the Restoration thereof to the Pre-Existing Condition, will be sufficient to meet all Operating Expenses, payments for Reserves and payments of principal and interest under the Loan and maintain a Debt Service Coverage Ratio at least equal to 1.15:1.00; and (iv) Lender reasonably determines that the Restoration of the Property to the Pre-Existing Condition will be completed within one (1) year of the date of the loss or casualty to the Property or the Taking, but in no event later than six (6) months prior to the Maturity Date; (v) in Lender's reasonable judgment less than thirty percent (30%) (in the case of a fire or other loss or casualty to the Property) or fifteen percent (15%) (in the case of a Taking) of the rentable area of the Improvements, and less than thirty percent (30%) (in the case of a fire or other loss or casualty to the Property) or fifteen percent (15%) (in the case of a Taking) of the fair market value of the Property, has been damaged, destroyed or rendered unusable as a result of such fire or other casualty or Taking; (vi) Lender is reasonably satisfied that tenant leases covering in the aggregate 75% of the rentable square footage of the Property shall remain in full force and effect during and after the Restoration of the Property (subject to the rent abatement provisions thereof applicable as a result of the casualty or Taking, so long as such abatement will end, and full rental payments shall resume, upon substantial completion of the Restoration); and (vii) Lender is reasonably satisfied that the Property can be restored and repaired as nearly as possible to the condition it was in immediately prior to such casualty or Taking and in compliance with all applicable zoning, building and other laws and codes (the "Pre-Existing Condition"), and in the case of a Taking, Lender is reasonably satisfied that the Taking will, upon completion of the Restoration, have no material adverse effect on the use, operation or value of the Property. Notwithstanding anything to the contrary set forth in this Section 5.5, to the extent the insurance proceeds paid or payable with respect to any casualty to the Property (either singly or when aggregated with all other then unapplied proceeds with respect to the Property) do not exceed the Restoration Threshold and the estimated cost of completing the applicable Restoration shall not be greater than the Restoration Threshold, and provided that no Event of Default shall have occurred and be continuing, such proceeds (other than business interruption and rent loss insurance proceeds) are to be paid directly to

51

Borrower to be applied to Restoration of the Property in accordance with the terms hereof. Lender may retain business interruption or rent loss insurance proceeds as a reserve, and disburse the same on a monthly basis into the Deposit Account for application to debt service on the Loan until such time as Restoration is complete.

Lender acknowledges that the REA contains provisions regarding restoration of the improvements to the premises subject thereto in the event of casualty or Taking. Notwithstanding anything contained herein to the contrary, Lender agrees that, with respect to insurance proceeds and Condemnation Proceeds arising from a casualty or Taking with respect to that portion of the Property subject to the REA (the "REA Premises Proceeds"), so long as no Event of Default exists hereunder, if Borrower demonstrates to Lender's reasonable satisfaction that a proposed exercise by Lender of its rights and remedies otherwise existing under this Section 5.5 or otherwise in this Loan Agreement or the other Loan Documents with respect to the REA Premises Proceeds and/or the Restoration of that portion of the Property subject to the REA would contravene the express provisions of the REA, if such REA remains in effect as of the date of such casualty or Taking, Lender shall conform (or withdraw if necessary) its exercise of rights and remedies so as not to cause such exercise of rights and remedies to result in a breach by Borrower under the REA, it being the intent of Borrower and Lender that Borrower comply with the terms of the REA under such circumstances.

(D)    Disbursement for Restoration. If Lender elects to make the insurance proceeds or Condemnation Proceeds available for Restoration of the Property (or is required to make such proceeds available pursuant to Section 5.5(C) above), the proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, but not more frequently than once a month and in requested amounts of not less than $100,000, upon receipt of evidence satisfactory to Lender that (i) all materials installed and work and labor performed in connection with the Restoration have been paid for in full (other than that to be paid from the current pending disbursement), and (ii) there exist no notices of pendency, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property. Borrower agrees that, if at any time during the Restoration, the cost of completing such Restoration, as reasonably determined by Lender, exceeds the undisbursed insurance proceeds, Borrower shall, promptly upon demand by Lender, deposit the amount of such excess with Lender, and Lender shall first disburse such deposit to pay for the costs of such Restoration on the same terms and conditions as the insurance proceeds are disbursed. If Borrower deposits such excess with Lender and if, after completion of the Restoration, any funds remain from the combination of insurance proceeds or Condemnation Proceeds and the funds so deposited with Lender by Borrower, and if no Event of Default shall have occurred and be continuing, then Lender shall disburse into the Deposit Account, for application pursuant to Article VII hereof, such remaining funds (together with any interest earned thereon).

(E)    Disbursement Conditions. Lender may, at Lender's option, condition disbursement of any insurance proceeds or Condemnation Proceeds in excess of the Restoration Threshold on Lender's reasonable approval of plans and specifications of an independent architect licensed in the state in which the Property is located, having at least five (5) years of experience as an architect and reasonably satisfactory to Lender (an "Approved Architect"), any and all material contractors, subcontractors and materialmen engaged in the Restoration and the

52

contracts and subcontracts under which they have been engaged, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen and such other evidence of costs, percentage completion of construction, application of payments, and satisfaction of liens as Lender may reasonably require. Lender shall not be obligated to disburse insurance proceeds or Condemnation Proceeds more frequently than once every calendar month. If insurance proceeds or Condemnation Proceeds are applied to the payment of the Obligations, any such application of proceeds to principal shall not extend or postpone the due dates of the monthly payments due under the Note or otherwise under the Loan Documents, or change the amounts of such payments. Any amount of insurance proceeds remaining in Lender's possession after full and final payment and discharge of all Obligations shall be refunded to Borrower or otherwise paid in accordance with applicable law. If the Property is sold at foreclosure or if Lender acquires title to the Property, Lender shall have all of the right, title and interest of Borrower in and to any insurance policies and unearned premiums thereon and in and to the proceeds resulting from any damage to the Property prior to such sale or acquisition, and to any Condemnation Proceeds.

(F)    Retainage.  In no event shall Lender be obligated to make disbursements of insurance proceeds or Condemnation Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Approved Architect, less a retainage equal to ten percent (10%) of such costs incurred until the Restoration has been completed. The retainage shall in no event be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The retainage shall not be released until the Approved Architect certifies to Lender that the Restoration has been completed substantially in accordance with the provisions of this Section 5.5 and that all material approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence reasonably satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the retainage.

Section 5.6    Inspection.  Borrower shall permit any authorized representatives designated by Lender to visit and inspect during normal business hours the Property and its business, including its financial and accounting records, and to make copies and take extracts therefrom, and to discuss its affairs, finances and business with its officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Unless an Event of Default has occurred and is continuing, Lender shall provide advance written notice of at least two (2) Business Days prior to visiting or inspecting the Property or Borrower's offices.

Section 5.7    Environmental Compliance.

(A)    Environmental Laws.  Borrower shall at all times comply in all material respects with all applicable Environmental Laws. Borrower shall not: (i) generate, use, transport, handle, store, release or dispose of any Hazardous Material in or into, on or onto, or from the Property (except in accordance with applicable law); or (ii) permit any Lien imposed pursuant to any Environmental Law to be imposed or to remain on the Property.

(B)  **Remedial Action**.  (i) Borrower shall promptly take and diligently prosecute any and all necessary remedial actions upon obtaining knowledge of the presence, storage, use, disposal, transportation, active or passive migration, release or discharge of any Hazardous Materials on, under or about the Property in violation of any Environmental Laws; provided, however, that whether or not such action is required under applicable Environmental Laws, Borrower shall be required to take all remedial action necessary to clean up and remove mold and microbial matter from the Property in the event that any action, suit or proceeding shall be commenced or threatened (in writing) by any Person or Governmental Authority with respect thereto or any investigation related to mold or microbial matter is commenced by any Governmental Authority, which action, suit, proceeding or investigation, if adversely determined, could reasonably be expected to have a Material Adverse Effect.  In the event Borrower undertakes or causes to be undertaken any remedial action with respect to any Hazardous Materials on, under or about the Property, Borrower shall conduct and complete such remedial action in compliance with all applicable Environmental Laws and in accordance with the applicable policies, orders and directives of all federal, state and local governmental authorities.

(ii)  If requested by Lender, all remedial actions under clause (i) above shall be performed by contractors, and under the supervision of a consulting engineer, which shall not be an Affiliate of Borrower, each approved in advance by Lender which approval shall not be unreasonably withheld or delayed. All costs and expenses reasonably incurred in connection with such remedial actions shall be paid by Borrower. If Borrower does not timely commence and diligently prosecute to completion the remedial actions, Lender may (but shall not be obligated to), upon 30 days prior written notice to Borrower of its intention to do so, cause such remedial actions to be performed.  Borrower shall pay or reimburse Lender on demand for all expenses (including reasonable attorneys' fees and disbursements, but excluding internal overhead, administrative and similar costs of Lender) reasonably relating to or incurred by Lender in connection with monitoring, reviewing or performing any remedial actions in accordance herewith.

(iii)  Borrower shall not commence any remedial actions under clause (i) above without Lender's prior written approval which approval shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, if the presence or threatened presence of Hazardous Material on, under or about the Property poses an immediate threat to the health, safety or welfare of any Person or the environment, or is of such a nature that an immediate response is necessary or required under applicable Environmental Law, then Borrower may commence all necessary remedial actions without Lender's prior written approval. In such events, Borrower shall notify Lender as soon as practicable and, in any event, within three Business Days, of any action taken.  Borrower shall not enter into any settlement agreement, consent decree or other compromise relating to Hazardous Materials or Environmental Laws unless and until Lender has provided its prior written consent thereto.

(C)  **Further Assurance**. If Lender at any time has a reasonable basis to believe that a violation of any Environmental Law related to the Property has occurred and is continuing or that any basis for a material Environmental Claim affecting any Borrower Party or related to the Property exists, then Borrower agrees, promptly after written request from Lender, to provide Lender with such reports, certificates, engineering studies or other written material or data as

54

Lender may reasonably require so as to satisfy Lender that the Borrower Parties and the Property are in material compliance with all applicable Environmental Laws.

(D)    **O & M Program**.  In the event the Environmental Report recommends the development of an operation and maintenance program for the Property (including, without limitation, with respect to the presence of asbestos and/or lead-based paint) ("<u>O & M Program</u>"), Borrower shall develop an O & M Program, as approved by Lender, in Lender's sole discretion, and shall, during the term of the Loan, including any extension or renewal thereof, comply in all respects with the terms and conditions of the O & M Program.  The O & M Program for asbestos-containing materials is attached hereto as Schedule 5.7 and is hereby approved and shall constitute the O & M Program for asbestos-containing materials hereunder.

## Section 5.8    <u>Environmental Disclosure</u>.

(A)    Borrower shall promptly upon becoming aware thereof advise Lender in writing and in reasonable detail of: (1) any release, disposal or discharge of any Hazardous Material on, under, or about the Property required to be reported to any federal, state or local governmental or regulatory agency under the applicable Environmental Laws except such releases, disposals or discharges pursuant to and in compliance with valid permits, authorizations or registrations under said Environmental Laws; (2) any and all written communications sent or received by Borrower with respect to any Environmental Claims or any release, disposal or discharge of Hazardous Material required to be reported to any federal, state or local governmental or regulatory agency; (3) any remedial action taken by Borrower or any other Person in response to any Hazardous Material on, under or about the Property; (4) the discovery by Borrower of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be classified as "border-zone property" or to be otherwise subject to any restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws the existence of which could result in an Environmental Claim with respect to the Property; and (5) any request for information from any governmental agency that indicates such agency is investigating whether Borrower may be potentially responsible for a release, disposal or discharge of Hazardous Materials.

(B)    Borrower shall promptly notify Lender of any proposed action to be taken pertaining in any way to the Property to commence any operations that could reasonably be expected to subject Borrower or the Property to additional laws, rules or regulations, including laws, rules and regulations requiring additional or amended environmental permits or licenses which could reasonably be expected to subject Borrower to any material obligations or requirements under any Environmental Laws.  Borrower shall, at its own expense, provide copies of such documents or information as Lender may reasonably request in relation to any matters disclosed pursuant to this Section.

## Section 5.9    <u>Compliance with Laws and Contractual Obligations</u>.  Borrower will (A) comply in all material respects with the requirements of all present and future applicable laws, rules, regulations and orders of any governmental authority in all jurisdictions in which it is now doing business or may hereafter be doing business, (B) maintain all material licenses and permits now held or hereafter acquired by Borrower relating to Borrower, the Property or operations conducted there at, and (C) perform, observe, comply and fulfill all of its obligations,

covenants and conditions contained in any Contractual Obligation to the extent any failure to perform, observe, comply or fulfill such obligations, covenants and conditions could have a Material Adverse Effect.

**Section 5.10** **Further Assurances.** Borrower Parties and their Affiliates shall, from time to time, execute and/or deliver such documents, instruments, agreements, financing statements, and perform such acts as Lender at any time may reasonably request to evidence, preserve and/or protect the Collateral at any time securing or intended to secure the Obligations and/or to carry out the purposes of this Loan Agreement and the other Loan Documents.

**Section 5.11** **Performance of Agreements and Leases.** Each Borrower Party shall duly and punctually perform, observe and comply in all material respects with all of the terms, provisions, conditions, covenants and agreements on its part to be performed, observed and complied with (i) hereunder and under the other Loan Documents to which it is a party, and (ii) agreements entered into or assumed by such Person in connection with the Property, and will not suffer or permit any default or event of default (giving effect to any applicable notice requirements and cure periods) to exist under any of the foregoing. Borrower shall comply with, observe and perform all of Borrower's material obligations as landlord under the Leases and shall enforce the material terms, covenants and conditions contained in the Leases upon the part of the tenants thereunder to be observed or performed. Borrower will not lease any portion of the Property for any use contrary to the existing character of the Property except with the prior written approval of Lender.

**Section 5.12** **Leases.**

(A)     Except as provided in Section 5.12(B) below, without the prior written consent of Lender, Borrower shall not (i) enter into any Lease; (ii) cancel or terminate (including, without limitation, by exercise of any landlord recapture rights) any Lease; (iii) approve any assignment of any Lease that releases the original tenant from its obligations under such Lease, (iv) amend, modify or waive the provisions of any Lease in any material respect (including, without limitation, any amendment, modification or waiver reducing the fixed initial term of any Lease, reducing the rent payable under any Lease, changing any renewal provisions of any Lease or materially increasing the obligations of the landlord or materially decreasing the obligations of the tenant under any Lease or pursuant to which any premises covered by such Lease is surrendered); or (v) cancel or modify any guaranty, or release any security deposit, letter of credit, or other item constituting security pertaining to any Lease.

(B)     Notwithstanding the provisions of Subsection 5.12(A) above, provided that no Event of Default shall have occurred and be continuing, Lender's consent shall not be required as provided above for the creation, assignment, termination, amendment or modification of any Lease which is not a Major Lease provided that:

(i)     the applicable Lease (or amendment or modification of a Lease if such amendment or modification adjusts or otherwise affects rent) provides for payment of a net effective rent (after taking into account any free rent, construction allowances or other concessions granted by landlord) and other material amounts payable no less than the then effective fair market rent then prevailing for similar properties and leases in the market area (and

56

taking into account the type and creditworthiness of the tenant, the length of the term including any renewals, and the location and size of the premises covered thereby);

(ii)    the applicable Lease (or amendment or modification) is otherwise on commercially reasonable terms;

(iii)    a copy of such Lease is delivered to Lender promptly after execution thereof together with Borrower's certification that such Lease satisfies the foregoing conditions of this Section 5.12.

(iv)    such Lease, amendment or modification does not provide for the rent payable thereunder to reduce over the term of such Lease;

(v)    such Lease, amendment or modification does not contain any options to purchase or other rights with respect to the ownership of the Property, does not contain any restrictions on landlord's rights to lease remaining portions of the Property, except upon terms satisfying the other requirements of this Section, and does not contain any options for the tenant thereunder to terminate such Lease, other than in the event of a material casualty or condemnation;

(vi)    such Lease, amendment or modification is entered into on an arm's-length basis on the standard form of Lease which Lender has previously approved, with such non-material changes thereto as a proposed tenant may request and to which Borrower is willing to agree; and

(vii)    such amendment or modification of the applicable Lease is required to be entered into pursuant to the terms of such Lease or each of the following conditions are satisfied: (1) such Lease, as so amended or modified, would not constitute a Major Lease and would, after such amendment or modification, satisfy the conditions of this Section 5.12(B), as applicable; (2) such amendment or modification does not release any Person from its obligations under the Lease so amended or modified or reduce the square footage demised thereunder; (3) to the extent that any additional space is demised pursuant to such amendment or modification, with respect thereto, such amendment or modification satisfies the provisions of this Section 5.12(B), as applicable; (4) such amendment or modification does not reduce the rent payable under the Lease so amended or modified; and (5) such amendment or modification does not otherwise have a material adverse effect on the fair market value of the Property or the Loan Documents.

(C)    Any request for approval of a Lease, or assignment, termination, amendment or modification of any Lease requiring approval as set forth above shall be made to Lender in writing and together with such request Borrower shall furnish to Lender: (i) such biographical and financial information about the proposed tenant and any guarantor of such proposed Lease as Lender may reasonably require, (ii) a copy of the proposed form of Lease (or amendment or modification), and (iii) a summary of the material terms of such proposed Lease (or amendment or modification) including, without limitation, rental terms and the term of the proposed Lease and any options.

Borrower shall promptly send Lender copies of any notices of default received from the tenant under any Lease, and will enforce (short of terminating a Major Lease, unless

Lender consents thereto, which consent shall not be unreasonably withheld or unduly delayed)
the performance by each tenant of the tenant's obligations under any Lease.

Except for Security Deposits, no Lease shall provide for payment of rent more
than one month in advance, and Borrower shall not under any circumstances collect any rent
more than one month in advance.  Borrower, at Lender's request, shall furnish Lender with
executed copies of all Leases hereafter made (to the extent not theretofore provided to Lender).
Each Lease or a separate agreement with the tenant of such Lease, in recordable form and
substance reasonably satisfactory to Lender, shall specifically provide that such Lease is
subordinate to the Mortgage; that the tenant attorns to Lender, such attornment to be effective
upon Lender's acquisition of title to the Property; that the tenant agrees to execute such further
evidences of attornment as Lender may from time to time reasonably request; that the attornment
of the tenant shall not be terminated by foreclosure; that in no event shall Lender, as holder of
the Mortgage or as successor landlord, be liable to the tenant for any act or omission of any prior
landlord or for any liability or obligation of any prior landlord occurring prior to the date that
Lender or any subsequent owner acquire title to the Property.  Except as otherwise provided in
this Section, Borrower shall not, without Lender's written consent, execute, modify, surrender or
terminate, either orally or in writing, any Lease now existing or hereafter made of all or any part
of the Property, permit an assignment or sublease of a Lease without Lender's written consent, or
request or consent to the subordination of any Lease of all or any part of the Property to any lien
subordinate to the Mortgage.  If Borrower becomes aware that any tenant proposes to do, or is
doing, any act or thing which may give rise to any right of set-off against rent, Borrower shall
(i) take such steps as shall be reasonably calculated to prevent the accrual of any right to a set-off
against rent or, if such set-off has actually accrued, promptly take reasonable measures to cause
such right of set-off to be discharged or otherwise cause rents to be payable without set-off or
deduction, and (ii) notify Lender thereof and of the amount of said set-offs and the action being
taken by Borrower to remedy the same.

## Section 5.13   Management.

(A)     Borrower shall cause Manager to manage the Property in accordance with the
Management Agreement.  Borrower shall (i) diligently perform and observe all of the material
terms, covenants and conditions of the Management Agreement on the part of Borrower to be
performed and observed and (ii) promptly notify Lender of any notice to Borrower of any default
under the Management Agreement of which it is aware. If Borrower shall default in the
performance or observance of any material term, covenant or condition of the Management
Agreement on the part of Borrower to be performed or observed beyond applicable notice and
cure periods, then, without limiting Lender's other rights or remedies under this Agreement or
the other Loan Documents, and without waiving or releasing Borrower from any of its
obligations hereunder or under the Management Agreement upon five (5) Business Days' notice
to Borrower, Lender shall have the right, but shall be under no obligation, to pay any sums and to
perform any act as may be appropriate to cause all the material terms, covenants and conditions
of the Management Agreement on the part of Borrower to be performed or observed.  Borrower
shall cause any new Manager to execute and deliver a subordination agreement reasonably
satisfactory to Lender at the time of execution and delivery of any Management Agreement.

(B)   Borrower shall not surrender, terminate, cancel, materially modify, renew or extend such Management Agreement, or enter into any other Management Agreement with Manager or any other Person, or consent to the assignment by the Manager of its interest under the Management Agreement, in each case without the express consent of Lender, which consent may be conditioned upon Borrower delivering a Rating Confirmation. If at any time Lender consents to the appointment of a new Manager (which consent shall not be unreasonably withheld in the absence of an Event of Default if a Rating Confirmation is obtained, or if Lender does not require a Rating Confirmation), such new Manager and Borrower shall, as a condition of Lender's consent, execute a subordination of management agreement in the form delivered in connection with the closing of the Loan. Borrower shall not permit Manager to assign or subcontract Manager's rights, duties and responsibilities under the Management Agreement to any other Person without the express consent of Lender.

(C)   Lender shall have the right to require Borrower to replace the Manager with a Person chosen by Lender, upon the earliest to occur of any one or more of the following events: (i) the occurrence and continuance of an Event of Default; (ii) thirty (30) days after notice from Lender to Borrower that Manager has engaged in fraud, gross negligence, malfeasance or willful misconduct arising from or in connection with its performance under the Management Agreement, or Manager's default under the Management Agreement which is not cured within any applicable cure period provided under the Management Agreement; (iii) a change in control of Manager, or (iv) if the Debt Service Coverage Ratio shall be less than the Minimum DSCR Threshold for any Calendar Quarter.

**Section 5.14   Material Agreements.**  Except for Leases complying with the Loan Documents and any Management Agreement complying with the foregoing, Borrower shall not enter into or become obligated under any material agreement pertaining to the Property, including without limitation brokerage agreements, unless the same may be terminated without cause and without payment of a penalty or premium, on not more than thirty (30) days' prior written notice.

**Section 5.15   Certain VCOC Provisions.**  Lender, and its assignees and participants, at their request, shall have the following additional rights relating to the management of Borrower: (i) the rights to discuss the business operations, properties and financial and other condition of Borrower including significant business activities and business and financial developments, with Borrower's officers, employees and directors; (ii) the right to submit proposals or suggestions to such Borrower's management with the requirement that Borrower's management discuss such advice, proposals or suggestions with the Lender within a reasonable period after such submission considering them in good faith, in meetings which shall occur no less frequently than bi-monthly; (iii) the right to examine the books and records, operating reports, budgets and other financial reports of Borrower on a regular basis, and to visit and inspect Borrower's facilities and to reasonably require information at reasonable times and intervals concerning the general status of Borrower's financial condition and operations; (iv) the right to be notified of any material development to or affecting Borrower's business and to consult with and advise management with respect to such matters; (v) the right to discuss with management of Borrower, including management's proposed reorganization plans and operating plan for going forward after such plan of reorganization has been effected; and (vi) the right to request from Borrower in addition to the information provided pursuant to this Loan Agreement, when available, copies of all financial statements, forecasts and projections provided to or approved by Borrower's

management to its members and/or such other business and financial data may be reasonably requested.

**Section 5.16    Estoppel Certificates.**  Within ten (10) Business Days following a request by Lender, Borrowers' Designee (on behalf of Borrower) shall provide to Lender a duly acknowledged written statement confirming (i) the amount of the outstanding principal balance of the Loan, (ii) the terms of payment and maturity date of the Note, (iii) the date to which interest and principal has been paid, (iv) to Borrower's knowledge, whether any offsets or defenses exist against the Obligations, and if any such offsets or defenses are alleged to exist, the nature thereof shall be set forth in detail, (v) that this Loan Agreement, the Note, the Mortgage and the other Loan Documents are valid, legal and binding obligations of Borrower and have not been modified or amended, or, if modified or amended, giving particulars of any such modification or amendment, and (vi) such other factual matters as Lender shall reasonably request.

**Section 5.17    Indebtedness.**  So long as the Loan is outstanding, Borrower shall not directly or indirectly create, incur, assume, guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness except:

(A)    the Obligations; and

(B)    unsecured trade payables not evidenced by a note and arising out of purchases of goods or services in the ordinary course of business and operation of the Property; provided that (i) each such trade payable is payable not later than sixty (60) days after the original invoice date and is paid on or before the date when due and (ii) the aggregate amount of such trade payables outstanding for all Borrowers does not, at any time, exceed $500,000.00  In no event shall any Indebtedness other than the Loan be secured, in whole or in part, by the Property or any portion thereof or interest therein.

**Section 5.18    Liens and Related Matters.**  The obligations of Borrower Parties under this Section are in addition to and not in limitation of their obligations under Article XI herein.  So long as the Loan is outstanding:

(A)    **No Liens.**  Borrower will not directly or indirectly create, incur, assume, suffer, or permit to exist any Lien on or with respect to the Property, any other Collateral or any direct or indirect ownership interest in Borrower, except Permitted Encumbrances.

(B)    **No Negative Pledges.**  Borrower will not enter into or assume any agreement (other than the Loan Documents) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired.

**Section 5.19    Contingent Obligations.**  Subject to the limitations set forth in Section 5.17 above, Borrower will not directly or indirectly create or become or be liable with respect to any Contingent Obligation

**Section 5.20    Restriction on Fundamental Changes.**  Except as otherwise expressly permitted under this Loan Agreement (or with the prior written consent of Lender):

60

(A)    Borrower and General Partner will not, and will not permit any other Person to, (i) amend, modify or waive any term or provision of any Borrower's or General Partner's partnership agreement, certificate of limited partnership, limited liability company agreement, operating agreement or other organizational documents of such Borrower or General Partner relating to any of the representations, warranties or covenants of Article IX of this Loan Agreement or this Section 5.20 or any other material term or provision of any Borrower's or General Partner's organizational documents unless required by law; or (ii) liquidate, terminate, wind-up or dissolve any Borrower or General Partner; or (iii) merge with or consolidate any Borrower or General Partner into another Person.

(B)    No Borrower Party shall cancel or otherwise forgive or release any material claim or debt owed to Borrower by any Person, except for adequate consideration or in the ordinary course of Borrower's business.

(C)    No Borrower Party shall enter into any agreement which expressly restricts the ability of such Borrower Party to enter into amendments, modifications or waivers of any of the Loan Documents.

(D)    No Borrower Party shall assign or transfer any of its interest in any licenses, permits, variances and certificates obtained by such Borrower Party and used in connection with the ownership, operation, use or occupancy of the Property (including, without limitation, business licenses, state health department licenses, licenses to conduct business and all such other permits, licenses and rights, obtained from any Governmental Authority or private Person concerning ownership, operation, use or occupancy of the Property).

(E)    No Borrower Party shall, nor permit or suffer any other Person on its behalf, to (i) issue, sell, assign, pledge, convey, dispose or otherwise encumber any stock, membership interest, partnership interest, or other equity or beneficial interest in such Borrower Party or (ii) grant any options, warrants, purchase rights or other similar agreements or understandings with respect thereto.

(F)    No Borrower Party (except for Guarantor) shall acquire by purchase or otherwise all or any part of the business or assets of, or stock or other evidence of beneficial ownership of, any Person.

**Section 5.21    Transactions with Related Persons.**  Except for fees payable to Manager under the Management Agreement, and except for payments to Master Tenant Borrower and SMT Borrowers under each Master Sublease and payments to Owner Borrower and Master Tenant Borrower under each Master Lease, Borrower shall not pay any management, consulting, director or similar fees to any Related Person of Borrower or to any director or manager (other than any customary fees of the Independent Director), officer or employee of Borrower. Borrower shall not directly or indirectly enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Related Person of Borrower or with any director, officer or employee of any Borrower Party, except transactions in the ordinary course of and pursuant to the reasonable requirements of the business of Borrower and upon fair and reasonable terms which are no less favorable to Borrower than would be obtained in a comparable arm's length transaction with a Person that is

61

not a Related Person of Borrower. Borrower shall not make any payment or permit any payment to be made to any Related Person of Borrower when or as to any time when any Event of Default shall exist.

**Section 5.22    ERISA.**

(A)    <u>No ERISA Plans</u>.    Borrower will not establish any Employee Benefit Plan, Pension Plan or Multiemployer Plan, or will commence making contributions to (or become obligated to make contributions to) any Employee Benefit Plan, Pension Plan or Multiemployer Plan.

(B)    <u>Compliance with ERISA</u>.    Borrower shall not: (i) engage in any Prohibited Transaction; or (ii) permit the establishment of any Employee Benefit Plan providing post-retirement welfare benefits or establish or amend any Employee Benefit Plan which establishment or amendment could result in liability to Borrower or any ERISA Affiliate or increase the obligation of Borrower. In addition to the prohibitions set forth in Article XI hereof, and not in limitation thereof, Borrower shall not Transfer its interest or rights in this Agreement or in the Property, or attempt to do any of the foregoing or suffer any of the foregoing, nor shall any Person owning a direct or indirect interest in Borrower Transfer any of its rights or interest (direct or indirect) in Borrower, attempt to do any of the foregoing or suffer any of the foregoing, nor shall Borrower or any Person owning a direct or indirect interest in Borrower take, without limitation, any action or fail to take any action, if, in any such case, doing so would (i) cause the Loan or the exercise of any of Lender's rights in connection therewith to constitute a Prohibited Transaction (unless Borrower furnishes a legal opinion reasonably satisfactory to Lender that the same is exempt from the Prohibited Transaction provisions or ERISA and the IRC or otherwise does not constitute a Prohibited Transaction), assuming solely for this purpose that Lender is a Party In Interest or a Disqualified Person with respect to an employee benefit plan, if any, which has directly or indirectly invested in any Borrower or General Partner, or (ii) otherwise result in Lender being deemed in violation of any applicable provisions of ERISA with respect to the Loan. Borrower and General Partner shall take such steps as are necessary to assure that each of them (and their respective shareholders, partners and members) does not commit any act, or fail to commit any act, the occurrence of which or the failure of which to occur would cause the Loan to be Prohibited Transaction.

(C)    <u>No Plan Assets</u>.    Borrower shall not at any time during the term of this Loan Agreement become (1) an employee benefit plan defined in Section 3(3) of ERISA which is subject to ERISA, (2) a plan as defined in Section 4975(e)(1) of the IRC which is subject to Section 4975 of the IRC, (3) a "governmental plan" within the meaning of Section 3(32) of ERISA or (4) an entity any of whose underlying assets constitute "plan assets" of any such employee benefit plan, plan or governmental plan for purposes of Title I or ERISA, Section 4975 of the IRC or any state statutes applicable to Borrower regulating investments of governmental plans. Borrower shall deliver to Lender such certification or other evidence from time to time throughout the term of the Loan, as reasonably requested by Lender that the assets of Borrower do not and will not constitute "plan assets" for the purposes of Title I of ERISA of any "employee benefit plan" as defined in Section 3 (3) of ERISA, which is subject to Title I or ERISA because Borrower is a Real Estate Operating Company as defined in the U.S. Department of Labor Asset Regulation (29 C.F.R. 2510.3-101(e)). For so long as any portion of the Loan is

62

outstanding, Borrower shall comply with all requirements and take all actions necessary to maintain Borrower's status s "Real Estate Operating Company" under the U.S. Department of Labor Plan Asset Regulations and to otherwise operate so as to continue to qualify as a "Real Estate Operating Company" under the Plan Asset Regulations (29 C.F.R. 2510.3-101(e)) such that Borrower will not be deemed to be an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, and the assets of Borrower will not be deemed to constitute "plan assets" of one or more such plans for the purposes of Title 1 of ERISA. Notwithstanding the foregoing, for so long as long as any portion of the Loan is outstanding, no transfer, restructuring, mergers or changes of control with respect to Borrower shall be permitted to the extent same would cause Borrower to no longer be a 'Real Estate Operating Company' under the Plan Asset Regulations.

(D)     **Indemnification**. If the provisions of this Section 5.22 are violated, Borrower agrees, at its own cost and expense, to take such steps Lender shall reasonably request to prevent the occurrence of a Prohibited Transaction or to correct the occurrence of a Prohibited Transaction. Borrower agrees to indemnify, defend and hold the Indemnified Parties free and harmless from and against all loss, costs (including, without limitation, reasonable attorney's fees and expenses), taxes, penalties, damages and expenses any Indemnified Party may suffer by reason of the investigation, defense and settlement of claims based upon a breach of the foregoing provisions. The foregoing indemnification shall survive repayment of the Loan.

**Section 5.23     Lender's Expenses**. Borrower shall pay, on demand by Lender, all reasonable expenses, charges, costs and fees (including reasonable attorneys' fees and expenses) in connection with the negotiation, documentation, closing, administration, servicing, enforcement, interpretation, and collection of the Loan and the Loan Documents, and in the preservation and protection of Lender's rights hereunder and thereunder. Without limitation of the foregoing, Borrower shall pay all reasonable costs and expenses, including reasonable attorneys' fees, incurred by Lender in any case or proceeding under Title 11 of the United States Code (or any law succeeding or replacing any of the same). At the Closing, Lender is authorized to pay directly from the proceeds of the Loan any or all of the foregoing expenses then or theretofore incurred.

**Section 5.24     Environmental Matters; Inspection**.

(A)     Borrower shall not permit any Hazardous Materials to be present on, under or to emanate from the Property, or migrate from adjoining property controlled by Borrower onto or into the Property, except under conditions permitted by applicable Environmental Laws and, in the event that such Hazardous Materials are present on, under or emanate from the Property, or migrate onto or into the Property, Borrower shall cause the removal or remediation of such Hazardous Materials, in accordance with this Loan Agreement and Environmental Laws (including, where applicable, the National Contingency Plan promulgated pursuant to the Comprehensive Environmental Response, Compensation and Liability Act). Borrower shall use best efforts to prevent, and to seek the remediation of, any migration of Hazardous Materials onto or into the Property from any adjoining property in accordance with Environmental Laws.

(B)     Upon reasonable prior written notice, Lender shall have the right at all reasonable times to enter upon and inspect all or any portion of the Property, provided that such inspections

shall not unreasonably interfere with the operation or the tenants, residents or occupants of the Property. If Lender has reasonable grounds to suspect that remedial actions may be required, Lender shall notify Borrower and, thereafter, may select a consulting engineer to conduct and prepare reports of such inspections (with notice to Borrower prior to the commencement of such inspection).    Provided no Event of Default exists, Borrower shall be given a reasonable opportunity to review any reports, data and other documents or materials reviewed or prepared by the engineer, and to submit comments and suggested revisions or rebuttals to same. The inspection rights granted to Lender in this Section 5.24 shall be in addition to, and not in limitation of, any other inspection rights granted to Lender in this Loan Agreement, and shall expressly include the right (if Lender suspects that remedial actions may be required) to conduct soil borings, establish ground water monitoring wells and conduct other customary environmental tests, assessments and audits.

(C)    Borrower agrees to bear and shall pay or reimburse Lender on demand for all sums advanced and reasonable expenses incurred (including reasonable attorneys' fees and disbursements, but excluding internal overhead, administrative and similar costs of Lender) reasonably relating to, or incurred by Lender in connection with, the inspections and reports described in this Section 5.24 (to the extent such inspections and reports relate to the Property) in the following situations:

(i)    If Lender has reasonable grounds to believe, at the time any such inspection is ordered, that there exists an occurrence or condition that could lead to an Environmental Claim;

(ii)    If any such inspection reveals an occurrence or condition that is reasonably likely to lead to an Environmental Claim; or

(iii)    If an Event of Default with respect to the Property exists at the time any such inspection is ordered, and such Event of Default relates to any representation, covenant or other obligation pertaining to Hazardous Materials, Environmental Laws or any other environmental matter.

**Section 5.25    Environmental Claims.** Lender may join and participate in, as a party if Lender so determines, any legal or administrative proceeding or action concerning the Property or any portion thereof under any Environmental Law, if, in Lender's reasonable judgment, the interests of Lender shall not be adequately protected by Borrower; provided, however, that Lender shall not participate in day-to-day decision making with respect to environmental compliance. Borrower shall pay or reimburse Lender on demand for all reasonable sums advanced and reasonable expenses incurred (including reasonable attorneys' fees and disbursements, but excluding internal overhead, administrative and similar costs of Lender) incurred by Lender in connection with any such action or proceeding.

**Section 5.26    Environmental Indemnification.** Borrower shall indemnify, reimburse, defend, and hold harmless Lender and its parent, subsidiaries, Affiliates, shareholders, directors, officers, employees, representatives, agents, successors, assigns and attorneys (collectively, the "Indemnified Parties") for, from, and against all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, costs and expenses (including, without limitation,

64

interest, penalties, reasonable attorneys' fees, disbursements and expenses, and reasonable consultants' fees, disbursements and expenses (but excluding internal overhead, administrative and similar costs of Lender)), asserted against, resulting to, imposed on, or incurred by any Indemnified Party, directly or indirectly, in connection with any of the following (except to the extent same are directly and solely caused by the fraud, bad faith, gross negligence or willful misconduct of any Indemnified Party):

    (i)    events, circumstances, or conditions which are alleged to, or do, form the basis for an Environmental Claim;

    (ii)    any pollution or threat to human health or the environment that is related in any way to Borrower's or any previous owner's or operator's management, use, control, ownership or operation of the Property (including, without limitation, all on-site and off-site activities involving Hazardous Materials), and whether occurring, existing or arising prior to or from and after the date hereof, and whether or not the pollution or threat to human health or the environment is described in the Environmental Reports;

    (iii)    any Environmental Claim against any Person whose liability for such Environmental Claim Borrower has or may have assumed or retained either contractually or by operation of law; or

    (iv)    the breach of any representation, warranty or covenant set forth in Section 5.7 or any of Sections 5.24 through 5.26, inclusive.

The provisions of and undertakings and indemnification set forth in this Section 5.26 shall survive the satisfaction and payment of the Indebtedness and termination of this Loan Agreement.

**Section 5.27**  **Operation of Property**.  Borrower shall cause the operation of the Property to be conducted at all times in a manner consistent with at least the level of operation of the Property as of the Closing Date for the Loan, including, without limitation, the following:

    (i)    to maintain or cause to be maintained the standard of the Property at all times at a level not lower than that maintained by prudent managers of similar facilities or land in the region where the Property is located;

    (ii)    to operate or cause to be operated the Property in a prudent manner in compliance in all material respects with applicable Legal Requirements and Insurance Requirements relating thereto and maintain or cause to be maintained all licenses, permits and any other agreements necessary for the continued use and operation of the Property; and

    (iii)    to maintain or cause to be maintained sufficient inventory, equipment and other personal property of types and quantities at the Property to enable Borrower to operate the Property and to comply with all Leases affecting the Property.

**Section 5.28**  **Taxes on Security**.  Borrower shall pay all taxes, charges, filing, registration and recording fees, excises and levies payable with respect to the Note or the Lien created or secured by the Loan Documents, other than income, franchise, doing business and other analogous taxes

imposed on Lender. If there shall be enacted any law (1) deducting the Loan from the value of the Collateral for the purpose of taxation, (2) affecting Lender's Lien on the Collateral or (3) changing existing laws of taxation of mortgages, deeds of trust, security deeds, or debts secured by realty, or changing the manner of collecting any such taxes, Borrower shall promptly pay to Lender, on demand, all taxes, costs and charges for which Lender is or may be liable as a result thereof; provided, however, if such payment would be prohibited by law or would render the Loan usurious, then instead of collecting such payment, Lender may declare all amounts owing under the Loan Documents to be immediately due and payable.

**Section 5.29**    **Cooperate in Legal Proceedings**. Borrower shall reasonably cooperate with Lender with respect to any proceedings before any Governmental Authority which may in any way materially affect the rights of Lender hereunder or any rights obtained by Lender under any of the Loan Documents and, in connection therewith, shall not prohibit Lender, at its election, from participating in any such proceedings.

**Section 5.30**    **Insurance Benefits**. Borrower shall reasonably cooperate with Lender in obtaining for Lender the benefits of any insurance proceeds lawfully or equitably payable to Lender in connection with the Property. Lender shall be reimbursed for any expenses reasonably incurred in connection therewith (including reasonable attorneys' fees and disbursements and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of a fire or other casualty affecting the Property or any part thereof, but excluding internal overhead, administrative and similar costs of Lender) out of such insurance proceeds, all as more specifically provided in this Loan Agreement.

**Section 5.31**    **Tenant Estoppels**. Upon request by Lender, Borrower shall exercise commercially reasonable efforts to obtain and deliver, in form and substance reasonably satisfactory to Lender, estoppel certificates and/or subordination agreements from tenants from which satisfactory estoppel certificates and/or subordination agreements were not obtained prior to Closing.

**Section 5.32**    **Prohibited Persons**. Borrower covenants and agrees that no Borrower, General Partner, Limited Partner, Guarantor, SMT Guarantor nor any of their respective Affiliates, officers, directors, partners or members will knowingly: (i) conduct any business, nor engage in any transaction or dealing, with any Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person; or (ii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in EO13224. Borrower further covenants and agrees to deliver (from time to time) to Lender any such certification or other evidence as may be requested by Lender in its sole and absolute discretion, confirming that: (i) no Borrower, General Partner, Limited Partner, Guarantor, SMT Guarantor nor their respective officers, directors, partners, members or Affiliates is a Prohibited Person; and (ii) no Borrower, General Partner, Limited Partner, Guarantor, nor their respective officers, directors, partners, members or Affiliates has to its knowledge engaged in any business transaction or dealings with a Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person.

66

**Section 5.33** **Master Lease/Master Sublease.** With respect to the Master Lease and Master Sublease, each Borrower agrees as follows:

(A)    The Master Lease, and all rights and privileges and remedies of each Borrower (both those of Owner Borrower, as landlord, and of each SMT Borrower and Master Tenant Borrower, each as tenant) thereunder, including without limitation, any rights of first refusal, purchase options or other similar rights under the Master Lease and all rights and remedies of each such Borrower, including rights of indemnification, are and shall be and remain in all respects subject and subordinate to the Mortgage and the other Loan Documents and the Liens created thereby, and to all rights of the Lender thereunder.

(B)    The Master Sublease, and all rights and privileges and remedies of each Borrower (both those of Master Tenant Borrower and each SMT Borrower, each as sublessor, and Master Subtenant Borrower, as sublessee) thereunder, including without limitation, any rights of first refusal, purchase options or other similar rights under the Master Sublease and all rights and remedies of each such Borrower, including rights of indemnification, are and shall be and remain in all respects subject and subordinate to the Mortgage and the other Loan Documents and the Liens created thereby, and to all rights of the Lender thereunder.

(C)    Each Borrower shall perform all of its respective obligations, whether as landlord, tenant, sub-landlord, sub-tenant or otherwise, under the Master Lease and the Master Sublease, and shall not terminate, cancel or surrender the Master Lease or the Master Sublease, or, without Lender's prior written consent, amend or modify the Master Lease or the Master Sublease or assign its interest, as lessor, lessee, sublessor, sublessee or otherwise, under the Master Lease or the Master Sublease (other than pursuant to an SMT Borrower Transfer approved by Lender pursuant to Section 11.4 hereof).

(D)    Each Borrower hereby waives any rights it may have (whether by operation of law or pursuant to the terms of the Master Lease and/or the Master Sublease), so long as any Obligation is outstanding, to create or suffer to exist any Lien on all or any portion of any other leasehold, subleasehold or sub-subleasehold interest held by any other Borrower pursuant to the terms of the Master Lease and/or the Master Sublease, as applicable, and, so long as the Loan is outstanding, no Borrower shall place a Lien on all or any portion of any other tenant, subtenant or sub-subtenant interest held by any other Borrower pursuant to the terms of the Master Lease and/or the Master Sublease, as applicable.

(E)    Borrower agrees to give (i) prompt written notice to Lender of any default by any party under the Master Lease or the Master Sublease (which shall include, but not be limited to, copies of any default notices sent to any other party or received by Borrower), and (ii) prompt written notice (and in any event within five (5) Business Days after becoming aware of the same) to Lender of (1) any litigation or arbitration with respect to the Master Lease or the Master Sublease, or (2) any action or proceeding to terminate or collect rent or other amounts under or otherwise enforce performance under the Master Lease or the Master Sublease or to obtain or recover possession of the Property or any portion thereof. Borrower shall furnish to Lender all information that it may reasonably request concerning the performance by Borrower of Borrower's respective obligations under the Master Lease and/or the Master Sublease, as applicable.

67

(F)    Borrower shall from time to time upon the written request of Lender cooperate with Lender and to deliver to Lender estoppel certificates, in form and substance reasonably acceptable to Lender, with respect to the Master Lease and Master Sublease.

**Section 5.34    Minimum Ownership Interest.**  So long as any Obligation is outstanding, (i) Guarantor shall directly or indirectly own and retain at least a 51% interest in each General Partner and each of the Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower, and (ii) Guarantor shall continue to maintain control (directly or indirectly) of Owner Borrower, Master Tenant Borrower, Master Subtenant Borrower and each General Partner.

**Section 5.35    JC Penney Supplemental Agreement.**  Borrower shall not, and shall not cause suffer or permit, by volitional act or otherwise, any other Person to, surrender, terminate, cancel or materially modify, renew or extend that certain Supplemental Agreement dated as of the date hereof between IPofA WOM JCP, LP, as owner ("JC Penney Owner"), and Owner Borrower, as developer, relating to the outlot parcel located on the Property and formerly known as the JC Penney outlot (hereinafter, the "Supplemental Agreement"), or consent to the assignment by the Owner of its interest under the Supplemental Agreement, in each case without the express consent of Lender.  Borrower shall (i) diligently perform and observe, and cause JC Penney Owner to diligently perform and observe, all of the material terms, covenants and conditions of the Supplemental Agreement, and (ii) promptly notify Lender of any notice of any default under the Supplemental Agreement of which it is aware or of which it receives notice. If Borrower shall default in the performance or observance of any material term, covenant or condition of the Supplemental Agreement beyond applicable notice and cure periods, then, without limiting Lender's other rights or remedies under this Loan Agreement or the other Loan Documents, without waiving or releasing Borrower from any of its obligations hereunder or under the Supplemental Agreement upon five (5) Business Days' notice to Borrower and JC Penney Owner, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Supplemental Agreement, on the part of Borrower to be performed or observed.

## ARTICLE VI
## RESERVES

**Section 6.1    Security Interest in Reserves; Other Matters Pertaining to Reserves.**

(A)    Borrower hereby pledges, assigns and grants to Lender a security interest in and to all of Borrower's right, title and interest in and to the Reserves, as security for payment and performance of all of the Obligations hereunder and under the Note and the other Loan Documents. The Reserves constitute Account Collateral and are subject to the security interest in favor of Lender created herein and all provisions of this Loan Agreement and the other Loan Documents pertaining to Account Collateral.

(B)    In addition to the rights and remedies provided in Article VII and elsewhere herein, upon the occurrence and continuance of any Event of Default, Lender shall have all rights and remedies pertaining to the Reserves as are provided for in any of the Loan Documents or under any applicable law.  Without limiting the foregoing, upon and at all times after the occurrence and during the continuance of any Event of Default, Lender in its sole and absolute

discretion, may use the Reserves (or any portion thereof) for any purpose, including but not limited to any combination of the following: (i) payment of any of the Obligations including the Prepayment Consideration applicable upon such payment in such order as Lender may determine in its sole discretion; provided, however, that such application of funds shall not cure or be deemed to cure any default; (ii) reimbursement of Lender for any losses or expenses (including, without limitation, reasonable legal fees) suffered or incurred as a result of such Event of Default; (iii) payment for the work or obligation for which such Reserves were reserved or were required to be reserved; and (iv) application of the Reserves in connection with the exercise of any and all rights and remedies available to Lender at law or in equity or under this Loan Agreement or pursuant to any of the other Loan Documents.

**Section 6.2    Funds Deposited with Lender.**

    (A)    **Interest, Offsets**. Except only as expressly provided otherwise herein, all funds of Borrower which are deposited with Lender as Reserves hereunder shall be held by Lender in one or more Permitted Investments. Lender is authorized to commingle any of the Reserves with each other and with any other funds held by Lender. All interest which accrues on the Reserves shall be taxable to Borrower and shall be added to and disbursed in the same manner and under the same conditions as the principal sum on which said interest accrued. Additional provisions pertaining to investments are set forth in Article VII.

    (B)    **Funding at Closing**. Borrower shall deposit with Lender the amounts necessary to fund each of the Reserves as set forth below. Deposits into the Reserves at Closing may occur by deduction from the amount of the Loan that otherwise would be disbursed to Borrower, followed by prompt deposit of the same into the applicable Sub-Account of the Deposit Account in accordance with the terms hereof. Notwithstanding such deductions, the Loan shall be deemed for all purposes to be fully disbursed at Closing.

**Section 6.3    Impositions and Insurance Reserve.** On the Closing Date, Borrower shall deposit with Lender (or such agent of Lender as Lender may designate in writing to Borrower from time to time) $1,035,267.60, and thereafter Borrower shall deposit with Lender monthly, on each Payment Date commencing with the First Payment Date, 1/12th of the annual charges (as estimated by Lender) for all Impositions and Insurance Premiums payable with respect to the Property hereunder (said funds, together with any interest thereon and any additions thereto, the "Impositions and Insurance Reserve"). Borrower shall also deposit with Lender on demand, to be added to and included within such reserve, a sum of money which Lender reasonably estimates, together with such monthly deposits, will be sufficient to make the payment of each such charge at least thirty (30) days prior to the date initially due. Borrower shall provide Lender with bills and all other documents necessary for the payment of the foregoing charges at least thirty (30) days prior to the date on which each payment shall first become due. So long as (i) no Event of Default has occurred and is continuing, (ii) Borrower has provided Lender with the foregoing bills and other documents in a timely manner, and (iii) sufficient funds are held by Lender for the payment of the Impositions and Insurance Premiums (if applicable) relating to the Property, Lender shall pay said items or disburse to Borrower from such Reserve amounts sufficient to pay said items.

**Section 6.4    Replacement Reserve.** At Closing, Borrower shall reserve from the proceeds of the Loan and shall deposit with Lender $0.00 and, thereafter, Borrower shall deposit with Lender monthly, on each Payment Date commencing with the First Payment Date, an amount equal to (i) $0.20 per rentable square foot of space at the Property, divided by (ii) twelve (12), for the purpose of creating a reserve for Capital Expenditures (said funds, together with any interest thereon and additions thereto, the "Replacement Reserve"). The funds contained in the Replacement Reserve shall be utilized solely to reimburse Borrower for the actual bona fide out-of-pocket cost of Capital Expenditures performed during the term of the Loan in accordance with the schedule of permitted capital expenditures attached hereto as Schedule 6.4, or for such other Capital Expenditures as are approved by Lender for disbursements from the Replacement Reserve ("Approved Capital Expenditures"), and shall not be used by Borrower for purposes for which any other Reserve is established. Upon Borrower's written request for disbursement, Lender shall disburse funds from the Replacement Reserve to or for the account of Borrower, to reimburse Borrower for such Approved Capital Expenditures, on the Payment Date following such request, upon satisfaction of each of the conditions listed on Schedule 6.7 and each of the conditions set forth in Section 6.7.

**Section 6.5    Leasing Reserves.** At Closing, Borrower shall reserve from the proceeds of the Loan and deposit with Lender $6,700,000 (said funds, together with any interest thereon and additions thereto, the "Leasing Reserve") for the purpose of creating a reserve for tenant improvement costs or allowances therefor and leasing commissions, to the extent required to be paid by Borrower in connection with leasing space at the Property pursuant to Leases hereafter executed which have been approved, or are deemed approved, by Lender, or for which no approval is required by Lender in accordance with the terms and conditions hereof and the other Loan Documents (collectively, "Approved Leasing Costs"); provided, that Approved Leasing Costs shall not include hard and soft construction costs associated with any expansion of existing Improvements or new Improvements or material structural alterations to the Property, unless approved by Lender for disbursement from the Leasing Reserve of Supplemental Leasing Reserve, as applicable, in Lender's sole discretion (for example, the theater expansion under consideration, or any remodeling or reconstruction of the mall entrance(s), would not qualify for disbursement from the Leasing Reserve or Supplemental Leasing Reserve, notwithstanding that such projects may be undertaken in connection with or pursuant to Leases or amendments thereto). Upon Borrower's written request for disbursement, Lender shall disburse funds from the Leasing Reserve to or for the account of Borrower, to reimburse Borrower for such Approved Leasing Costs, on the Payment Date following such request, upon satisfaction of each of the conditions listed on Schedule 6.7 and each of the conditions set forth in Section 6.7. In the event, at any time and from time to time, the aggregate amount of undisbursed funds on deposit in the Leasing Reserve falls below $2,000,000, exclusive of any amounts required to be deposited by Borrower under Section 6.9 hereof (the "Leasing Reserve Cap"), Borrower shall deposit with Lender monthly, on each Payment Date commencing with the first Payment Date following the date on which the aggregate undisbursed funds on deposit in the Leasing Reserve falls below the Leasing Reserve Cap, an amount equal to (i) $42,208.08 per month, until the aggregate amount of undisbursed funds on deposit in the Leasing Reserve equals or exceeds the Leasing Reserve Cap. Notwithstanding anything to the contrary contained above, Lender shall have the right, but not the obligation, in its sole and absolute discretion from time to time, to disburse funds deposited into the Leasing Reserve for application to monthly debt service

70

payments then due under the Loan or monthly deposits into the Replacement Reserve and Impositions and Insurance Reserve, in the event cash flow is not sufficient to pay such amounts.

### Section 6.6    Security Deposits; Lease Recoveries.

(A)    Borrower or Manager shall deposit all Security Deposits into the Deposit Account, for allocation to the Security Deposit Sub-Account, within two (2) Business Days of receipt, and in the case of Security Deposits which are in the form of letters of credit, Borrower shall deliver such letters of credit to Lender and execute such documents and take such actions as are necessary to create a perfected security interest in favor of Lender in such letters of credit and the proceeds thereof, as determined by Lender, including without limitation, if Lender requires, causing the Lender or its designee to become the beneficiary under such letters of credit; provided, that so long as no Event of Default exists and Borrower delivers such letters of credit to Lender to hold under this Loan Agreement, Borrower shall not be obligated to cause the Lender to be named as the beneficiary under such letters of credit unless and until an Event of Default exists, whereupon Borrower shall take all actions as are necessary in order to transfer or re-issue such letters of credit to Lender or its designee as beneficiary and, in addition, Borrower hereby constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution to take in the name of Borrower any and all actions necessary to cause such letters of credit to be transferred or re-issued to Lender as beneficiary. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

(B)    If any tenant under any Lease with respect to which Lender holds a Security Deposit, including any letter of credit, defaults such that the Security Deposit (including any letter of credit) may be drawn upon on account of such default, such draw shall be permitted at Borrower's request, or at Lender's option without a request of Borrower, and the proceeds thereof shall be transferred to the Lease Recovery Sub-Account. Borrower shall additionally from time to time deposit with Lender any Lease termination payments (whether such payments are payable in accordance with the terms of any Lease or by agreement between landlord and tenant, with Lender's approval if required hereunder) or recoveries upon the enforcement of the Leases and the guaranties, if any, thereof, upon any default beyond the applicable cure period thereunder, all of which shall be deposited into the Lease Recovery Sub-Account. Provided no Event of Default exists, Lender shall upon Borrower's request disburse funds from the Lease Recovery Sub-Account to or for the account of Borrower, to reimburse Borrower for Approved Leasing Costs with respect to the reletting of the space (the "Lease Recovery Space") demised under the Lease(s) for which the related Security Deposits and/or defaulted lease recoveries or lease termination payments were made and/or applied (the "Lease Recovery Amount" for such Lease Recovery Space), upon satisfaction of each of the conditions listed on Schedule 6.7 and each of the conditions set forth in Section 6.7, but only if and provided that Borrower demonstrates to Lender's satisfaction that the Debt Service Coverage Ratio, taking into account the rent under the new Lease(s), is equal to or in excess of the Minimum DSCR Threshold, whereupon, in the event and upon full reletting of the Lease Recovery Space, the balance of the related Lease Recovery Amount shall be transferred to the Leasing Reserve when and if the tenant(s) under such new Leases shall have taken occupancy and commenced paying rent, and all leasing commissions, tenant improvement costs and other tenant inducements under such new Leases shall have been paid in full.

**Section 6.7**    **Conditions to Disbursements from the Replacement Reserve and Leasing Reserve; Performance of Work.**

(A)    **Disbursements from the Replacement Reserve and Leasing Reserve.**  Upon Borrower's request for disbursement, Lender shall disburse funds from the Replacement Reserve or the Leasing Reserve or, subject to satisfaction of the conditions set forth in Section 6.6 above, from the Lease Recovery Sub-Account (such Reserves, the "Work Reserves") to or for the account of Borrower, to reimburse Borrower for Approved Capital Expenditures or Approved Leasing Costs, respectively (collectively, "Approved Expenditures"; and the related Capital Expenditures or tenant improvements to which any such request for disbursement relates shall be referred to as the "Work"), on the Payment Date following such request, upon satisfaction of each of the conditions listed on Schedule 6.7 and each of the conditions set forth below:

(i)    Except as provided in this Section 6.7, each request for disbursement from the Work Reserves shall be made only after completion of the Approved Expenditures for which disbursement is requested.

(ii)    If (1) the cost of a particular item of the Approved Expenditures exceeds $25,000, (2) the contractor performing such item of the Approved Expenditures requires periodic payments pursuant to the terms of a written contract, and (3) Lender has approved in writing in advance such periodic payments (such approval not to be unreasonably withheld or delayed), a request for disbursement from the Work Reserves may be made after completion of a portion of the work under such contract, provided (v) such contract requires payment upon completion of such portion of the work, (w) the materials for which the request is made are on site at the Property and are properly secured or have been installed in the Property, (x) all other conditions in this Loan Agreement for disbursement have been satisfied, (y) funds remaining in the applicable Work Reserve together with the amounts that are scheduled to be deposited therein by Borrower are, in Lender's reasonable judgment, sufficient to complete such item of Approved Capital Expenditures or Approved Leasing Costs, as the case may be, and (z) if required by Lender, each contractor or subcontractor receiving payments under such contract shall provide a waiver of lien with respect to amounts which have been paid to that contractor or subcontractor.

(iii)    Each disbursement from a Work Reserve, except for a final disbursement, shall be in the amount of actual costs incurred for completed Work (as certified by an Approved Architect) less a retainage equal to ten percent (10%) of such costs incurred until such Work has been completed.  For all work exceeding the total amount of $100,000, the retainage shall in no event be less than the percentage of such costs that the contract with the relevant contractor or supplier specifies to be retained and advanced as part of the final disbursement.  No funds will be advanced for materials stored at any Property unless such materials are properly stored and secured at the Property in accordance with Borrower's customary procedures and sound construction practices as reasonably determined by Lender.  The retainage shall not be released until the Approved Architect certifies to Lender that the Work has been completed substantially in accordance with the provisions of this Section 6.7 and that all material approvals necessary for occupancy and use of the subject leased space at the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence reasonably satisfactory to Lender that the costs of the Work have been paid in full or will be paid in full out of the retainage.

72

(iv)    The amount of all invoices in connection with the Work with respect to which a disbursement is requested and which has been approved by Lender shall be disbursed by Lender either directly to Borrower (in which event, Borrower covenants and agrees to promptly pay such invoices) or, if an Event of Default has occurred and is continuing, at Lender's option and in Lender's sole and absolute discretion, directly to the contractor, supplier, materialman, mechanic or subcontractor indicated on said invoices unless already paid by Borrower and Lender has received reasonable evidence of such payment in which case Lender shall reimburse Borrower. In the event that any Borrower requests that any amounts be disbursed directly to Borrower pursuant to the foregoing sentence, Borrower shall be required to deliver evidence reasonably acceptable to Lender of payment of all invoices for which disbursements were previously made to Borrower as a condition to such requested disbursement.

(v)    No more than one disbursement will be made by Lender from a Work Reserve in any calendar month, and no disbursement will be made on any day other than a Payment Date. Lender shall not be required to make any disbursement from a Work Reserve with respect to the Property unless such requested disbursement is in an amount equal to or greater than $10,000.

(vi)    Lender reserves the right, at its option and as a condition to any disbursement from a Work Reserve, to approve (1) all drawings and plans and specifications, if any, for any Work which require aggregate payments in amounts exceeding $25,000, and (2) all contracts and work orders with materialmen, mechanics, suppliers, subcontractors, contractors and other parties providing labor or materials in connection with any Work which require aggregate payments in amounts exceeding $25,000. Any such approval shall not be unreasonably withheld, conditioned or delayed and shall be deemed given if Lender fails to respond within ten (10) Business Days after Lender receives all information reasonably required to adequately review such drawings, plans and specifications, contracts or work orders.

(vii)    For any Work which requires aggregate payments in amounts exceeding $25,000 or is structural in nature or relates to the fire life safety systems at the Property, Lender may require an inspection of the Property prior to making a monthly disbursement from the applicable Work Reserve in order to verify completion of the work for which disbursement is sought. Lender may require that such inspection be conducted by an appropriate independent qualified architect or engineer selected by Lender and/or may require a copy of a certificate of completion by an independent qualified architect or engineer licensed in the state where the applicable Property is located and otherwise acceptable to Lender prior to the disbursement of any amounts from the applicable Work Reserve. Borrower shall pay the reasonable, out-of-pocket expense of such inspections as required hereunder, whether such inspections are conducted by Lender or by an independent qualified professional, up to a maximum of four (4) such inspections during any calendar year. If Lender should require more than four (4) such inspections during any calendar year, unless an Event of Default has occurred during such calendar year, the expense of each additional inspection in any calendar year (over the four maximum) shall be borne by Lender.

(viii)    In addition to the above conditions, (1) any retainage held by Lender pursuant to Section 6.7(A)(iii) above in connection with any Approved Leasing Costs shall not be released until Borrower has delivered to Lender an estoppel certificate or letter executed by

the applicable tenant certifying that all applicable Work has been completed (except for minor or insubstantial details of construction that remain to be performed (i.e., so-called "punch list" items)) by Borrower in accordance with the applicable Lease and that such tenant has accepted the premises covered thereby and (2) payment of any leasing commissions from the Leasing Reserve shall be subject to satisfaction of all conditions precedent to payment of same under the brokerage or leasing agreement pursuant to which such commissions are payable.

(B)    **Performance of Work**.

(i)    Borrower shall complete all Work in a good and workmanlike manner as soon as practicable following the commencement thereof in accordance with all Legal Requirements. The insufficiency of the balance in the applicable Work Reserve shall not relieve Borrower from its obligation to perform and complete the related Work as herein provided or to fulfill all other preservation and maintenance covenants in the Loan Documents.

(ii)    In the event Lender determines in its reasonable discretion that any Work is not being performed in a workmanlike or timely manner or that any Work has not been completed in a workmanlike manner, Lender shall have the option to withhold disbursement for such unsatisfactory work and so notify Borrower with reasonable detail regarding the basis for Lender's dissatisfaction and, after the expiration of thirty (30) days from the giving of such notice by Lender to Borrower of such unsatisfactory work without the cure thereof (or, if such unsatisfactory work is susceptible of a cure but cannot reasonably be cured within said thirty (30) day period and provided that Borrower shall have commenced to cure such unsatisfactory work within said thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, after the expiration of such longer period as is reasonably necessary for Borrower in the exercise of due diligence to cure such unsatisfactory work, up to a maximum of an additional sixty (60) days, without the cure thereof), Lender may proceed under existing contracts or contract with third parties to complete such Work, as the case may be, and apply amounts contained in the applicable Work Reserve toward the labor and materials necessary to complete the same, without providing any additional prior notice to Borrower, and exercise any and all other remedies available to Lender upon and during the continuance of an Event of Default hereunder.

(iii)    In order to facilitate Lender's completion or making of any Work pursuant to Section 6.7(B)(ii) above, Borrower grants Lender the right to enter onto the Property after the expiration of the notice specified above and perform any and all work and labor necessary to complete the applicable Work and/or employ watchmen to protect the Property from damage. All sums so expended by Lender shall be deemed to have been advanced under the Loan to Borrower and secured by the Mortgage. For this purpose, Borrower constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution to complete or undertake the applicable Work in the name of Borrower pursuant to Section 6.7(B)(ii) above. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked. Borrower empowers said attorney-in-fact as follows: (1) to use any funds in the applicable Work Reserve for the purpose of making or completing any Work; (2) to make such additions, changes and corrections to any Work as shall be reasonably necessary or desirable to complete the same; (3) to employ such contractors, subcontractors, agents, architects and inspectors as shall be required for such purposes; (4) to pay, settle or compromise all existing

74

bills and claims which are or may become Liens against the Property, or as may be necessary or desirable for the completion of any Work, or for clearance of title; (5) to execute all applications and certificates in the name of Borrower which may be required by any of the contract documents; (6) in its reasonable discretion, to prosecute and defend all actions or proceedings in connection with the Property or the rehabilitation and repair of the Property; and (7) to do any and every act which Borrower might do in its own behalf to fulfill the terms of this Loan Agreement.

(iv)    Nothing in this Section shall: (1) make Lender responsible for making or completing any Work; (2) require Lender to expend funds in addition to the amounts on deposit in the applicable Work Reserve to make or complete any Work; (3) obligate Lender to proceed with any Work; or (4) obligate Lender to demand from Borrower additional sums to make or complete any Work.

(v)    Borrower shall permit Lender and Lender's agents and representatives (including, without limitation, Lender's engineer, architect or inspector) or third parties performing any Work pursuant to this Section 6.7 to enter onto the Property during normal business hours upon reasonable prior notice (subject to the rights of tenants under their Leases) to inspect the progress of any Work and all materials being used in connection therewith, to examine all plans and shop drawings relating thereto which are or may be kept at the Property, and to complete any Work made pursuant to Section 6.7(B)(ii). Borrower shall cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other persons described above in connection with inspections described in this Section 6.7(B) or the completion of the Work pursuant to this Section 6.7(B).

(vi)    All Work and all materials, equipment, fixtures and any other item comprising a part thereof shall be constructed, installed or completed, as applicable, free and clear of all mechanic's, materialman's or other liens (except for the Permitted Encumbrances).

(vii)    All Work shall comply with all applicable legal requirements of all Governmental Authorities having jurisdiction over the Property and applicable insurance requirements, including, without limitation, applicable building codes, special use permits, environmental regulations and requirements of insurance underwriters.

(C)    **Indemnification.** Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations, costs and expenses (including, without limitation, litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with the performance of the Work, except to the extent caused by the bad faith, willful misconduct or gross negligence of Lender. Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor or materials in connection with the Work; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

**Section 6.8    Sublease Reserve.** In connection with each Initial SMT Borrower Transfer, Borrower shall deposit with Lender an amount equal to the product of $8,500,0000 multiplied by the SMT Borrower Unit Percentage (expressed as a decimal, i.e., 3% = .03) for such SMT

Borrower (such deposits (each an "Initial Deposit"), together with any interest thereon and additions thereto, collectively, the "Sublease Reserve") for deposit into the Sublease Reserve Sub-Account to be held as additional Collateral for the Loan. In the event that cash available for distribution to the Borrower from time to time under Section 7.3(A)(viii) hereof is not sufficient to pay rent (other than the amount of rent equal to debt service on the Loan) then due or to become due within the next thirty (30) days under the SMT Master Subleases, then so long as no Event of Default exists Lender shall promptly upon Master Subtenant Borrower's request transfer funds, if any, available in the Sublease Reserve to Master Subtenant Borrower for application to pay such rent then due, or to become due within the next thirty (30) days, under the SMT Master Subleases.

**Section 6.9    Supplemental Leasing Reserve.**    Upon the occurrence and during the continuance of a Supplemental Leasing Reserve Condition, Borrower shall deposit with Lender monthly, on each Payment Date commencing with the first Payment Date following the date on which the Supplemental Leasing Release Condition occurred, an amount equal to (i) $52,760.10 per month the "Monthly Supplemental Leasing Reserve Amount"), which deposits (together with any interest thereon and additions thereto, collectively, the "Supplemental Leasing Reserve") shall be held in the Supplemental Leasing Reserve Sub-Account for the purpose of creating an additional reserve for Approved Leasing Costs; provided, if, on any Payment Date, the funds available for application on such Payment Date pursuant to Section 7.3(A)(vii) are not sufficient to fund the Supplemental Leasing Reserve in the amount of the Monthly Supplemental Leasing Reserve Amount on such Payment Date (the amount of such insufficiency being referred to as the "Supplemental Leasing Reserve Deficiency"), such Supplemental Leasing Reserve Deficiency shall accrue and shall be due on the next occurring Payment Date(s) and shall continue to accrue, together with any other Supplemental Leasing Reserve Deficiencies, until either (i) such funds available for application on such Payment Date pursuant to Section 7.3(A)(vii) are sufficient to pay the then current Monthly Supplemental Leasing Reserve Amounts and the aggregate amount of all Supplemental Leasing Reserve Deficiencies and all Supplemental Leasing Reserve Deficiencies are satisfied or (ii) the Supplemental Leasing Reserve Cure occurs. The Supplemental Leasing Reserve shall be disbursed to pay Approved Leasing Costs in the same manner as disbursements from the Leasing Reserve in the event the Leasing Reserve balance is reduced to zero from time to time. All amounts deposited into the Supplemental Leasing Reserve shall be in addition to the amounts required to be deposited by Borrower under Section 6.5, and the balance in the Supplemental Leasing Reserve shall not be included in or credited toward the Leasing Reserve Cap. Notwithstanding anything to the contrary contained above, Lender shall have the right, but not the obligation, in its sole and absolute discretion from time to time, to disburse funds deposited into the Supplemental Leasing Reserve for application to monthly debt service payments then due under the Loan or monthly deposits into the Replacement Reserve and Impositions and Insurance Reserve, in the event cash flow is not sufficient to pay such amounts.

# ARTICLE VII
## CLEARING ACCOUNT; DEPOSIT ACCOUNT; CASH MANAGEMENT

**Section 7.1    Establishment of Clearing Account and Deposit Account.**

(A)    **Clearing Account and Deposit Account.** Borrower acknowledges and confirms that, on or before the Closing Date and pursuant to the terms hereof, Borrower has established and will maintain (1) an Eligible Account with the Clearing Account Bank for the benefit of Lender, as secured party hereunder, to serve as the "Clearing Account" (said account and any account replacing the same in accordance with this Loan Agreement, the "Clearing Account"), and (2) an Eligible Account with the Deposit Account Bank in the name of Lender, as secured party hereunder, to serve as the "Deposit Account" (said account, any account replacing the same in accordance with this Loan Agreement, the "Deposit Account"; the Clearing Account Bank and the Deposit Account Bank are sometimes collectively referred to herein as the "Account Banks"). The Clearing Account and the Deposit Account shall each be under the sole dominion and control of Lender (which dominion and control may be exercised by Servicer); and except as expressly provided hereunder, Borrower shall have no rights to control or direct the investment or payment of funds therein. Lender may elect to change any financial institutions in which the Clearing Account and the Deposit Account are maintained. The Deposit Account shall be deemed to contain such sub-accounts as Lender may designate ("Sub-Accounts"), which may be maintained as separate ledger accounts and need not be separate Eligible Accounts. The Sub-Accounts shall include the following:

(i)    "**Debt Service Sub-Account**" shall mean the Sub-Account of the Deposit Account established for the purposes of reserving for payments of the Monthly Debt Service Payments and other amounts due Lender under the Loan Documents.

(ii)    "**Reserve Sub-Accounts**" shall mean the Sub-Accounts of the Deposit Account established for the purpose of holding funds in the Reserves including: (a) the "Impositions and Insurance Reserve Sub-Account" (which shall hold the Impositions and Insurance Reserve); (b) the "Replacement Reserve Sub-Account" (which shall hold the Replacement Reserve); (c) the "Leasing Reserve Sub-Account" (which shall hold the Leasing Reserve); (d) the "Lease Recovery Sub-Account" (which shall hold any Lease Recovery Amounts); (e) the "Sublease Reserve Sub-Account" (which shall hold the Sublease Reserve), and (f) the "Supplemental Leasing Reserve Sub-Account" (which shall hold the Supplemental Leasing Reserve).

(iii)    "**Operating Expenses Sub-Account**" shall mean the Sub-Account of the Deposit Account established for the purposes of reserving for payments for Operating Expenses.

(iv)    "**Security Deposit Sub-Account**" shall mean the Sub-Account of the Deposit Account established for the purposes of holding Security Deposits.

(B)    **Account Name.** The Accounts shall each be in the name of Lender, as secured party, or, at Lender's option, in the name of Borrower for the benefit of Lender, as secured party; provided, however, that in the event Lender transfers or assigns the Loan, the Account Banks, at Lender's request, shall change the name of each Account or the beneficiary thereof to the name

77

of the transferee or assignee. In the event Lender retains a Servicer to service the Loan, the Account Banks, at Lender's request, shall change the name of each Account or the beneficiary thereof to the name of Servicer, as agent for Lender.

(C) **Eligible Accounts/Characterization of Accounts**. Borrower and the Clearing Account Bank shall maintain the Clearing Account as an Eligible Account, and Borrower and Deposit Account Bank shall maintain the Deposit Account and each Sub-Account as an Eligible Account. Each Account is and shall be treated as a "securities account" as such term is defined in Section 8-501(a) of the UCC or a "deposit account" as such term is defined in Section 9-102(a)(29) of the UCC, as the context may require. Each item of property (whether investment property, financial asset, securities, instrument, cash or other property) credited to each Account shall be treated as a "financial asset" within the meaning of Section 8-102(a)(9) of the UCC. Borrower agrees that each Account Bank shall, subject to the terms of this Agreement, treat Lender as entitled to exercise the rights that comprise any financial asset credited to each Account. All securities or other property underlying any financial assets credited to each Account (other than cash) shall be registered in the name of the applicable Account Bank, indorsed to the applicable Account Bank or in blank or credited to another securities account maintained in the name of the applicable Account Bank and in no case will any financial asset credited to any Account be registered in the name of Borrower, payable to the order of Borrower or specially indorsed to Borrower.

(D) **Permitted Investments**. Sums on deposit in the Accounts shall not be invested except in Permitted Investments. Funds in the Clearing Account shall not bear interest or be subject to investment. Except during the existence of any Event of Default, Borrower shall have the right to direct Deposit Account Bank to invest sums on deposit in the Deposit Account (including the Sub-Accounts) in Permitted Investments approved by the Deposit Account Bank; provided, however, in no event shall Borrower direct Deposit Account Bank to make a Permitted Investment if the maturity date of that Permitted Investment is later than the date on which the invested sums are required for payment of an obligation for which the Account was created. After an Event of Default and during the continuance thereof, Lender may direct the Deposit Account Bank to invest sums on deposit in the Deposit Account (including the Sub-Accounts) in Permitted Investments as Lender shall determine in its sole discretion. Borrower hereby irrevocably authorizes and directs the Deposit Account Bank to apply any income earned from Permitted Investments to the respective Accounts. The amount of actual losses sustained on a liquidation of a Permitted Investment shall be deposited into the Deposit Account by Borrower no later than one (1) Business Day following such liquidation to the extent required to meet current obligations. Borrower shall be responsible for payment of any federal, state or local income or other tax applicable to income earned from Permitted Investments. The Accounts shall be assigned the federal tax identification number of Borrower. Any interest, dividends or other earnings which may accrue on the Accounts shall be added to the balance in the applicable Account and allocated and/or disbursed in accordance with the terms hereof; provided that any interest, dividends or other earnings from funds deposited as part of the Impositions and Insurance Reserve shall be retained by Lender or its designee (such as the Servicer) as its property and supplemental compensation.

**Section 7.2    Deposit of Receipts into the Clearing Account**. Borrower shall and shall cause Manager to direct (i) all tenants under the Leases to pay all Rents thereunder directly into the

78

Clearing Account and (ii) any and all other Receipts (including Rents that are not paid into the Clearing Account in accordance with the foregoing) to be deposited promptly into the Clearing Account and in no event later than two (2) Business Days after the same are paid to or for the benefit of Borrower. Without limitation of the foregoing, Borrower shall notify and advise each tenant under each Lease to send directly to the Clearing Account all payments of Rent pursuant to an instruction letter in the form of Schedule B attached hereto (a "Tenant Direction Letter"). Without the prior written consent of Lender, neither Borrower nor Manager shall (i) terminate, amend, revoke or modify any Tenant Direction Letter in any manner whatsoever, or (ii) direct or cause any tenant to pay any amount in any manner other than as provided in the related Tenant Direction Letter. To the extent that Borrower or any Person on Borrower's behalf holds any Receipts or Security Deposits, whether in accordance with this Loan Agreement or otherwise, (i) such amounts shall be deemed to be Collateral and shall be held in trust for the benefit, and as the property, of Lender, (ii) such amounts shall not be commingled with any other funds or property of Borrower or Manager, and (iii) Borrower or Manager shall deposit such amounts in the Clearing Account within two (2) Business Days of receipt. So long as the Loan shall be outstanding, neither Borrower nor Manager shall open any other property accounts other than the Clearing Account and the Deposit Account for the deposit of Rent, Security Deposits or revenues from the Property. Borrower represents, warrants and covenants that there are no other accounts maintained by Borrower or Manager into which revenues from the ownership and operation of the Property are deposited.

## Section 7.3    Application of Funds in Accounts.

(A)    **Allocations**. If any Event of Default shall occur and be continuing, then notwithstanding anything to the contrary in this Section or elsewhere, Lender shall have all rights and remedies available under applicable law and under the Loan Documents. Provided no Event of Default exists, Lender shall direct the Clearing Account Bank to transfer all funds deposited in to the Clearing Account into the Deposit Account on a daily basis, and Lender shall direct the Deposit Account Bank to allocate all available funds on deposit in the Deposit Account (other than those allocated to Sub-Accounts, and excepting any Rent that is paid more than one (1) month in advance, which shall be retained in the Deposit Account until payment thereof is due under the applicable Lease) on each Payment Date in the following amounts and order of priority:

(i)    First, to the Impositions and Insurance Reserve Sub-Account in the amount of the monthly deposit required to be made into the Impositions and Insurance Reserve pursuant to Section 6.3 hereof on such Payment Date;

(ii)    Second, to the Debt Service Sub-Account in the amount of the Monthly Debt Service Payment due on such Payment Date, for application on such Payment Date in accordance with Section 2.4(A) hereof (such application shall also constitute and be credited, in the amount thereof, (a) as between Master Subtenant Borrower, as subtenant, and Master Tenant Borrower and each SMT Borrower, as sublandlords, to Master Sublease rent, and (b) as between Master Tenant Borrower and each SMT Borrower, as tenants, and Owner Borrower, as landlord to Master Lease rent under the Master Lease);

79

(iii)    Third, to Lender to pay any other amounts, if any, then due Lender under the Loan Documents;

(iv)    Fourth, to the Replacement Reserve Sub-Account in the amount of the monthly deposit required to be made into the Replacement Reserve pursuant to Section 6.4 hereof on such Payment Date;

(v)    Fifth, to the Leasing Reserve Sub-Account in the amount of the monthly deposit, if any, required to be made into the Leasing Reserve pursuant to Section 6.5 hereof on such Payment Date;

(vi)    Sixth, an amount equal to the applicable monthly operating expenses provided in the Approved Operating Budget (or such other amount as shall be approved by Lender) shall be transferred to the Operating Expenses Sub-Account;

(vii)    Seventh, if a Supplemental Leasing Reserve Condition exists, and after allocation for items (i) through (vi) above, first (a) an amount equal to the Monthly Supplemental Leasing Reserve Amount plus any Supplemental Leasing Reserve Deficiencies accrued in accordance with Section 6.9 shall be deposited into the Supplemental Leasing Reserve Sub-Account, and then (b) to the extent there are any excess funds available after such application pursuant to the foregoing subclause (a) of this item (vii), such excess amounts shall, provided no Event of Default exists, on or promptly following such Payment Date be disbursed to Master Subtenant Borrower for application to rent (other than the amount equal to debt service on the Loan) due under each Master Sublease, with any remainder to be retained by Master Subtenant Borrower; and

(viii)    Eighth, if a Supplemental Leasing Reserve Condition does not exist, all available amounts on each Payment Date after allocation for items (i) through (vi) above shall, provided no Event of Default exists, on or promptly following such Payment Date be disbursed to Master Subtenant Borrower for application to payments due under each Master Sublease, with any remainder to be retained by Master Subtenant Borrower.

(B)    **Cure of Supplemental Leasing Reserve Condition**. So long as no Event of Default exists, a Supplemental Leasing Reserve Condition shall be deemed cured if the Property achieves a Debt Service Coverage Ratio of not less than the Minimum DSCR Ratio for two consecutive Calendar Quarters after the occurrence of the Supplemental Leasing Reserve Condition, measured at the end of each such two consecutive Calendar Quarters (each a "Supplemental Leasing Reserve Cure").

(C)    **Required Payments**. Borrower shall in all events be required to pay when due hereunder the Monthly Debt Service Payments, any required monthly deposits into Reserves and all other amounts due under this Loan Agreement and the other Loan Documents, regardless of whether funds are deposited or held in sufficient amount in the Deposit Account or any other Accounts for such payments.

(D)    **Operating Expenses Disbursements**. Prior to the occurrence of a Supplemental Leasing Reserve Condition, funds deposited into the Operating Expenses Sub-Account on or prior to any Payment Date shall be disbursed to Borrower on or promptly following such

Payment Date, and Borrower shall use such funds for the payment of Operating Expenses in accordance with the Approved Operating Budget. During the continuance of a Supplemental Leasing Reserve Condition, Lender may require compliance with reasonable conditions prior to disbursement of amounts for Operating Expenses held in the Operating Expenses Sub-Account including, without limitation, the following:

(i)     Borrower shall submit a request for payment not more frequently than twice per calendar month, which request shall include invoices, receipts, comparison with the Approved Operating Budget and other evidence reasonably required by Lender with respect to the Operating Expenses or other permitted expenditures which are the subject of such request;

(ii)    Such request for payment shall be signed by Borrower, certifying that the requested funds are to be used to pay Operating Expenses in accordance with the Approved Operating Budget for the Property and for no other purpose, and that all information in such request is true and complete;

(iii)   Such request shall include a line-item accounting comparing Operating Expenses incurred in the subject month and on a year-to-date basis with the Approved Operating Budget;

(iv)    There shall be sufficient funds for such disbursement in the Operating Expense Sub-Account;

(v)     Lender shall have received evidence reasonably satisfactory to Lender, and Lender shall have determined that sufficient funds will be available for unincurred or unfunded remaining Operating Expenses in the Approved Operating Budget for such calendar month and any additional expenses then reasonably foreseen (and in the case of an imbalance, Lender may require a deposit of additional funds in the amount of the shortfall); and

(vi)    At Lender's option, Lender may issue payment directly to Borrower or to Manager.

(E)     **Event of Default**. Notwithstanding anything herein to the contrary, upon the occurrence and during the continuance of an Event of Default, all funds on deposit in the Clearing Account, the Deposit Account and/or the Sub-Accounts shall be disbursed to or as directed by Lender. Without in any way limiting the foregoing or Lender's rights and remedies upon an Event of Default, and subject to Lender's direction otherwise from time to time, in whole or in part, in Lender's sole and absolute discretion, after and during the continuance of an Event of Default Lender may direct the Account Banks to allocate all available funds on deposit in the Clearing Account and Deposit Account, or either of them, to: (a) any debt service or other Obligation due under this Loan Agreement or the other Loan Documents; (b) any reserve account or sub-account established under this Loan Agreement for, or otherwise as a reserve for, operating expenses, taxes, insurance, capital expenses, costs and expenses of maintenance, repairs and restoration, and other expenditures relating to the use, management, operation or leasing of the Property; and/or (c) any costs and expenses incurred by Lender in connection with such Event of Default, or expended by Lender to protect or preserve the value of the Property.

**Section 7.4    Budget Approvals**. No later than thirty (30) days prior to the expiration of each calendar year, Borrower shall deliver to Lender the proposed Operating Budget and the Capital Expenditure Budget (in each case presented on a monthly and annual basis) for the Property for the following calendar year. Each such proposed Operating Budget shall identify and set forth Borrower's best estimate, after due consideration, of all revenue, costs, and expenses for the Property, and shall specify gross revenues and Operating Expenses. The Capital Expenditure Budget shall identify and set forth Borrower's best estimate, after due consideration, of all costs and expenses contemplated to be necessary in the related budget year (and, as to projects initiated or to be initiated in or prior to the budget year but not completed in the budget year, the estimated cost and completion schedule) for capital improvements and leasehold improvements, leasing commissions and other leasing costs not included in the Operating Budget, and the contemplated sources of payment of the same. The Operating Budget shall be subject to Lender's reasonable approval, and upon such approval shall, with any amendments thereto approved by Lender from time to time, constitute the "Approved Operating Budget" hereunder. If a proposed Operating Budget is not in form and substance reasonably satisfactory to Lender, Lender may disapprove the same and specify the reasons therefor, and Borrower shall promptly amend and resubmit for approval a revised budget, making such changes as are necessary to comply with the reasonable requirements of Lender; provided that until such time as Borrower has resubmitted the revised budget and Lender has approved such revised budget, the parties shall operate under the provisions of this Article VII using the immediately preceding Lender-approved budget, except that actual amounts shall be used for real estate taxes, insurance premiums for insurance required hereunder and utilities expenses. Capital Expenditures shall not be included in the Approved Operating Budget unless Lender shall approve the same in writing in its sole and absolute discretion.

**Section 7.5    Sole Dominion and Control**.    Borrower acknowledges and agrees that the Accounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof.  Notwithstanding anything set forth herein to the contrary, neither Borrower nor Manager nor any other Person, through or under Borrower, shall have any control over the use of, or any right to withdraw any amount from, any Account, and Borrower acknowledges that the Account Banks shall comply with all instructions originated by Lender without further consent by Borrower.  Borrower acknowledges and agrees that Account Banks shall comply with the instructions of Lender with respect to the Accounts without the further consent of Borrower or Manager.  Borrower acknowledges and agrees that Account Bank shall comply with all "entitlement orders" (as defined in Section 8-102(a)(8) of the UCC) and instructions originated by Lender without further consent by Borrower or any other Person.

**Section 7.6    Pledge of Accounts**.

(A)    **Security for Obligations**.    To secure the full and punctual payment and performance of all Obligations of Borrower under this Loan Agreement, the Note, the Mortgage, and all other Loan Documents, Borrower hereby grants to Lender a first priority continuing security interest in and to the following property of Borrower, whether now owned or existing or hereafter acquired or arising and regardless of where located (all of the same constituting part of the Account Collateral hereunder:

(i)    the Clearing Account, the Deposit Account and each of the Sub-Accounts, and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts, including, without limitation, all deposits or wire transfers made to the Accounts; and any and all Account Collateral;

(ii)    any and all amounts invested in Permitted Investments;

(iii)    all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and

(iv)    to the extent not covered by clauses (i), (ii) or (iii) above, all "proceeds" (as defined under the UCC) of any or all of the foregoing.

Lender shall have with respect to the foregoing collateral, in addition to the rights and remedies herein set forth, all of the rights and remedies available to a secured party under the UCC, as if such rights and remedies were fully set forth herein.

(B)    **Rights on Default**.  Upon the occurrence and during the continuance of an Event of Default, Lender may notify each of the Account Banks of such Event of Default and, without notice from Account Banks or Lender, (a) Borrower shall have no further right in respect of (including, without limitation, the right to instruct Lender or any Account Bank to transfer from) the Accounts, (b) Lender may direct the Account Banks to liquidate and transfer any amounts then invested in Permitted Investments to the Accounts or reinvest such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or to enable Account Banks, as agent for Lender, or Lender to exercise and enforce Lender's rights and remedies hereunder with respect to any Account Collateral, and (c) Lender may apply any Account Collateral to any Obligations in such order of priority as Lender may determine.  The proceeds of any disposition of the Account Collateral, or any part thereof, may be applied by Lender to the payment of the Obligations in such priority and proportions as Lender in its discretion shall deem proper.

(C)    **Financing Statement; Further Assurances**.  Borrower hereby irrevocably authorizes Lender at any time and from time to time to file in any filing office in any jurisdiction any initial financing statements and amendments thereto that (1) indicate the Account Collateral and other Collateral (i) as all assets of Borrower or words of similar effect, regardless of whether any particular asset comprised in the Account Collateral or other Collateral falls within the scope of Article 9 of the UCC or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (2) contain any other information required by Part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether Borrower is an organization, the type of organization and any organization identification number issued to such Borrower, and (ii) a sufficient description of real property to which the Collateral relates. Borrower agrees to furnish any such information to Lender promptly upon request. Borrower also ratifies its authorization for Lender to have filed in any jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof.  Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action,

83

that may be reasonably necessary or desirable, or that Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby (including, without limitation, any security interest in and to any Permitted Investments) or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Account Collateral. In the event of any change in name, identity or structure of Borrower, such Borrower shall notify Lender thereof and promptly after Lender's request shall execute, file and record such UCC financing statements as are necessary to maintain the priority of Lender's lien upon and security interest in the Account Collateral, and shall pay all expenses and fees in connection with the filing and recording thereof. If Lender shall require the filing or recording of additional UCC financing or continuation statements, Borrower shall, promptly after request, execute, file and record such UCC financing or continuation statements as Lender shall deem necessary, and shall pay all expenses and fees in connection with the filing and recording thereof.

(D)  **Termination of Agreement**.  This Loan Agreement shall create a continuing security interest in the Account Collateral and shall remain in full force and effect until payment in full of the Obligations.  Upon payment and performance in full of the Obligations, this Loan Agreement shall terminate and Borrower shall be entitled to the return, upon its request and at its expense, of such of the Account Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof, and Lender shall execute such instruments and documents as may be reasonably requested by Borrower to evidence such termination and the release of the lien hereof.

**Section 7.7    Lender Appointed Attorney-In-Fact**.  Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact, coupled with an interest and with full power of substitution, to execute, acknowledge and deliver during the existence of an Event of Default any instruments and to exercise and enforce every right, power, remedy, option and privilege of Borrower with respect to the Account Collateral, and do in the name, place and stead of Borrower, all such acts, things and deeds for and on behalf of and in the name of Borrower, which Borrower is required to do hereunder or under the other Loan Documents or which Lender may deem necessary or desirable to more fully vest in Lender the rights and remedies provided for herein and to accomplish the purposes of this Loan Agreement including, without limitation, the filing of any UCC financing statements or continuation statements in appropriate public filing offices on behalf of Borrower, in any of the foregoing cases, upon Borrower's failure to take any of the foregoing actions within five (5) Business Days after notice from Lender.  The foregoing powers of attorney are irrevocable and coupled with an interest.  If Borrower fails to perform any agreement herein contained and such failure shall continue for five (5) Business Days after notice of such failure is given to Borrower, Lender may perform or cause performance of any such agreement, and any reasonable expenses of Lender and any Account Banks in connection therewith shall be paid by Borrower.

### ARTICLE VIII
### DEFAULT, RIGHTS AND REMEDIES

**Section 8.1    Event of Default**.

"**Event of Default**" shall mean the occurrence or existence of any one or more of the following:

84

(A)   **Scheduled Payments.**   Failure of Borrower to pay any scheduled payment amount when the same is due under this Loan Agreement, the Note, or any other Loan Documents (whether such amount is interest, principal, Reserves, or otherwise), including without limitation the failure to pay all outstanding Obligations on the Maturity Date; or

(B)   **Other Payments.**   Failure of Borrower to pay any amount from time to time owing under this Loan Agreement, the Note, or any other Loan Documents (other than amounts subject to the preceding paragraph) within ten (10) days after written notice from Lender to Borrower that same is due; or

(C)   **Breach of Reporting Provisions.**   Failure of any Borrower Party to perform or comply with any term or condition contained in Section 5.1 which continues for a period of thirty (30) days after written notice; or

(D)   **Breach of Provisions Regarding Insurance, Transfers, Liens, Single Purpose.**   (i) Failure to keep in force the insurance required by Section 5.4 hereof; (ii) the failure to comply with any other covenant of Section 5.4 which failure under this clause (ii) continues for five (5) Business Days after notice from Lender; (iii) breach of Article IX or Article XI hereof; (iv) breach or default under any of Sections 5.13(B), 5.17, 5.18 or 5.19 hereof; or (v) breach or default under Section 6.6(A) hereof or Section 7.2 hereof; or

(E)   **Breach of Warranty.**   Any representation, warranty, certification or other statement made by any Borrower Party or Affiliate thereof in any Loan Document or in any statement or certificate at any time given in writing pursuant to or in connection with any Loan Document is false or misleading in any material respect as of the date made; or

(F)   **Other Defaults Under Loan Documents.**   A default shall occur in the performance of or compliance with any term contained in this Loan Agreement or the other Loan Documents and such default is not fully cured within thirty (30) days after receipt by Borrower of notice from Lender of such default (other than occurrences described in other provisions of this Section 8.1 or the Loan Documents for which a different grace or cure period is specified or which constitute immediate Events of Default); provided however that if (i) the default is capable of cure but with diligence cannot be cured within such period of thirty (30) days, (ii) Borrower has commenced the cure of same within such thirty (30)-day period and at all times after such commencement has pursued such cure diligently, and (iii) Borrower delivers to Lender promptly following demand (which demand may be made from time to time by Lender) evidence satisfactory to Lender of the foregoing, then such period shall be extended for so long as is reasonably necessary for Borrower in the exercise of due diligence to cure such default, but in no event beyond the ninetieth (90th) day after the original notice of default; or

(G)   **Involuntary Bankruptcy; Appointment of Receiver, etc.**   (i) A court enters a decree or order for relief with respect to any Borrower Party in an Involuntary Borrower Party Bankruptcy, which decree or order is not stayed or other similar relief is not granted under any applicable federal or state law; (ii) the occurrence and continuance of any of the following events for sixty (60) days unless dismissed or discharged within such time: (x) an Involuntary Borrower Party Bankruptcy is commenced, (y) a decree or order of a court for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over

85

any Borrower Party or over all or a substantial part of its respective property, is entered, or (z) an interim receiver, trustee or other custodian is appointed without the consent of any Borrower Party, for all or a substantial part of the property of such Person; or

(H)    **Voluntary Bankruptcy; Appointment of Receiver, etc.** (i) An order for relief is entered with respect to any Borrower Party, or any such Person commences a voluntary case under the Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case or to the conversion of an involuntary case to a voluntary case under any such law or consents to the appointment of or taking possession by a receiver, trustee or other custodian for any Borrower Party or for all or a substantial part of the property of any Borrower Party; (ii) any Borrower Party makes any assignment for the benefit of creditors; or (iii) the Board of Directors or other governing body of any Borrower Party adopts any resolution or otherwise authorizes action to approve any of the actions referred to in this Section 8.1(H); or

(I)    **Bankruptcy Involving Ownership Interests or Property**. Other than as described in either of Sections 8.1(G) or (H), all or any portion of the Collateral becomes property of the estate or subject to the automatic stay in any case or proceeding under the Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect (provided that if the same occurs in the context of an involuntary proceeding, it shall not constitute an Event of Default if it is dismissed or discharged within sixty (60) days following its occurrence); or

(J)    **Solvency**. Any Borrower Party ceases to be solvent or admits in writing its inability to pay its debts as they become due; or

(K)    **Judgment and Attachments**. Any lien, money judgment, writ or warrant of attachment, or similar process is entered or filed against any Borrower or General Partner or any of its assets, which claim is not fully covered by insurance (other than with respect to the amount of commercially reasonable deductibles permitted hereunder), is in an amount in excess of $100,000 (when aggregated with all other such matters) or could otherwise reasonably be expected to have a Material Adverse Effect and remains undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days; or

(L)    **Injunction**. Borrower Party is enjoined, restrained or in any way prevented by the order of any court or any administrative or regulatory agency from conducting all or any material part of its business; or

(M)    **Invalidity of Loan Documents**. This Loan Agreement, the Mortgage or any Loan Document for any reason ceases to be in full force and effect or ceases to be a legally valid, binding and enforceable obligation of Borrower or any Lien securing the Obligations shall, in whole or in part, cease to be a perfected first priority Lien, subject to the Permitted Encumbrances (except in any of the foregoing cases in accordance with the terms hereof or under any other Loan Document), or any Person who is a party thereto, other than Lender, denies that it has any further liability (as distinguished from denial of the existence of a Default or Event of Default) under any Loan Documents to which it is party, or gives notice to such effect; or

86

   (N)   **Cross-Default with Other Loan Documents**.  A default beyond any applicable grace periods shall occur under any of the other Loan Documents; or

   (O)   **Default under Management Agreement**.  Any event of default on the part of Borrower shall occur and be continuing under the Management Agreement; or

   (P)   **Default under Master Lease/Master Sublease**.  Any default on the part of Master Subtenant Borrower shall occur and be continuing under any Master Sublease, or any default on the part of any SMT Borrower or Master Tenant Borrower shall occur and be continuing under any Master Lease.

If more than one of the foregoing paragraphs shall describe the same condition or event, then Lender shall have the right to select which paragraph or paragraphs shall apply.  In any such case, Lender shall have the right (but not the obligation) to designate the paragraph or paragraphs which provide for non-written notice (or for no notice) or for a shorter time to cure (or for no time to cure).

## Section 8.2     Acceleration and Remedies.

   (A)   Upon the occurrence of any Event of Default described in any of Sections 8.1(G), (H) or (I), the unpaid principal amount of and accrued interest and fees on the Loan and all other Obligations shall automatically become immediately due and payable, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other requirements of any kind, all of which are hereby expressly waived by each Borrower Party.  Upon and at any time after the occurrence of any other Event of Default, at the option of Lender, which may be exercised without notice or demand to anyone, all or any portion of the Loan and other Obligations shall immediately become due and payable.

   (B)   Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Loan Agreement or any of the other Loan Documents, or at law or in equity, may be exercised by Lender at any time and from time to time, whether or not all or any of the Obligations shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, if an Event of Default is continuing (i) to the fullest extent permitted by law, Lender shall not be subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Obligations or the Obligations have been paid in full.

87

(C)    Lender shall have the right from time to time to partially foreclose the Mortgage in any manner and for any amounts secured by such Mortgage then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Mortgage to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Mortgage to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Mortgage as Lender may elect.   Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of sums secured by the Mortgage and not previously recovered.

(D)    Any amounts recovered from the Property or any other collateral for the Loan after an Event of Default may be applied by Lender toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions as Lender in its sole discretion shall determine.

(E)    The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Loan Agreement or the other Loan Documents, or existing at law or in equity or otherwise.   Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion.   No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.   A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

**Section 8.3    Performance by Lender.**

(A)    If any Borrower Party shall fail to perform, or cause to be performed, any covenant, duty or agreement contained in any of the Loan Documents beyond any applicable notice and cure period, Lender may (but shall have no obligation to) perform or attempt to perform such covenant, duty or agreement on behalf of such Borrower Party.   In such event, Borrower shall, at the request of Lender, promptly pay to Lender any amount reasonably expended by Lender in such performance or attempted performance, together with interest thereon at the Default Rate, from the date of such expenditure until paid.   Any amounts advanced or expended by Lender to perform or attempt to perform any such matter shall be added to and included within the indebtedness evidenced by the Note and shall be secured by all of the Collateral securing the applicable Loan.   Notwithstanding the foregoing, it is expressly agreed that Lender shall not have any liability or responsibility for the performance of any obligation of any Borrower Party under this Loan Agreement or any other Loan Document.

(B)    Lender may cease or suspend any and all performance required of Lender under the Loan Documents upon and during the continuance of any Event of Default.

## ARTICLE IX
## SINGLE-PURPOSE, BANKRUPTCY-REMOTE REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 9.1**    <u>Applicable to Borrower and each General Partner.</u>    Borrower hereby represents, warrants and covenants as of the Closing Date and until such time as all Obligations are paid in full, that absent express advance written waiver from Lender, which may be withheld in Lender's sole discretion, each Borrower and each General Partner:

(A)    was and shall continuously be, as to Borrower, organized solely for purpose of owning and operating the interest in the Property owned, leased or subleased by it, and, as to each General Partner, organized solely for purposes of acting as the general partner of the applicable Borrower;

(B)    has not owned, does not own and will not own any assets other than, as to Borrower, its respective interest in the Property (including incidental personal property necessary for the operation thereof and proceeds therefrom), and as to General Partner, its general partnership interest in the applicable Borrower;

(C)    is not engaged and will not engage in any business, directly or indirectly, other than, as to Borrower, the ownership, management and operation of the interest in the Property owned, leased or subleased by it, and, as to General Partner, acting as the sole general partner of the applicable Borrower;

(D)    has not entered into and will not enter into any contract or agreement with any partner, member, shareholder, trustee, beneficiary, principal, joint venturer or Affiliate of any Borrower or General Partner except in the ordinary course of its business pursuant to written agreements upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than such Affiliate;

(E)    has not incurred and will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than, with respect to Borrower (i) the Obligations, and (ii) subject to the terms and conditions of Section 5.17, unsecured trade payables incurred in the ordinary course of business of operating the Property and Indebtedness relating to financing of equipment and personal property in the ordinary course of business of operating the Property;

(F)    has not made and will not make any loan or advances to any Person (including any of its Affiliates);

(G)    has remained and as of the Closing Date reasonably expects to remain, solvent, and has maintained, and as of the Closing Date reasonably expects to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(H)    has not acquired and will not acquire obligations or securities of any Person;

(I)    has not failed and will not fail to correct any known misunderstanding regarding its separate identity;

(J)    has done or caused to be done and will do all things necessary to preserve its existence;

(K)    shall continuously maintain its existence and be qualified to do business in all states necessary to carry on its business, including the states in which the Property are located;

(L)    will conduct and operate its business as presently conducted and operated and in its own name;

(M)    has maintained and will maintain books, records, bank accounts, financial statements, accounting records and other entity documents separate from those of its partners, members, shareholders, trustees, beneficiaries, principals, Affiliates, and any other Person;

(N)    has been and will be, and at all times has held and will hold itself out to the public as, a legal entity separate and distinct from any other Person (including any of its partners, members, shareholders, trustees, beneficiaries, principals and Affiliates, and any Affiliates of any of the same), and not as a department or division of any Person;

(O)    will file such tax returns with respect to itself as may be required under applicable law and has prepared and will prepare separate tax returns and financial statements, or if part of a consolidated group, is shown as a separate member of such group;

(P)    has paid and shall pay its own liabilities, indebtedness, and obligations of any kind, as the same shall become due, from its own separate assets, rather than from those of other Persons;

(Q)    will not enter into any transaction of merger or consolidation, or acquire by purchase or otherwise all or substantially all of the business or assets of, or any stock or beneficial ownership of, any Person;

(R)    has not commingled and will not commingle or permit to be commingled its funds or other assets with those of any other Person; and has held and will hold its assets in its own name, except for the Accounts or as otherwise expressly permitted under the Loan Documents;

(S)    has maintained and will maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(T)    has not, does not and will not hold itself out to be responsible for the debts or obligations of any other Person;

(U)    has not and will not guarantee or otherwise become liable on or in connection with any obligation of any other Person;

(V)    except for funds deposited into the Accounts or as otherwise expressly permitted in accordance with the Loan Documents, shall not hold title to its assets other than in its name;

90

(W)    complies and shall at all times hereafter comply with all of the assumptions, statements, certifications, representations, warranties and covenants regarding or made by it contained in or appended to the nonconsolidation opinion delivered pursuant hereto;

(X)    has paid and will pay its own liabilities and expenses, out of its own funds;

(Y)    has held and will hold regular meetings, as appropriate to conduct its business and has observed and will observe all partnership and limited liability company formalities, as applicable, and record keeping;

(Z)    has allocated and will allocate fairly and reasonably the costs associated with common employees and any overhead for shared office space and has used and will use separate stationary, invoices and checks;

(AA)    has not and will not identify itself or any of its partner or shareholders, or Affiliates, or their respective partners, shareholders or members, or any other Person, as a division or part of it;

(BB)    has paid and will pay the salaries of its own employees and has maintained and will maintain a sufficient number of employees (if any) in light of its contemplated business operations;

(CC)    maintains, and will continue to maintain, its books and records and financial statements separate from those of any other Person, or if part of a consolidated group, is shown as a separate member of such group;

(DD)    except for the Accounts, maintains, and will continue to maintain, its bank accounts separate from those of any other Person;

(EE)    except for the Accounts, does not and will not commingle its funds or assets with those of any other Person, and holds and will hold its assets in its own name;

(FF)    shall not (i) liquidate or dissolve, in whole or in part; (ii) consolidate, merge or enter into any form of consolidation with or into any other Person, nor convey, transfer or lease its assets substantially as an entirety to any Person nor permit any Person to consolidate, merge or enter into any form of consolidation with or into itself, nor convey, transfer or lease its assets substantially as an entirety to any Person; or (iii) amend any provisions of its organizational documents containing provisions similar to those contained in this Article IX;

(GG)    is and shall continue to be, in the case of Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower, a limited partnership, and in the case of each General Partner and each SMT Borrower, a limited liability company, whose limited partnership agreement or operating agreement (collectively, the "Borrower Organizational Documents") shall contain each of the representations, covenants and warranties set forth in this Article 9;

(HH)    each General Partner and each SMT Borrower is and shall continue to be a limited liability company formed under the laws of the State of Delaware with one (1) member (the "Single Member") in addition to the Independent Director (as defined below), whose limited

liability company agreement (the "LLC Organizational Documents") require it to comply, and in the case of General Partner additionally to cause the Borrower in which it holds a general partnership interests to comply, with each of the representations, covenants and warranties set forth in this Article 9 and require such General Partner or SMT Borrower, as applicable, to at all times cause there to be at least one (1) duly appointed independent manager of General Partner or SMT Borrower, as applicable, who is a natural person (each an "Independent Director") whose affirmative vote will be required in order for a voluntary filing for protection under the Bankruptcy Code or similar action by (in the case of each SMT Borrower) such SMT Borrower or (in the case of each General Partner) such General Partner or the Borrower in which such General Partner owns a partnership interest, and who is not at the time of such individual's appointment as Independent Director, shall not be during such individual's tenure as Independent Director, and may not have been at any time during the preceding five years, a shareholder, member or partner of, or an officer, director, except in his or her capacity as Independent Director of General Partner or SMT Borrower, paid consultant or employee of, customer of or supplier to or a member of the immediate family of any Borrower Party (except in his or her capacity as Independent Director of General Partner or SMT Borrower) or any of their respective shareholders, members, partners, subsidiaries or affiliates or any person or other entity controlling or under common control with any such shareholder, member, partner, supplier or customer or any member of the immediate family of any of them; provided, however, that the foregoing limitations on the use of person who are directors of Affiliates of Borrower as Independent Directors shall not apply to Borrower's use of natural persons employed by CT Corporation or any reputable, national service similar to CT Corporation and reasonably approved by Lender to fill the position of Independent Director required hereunder, notwithstanding that such persons may also act as independent directors of such Affiliates of Borrower. As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, whether through ownership of voting securities, by contract or otherwise;

(II)    The LLC Organizational Documents for each General Partner and SMT Borrower shall (i) at all times cause there to be at least one (1) springing member of each General Partner or SMT Borrower who shall be a Person that has no direct or indirect interest in such General Borrower or SMT Borrower (other than serving as the springing member of such General Partner or SMT Borrower) and (ii) provide and continue to provide that upon the occurrence of any event that causes the Single Member of such General Partner or SMT Borrower to cease to be a member of such General Partner or SMT Borrower, the springing member of such General Partner or SMT Borrower shall, without action of any person and simultaneously with such Single Member ceasing to be a member of such General Partner or SMT Borrower, automatically continue as a member of such General Partner or SMT Borrower and shall continue such General Partner or SMT Borrower without dissolution;

(JJ)    Borrower shall cause reputable Delaware counsel acceptable to Lender (the "Delaware Law Firm") to deliver to Lender an opinion letter reasonably satisfactory to Lender, whereby the Delaware Law Firm opines (which opinion may be subject to standard assumptions, qualifications, limitations and exceptions acceptable to Lender), among other requirements of Lender, that: (1) the unanimous consent of each of the applicable Single Member and the applicable Independent Director is required in order for any Borrower or General Partner to file a voluntary bankruptcy petition; (2) the provision in the LLC Organizational Documents for each

General Partner and SMT Borrower that requires unanimous consent as a condition to filing a voluntary bankruptcy petition is enforceable against each applicable Single Member; (3) the bankruptcy, dissolution, liquidation or death of the applicable Single Member will not cause any related General Partner or SMT Borrower to be dissolved; (4) no creditor of the applicable Single Member shall have the right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, any of the related General Partner's or SMT Borrower's property; and (5) Delaware law, not federal law, governs the determination of what persons or entities have the authority to file a voluntary bankruptcy petition on behalf of General Partner or SMT Borrower.

(KK)    The Borrower Organizational Documents for each Borrower shall provide and shall at all times continue to provide that Borrower shall not cause, permit, or empower its partners, members, board of managers, or any other person to vote on, authorize or take any Material Action (as defined below) without the unanimous written consent of all the partners or members of Borrower, as applicable, and also (i) in the case of each SMT Borrower, the Independent Manager of such SMT Borrower, and (ii) including, in the case of Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower, the related General Partner of such Borrower, and that any purported consent of any such SMT Borrower or the related General Partner of any of Owner Borrower, Master Tenant Borrower or Master Subtenant Borrower shall not be effective or constitute a consent of such SMT Borrower or General Partner unless the related LLC Organizational Documents comply with the requirements of this Agreement, and in any event in the case of each General Partner shall not be effective or constitute a consent of the General Partner without the unanimous written consent of all the members of General Partner and the Independent Director of the General Partner. The LLC Organizational Documents for each SMT Borrower and General Partner, and the Borrower Organizational Documents for each other Borrower, shall each provide and shall at all times continue to provide that none of any Borrower nor, as applicable, any General Partner shall cause, permit, or empower its respective partners, members, board of managers, or any other person to vote on, authorize or take any Material Action (as defined below) without the unanimous written consent of the partners or members, as applicable, of such Borrower and (i) in the case of each of Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower, the members of its General Partner and the Independent Director of such General Partner, and (ii) in the case of each SMT Borrower, the Independent Director of such SMT Borrower. As used herein, "Material Action" shall mean, with respect to each Borrower and General Partner, to institute proceedings to have such Borrower or General Partner adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against such Borrower or General Partner or file a petition seeking or consent to, reorganization or relief with respect to such Borrower or General Partner under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of such Borrower or General Partner or a substantial part of such Borrower's or General Partner's property, or make any assignment for the benefit of creditors of such Borrower or General Partner, or admit in writing such Borrower's or General Partner's inability to pay its debts generally as they become due, or take action in furtherance of any such action.

**Section 9.2**    Prior Conduct of Owner Borrower and Master Subtenant Borrower.    Owner Borrower and Master Subtenant Borrower each hereby further represents, warrants and certifies to and for the benefit and reliance of Lender that: (i) upon closing of the Loan, the prior loans

identified on the certificate attached hereto as <u>Schedule 9.2</u> (the "Prior Loans") shall have been fully paid and satisfied, and no Borrower nor any Borrower Party shall have any continuing liability, actual or contingent, for the Prior Loans or under the loan documents evidencing, securing or relating to the Prior Loans (the "Prior Loan Documents"), and no recourse whatsoever against any portion of the Property shall be available to satisfy the Prior Loans under any circumstances; (ii) Owner Borrower and Master Subtenant Borrower have each provided Lender with true, correct and complete copies of (A) such Borrower's and its General Partner's current (and since the date of such entity's inception) financial statements, (B) such Borrower's and its General Partner's current (and since the date of such entity's inception) Borrower Organizational Documents and LLC Organizational Documents, as applicable, and (C) the Prior Loan Documents; (iii) each of Owner Borrower, Master Subtenant Borrower, GP Owner and GP Master Subtenant has prior to the Closing Date (and at all times since the date of each entity's inception) conducted its affairs as a special purpose bankruptcy remote entity in substantial accordance with the provisions of <u>Section 9.1</u> (other than the provisions respecting maintenance of an Independent Director and provisions required to be included in its organizational documents under <u>Section 9.1</u>), and (A) with respect to Owner Borrower, in substantial accordance with the provisions of its limited partnership agreement excerpted and attached to the certificate attached hereto as <u>Schedule 9.2</u> (the "<u>Former OB SPE Provisions</u>"), which Former OB SPE Provisions have been in effect and contained in such Owner Borrower's limited partnership agreement since the inception of the Owner Borrower and have continued in effect until the amendment to the limited partnership agreement of the Owner Borrower to incorporate the provisions of <u>Section 9.1</u>, (B) with respect to Master Subtenant Borrower, in substantial accordance with the provisions of its limited partnership agreement excerpted and attached to the certificate attached hereto as <u>Schedule 9.2</u> (the "<u>Former MS SPE Provisions</u>"), which Former MS SPE Provisions have been in effect and contained in such Master Tenant Borrower's limited partnership agreement since the inception of the Master Tenant Borrower and have continued in effect until the amendment to the limited partnership agreement of the Master Tenant Borrower to incorporate the provisions of <u>Section 9.1</u>, and (C) with respect to GP Owner, in substantial accordance with the provisions of its limited liability company agreement excerpted and attached to the certificate attached hereto as <u>Schedule 9.2</u> (the "<u>Former GPO SPE Provisions</u>"), which Former GPO SPE Provisions have been in effect and contained in such GP Owner's limited liability company agreement since the inception of the GP Owner and have continued in effect until the amendment to the limited liability company agreement of the GP Owner to incorporate the provisions of <u>Section 9.1</u>; and (iv) each of Owner Borrower's, Master Subtenant Borrower's, GP Owner's and GP Master Subtenant's certifications and statements set forth in the certificate attached hereto as <u>Schedule 9.2</u> are true and correct.

## ARTICLE X
## RESTRUCTURING LOAN, SECONDARY MARKET TRANSACTIONS

**Section 10.1   <u>Secondary Market Transactions Generally</u>.**   Lender shall have the right to engage in one or more Secondary Market Transactions with respect to the Loan, and to structure and restructure all or any part of the Loan, including without limitation in multiple tranches, as a wraparound loan, or for inclusion in a Securitization. Without limitation, Lender shall have the right to cause the Note and the Mortgage to be split into a first and a second mortgage loan, or into a one or more loans secured by mortgages and by ownership interests in Borrower in whatever proportion Lender determines, and thereafter to engage in Secondary Market

Transactions with respect to all or any part of the indebtedness and loan documentation. Borrower acknowledges that it is the intention of the parties that all or a portion of the Loan will be securitized and that all or a portion of the Loan will be rated by one or more Rating Agencies. Borrower further acknowledges that additional structural modifications may be required to satisfy issues raised by any Rating Agencies. As used herein, "Secondary Market Transaction" means any of (i) the sale, assignment, or other transfer of all or any portion of the Obligations or the Loan Documents or any interest therein to one or more investors, (ii) the sale, assignment, or other transfer of one or more participation interests in the Obligations or Loan Documents to one or more investors, (iii) the transfer or deposit of all or any portion of the Obligations or Loan Documents to or with one or more trusts or other entities which may sell certificates or other instruments to investors evidencing an ownership interest in the assets of such trust or the right to receive income or proceeds therefrom or (iv) any other Securitization backed in whole or in part by the Loan or any interest therein.

**Section 10.2    Cooperation; Limitations.**    Borrower shall use all reasonable efforts and cooperate in good faith with Lender in effecting any such restructuring or Secondary Market Transaction. Such cooperation shall include without limitation, executing and delivering such amendments to the Loan Documents and the organizational documents of Borrower Parties as Lender may reasonably request, provided however that no such amendment shall (i) modify the aggregate weighted average of the interest rate payable under the Loan, (ii) modify the stated maturity date of the Loan, (iii) modify the aggregate amortization of the principal amount of the Loan, (iv) modify the non-recourse provisions of the Loan or (v) modify any provision, the effect of which would materially and substantively increase Borrower's obligations or materially and substantively decrease Borrower's rights under the Loan Documents. Such cooperation also shall include using reasonable efforts to obtain such certificates and assurances from governmental entities and others as Lender may reasonably request; provided that Borrower shall not be required to incur any material out-of-pocket cost or expense in connection therewith, other than if Borrower chooses to engage legal counsel, in which case, Borrower shall be solely responsible for Borrower's legal fees and expenses for such counsel.

**Section 10.3    Information.**    Borrower shall provide such access to the Property, personnel of the Manager and of Borrower's constituent members and such information, reports, copies of notices and documents relating to Borrower Parties, Manager, the Property and Collateral and the business and operations of all of the foregoing and such opinions of counsel (including, without limitation, nonconsolidation opinions) as Lender may reasonably request or as any Rating Agency may request in connection with any such Secondary Market Transaction including, without limitation, updated financial information, appraisals, market studies, environmental reviews (Phase Is and, if appropriate, Phase IIs), Property Condition Report(s) and other due diligence investigations together with appropriate verification of such updated information and reports through letters of auditors and consultants and, as of the closing date of the Secondary Market Transaction, updated representations and warranties made in the Loan Documents and such additional representations and warranties any Rating Agency may request or Lender or any purchaser, transferee, assignee, trustee, servicer or potential investor (the Rating Agencies and all of the foregoing parties, collectively, "Interested Parties") may reasonably request, provided, that, Borrower shall not be required to incur material out-of-pocket costs or expenses in connection therewith, other than if Borrower chooses to engage legal counsel, in which case, Borrower shall be solely responsible for Borrower's legal fees and

expenses for such counsel, and, provided further, that no such additional representations and warranties shall materially and substantially increase Borrower's obligations or materially and substantially decrease Borrower's rights under the Loan Documents. Within ten (10) days after request by Lender, if required by any Rating Agency or otherwise reasonably required by Lender, Borrower shall provide revisions or "bringdowns" to the opinions delivered at Closing (including nonconsolidation opinions), or if required new versions of such opinions, addressed to Lender, any trustee under any Securitization backed in whole or in part by the Loan, any Rating Agency that assigns a rating to any securities in connection therewith and any investor purchasing securities therein. Lender shall be permitted to share all such information with the investment banking firms, Rating Agencies, accounting firms, law firms, other third party advisory firms, potential investors, servicers and other service providers and other parties involved in any proposed Secondary Market Transaction. Borrower understands that any such information may be incorporated into any offering circular, prospectus, prospectus supplement, private placement memorandum or other offering documents for any Secondary Market Transaction. Lender and all of the aforesaid third-party advisors and professional firms and investors shall be entitled to rely upon such information. Without limiting the foregoing, Borrower and Guarantor shall provide in connection with each of (i) a preliminary and a final private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable (the documents referred to in the foregoing clauses (i) and (ii), collectively, the "Disclosure Documents"), an agreement certifying that Borrower and Guarantor have examined such Disclosure Documents specified by Lender and that each such Disclosure Document, as it relates to Borrower, Guarantor, any Affiliates, the Property, Manager and all other aspects of the Loan, does not, and as to information provided in third party reports of engineers and environmental consultants, to Borrower's and Guarantor's knowledge after due inquiry, does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (a "Disclosure Certificate"). Borrower and Guarantor shall indemnify, defend, protect and hold harmless Lender, its Affiliates, directors, employees, agents and each Person, if any, who controls Lender or any such Affiliate within the meaning of Section 15 of the Securities Act of 1933 or Section 20 of the Securities Exchange Act of 1934, and any other placement agent or underwriter with respect to any Securitization or Secondary Market Transaction from and against any losses, claims, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) that arise out of or are based upon any untrue statement of any material fact contained in any Disclosure Certificate or other information or documents furnished by Borrower, Guarantor or their Affiliates or in any representation or warranty of any Borrower Party contained herein or in the other Loan Documents or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information not materially misleading. Lender and its Affiliates may publicize the existence of the Obligations in connection with Lender's Secondary Market Transaction activities or otherwise.

**Section 10.4  Additional Provisions.**  In any Secondary Market Transaction, Lender may transfer its obligations under this Loan Agreement and under the other Loan Documents (or may transfer the portion thereof corresponding to the transferred portion of the Obligations), and thereafter Lender shall be relieved of any obligations hereunder and under the other Loan Documents arising after the date of said transfer with respect to the transferred interest. Each

transferee investor shall become a "Lender" hereunder. The holders from time to time of the Loan and/or any other interest of the "Lender" under this Loan Agreement and the other Loan Documents may from time to time enter into one or more co-lender agreements, intercreditor agreements or other agreements with each other and/or with the holder(s) of any other loans or other Persons in their discretion. Borrower acknowledges and agrees that such agreements, as the same may from time to time be amended, modified or restated, may govern the exercise of the powers and discretionary authority of the Lender and/or any other interest of the Lender hereunder and under the other Loan Documents, but Borrower shall be entitled to rely upon any actions taken by any designated servicer(s) or agent(s) of Lender, whether or not within the scope of its power and authority under such other agreements.

**ARTICLE XI**
**RESTRICTIONS ON LIENS AND TRANSFERS**

**Section 11.1    Restrictions on Transfer and Encumbrance.** Except as expressly permitted in this Article XI, Borrower shall not cause or suffer to occur or exist, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, any sale, transfer, assignment, mortgage, pledge, Lien or encumbrance (other than Permitted Encumbrances) of (i) all or any part of the Property or any interest therein, or (ii) the Master Lease or the Master Sublease, or all or any part of the leasehold, subleasehold or sub-subleasehold estate under the Master Lease or the Master Sublease, or the interest of the lessor, lessee, sublessor, sublessee, sub-sublessor or sub-sublessee thereunder (in each case except pursuant to SMT Borrower Transfers made in accordance with Section 11.4), or (iii) any direct or indirect ownership or beneficial interest in any Borrower or any General Partner, irrespective of the number of tiers of ownership or any profits or proceeds of any such direct or indirect ownership interest, or (iv) any change of control of any Borrower or any General Partner (any of the foregoing, a "Transfer") without the prior written consent of Lender, which Lender may withhold in its sole and absolute discretion.

**Section 11.2    Permitted Transfers of Beneficial Interests in Borrower.** Notwithstanding anything to the contrary contained in this Article XI, provided that (i) no Event of Default then exists, (ii) GP Owner shall continue to be the sole general partner of Owner Borrower owning not less than a 1% partnership interest in Owner Borrower, (iii) GP Master Tenant shall continue to be the sole general partner of Master Tenant Borrower owning not less than a 1% partnership interest in Master Tenant Borrower, (iv) GP Master Subtenant shall continue to be the sole general partner of Master Subtenant Borrower owning not less than a 1% partnership interest in Master Subtenant Borrower, (v) Guarantor shall continue to directly or indirectly own and retain at least a 51% interest in each General Partner and each of the Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower, and Guarantor shall continue to maintain control (directly or indirectly) of Owner Borrower, Master Tenant Borrower, Master Subtenant Borrower and each General Partner, and (vi) as to each SMT Borrower, the related SMT Guarantor shall continue to maintain control (directly or indirectly) such SMT Borrower, the following beneficial interests may be transferred without Lender's consent subject to the limitations and conditions applicable thereto as set forth below:

(A)    Transfers (but not pledges, collateral assignments or encumbrances) of up to 49% of the direct or indirect ownership interests in Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower, provided that (i) in each case, the applicable Borrower shall give

97

Lender written notice of such transfer together with copies of all instruments effecting such transfer not less than ten (10) Business Days prior to the date of such transfer; (ii) in each case, such transfer does not and will not result in the termination or dissolution of any Borrower or any Borrower Party, by operation of law or otherwise; (iii) no Person not currently owning, directly or indirectly, more than 49% of the beneficial ownership interests in any Borrower acquires (when such Person's interests are aggregated with those of such Person's Affiliates) more than 49% of the beneficial direct or indirect ownership interests in any Borrower; (v) such transfer shall not result in a change of control of Borrower or General Partner or a change of Manager without Lender's written consent; and (vi) in each case, the single purpose nature and bankruptcy remoteness of each Borrower and General Partner after such transfer is satisfactory to Lender and in accordance with the standards of the Rating Agencies; and

(B)      Transfers (but not pledges, collateral assignments or encumbrances) of up to 49% of the direct or indirect ownership interests in any SMT Borrower (or in the event the owner of such ownership interests in an SMT Borrower shall die, transfers of greater interests to his or her heirs, if the conditions set forth in clause (vii) below are satisfied), provided that (i) in each case (other than transfers to heirs upon the death of an owner as aforesaid, if the conditions set forth in clause (vii) below are satisfied), the applicable SMT Borrower shall give Lender written notice of such transfer together with copies of all instruments effecting such transfer not less than ten (10) Business Days prior to the date of such transfer; (ii) in each case, such transfer does not and will not result in the termination or dissolution of such SMT Borrower, by operation of law or otherwise; (iii) no Person not currently owning, directly or indirectly, more than 49% of the beneficial ownership interests in such SMT Borrower acquires (when such Person's interests are aggregated with those of such Person's Affiliates) more than 49% of the beneficial direct or indirect ownership interests in such SMT Borrower (other than, in the event the owner of such ownership interests in an SMT Borrower shall die, as a result of transfers of greater interests to his or her heirs, if the conditions set forth in clause (vii) below are satisfied); (v) such transfer shall not result in a change of control of such SMT Borrower (other than, in the event the owner of such ownership interests in an SMT Borrower shall die, as a result of transfers of greater interests to his or her heirs, if the conditions set forth in clause (vii) below are satisfied) or a change of Manager without Lender's written consent; (vi) in each case, the single purpose nature and bankruptcy remoteness of such SMT Borrower after such transfer is satisfactory to Lender and in accordance with the standards of the Rating Agencies; and (vii) in the event of a transfer of more than 49% of the beneficial ownership interests, or the controlling ownership interest, in such SMT Borrower occurs as a result of the death of the owner of such ownership interests, the following additional conditions must be satisfied within ninety (90) days after such transfer in order for such transfer to constitute a permitted transfer hereunder:

(a)      Lender shall receive, within ten (10) days after such transfer, written notice of such transfer;

(b)      the transferee either shall be, or shall within the aforementioned ninety (90) day period shall have transferred the majority ownership interest and control in the SMT Borrower to, a person (the "Successor SMT Owner") that shall have executed and delivered to Lender an SMT Owner Certificate in substantially the form of Schedule 11.4(a) attached hereto, or such other form as is approved by Lender, and the statements contained in the SMT Owner Certificate shall be true and correct and show no adverse

98

matters, and without limiting the foregoing, the Successor SMT Owner controlling the SMT Borrower (the "Successor SMT Guarantor") shall be a natural person having a net worth of not less than $500,000 and cash or cash equivalent liquid assets, net of current liabilities (each as further described in the form of SMT Owner Certificate attached as Schedule 11.4(a)) of not less than $250,000, and each subject Successor SMT Owner, together with each Person controlling, controlled by or under common control with such Successor SMT Owner, shall (1) have never been convicted of a felony, (3) have not been the subject of a bankruptcy or foreclosure proceeding within the preceding ten-year period, (4) have no outstanding judgments against him/her/it, (5) shall not be involved in material litigation which may have an adverse effect on him/her/it or on his/her/its financial capacity or prospects, (5) shall be an "Accredited Investor" as defined in Regulation D, as promulgated under the Securities Act of 1933 and (6) shall not be a Prohibited Person;

(c)    Lender shall have received, from reputable search firms reasonably satisfactory to Lender, ten year judgment, tax lien, bankruptcy and litigation searches, and so-called "Patriot Act" searches of listings of Prohibited Persons, for each Successor SMT Owner showing no adverse matters;

(d)    The Successor SMT Guarantor shall execute and deliver to Lender an SMT Guaranty in the form attached hereto as Schedule 11.4(c);

(e)    The Successor SMT Owner shall deliver to Lender (1) an opinion of counsel reasonably approved by Lender, in form and substance reasonably satisfactory to Lender, to the effect that the Successor SMT Guaranty and other loan documents, if any, executed and delivered by SMT Borrower and the Successor SMT Guarantor have been duly authorized, executed and delivered and are enforceable in accordance with their terms, and such other matters as Lender may reasonably request, and (2) a substantive non-consolidation opinion of counsel reasonably approved by Lender, in form and substance reasonably satisfactory to Lender, with respect to SMT Borrower and its Successor SMT Owners; and

(f)    Borrower shall pay or reimburse Lender for Lender's costs and expenses associated with the foregoing.

For purposes of this Section 11.2, "control" shall have the meaning given thereto in the definition of "Affiliate" in Section 1.1 and a "change of control" of any Person shall include the Transfer of legal or equitable ownership interests in such Person which after giving effect to such Transfer results in any transferee or pledgee of such interests holding more than a 49% legal or equitable ownership interest or security interest in such Person.

## Section 11.3    Assumability.

(A)    In the event that Borrower desires to transfer all of the Property (or a direct or indirect beneficial ownership interest in each Borrower which is not a permitted Transfer under Section 11.2 above or Section 11.4 below) to another party (the "Transferee Borrower") and have the Transferee Borrower assume all of Borrower's obligations under the Loan Documents,

99

and have replacement guarantors and indemnitors assume all of the obligations of Guarantor under the Loan Documents from and after such transfer (collectively, a "Transfer and Assumption"), Borrower may make a written application to Lender for Lender's consent to the Transfer and Assumption, subject to the conditions set forth in this Section; provided that no more than one Transfer and Assumption shall be permitted during the term of the Loan. Together with such written application, Borrower shall pay to Lender the reasonable review fee then required by Lender. Borrower also shall pay on demand all of the costs and expenses incurred by Lender, including reasonable attorneys' fees and expenses, and including the fees and expenses of Rating Agencies and other outside entities, in connection with considering any proposed Transfer and Assumption, whether or not the same is permitted or occurs. Lender may grant or withhold its consent to a Transfer and Assumption in its sole and absolute discretion. Completion of any Transfer and Assumption shall be subject to such conditions as Lender may determine to impose, and shall in any event be subject to satisfaction of the following conditions:

(i)     No Default or Event of Default shall have occurred and be continuing;

(ii)     Borrower shall have submitted to Lender true, correct and complete copies of information and documents reasonably requested by Lender concerning the Property, the Transferee Borrower and any replacement guarantors and indemnitors;

(iii)     Evidence satisfactory to Lender shall have been provided showing that the Transferee Borrower and such of its Affiliates as shall be designated by Lender comply with Article IX, as those provisions may be modified by Lender taking into account the ownership structure of Transferee Borrower and its Affiliates;

(iv)     Borrower shall have obtained (and delivered to Lender) a Rating Confirmation with respect to the Transfer and Assumption and all related transactions;

(v)     Transferee Borrower or the Person or group of Persons who owns and controls the Transferee Borrower, in Lender's sole judgment, shall have sufficient experience in managing assets similar in size and type to the Property.

(vi)     In Lender's sole judgment, the Transferee Borrower and the partners, members or shareholders of the Transferee Borrower are financially sound or have sufficient financial resources to manage the Property for the term of the Loan;

(vii)     The identity, experience, and financial condition of the Transferee Borrower and the replacement guarantors and indemnitors shall be acceptable to Lender in its sole and absolute discretion;

(viii)     Borrower shall deliver to Lender at the closing of the Transfer and Assumption an assumption fee in the amount of one percent (1%) of the then unpaid principal balance of the Loan;

(ix)     Borrower, Transferee Borrower, the original and replacement guarantors and indemnitors shall execute and deliver such documents as Lender may require, in form and substance satisfactory to Lender, to evidence the Transfer and Assumption, including replacement guaranties and indemnities and Loan Document modifications;

(x)    Counsel to the Transferee Borrower and replacement guarantors and indemnitors shall deliver to Lender opinions in form and substance satisfactory to Lender as to substantially the same matters for which opinions were required in connection with the origination of the Loan (and as to such additional matters as the Lender and Rating Agencies may require), including, without limitation, a bankruptcy non-consolidation opinion;

(xi)    Borrower shall cause to be delivered to Lender, an endorsement to Lender's policy of title insurance in form and substance acceptable to Lender, in Lender's reasonable discretion, relating to, among other things, the change in the identity of the vestee and execution and delivery of the Transfer and Assumption documents and the continuing priority of the Lender's Mortgage and the continuing effect of the title insurance and all endorsements thereto; and

(xii)    Borrower shall pay to Lender all reasonable costs and expenses incurred by Lender in connection with the Transfer and Assumption, including but not limited to, Lender's reasonable attorneys' fees and expenses, all recording fees, Rating Agency fees and expenses, and all fees payable to the title company in connection with the Transfer and Assumption. Borrower shall pay such costs and expenses of Lender regardless of whether any proposed Transfer and Assumption is approved by Lender or occurs.

## Section 11.4    Permitted SMT Borrower Transfers.

(A)    Initial SMT Borrower Transfers.    Notwithstanding anything to the contrary contained in this Article XI, provided no Event of Default has occurred and is continuing and the Master Unit Outline has been completed and reasonably approved by Lender, one or more newly formed Delaware limited liability companies which satisfy the requirements of Section 9.1 hereof (each an "SMT Borrower") may from time to time on or prior to February 28, 2007 (i) sublease from the Master Tenant Borrower a subleasehold interest in the SMT Units under an SMT Master Lease and, as a condition thereto, simultaneously sub-sublease such SMT Units to Master Subtenant Borrower under an SMT Master Sublease, and (ii) join in and assume, on a joint and several basis, Borrower's obligations under the Loan Documents (each such transaction involving an individual SMT Borrower, an "Initial SMT Borrower Transfer"), upon and subject to satisfaction of the following conditions:

(i)    Master Tenant Borrower shall make a written application for approval by Lender of such Initial SMT Borrower Transfer not less than fifteen (15) Business Days prior to the proposed Initial SMT Borrower Transfer, which application shall include (a) a non-refundable $2,500 processing fee for each proposed Initial SMT Borrower Transfer (for example, if there are 10 proposed simultaneous or separate Initial SMT Borrower Transfers, the processing fee would be $25,000), and (b) a certification of the owner(s) of the beneficial interests in the proposed SMT Borrower (each, a "SMT Owner") in substantially the form of Schedule 11.4(a) attached hereto, or such other form as is approved by Lender (the "SMT Owner Certificate");

(ii)    the statements contained in the SMT Owner Certificate shall be true and correct and show no adverse matters, and without limiting the foregoing, the SMT Owner controlling the SMT Borrower (the "SMT Guarantor") shall be a natural person having a net worth of not less than $500,000 and cash or cash equivalent liquid assets, net of current liabilities

(each as further described in the form of SMT Owner Certificate attached as Schedule 11.4(a)) of not less than $250,000, and each subject SMT Owner, together with each Person controlling, controlled by or under common control with such SMT Owner, shall (1) have never been convicted of a felony, (3) have not been the subject of a bankruptcy or foreclosure proceeding within the preceding ten-year period, (4) have no outstanding judgments against him/her/it, (5) shall not be involved in material litigation which may have an adverse effect on him/her/it or on his/her/its financial capacity or prospects, (5) shall be an "Accredited Investor" as defined in Regulation D, as promulgated under the Securities Act of 1933 and (6) shall not be a Prohibited Person;

(iii)    Lender shall have received, from reputable search firms reasonably satisfactory to Lender, ten year judgment, tax lien, bankruptcy and litigation searches, and so-called "Patriot Act" searches of listings of Prohibited Persons, for each SMT Owner showing no adverse matters, and a UCC search with respect to the SMT Borrower showing no adverse matters;

(iv)    The SMT Owner(s) shall not be Affiliates of Owner Borrower, Master Tenant Borrower or Master Subtenant Borrower, Guarantor or their respective Affiliates;

(v)    Each SMT Borrower shall be a single-purpose, bankruptcy remote Delaware limited liability company that complies with the requirements of Article IX hereof, the operating agreement of which shall be in substantively the form attached hereto as Schedule 11.4(b);

(vi)    no more than 200 SMT Borrowers, and no more than 200 Initial SMT Borrower Transfers, shall be permitted, and no Initial SMT Borrower Transfer shall be permitted after February 28, 2007;

(vii)    each proposed SMT Borrower and SMT Owner shall be subject to Lender's prior written consent, which if the criteria set forth in the foregoing clauses (i)-(vi) are satisfied (a) shall not be unreasonably withheld, and (b) shall be deemed granted for SMT Borrowers acquiring (when aggregated with their Affiliates, inclusive of past transfers) less than a 2.38% SMT Unit Percentage; in the case of a proposed SMT Borrower acquiring (when aggregated with their Affiliates, inclusive of past transfers) a 2.38% or greater SMT Unit Percentage, such SMT Borrower and its SMT Owner(s) shall provide such additional financial and other information as Lender may require in order to evaluate such SMT Borrower and SMT Owner(s);

(viii)    Each SMT Guarantor with respect to each SMT Borrower shall execute and deliver to Lender a Guaranty of Recourse Obligations in the form attached hereto as Schedule 11.4(c)(each an "SMT Guaranty");

(ix)    Borrower shall deposit with Lender an amount equal to the product of $8,500,0000 multiplied by the SMT Borrower Unit Percentage (expressed as a decimal, i.e., 3% = .03) to be deposited into the Sublease Reserve in accordance with the terms of Section 6.8 hereof;

102

(x)    (1) The SMT Borrower and Master Tenant Borrower shall execute and deliver, and provide a counterpart to Lender of, the SMT Master Lease in the form attached hereto as Schedule 11.4(d), together with a recordable memorandum of SMT Master Lease in the form attached hereto as Schedule 11.4(e), and (2) the SMT Borrower, Master Tenant Borrower and Master Subtenant Borrower shall execute and deliver, and provide a counterpart to Lender of, the SMT Master Sublease in the form attached hereto as Schedule 11.4(f), together with a recordable memorandum of SMT Master Sublease in the form attached hereto as Schedule 11.4(g);

(xi)    The SMT Borrower shall execute and deliver to Lender an assignment and assumption agreement in the form attached hereto as Schedule 11.4(h)(each a "SMT Assumption Agreement"), pursuant to which, among other things, such SMT Borrower shall, subject to the limitations on recourse as provided in Article XII of this Agreement, join in and assume all liabilities and obligations under the Loan Documents such that each existing Borrower and each SMT Borrower shall be jointly and severally liable for all of the liabilities and obligations under the Loan Documents, and upon the execution and delivery of such assignment and assumption agreement such SMT Borrower shall be a "Borrower" for all purposes under the Loan Documents;

(xii)    The SMT Borrower and Master Tenant Borrower shall execute and deliver to Lender any other documents or deliverables reasonably required by Lender related to the SMT Borrower Transfer, including title insurance endorsements, in form and substance reasonably acceptable to Lender, provided that Lender may not require pursuant to this clause (xi) an assignment and assumption agreement in any form other than the assignment and assumption agreement attached hereto as Schedule 11.4(h) or a guaranty other than in the form attached hereto as Schedule 11.4(c), or the execution and delivery of additional Loan Documents which impose obligations upon SMT Borrower or SMT Guarantor in addition to those contained in such forms attached as Schedules 11.4(c) and (h), except as may be necessary to accommodate any material change in fact or law;

(xiii)    The SMT Borrower shall deliver to Lender (a) an opinion of counsel reasonably approved by Lender, in form and substance reasonably satisfactory to Lender, to the effect that such SMT Borrower is duly formed, validly existing, and in good standing under the laws of the State of Delaware, that the SMT Assumption Agreement, SMT Guaranty and other loan documents, if any, executed and delivered by SMT Borrower and SMT Guarantor have been duly authorized, executed and delivered and are enforceable in accordance with their terms, and such other matters as Lender may reasonably request, and (b) a substantive non-consolidation opinion of counsel reasonably approved by Lender, in form and substance reasonably satisfactory to Lender, with respect to SMT Borrower and its SMT Owners (provided that in the case of both (a) and (b) above an opinion from a firm and in the form delivered and approved by Lender in connection with the first or any subsequent Initial SMT Borrower Transfer shall, for purposes of proposed Initial SMT Borrower Transfers thereafter, be considered to be in form and substance reasonably satisfactory to Lender, subject to any changes or further opinions that Lender may reasonably require in light of material changes in facts, circumstances or law); and

(xiv)    Borrower shall pay or reimburse Lender for Lender's costs and expenses associated with the Initial SMT Borrower Transfer as provided in Section 11.4(C) below.

(B)    Notwithstanding anything to the contrary contained in this Article XI, provided no Event of Default has occurred and is continuing, an SMT Owner may transfer all or a majority of its ownership interest in its related SMT Borrower to a new beneficial owner (a "Substitute SMT Owner")(each such transaction involving an individual SMT Borrower, a "Subsequent SMT Borrower Transfer"), upon and subject to satisfaction of the following conditions:

(i)    SMT Borrower shall make a written application for approval by Lender of such Subsequent SMT Borrower Transfer not less than fifteen (15) Business Days prior to the proposed Subsequent SMT Borrower Transfer, which application shall include (a) a non-refundable $2,500 processing fee for each proposed Subsequent SMT Borrower Transfer, and (b) a certification of each proposed Substitute SMT Owner in substantially the form of the SMT Owner Certificate;

(ii)    the statements contained in the SMT Owner Certificate shall be true and correct and show no adverse matters, and without limiting the foregoing, the Substitute SMT Owner to acquire control of the SMT Borrower (the "Substitute SMT Guarantor") shall be a natural person having a net worth of not less than $500,000 and cash or cash equivalent liquid assets, net of current liabilities (each as further described in the form of SMT Owner Certificate attached as Schedule 11.4) of not less than $250,000, and each subject Substitute SMT Owner, together with each Person controlling, controlled by or under common control with such SMT Owner, shall (1) have never been convicted of a felony, (3) have not been the subject of a bankruptcy or foreclosure proceeding within the preceding ten-year period, (4) have no outstanding judgments against him/her/it, (5) shall not be involved in material litigation which may have an adverse effect on him/her/it or on his/her/its financial capacity or prospects, (5) shall be an "Accredited Investor" as defined in Regulation D, as promulgated under the Securities Act of 1933 and (6) shall not be a Prohibited Person;

(iii)    Lender shall have received, from reputable search firms reasonably satisfactory to Lender, ten year judgment, tax lien, bankruptcy and litigation searches, and so-called "Patriot Act" searches of listings of Prohibited Persons, for each Subsequent SMT Owner showing no adverse matters;

(iv)    Each SMT Borrower shall remain a single-purpose, bankruptcy remote Delaware limited liability company that complies with the requirements of Article IX hereof, the operating agreement of which shall be in substantially the form attached hereto as Schedule 11.4(b);

(v)    The Substitute SMT Owner(s) shall not be Affiliates of Owner Borrower, Master Tenant Borrower or Master Subtenant Borrower, Guarantor or their respective Affiliates;

(vi)    no more than 200 SMT Borrowers shall be permitted;

(vii)    each proposed Substitute SMT Owner shall be subject to Lender's prior written consent, which if the criteria set forth in the foregoing clauses (i)-(vi) are satisfied (a)

104

shall not be unreasonably withheld and (b) shall be deemed granted for an Substitute SMT Owner that is acquiring an interest in an SMT Borrower (when aggregated with their Affiliates, inclusive of past transfers) of less than a 2.38% SMT Unit Percentage;

(viii)    Each Substitute SMT Guarantor with respect to each SMT Borrower shall execute and deliver to Lender an SMT Guaranty;

(ix)    The SMT Borrower and Master Tenant Borrower shall execute and deliver to Lender any other documents or deliverables reasonably required by Lender related to the Subsequent SMT Borrower Transfer, in form and substance reasonably acceptable to Lender, provided that Lender may not require pursuant to this clause (xi) a guaranty other than in the form attached hereto as Schedule 11.4(c), or the execution and delivery of additional Loan Documents which impose (rather than reaffirm) obligations upon any SMT Borrower, in addition to those contained in such form attached as Schedule 11.4(c), except as may be necessary to accommodate any material change in fact or law;

(x)    The SMT Borrower shall deliver to Lender (a) an opinion of counsel reasonably approved by Lender, in form and substance reasonably satisfactory to Lender, to the effect that such SMT Borrower is duly formed, validly existing, and in good standing under the laws of the State of Delaware, that the SMT Guaranty and other loan documents, if any, executed and delivered by SMT Borrower and Substitute SMT Guarantor have been duly authorized, executed and delivered and are enforceable in accordance with their terms, and such other matters as Lender may reasonably request, and (b) a substantive non-consolidation opinion of counsel reasonably approved by Lender, in form and substance reasonably satisfactory to Lender, with respect to SMT Borrower and its Substitute SMT Owners (provided that in the case of both (a) and (b) above an opinion from a firm and in the form delivered and approved by Lender in connection with the first or any subsequent SMT Borrower Transfer shall, for purposes of proposed SMT Borrower Transfers thereafter, be considered to be in form and substance reasonably satisfactory to Lender, subject to any changes or further opinions that Lender may reasonably require in light of material changes in facts, circumstances or law); and

(xi)    Borrower shall pay or reimburse Lender for Lender's costs and expenses associated with the Subsequent SMT Borrower Transfer as provided in Section 11.4(C) below.

Upon completion of any Subsequent SMT Borrower Transfer the Substitute SMT Owner shall constitute an SMT Owner hereunder, the Substitute SMT Guarantor shall constitute an SMT Guarantor hereunder.

(C)    In addition to the processing fees described above, Borrower also shall pay or reimburse Lender on demand for all of the reasonable out-of-pocket costs and expenses incurred by Lender, including without limitation reasonable attorneys' fees and expenses, title insurance fees and premiums, UCC financing statement preparation and filing, and costs of recordation of documents to be recorded, in connection with any proposed Initial SMT Borrower Transfer or Subsequent SMT Borrower Transfer (each Initial SMT Borrower Transfer and each Subsequent SMT Borrower Transfer is sometimes referred to herein as a "SMT Borrower Transfer"), whether or not the same occurs.

# ARTICLE XII
## RECOURSE; LIMITATIONS ON RECOURSE

**Section 12.1** <u>Limitations on Recourse</u>. Subject to the provisions and qualifications of this Article, Lender shall not enforce the liability and obligation of Borrower to perform and observe any of their obligations that may be contained in the Note, this Loan Agreement, the Mortgage or any other Loan Document by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Loan Agreement, the Mortgage and the other Loan Documents, or in the Property, the Rents, or any other Collateral pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other Collateral. Lender, by accepting the Note, this Loan Agreement, the Mortgage and the other Loan Documents, shall not sue for, seek or demand any monetary judgment against any Borrower in any such action or proceeding under or by reason of or under or in connection with the Note, this Loan Agreement, the Mortgage or the other Loan Documents. Notwithstanding anything to the contrary in this Loan Agreement, the Mortgage or any of the Loan Documents, the provisions of this Section 12.1 and the other provisions of the Loan Documents shall not, however: (a) constitute a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Obligations secured by the Mortgage or to require that all Collateral shall continue to secure all of the Obligations owing to Lender in accordance with the Loan Documents; (b) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (c) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage or other Loan Documents; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; or (f) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Mortgage and other Loan Documents or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property or any other Collateral.

**Section 12.2** <u>Recourse to Primary Borrower Parties and Guarantor.</u>

(I) <u>Each SMT Borrower and SMT Guarantor</u>. Notwithstanding the provisions of Section 12.1 or anything contained herein to the contrary, each SMT Borrower and its related SMT Guarantor shall be personally liable for, and the provisions of Section 12.1 shall not in any way limit or constitute a waiver of the right of Lender to enforce the liability and obligation of such SMT Borrower and SMT Guarantor, by money judgment or otherwise, for the following, all of which shall be the personal obligation and liability of such SMT Borrower under this Loan Agreement and of its related SMT Guarantor under the SMT Guaranty: (A) the entire Loan and all the other Obligations in the event (i) a voluntary bankruptcy filing or other similar event by such SMT Borrower occurs; (ii) any Involuntary Borrower Party Bankruptcy shall be filed or instituted against such SMT Borrower if the same is solicited, procured, consented to or acquiesced in by such SMT Borrower or its related SMT Guarantor or any Affiliate of any of them, except for any such action brought by Lender as set forth in clause (iv) below; (iii) such

106

SMT Borrower or its related SMT Guarantor or any Affiliate of any of them files or institutes or joins in the filing or institution of, or solicits, procures, consents to or acquiesces to any filing or institution of any bankruptcy or similar petition or proceeding against any other Borrower, except for any such action brought by Lender as set forth in clause (iv) below; (iv) subsequent to the commencement of any bankruptcy or similar proceeding with respect to any Borrower, any involuntary bankruptcy proceeding is brought by Lender against one or more of the Borrower(s)(which may include such SMT Borrower) and such SMT Borrower or its related SMT Guarantor or any Affiliate of any of them files any motion contesting the same; (v) any breach by such SMT Borrower of Article IX hereof or Article XI hereof; (vi) such SMT Borrower or its related SMT Guarantor or any Affiliate of any of them contests or in any way challenges, directly or indirectly, the enforceability of its SMT Master Lease or SMT Master Sublease or the characterization of the interests established thereby as other than the lease and sublease structure described therein; (vii) in the absence of Lender's prior written consent, such SMT Borrower enters into or consents to any termination of the Management Agreement; or (viii) such SMT Borrower fails to enter into any workout plan or modification of the Loan upon the occurrence of an Event of Default that has been approved by SMT Borrowers the SMT Relative Percentages of which aggregate to 51% of more at the time of such Event of Default; (B) without limiting the provisions of clause (A) above, the amount of (i) any insurance proceeds, condemnation awards or other sums or payments relating to the Property or the insurance required hereunder which are received by such SMT Borrower or any Affiliate thereof and are not applied by such SMT Borrower or its Affiliate in accordance with the provisions of the Loan Documents, or which are otherwise misappropriated by such SMT Borrower or any Affiliate thereof; (ii) any rents, profits, issues, products and income of the Property, Security Deposits, Lease termination payments or recoveries upon Leases, rents collected in advance or any other funds received or collected by or on behalf of such SMT Borrower or any Affiliate thereof which are not applied by such SMT Borrower or any Affiliate thereof in accordance with the Loan Documents, or which are otherwise misappropriated by such SMT Borrower Party or any Affiliate thereof; (iii) any payments made by such SMT Borrower to any Affiliate thereof in violation of the Loan Documents after the occurrence and during the continuance of an Event of Default; and (iv) all reasonable costs and expenses, including attorneys' fees and expenses, incurred in collecting any amount due under the Loan Documents which, as to such SMT Borrower, is a recourse obligation of such SMT Borrower as described in this Section 12.2(I) or, as to SMT Guarantor, is a recourse obligation of SMT Guarantor under its SMT Guaranty, as applicable; or is an obligation of Borrower under the Environmental Indemnity; and (C) without limiting the provisions of clauses (A) and (B) above, any liability, loss, damage, cost or expense (including, without limitation, attorneys' fees and expenses) suffered or incurred by Lender resulting from any and all of the following: (i) the occurrence of any of the events described in the foregoing clauses (A) and (B); (ii) fraud or intentional misrepresentation by such SMT Borrower or any Affiliate thereof in this Loan Agreement or any other Loan Document or otherwise in connection with the Loan; (iii) such SMT Borrower, its related SMT Guarantor or any Affiliate of any of them contests or in any way interferes with, directly or indirectly, any foreclosure action or sale commenced by Lender or with any other enforcement of Lender's rights, powers or remedies under any of the Loan Documents or under any document evidencing, securing or otherwise relating to the Property or any other collateral for the Obligations (whether by making any motion, bringing any counterclaim, claiming any defense, seeking any injunction or other restraint, commencing any action seeking to consolidate any such foreclosure or other

107

enforcement with any other action, or otherwise), other than contests brought in good faith by such SMT Borrower upon which such SMT Borrower ultimately prevails pursuant to a final, non-appealable judgment entered against Lender; (iv) the seizure or forfeiture of the Property, or any portion thereof, or Lender's interest therein, resulting from criminal wrongdoing by such SMT Borrower or its Affiliates; or (v) failure by Borrower to comply with the covenants, obligations, liabilities, warranties and representations contained in the Environmental Indemnity or otherwise pertaining to environmental matters.

(II) Owner Borrower, Master Tenant Borrower, Master Subtenant Borrower and Guarantor. Notwithstanding the provisions of Section 12.1 or anything contained herein to the contrary, Owner Borrower, Master Tenant Borrower, Master Subtenant Borrower and Guarantor shall be personally liable for, and the provisions of Section 12.1 shall not in any way limit or constitute a waiver of the right of Lender to enforce the liability and obligation of Owner Borrower, Master Tenant Borrower, Master Subtenant Borrower and Guarantor, by money judgment or otherwise, for the following, all of which shall be the personal obligation and liability of Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower under this Loan Agreement and of Guarantor under the Guaranty: (A) the entire Loan and all the other Obligations in the event of (i) a voluntary bankruptcy filing or other similar event by any Borrower; (ii) any Involuntary Borrower Party Bankruptcy which is solicited, procured, consented to or acquiesced in by any Borrower Party or any Affiliate of any of them, except for any such action brought by Lender as set forth in clause (iii) below; (iii) subsequent to the commencement of any bankruptcy or similar proceeding with respect to any Borrower, any involuntary bankruptcy proceeding is brought by Lender against one or more of the Borrower(s)(which may include any or all of Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower) and any Borrower Party or any Affiliate of any of them files any motion contesting the same; (iv) any Borrower Party or any Affiliate of any of them contests or in any way challenges, directly or indirectly, the enforceability of any of the Master Lease or Master Sublease or the characterization of the interests established thereby as other than the lease and sublease structure described therein; (v) in the absence of Lender's prior written consent, such Borrower enters into or consents to any termination of the Management Agreement; (vi) any Borrower fails to enter into any workout plan or modification of the Loan upon the occurrence of an Event of Default that has been approved by SMT Borrowers the SMT Relative Percentages of which aggregate to 51% of more at the time of such Event of Default; (vii) breach of Article IX hereof or Article XI hereof; or (viii) the failure of Borrower to pay to Lender the first regularly scheduled installment of principal and interest on the Loan on the First Payment Date; (B) without limiting the provisions of clause (A) above, the amount of (i) any insurance proceeds, condemnation awards or other sums or payments relating to the Property or the insurance required hereunder which are not applied by any Borrower Party or any Affiliate thereof in accordance with the provisions of the Loan Documents, or which are otherwise misappropriated by any Borrower Party or any Affiliate thereof; (ii) any rents, profits, issues, products and income of the Property, Security Deposits, Lease termination payments or recoveries upon Leases, rents collected in advance or any other funds received or collected by or on behalf of Borrower or any other Borrower Party or any Affiliate thereof which are not applied by any Borrower Party or any Affiliate thereof in accordance with the Loan Documents, or which are otherwise misappropriated by any Borrower Party or any Affiliate thereof, including without limitation any failure or refusal to deliver Security Deposits to Lender (including any failure to cause, if an Event of Default occurs, the re-issuance or transfer into the name of Lender

108

or its designee, as beneficiary, of any letters of credit issued by tenants); (iii) any payments made by Borrower to any Affiliate thereof in violation of the Loan Documents after the occurrence and during the continuance of an Event of Default; and (iv) all reasonable costs and expenses, including attorneys' fees and expenses, incurred in collecting any amount due under the Loan Documents which, as to any Borrower, is a recourse obligation of any Borrower as described in this Section 12.2 or, as to Guarantor, is a recourse obligation of Guarantor under the Guaranty, or is an obligation of Borrower and/or Guarantor under the Environmental Indemnity; and (C) without limiting the provisions of clauses (A) and (B) above, any liability, loss, damage, cost or expense (including, without limitation, attorneys' fees and expenses) suffered or incurred by Lender resulting from any and all of the following: (i) the occurrence of any of the events described in the foregoing clauses (A) and (B); (ii) fraud or intentional misrepresentation by any Borrower Party or any Affiliate thereof in this Loan Agreement or any other Loan Document or otherwise in connection with the Loan; (iii) any act of arson to the Property by any Borrower Party, its agents, Affiliates, officers, employees or property manager; (iv) any removal or disposal of any portion of the Property by any Borrower Party, its agents, Affiliates, officers, employees or property manager to the extent such Property is not replaced by the Primary Borrower Parties with like property of equivalent value; (v) waste of the Property; (vi) any Borrower Party or any Affiliate of any of them contests or in any way interferes with, directly or indirectly, any foreclosure action or sale commenced by Lender or with any other enforcement of Lender's rights, powers or remedies under any of the Loan Documents or under any document evidencing, securing or otherwise relating to the Property or any other collateral for the Obligations (whether by making any motion, bringing any counterclaim, claiming any defense, seeking any injunction or other restraint, commencing any action seeking to consolidate any such foreclosure or other enforcement with any other action, or otherwise), other than contests brought in good faith by any such Borrower upon which such Borrower ultimately prevails pursuant to a final, non-appealable judgment entered against Lender; (vii) the seizure or forfeiture of the Property, or any portion thereof, or Lender's interest therein, resulting from criminal wrongdoing by Borrower (or any of them), its agents, Affiliates, officers or employees; (viii) any claims for payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the Closing and funding of the Loan; (ix) Borrower's failure to pay transfer fees and charges due Lender under the Loan Documents in connection with any transfer of all or any part of the Property, or any interest therein, from Borrower to Borrower's transferee, or transfer of any beneficial interest in Borrower; (x) failure by Borrower to comply with the covenants, obligations, liabilities, warranties and representations contained in the Environmental Indemnity or otherwise pertaining to environmental matters; (xi) in the event Lender has waived (or Borrower has failed to pay) the monthly collection for real and personal property taxes, assessments, insurance premiums, or ground rents, then failure by Borrower to pay any or all such taxes, assessments, premiums and rents; (xii) in the event that an Affiliate of Borrower is the Manager, then any management fee taken by such Manager after the occurrence and during the continuance of an Event of Default unless otherwise approved by Lender in writing; (xiv) any claim, damages, offset or defense asserted by any tenant against Lender or any affiliate of Lender based on any act or omission (including any representation or other obligation) of Borrower (or any of them) or any agent, manager or other person employed by or acting on behalf of Borrower; or (xv) gross negligence or willful misconduct by Borrower (or any of them), its agents, Affiliates, officers or employees which causes or results in a material diminution, or material loss of value, of the Property that is not reimbursed by insurance or

which gross negligence or willful misconduct exposes Lender to claims, liability or costs of defense in any litigation or other legal proceeding.

**Section 12.3   Miscellaneous.**  No provision of this Article shall (i) affect (A) the enforcement of, or (B) the personal liability of and recourse against any guarantor or indemnitor (including without limitation the Guarantor) and the assets of any such guarantor and indemnitor for all liabilities and obligations under, the Environmental Indemnity, the Guaranty or any guaranty or similar agreement executed in connection with the Loan, (ii) release or reduce the debt evidenced by the Note, (iii) impair the lien of the Mortgage, this Loan Agreement or any other Loan Document, (iv) impair the rights of Lender to enforce any provisions of the Loan Documents, or (v) limit Lender's ability to obtain a deficiency judgment or judgment on the Loan or otherwise against any Borrower Party to the extent necessary to obtain any amount for which such Borrower Party may be personally liable in accordance with this Article or any other Loan Document.

<div align="center">

**ARTICLE XIII**
**MISCELLANEOUS**

</div>

**Section 13.1   Expenses and Attorneys' Fees.**  Except as otherwise expressly provided in the Loan Documents, whether or not the transactions contemplated hereby shall be consummated, Borrower agrees to promptly pay all reasonable fees, costs and expenses incurred by Lender in connection with any matters contemplated by or arising out of this Loan Agreement, including the following, and all such fees, costs and expenses shall be part of the Obligations, payable on demand: (A) reasonable fees, costs and expenses (including reasonable attorneys' fees, and other professionals retained by Lender) incurred in connection with the examination, review, due diligence investigation, documentation and closing of the financing arrangements evidenced by the Loan Documents; (B) reasonable fees, costs and expenses (including reasonable attorneys' fees and other professionals retained by Lender) incurred in connection with the administration of the Loan Documents and the Loan and any amendments, modifications and waivers relating thereto; (C) reasonable fees, costs and expenses (including reasonable attorneys' fees) incurred in connection with the review, documentation, negotiation and administration of any Borrower-initiated requests under or in connection with the Loan Documents (including without limitation requests for lease, budget, and management approvals and subordination, non-disturbance and attornment agreements); and (D) reasonable fees, costs and expenses (including attorneys' fees and fees of other professionals retained by Lender) incurred in any action to enforce or interpret this Loan Agreement or the other Loan Documents or to collect any payments due from Borrower under this Loan Agreement, the Note or any other Loan Document or incurred in connection with any refinancing or restructuring of the credit arrangements provided under this Loan Agreement, whether in the nature of a "workout" or in connection with any insolvency or bankruptcy proceedings or otherwise.  Any costs and expenses due and payable to Lender after the Closing Date may be paid to Lender pursuant to the terms hereof.

**Section 13.2   Indemnity.**  In addition to the payment of expenses as required elsewhere herein, whether or not the transactions contemplated hereby shall be consummated, Borrower agrees to indemnify, defend, protect, pay and hold Lender, its successors and assigns (including, without limitation, the trustee and/or the trust under any trust agreement executed in connection with any Securitization backed in whole or in part by the Loan and any other Person which may hereafter

<div align="center">110</div>

be the holder of the Note or any interest therein), and the officers, directors, stockholders, partners, members, employees, agents and Affiliates of Lender and such successors and assigns (collectively called the "Indemnitees") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, Tax Liabilities, broker's or finders fees, reasonable costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitee shall be designated a party thereto) that may be imposed on, incurred by, or asserted against that Indemnitee, in any manner relating to or arising out of any of the following (to the extent that insurance proceeds paid on account of same shall be inadequate) (A) the enforcement of any of the Loan Documents; (B) any breach by Borrower of any representation, warranty, covenant, or other agreement contained in any of the Loan Documents; (C) the presence, release, threatened release, disposal, removal, or cleanup of any Hazardous Material located on, about, within or affecting the Property or any violation of any applicable Environmental Law for which Borrower is liable; (D) any claim brought by any third party arising out of any condition or occurrence at or pertaining to the Property; (E) any design, construction, operation, repair, maintenance, use, non-use or condition of the Property or Improvements, including claims or penalties arising from violation of any applicable laws or insurance requirements, as well as any claim based on any patent or latent defect, whether or not discoverable by Lender; (F) any performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (G) any contest referred to in Section 5.3(B) hereof; (H) any obligation or undertaking relating to the performance or discharge of any of the terms, covenants and conditions of the landlord contained in the Leases; or (I) the use or intended use of the proceeds of any of the Loan (the foregoing liabilities herein collectively referred to as the "Indemnified Liabilities"). Any amounts payable to any Indemnitee by reason of the application of this Section 13.2 shall be payable on demand and shall bear interest at the Default Rate from the date such loss or damage is sustained by any Indemnitee until paid. The obligations and liabilities of Borrower under this Section 13.2 shall survive the term of the Loan and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**Section 13.3    Amendments and Waivers.**    Except as otherwise provided herein, no amendment, modification, termination or waiver of any provision of this Loan Agreement, the Note or any other Loan Document, or consent to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender (or any servicer or designee of Lender) and any other party to be charged. Each amendment, modification, termination or waiver shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on Borrower in any case shall entitle Borrower or other Person to any other or further notice or demand in similar or other circumstances (except for any notices as expressly required herein or under the other Loan Documents).

**Section 13.4    Retention of Borrower's Documents.**    Lender may, in accordance with Lender's customary practices, destroy or otherwise dispose of all documents, schedules, invoices or other papers, delivered by Borrower to Lender unless Borrower requests in writing that same be returned. Upon such request and at such Borrower's expense, Lender shall return such papers when Lender's actual or anticipated need for same has terminated.

111

**Section 13.5**  **Notices.**   Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given shall be in writing and addressed to the respective party as set forth below.   Notices shall be effective (i) three (3) Business Days after the date such notice is mailed, (ii) on the next Business Day if sent by a nationally recognized overnight courier service, (iii) on the date of delivery by personal delivery and (iv) on the date of transmission if sent by telefax during business hours on a Business Day (otherwise on the next Business Day) (with receipt of confirmation).   Notices shall be addressed as follows:

If to Borrower or any Borrower Party:

c/o Investment Properties of America, LLC
10800 Midlothian Turnpike
Suite 309
Richmond, Virginia 23235
Attn: Ed Okun
Facsimile: (804) 594-3550

With copies to:

Kutak Rock LLP
The Omaha Building
1650 Farnam Street
Omaha, Nebraska 68102-2186
Attn: Joseph O. Kavan
Facsimile: (402) 346-1148

If to Lender:

Greenwich Capital Financial Products, Inc.
600 Steamboat Road
Greenwich, Connecticut 06830
Attention: Commercial Mortgage Loan Department
Telephone No.: (203) 618-2373
Facsimile No.: (203) 629-8363

With a Copy to:

Greenwich Capital Financial Products, Inc.
600 Steamboat Road
Greenwich, Connecticut 06830
Attn: Legal Department
Telephone No.: (203) 625-6065
Facsimile No.: (203) 629-5718

Any party may change the address at which it is to receive notices to another address in the United States at which business is conducted (and not a post-office box or other similar receptacle), by giving notice of such change of address in accordance with the foregoing.   This

112

provision shall not invalidate or impose additional requirements for the delivery or effectiveness of any notice (i) given in accordance with applicable statutes or rules of court, or (ii) by service of process in accordance with applicable law. If there is any assignment or transfer of Lender interest in the Loan, then the new Lender may give notice to the parties in accordance with this Section, specifying the addresses at which the new Lender shall receive notice, such new Lender shall be entitled to notice at such address in accordance with this Section.

**Section 13.6   Survival of Warranties and Certain Agreements.**   All agreements, representations and warranties made herein shall survive the execution and delivery of this Loan Agreement, the making of the Loan hereunder and the execution and delivery of the Note. Notwithstanding anything in this Loan Agreement or implied by law to the contrary, the agreements of Borrower Parties to indemnify or release Lender or Persons related to Lender, or to pay Lender's costs, expenses, or taxes shall survive the payment of the Loan and the termination of this Loan Agreement.

**Section 13.7   Failure or Indulgence Not Waiver; Remedies Cumulative.**   No failure or delay on the part of Lender in the exercise of any power, right or privilege hereunder or under the Note or any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege. All rights and remedies existing under this Loan Agreement, the Note and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

**Section 13.8   Marshaling; Payments Set Aside.**   Lender shall not be under any obligation to marshal any assets in favor of any Person or against or in payment of any or all of the Obligations. To the extent that any Person makes a payment or payments to Lender, or Lender enforces its remedies or exercises its rights of set off, and such payment or payments or the proceeds of such enforcement or set off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all Liens, if any, and rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or set off had not occurred.

**Section 13.9   Severability.**   The invalidity, illegality or unenforceability in any jurisdiction of any provision in or obligation under this Loan Agreement, the Note or other Loan Documents shall not affect or impair the validity, legality or enforceability of the remaining provisions or obligations under this Loan Agreement, the Note or other Loan Documents or of such provision or obligation in any other jurisdiction.

**Section 13.10   Headings.**   Section and subsection headings in this Loan Agreement are included herein for convenience of reference only and shall not constitute a part of this Loan Agreement for any other purpose or be given any substantive effect.

**Section 13.11** <u>APPLICABLE LAW.</u>    THE PARTIES HEREBY AGREE AND IRREVOCABLY ELECT THAT THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES, AND PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW) AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT TO THE MORTGAGE AND THE ASSIGNMENT OF LEASES SHALL BE GOVERNED BY THE LAWS OF THE STATE WHERE THE PROPERTY IS LOCATED, EXCEPT THAT THE SECURITY INTERESTS IN ACCOUNT COLLATERAL SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK OR THE STATE WHERE THE SAME IS HELD.

**Section 13.12** <u>Successors and Assigns.</u>  This Loan Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns except that no Borrower Party may assign its rights or obligations hereunder or under any of the other Loan Documents except as expressly provided in Article XI.

**Section 13.13** <u>Sophisticated Parties, Reasonable Terms, No Fiduciary Relationship.</u> Borrower represents, warrants and acknowledges that (i) it is a sophisticated real estate investor, familiar with transactions of this kind, and (ii) it has entered into this Loan Agreement and the other Loan Documents after conducting its own assessment of the alternatives available to it in the market, and after lengthy negotiations in which it has been represented by competent legal counsel of its choice.  Borrower also acknowledges and agrees that the rights of Lender under this Loan Agreement and the other Loan Documents are reasonable and appropriate, taking into consideration all of the facts and circumstances including without limitation the quantity of the Loan, the nature of the Property, and the risks incurred by Lender in this transaction.  No provision in this Loan Agreement or in any of the other Loan Documents and no course of dealing between the parties shall be deemed to create (i) any partnership or joint venture between Lender and Borrower or any other Person, or (ii) any fiduciary or similar duty by Lender to Borrower or any other Person.  The relationship between Lender and Borrower is exclusively the relationship of a creditor and a debtor, and all relationships between Lender and any other Borrower Party are ancillary to such creditor/debtor relationship.

**Section 13.14** <u>Reasonableness of Determinations.</u>    In any instance where any consent, approval, determination or other action by Lender is, pursuant to the Loan Documents or applicable law, required to be done reasonably or required not to be unreasonably withheld, Borrower shall bear the burden of proof of showing that the same was not reasonable.  In all cases Lender shall conclusively be deemed to be acting reasonably when implementing any standard or requirement of any applicable Rating Agency, or in refusing or delaying any consent due to the existence of any Event of Default.  In no event shall references herein or in the other Loan Documents to the "existence" or "continuance" of an Event of Default imply that any Event of Default, or any Default, once maturing into an Event of Default due to the expiration of

any applicable cure period or by operation of this Loan Agreement in the event no cure period is provided hereunder, shall be further susceptible of cure by Borrower or otherwise cease to be an Event of Default in the absence of a written waiver of such Event of Default by the Lender. In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where, by law or under this Loan Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedy shall be limited to commencing an action seeking injunctive relief or declaratory judgment. Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 13.15 No Duty.** All attorneys, accountants, appraisers, and other professional Persons and consultants retained by Lender shall have the right to act exclusively in the interest of Lender and shall have no duty of disclosure, duty of loyalty, duty of care, or other duty or obligation of any type or nature whatsoever to any Borrower Party or Affiliates thereof, or any other Person.

**Section 13.16 Entire Agreement.** This Loan Agreement, the Note, and the other Loan Documents referred to herein embody the final, entire agreement among the parties hereto and supersede any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. There are no oral agreements among the parties to the Loan Documents.

**Section 13.17 Construction; Supremacy of Loan Agreement.** Borrower and Lender acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Loan Agreement and the other Loan Documents with its legal counsel and that this Loan Agreement and the other Loan Documents shall be construed as if jointly drafted by Borrower and Lender. If any term, condition or provision of this Loan Agreement shall be inconsistent with any term, condition or provision of any other Loan Document, then this Loan Agreement shall control.

**Section 13.18 Consent to Jurisdiction.** BORROWER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE COUNTY OF NEW YORK, STATE OF NEW YORK OR WITHIN THE COUNTY AND STATE IN WHICH THE PROPERTY IS LOCATED AND IRREVOCABLY AGREES THAT, SUBJECT TO LENDER'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS. BORROWER ACCEPTS FOR ITSELF AND IN CONNECTION WITH THE PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT, THE NOTE, SUCH OTHER LOAN DOCUMENTS OR SUCH OBLIGATION. EACH BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING, AND IRREVOCABLY (I) WAIVES PERSONAL SERVICE OF PROCESS UPON IT AND (II) AGREES AND

CONSENTS THAT ANY SERVICE OF PROCESS SERVED UPON IT IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF TO BORROWER AT THE ADDRESS SPECIFIED PURSUANT TO SECTION 13.5 HEREOF SHALL BE DEEMED IN EVERY RESPECT TO BE EFFECTIVE SERVICE OF PROCESS UPON SUCH BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF LENDER TO BRING PROCEEDINGS AGAINST ANY BORROWER PARTY IN THE COURTS OF ANY OTHER JURISDICTION.

Section 13.19 <u>Waiver of Jury Trial</u>. EACH OF BORROWER AND LENDER HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS LOAN AGREEMENT, ANY OF THE LOAN DOCUMENTS, OR ANY DEALINGS BETWEEN ANY BORROWER PARTY AND LENDER RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION AND THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. EACH OF BORROWER AND LENDER ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF IT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH OF BORROWER AND LENDER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS LOAN AGREEMENT, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS LOAN AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THE FUTURE. EACH OF BORROWER AND LENDER FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 13.19 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS LOAN AGREEMENT, THE LOAN DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOAN. IN THE EVENT OF LITIGATION, THIS LOAN AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 13.20 <u>Counterparts; Effectiveness</u>. This Loan Agreement and other Loan Documents and any amendments or supplements thereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts together shall constitute but

one and the same instrument. This Loan Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto.

**Section 13.21 Servicer.** Lender shall have the right from time to time to designate and appoint one or more Servicers, and to change or replace any Servicer. All rights of the Lender hereunder may exercised by Servicer. Servicer shall be entitled to the benefit of all obligations of any Borrower Party in favor of Lender.

**Section 13.22 Waiver of Notice.** Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or another Loan Document specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Loan Agreement or other Loan Documents does not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 13.23 Offsets, Counterclaims and Defenses.** Any assignee of Lender's interest in and to this Loan Agreement and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to this Loan Agreement and the other Loan Documents which Borrower may otherwise have against any assignor of this Loan Agreement and the other Loan Documents. No such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon this Loan Agreement or upon any other Loan Document. Any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 13.24 Waiver of Counterclaim.** To the fullest extent permitted by law, Borrower hereby waives the right to assert a counterclaim, other than compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

**Section 13.25 Brokers and Financial Advisors.** Borrower hereby represents that neither it nor any of its Affiliates has dealt with any financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Loan Agreement. Borrower hereby agrees to indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind in any way relating to or arising from a claim by any Person that such Person acted on behalf of the indemnifying party in connection with Borrower or its Affiliates transactions contemplated herein. The provisions of this Section 13.25 shall survive the expiration and termination of this Agreement and the repayment of the Obligations.

**Section 13.26 Joint and Several Liability.** Subject to the limitations on recourse as provided in Article XII of this Agreement, all representations, warranties, covenants (both affirmative and negative) and all other obligations hereunder and under the Loan Documents shall be the joint and several obligation of each person or entity comprising Borrower and any default hereunder or under the Loan Documents by any such person or entity shall be deemed a default by all such entities and Borrower. The representations, covenants and warranties contained herein and in the

117

Loan Documents shall be read to apply to each of the individual persons and entities comprising Borrower when the context so requires, but a breach of any such representation, covenant or warranty shall be deemed a breach by all such persons and entities and Borrower, entitling Lender to exercise all of its rights and remedies hereunder and under applicable law.

**Section 13.27 <u>Contribution Among Borrowers and Related Provisions</u>.**

(A)    Notwithstanding that each Borrower (each a "Co-Obligor") is jointly and severally liable with each other Borrower to Lender for payment of the Loan and other Obligations, as between the Co-Obligors, to the extent that a payment is made on the Obligations by a Co-Obligor (a "<u>Co-Obligor Payment</u>"), which, taking into account all other Co-Obligor Payments then previously or concurrently made by or attributable to any other Co-Obligor, exceeds the amount of the Co-Obligor Payment which otherwise would have been made by or attributable to such Co-Obligor if each such Co-Obligor had paid the aggregate Obligations satisfied by such Co-Obligor Payments in the same proportion as such Co-Obligor's Allocable Amount in effect immediately prior to such Co-Obligor Payment bore to the aggregate Allocable Amounts of all such Co-Obligors in effect immediately prior to such Co-Obligor Payment, then such Co-Obligor shall be entitled to contribution and indemnification from, and to be reimbursed by, the other Co-Obligors for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Co-Obligor Payment (such obligations of one Co-Obligor to another are herein referred to as the "<u>Contribution Obligations</u>"). The Co-Obligors acknowledge that the rights of contribution and indemnification hereunder shall constitute assets in favor of the Co-Obligor to which such contribution and indemnification is owing. As used herein, the "<u>Allocable Amount</u>" of any Co-Obligor, as of any date of determination, shall be determined to be an amount equal to the maximum amount of the Indebtedness which could then be claimed against such Co-Obligor without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the United States Federal Bankruptcy Code (11 U.S.C. Sec. 101 <u>et seq.</u>) or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law. This Section 13.27(A) is intended only to define the relative rights of the Co-Obligors, and nothing set forth in this Agreement is intended to or shall impair the obligations of any Co-Obligor to pay any amounts as and when the same shall become due and payable in accordance with the terms of the Loan Documents.

(B)    Each Co-Obligor hereby postpones and subordinates payment of all the Contribution Obligations, and makes all the Contribution Obligations subject in right of satisfaction, payment and performance, to the full and absolute payment of the Loan and other Obligations. Until the date that is one (1) year and one (1) day after the date that all of the Indebtedness has been paid and satisfied in full none of the Co-Obligors shall (a) assert, collect, sue upon, or enforce all or any part of the Contribution Obligations; (b) commence or join with any other creditors of any Co-Obligor in commencing any bankruptcy, reorganization, receivership or insolvency proceeding against any other Co-Obligor; (c) take, accept, ask for, sue for, receive, set off or demand any payments upon the Contribution Obligations; or (d) take, accept, ask for, sue for, receive, demand or allow to be created liens, security interests, mortgages, or pledges of or with respect to any of the assets of a Co-Obligor in favor of or for the benefit of the any other Co-Obligor.

118

(C)     Each of the Co-Obligors agrees that in the event of any bankruptcy, insolvency, arrangement, reorganization or receivership proceeding relating to any other Co-Obligor, the following shall apply:

(i)     In any such proceeding the Lender may, and is hereby irrevocably authorized and empowered (in its own name or in the name of the said Co-Obligor) but shall have no obligation to: demand, sue for, collect and receive every payment or distribution in respect of the Contribution Obligations and give acquittance therefor; and file claims and proofs of claims and take such other action (including, without limitation, voting the Contribution Obligations and approving or objecting to a plan of reorganization) as the Lender may deem necessary or advisable for the exercise or enforcement of any of the rights or interests of the Lender under this Section 13.27(C).

(ii)     In any such proceeding, each Co-Obligor will duly and promptly take such action as the Lender may request to  (i) collect for the account of the Lender the Contribution Obligations and to file appropriate claims or proofs of claim with respect thereto; and (ii) execute and deliver to the Lender such powers of attorney, assignments or other instruments as the Lender may request in order to enable it to enforce any and all claims with respect to the Contribution Obligations.

(D)     Each of the Co-Obligors acknowledges and agrees that (i) Lender would not make the Loan unless each Co-Obligor jointly and severally became obligated for the repayment of the Loan and granted liens on the collateral owned by said Co-Obligor to secure the payment of all of the Loan and other Obligations, and (ii) each Co-Obligor derives benefits from the Loan and the granting of liens by each Co-Obligor on the collateral owned by it securing the payment of the Loan and other Obligations.

**Section 13.28 Securities Laws Compliance.**  Borrower represents and warrants to Lender that no securities laws have been violated in connection with the issuing, selling, transferring or marketing of Master Lease or Master Sublease interests in the Property, and, without limiting the foregoing, no Borrower nor any of their Affiliates has made any material untrue statement in any offering memorandum or other offering materials provided to prospective investors in connection with any potential investment in any Master Lease or Master Sublease interests in the Property or has omitted any material fact or information from any such materials.  Borrower shall and shall cause all of their Affiliates to comply with any and all securities laws in connections with the issuing, selling, transferring or marketing of Master Lease and Master Sublease interests in the Property.  Without limiting the foregoing, no Borrower nor any of their Affiliates shall include any material untrue statement in any offering memorandum or other offering materials provided to prospective investors in connection with any potential investment in or acquisition of any such Master Lease and Master Sublease interests in the Property or shall omit any material fact or information from any such materials.

**Section 13.29 Borrowers' Designee.**  Each of the Borrowers hereby authorizes, designates and directs Borrowers' Designee to give Lender directions of any kind, to take the actions or make such deliveries specified herein to be taken or delivered by Borrowers' Designee (including under Sections 5.1 and 5.16 and Article X, and including with respect to any requisitions from any reserve accounts under Article XI) and to give and receive notices of any

# EXHIBIT B

PROMISSORY NOTE

$86,000,000.00

June 22, 2006

FOR VALUE RECEIVED, IPofA WEST OAKS MALL, LP, a Texas limited partnership ("Owner Borrower"), IPofA WOM MASTER LEASECO, LP, a Texas limited partnership ("Master Tenant Borrower") and IPofA WEST OAKS MALL LEASECO, LP, a Texas limited partnership ("Master Subtenant Borrower"; Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower, together with each SMT Borrower (as defined in the Loan Agreement), are collectively referred to herein as "Borrower"; references herein to "Borrower" shall mean each Person comprising Borrower, and also all of them collectively, jointly and severally), hereby unconditionally promises to pay to the order of GREENWICH CAPITAL FINANCIAL PRODUCTS, INC., as lender, having an address at 600 Steamboat Road, Greenwich, Connecticut 06830 ("Lender"), or at such other place as the holder hereof may from time to time designate in writing, the principal sum of EIGHTY SIX MILLION AND NO/100 DOLLARS ($86,000,000.00), or so much thereof as is advanced, in lawful money of the United States of America, with interest thereon to be computed from the date of this Note at the Interest Rate, and to be paid in accordance with the terms of this Note and that certain Loan and Security Agreement dated the date hereof between Borrower and Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"). All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

## ARTICLE 1: PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rates and at the times specified in Article II of the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

## ARTICLE 2: DEFAULT AND ACCELERATION

The Loan and all other Obligations shall without notice become immediately due and payable at the option of Lender (except as otherwise set forth in Section 8.2 of the Loan Agreement) if any payment required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default.

## ARTICLE 3: LOAN DOCUMENTS

This Note is being executed and delivered pursuant to the Loan Agreement and is secured by, among other things, that certain Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of the date hereof (the "Instrument") executed by Borrower, encumbering Borrower's fee simple and leasehold interest in and to certain real property and other property commonly known as West Oaks Mall,

located in Harris County, Texas, as more particularly described therein (the "**Property**") and that certain Assignment of Leases and Rents dated as of the date hereof (the "**Assignment of Leases**"), executed by Borrower and other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Instrument, the Assignment of Leases and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the Instrument, the Assignment of Leases or the other Loan Documents, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4: SAVINGS CLAUSE

Notwithstanding anything to the contrary, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the maximum lawful rate or amount, (b) in calculating whether any interest exceeds the lawful maximum, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the lawful maximum, any such excess shall be deemed to have been applied in accordance with the terms of Section 2.2(D) of the Loan Agreement.

## ARTICLE 5: NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6: WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Loan do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind. No release of any security for the Loan or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement, the Instrument, the Assignment of Leases or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower or any other Person who may become liable for the payment of all or any part of the Loan under this Note, the Loan Agreement, the Instrument, the Assignment of Leases or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement, the Instrument, the Assignment of Leases or the other Loan Documents. If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited

-2-

liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability. If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower," as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, which may be set forth in the Loan Agreement or any other Loan Document.)

### ARTICLE 7: TRANSFER

Upon the transfer of this Note, Lender may deliver all the collateral granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights and obligations herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights and obligations hereby given to it with respect to any liabilities and the collateral not so transferred.

### ARTICLE 8: EXCULPATION

The provisions of **Article XII** of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

### ARTICLE 9: GOVERNING LAW

(A) **THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE AND THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.**

(B) **EACH OF BORROWER AND LENDER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE COUNTY OF NEW YORK, STATE OF NEW YORK OR WITHIN THE COUNTY AND STATE IN WHICH THE PROPERTY IS LOCATED AND IRREVOCABLY AGREES THAT, SUBJECT TO LENDER'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS NOTE OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS. BORROWER ACCEPTS FOR ITSELF AND IN CONNECTION WITH THE PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON**

CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS NOTE, SUCH OTHER LOAN DOCUMENTS OR SUCH OBLIGATION. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF LENDER TO BRING PROCEEDINGS AGAINST ANY BORROWER PARTY IN THE COURTS OF ANY OTHER JURISDICTION.

### ARTICLE 10: NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 13.5 of the Loan Agreement.

### ARTICLE 11: JOINT AND SEVERAL LIABILITY

All representations, warranties, covenants (both affirmative and negative) and all other obligations hereunder and under the Loan Documents shall be the joint and several obligation of each person or entity comprising the Borrower and any default hereunder or under the Loan Documents by any such person or entity shall be deemed a default by all such entities and the Borrower. The representations, covenants and warranties contained herein and in the Loan Documents shall be read to apply to each of the individual persons and entities comprising the Borrower when the context so requires, but a breach of any such representation, covenant or warranty shall be deemed a breach by all such persons and entities and the Borrower, entitling Lender to exercise all of its rights and remedies hereunder and under applicable law.

### ARTICLE 12: FUTURE SMT BORROWERS

Pursuant to Section 11.4 of the Loan Agreement, one or more SMT Borrowers not a signatory to this Note on the date hereof may assume, on a joint and several basis, the obligations of the Borrower under the Loan Documents. Any and all such future SMT Borrower shall automatically become a "Borrower" of this Note and such Borrower shall be deemed a Borrower hereunder and jointly and severally liable under this Note, and each existing Borrower hereby irrevocably consents thereto.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

**BORROWER:**

**IPofA WEST OAKS MALL, LP,**
**a Texas limited partnership**

By:     IPofA WestOaks Mall GP, LLC,
        a Delaware limited liability company, its general partner

        By:     IPofA Fund Manager, LLC,
                a Virginia limited liability company, its Manager

                By:
                Name:    *Edward H. Okun*
                Its:     Manager


**IPofA WOM MASTER LEASECO, LP,**
**a Texas limited partnership**

By:     IPofA WOM MLC GP, LLC,
        a Delaware limited liability company, its general partner

        By:     IPofA Fund Manager, LLC,
                a Virginia limited liability company, its Manager

                By:
                Name:    *Edward H. Okun*
                Its:     Manager


**IPofA WEST OAKS MALL LEASECO, LP,**
**a Texas limited partnership**

By:     IPofA WOM LeaseCo GP, LLC,
        a Delaware limited liability company, its general partner

        By:     IPofA Fund Manager, LLC,
                a Virginia limited liability company, its Manager

                By:
                Name:    *Edward H. Okun*
                Its:     Manager

West Oaks - Note

# EXHIBIT C

**WHEN RECORDED MAIL TO:**

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Attn.: Charles E. Schrank

---

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## FEE AND LEASEHOLD DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

THIS FEE AND LEASEHOLD DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (as the same may be amended, restated, extended, supplemented or otherwise modified from time to time, this "Deed of Trust"), is made as of the 22nd day of June, 2006, by IPofA WEST OAKS MALL, LP, a Texas limited partnership ("Owner Borrower"), IPofA WOM MASTER LEASECO, LP, a Texas limited partnership ("Master Tenant Borrower") and IPofA WEST OAKS MALL LEASECO, LP, a Texas limited partnership ("Master Subtenant Borrower"; Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower, together with each SMT Borrower (as defined in the Loan Agreement), are collectively referred to herein as "Borrower"; references herein to "Borrower" shall mean each Person comprising Borrower, and also all of them collectively, jointly and severally), to LandAmerica Charter Title Company, a Texas corporation, having an address at 4265 San Felipe, Suite 350, Houston, Texas 77027, as Trustee ("Trustee"), for the benefit of GREENWICH CAPITAL FINANCIAL PRODUCTS, INC., a Delaware corporation, having an address at 600 Steamboat Road, Greenwich, Connecticut 06830 (together with its successors, assigns and transferees, "Lender"). Capitalized terms used herein but not otherwise defined shall have the respective meanings assigned to such terms in the Loan Agreement (hereinafter defined).

## WITNESSETH:

To secure the payment of a loan (the "Loan") in the original principal sum of EIGHTY SIX MILLION AND NO/100 DOLLARS ($86,000,000.00), lawful money of the United States of America, being made from Lender to Borrower on the date hereof pursuant to the terms and conditions of a certain Loan and Security Agreement, dated as of the date hereof (as amended, modified or restated, the "Loan Agreement"), between Borrower and Lender, which Loan is evidenced by and is to be paid with interest according to a Promissory Note dated as of the date hereof (collectively, as amended, modified, renewed or restated and together with any substitutes or replacements therefor, the "Note"), made by Borrower to Lender and all other sums now or hereafter

1



due hereunder, or otherwise due under the Loan Documents (as defined in the Loan Agreement) (the principal amount of the Loan, together with interest thereon and all sums due hereunder and under the Loan Agreement, the Note and the other Loan Documents being collectively called the "Debt"), and all of the agreements, covenants, conditions, warranties, representations and other obligations (other than to repay the Debt) made or undertaken by Borrower or any other person or entity to Lender or others as set forth in the Loan Documents (collectively, the "Obligations"), Borrower has given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, pledged, assigned, and hypothecated and by these presents does hereby give, grant, bargain, sell, alien, enfeoff, convey, confirm, pledge, assign and hypothecate unto Trustee, in trust for the benefit of Lender, with power of sale, (a) all of Borrower's right, title, interest and estate in and to the real property described on _Exhibit A_ attached hereto (the "_Premises_") and the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon (the "_Improvements_"), and (b) all of each Borrower's leasehold and sub-leasehold rights, title and interest in and to the Premises and the Improvements as landlord, tenant, sub-landlord, sub-tenant, sub-sublandlord, sub-subtenant or otherwise in, to and under the Prime Master Lease (as hereinafter defined), the Base Master Sublease (as hereinafter defined), each SMT Master Lease (as defined in the Loan Agreement) and each SMT Master Sublease (as defined in the Loan Agreement) and otherwise in and to the Premises and Improvements (collectively, the "Master Leasehold Estates"):

TOGETHER WITH: all right, title, interest and estate of Borrower now owned, leased or subleased, or hereafter acquired, in and to the following property, rights, interests and estates (the Premises and the Improvements, together with the following property, rights, interests and estates being hereinafter described, are collectively referred to herein as the "Mortgaged Property"):

(a)     all easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Premises, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Premises and the Improvements, and every part and parcel thereof, with the appurtenances thereto;

(b)     all machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature, whether tangible or intangible, whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Premises or the Improvements, or appurtenant thereto, and usable in connection with the present or future operation, enjoyment and occupancy of the

2



Premises and the Improvements (hereinafter collectively called the "Equipment"), including the proceeds of any sale or transfer of the foregoing, and the right, title and interest of Borrower in and to any of the Equipment which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Mortgaged Property is located (the "Uniform Commercial Code") superior in lien to the lien of this Deed of Trust;

(c)    all awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Mortgaged Property, whether from the exercise of the right of eminent domain or condemnation (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of said rights), or for a change of grade, or for any other injury to or decrease in the value of the Mortgaged Property;

(d)    all leases, tenancies, licenses, subleases, sub-subleases, assignments and/or other rental or occupancy agreements (including, without limitation, any and all guarantees and supporting obligations of and security deposit and letter of credit rights relating to any of the foregoing) heretofore or hereafter entered into affecting the use, enjoyment or occupancy of the Premises and the Improvements, and including any extensions, renewals, modifications or amendments thereof (collectively, the "Leases"), together with all rights, powers, privileges, options and other benefits of Borrower as lessor under the Leases, including, without limitation, the immediate and continuing right to receive and collect all rents, income, revenues, issues, profits, condemnation awards, insurance proceeds, moneys and security payable or receivable under the Leases or pursuant to any of the provisions thereof, whether as rent or otherwise, the right to accept or reject any offer made by any tenant pursuant to its Lease to purchase the Mortgaged Property and any other property subject to the Lease as therein provided and to perform all other necessary or appropriate acts with respect to such Leases as agent and attorney-in-fact for Borrower, and the right to make all waivers and agreements, to give and receive all notices, consents and releases, to take such action upon the happening of a default under any Lease, including the commencement, conduct and consummation of proceedings at law or in equity as shall be permitted under any provision of any Lease or by any law, and to do any and all other things whatsoever which Borrower is or may become entitled to do under any such Lease together with all accounts receivable, contract rights, franchises, interests, estates or other claims, both at law or in equity, relating to the Mortgaged Property, to the extent not included in rent earnings and income under any of the Leases, including the right to receive and collect any sums payable to Borrower thereunder and all deposits or other security or advance payments made by Borrower with respect to any of the services related to the Mortgaged Property or the operation thereof, and together with all rents, rent equivalents (including room revenues, if applicable), moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, distributions, dividends, allocations, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Premises and the Improvements (the "Rents"), and together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt, including, without limitation, (i) all of Borrower's right, title and interest in, to and under the Prime Master Lease and the Base Master Sublease (as defined in clauses (m) and

(n) below) and the SMT Master Lease and the SMT Master Sublease and all Rents received by or paid to or for the account of or benefit of each Borrower thereunder, and (ii) all of Borrower's right, title and interest in, to and under the Leases (including, without limitation, those constituting subleases and sub-subleases) and all Rents received by or paid to or for the account of or benefit of each Borrower under the Prime Master Lease, the Base Master Sublease, the SMT Master Lease and the SMT Master Sublease;

(e)    all of Borrower's right, title and interest in, to and under any and all reserve, deposit or escrow accounts (the "Accounts") made pursuant to any of the Loan Documents, together with all income, profits, benefits, investment property and advantages arising therefrom, and together with all rights, powers, privileges, options and other benefits of Borrower under the Accounts, and together with the right to do any and all other things whatsoever which Borrower is or may become entitled to do under the Accounts;

(f)    all trade names, software, trademarks, trademark applications, trademark licenses, servicemarks, logos, copyrights, copyright applications, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Mortgaged Property;

(g)    all proceeds of and any unearned premiums on any insurance policies covering the Mortgaged Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Mortgaged Property or any part thereof;

(h)    the right, following an Event of Default, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to commence any action or proceeding to protect the interest of the Lender in the Mortgaged Property or any part thereof;

(i)    all accounts, escrows, reserves, documents, instruments, chattel paper, monetary obligations, claims, deposits, investment property and general intangibles, as the foregoing terms are defined in the Uniform Commercial Code, and all books, records, plans, specifications, designs, drawings, permits, consents, licenses, franchises, management agreements, contracts, contract rights (including, without limitation, any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair, or other work upon the Mortgaged Property), approvals, actions, refunds or real estate taxes and assessments (and any other governmental impositions related to the Mortgaged Property), and causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, management, improvement, alteration, repair, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon;

(j)    all accounts receivable, contract rights, interests, estate or other claims, both in law and in equity, which Borrower now has or may hereafter acquire in the Mortgaged Property or any part thereof;

4

(k)     all rights which Borrower now has or may hereafter acquire, *to be indemnified and/or held harmless from any liability, loss, damage, cost or expense (including, without limitation, attorneys' fees and disbursements) relating to the Mortgaged Property or any part thereof;*

(l)     all personal property of Borrower;

(m)     that certain *Master Lease Agreement ("Prime Master Lease") dated as of June 22, 2006, between Owner Borrower, as landlord, and Master Tenant Borrower, as tenant, the leasehold estate created thereby (including, without limitation, Master Tenant Borrower's leasehold interests in and to the Master Units) and all modifications,* extensions and renewals of the Prime Master Lease and all credits, deposits (including, without limitation, any deposit of cash or securities or any other property which may be held to secure Master Tenant Borrower's performance of its obligations under the Prime Master Lease), options, privileges and rights under the Prime Master Lease, including, but not limited to, the right, if any, to renew or extend the Prime Master Lease for a succeeding term or terms, and all the estate, right, title, claim or demand whatsoever created thereunder either in law or in equity, in possession or expectancy of, in and to the Premises and Improvements or any part thereof;

(n)     that certain Master Sublease Agreement ("Base Master Sublease") dated as of June 22, 2006, between Master Tenant Borrower, as sub-landlord, and Master Subtenant Borrower, as sub-tenant, the sub-leasehold estate created thereby (including, without limitation, Master Subtenant Borrower's sub-leasehold interest in and to the Master Units), and all modifications, extensions and renewals of the Base Master Sublease and all credits, deposits (including, without limitation, any deposit of cash or securities or any other property *which may be held to secure Master Subtenant Borrower's performance of its obligations under the Base Master Sublease),* options, privileges and rights under the Base Master Lease, including, but not limited to, the right, if any, to renew or extend the Base Master Lease for a succeeding term or terms, and all the estate, right, title, claim or demand whatsoever created thereunder either in law or in equity, in possession or expectancy of, in and to the Premises and Improvements or any part thereof;

(o)     each SMT Master Lease now existing or hereinafter created, executed or delivered, between Master Tenant Borrower, as sub-landlord, and each SMT Borrower, as sub-tenant, the sub-leasehold estate created thereby (including, without limitation, each SMT Borrower's sub-leasehold interest in and to the SMT Units), and all modifications, extensions and renewals of each SMT Master Lease and all credits, deposits (including, without limitation, any deposit of cash or securities or any other property which may be held to secure SMT Borrowers' performance of its obligations under each such SMT Master Lease), options, privileges and rights under each SMT Master Lease, including, but not limited to, the right, if any, to renew or extend each such SMT Master Lease for a succeeding term or terms, and all the estate, right, title, claim or demand whatsoever created thereunder either in law or in equity, in possession or expectancy of, in and to the Premises and Improvements or any part thereof;

(p)     each SMT Master Sublease now existing or hereinafter created, executed or *delivered, between each SMT Borrower, as sub-sublandlord, and Master Subtenant Borrower, as* sub-subtenant, the sub-subleasehold estate created thereby (including, without limitation, Master

5



Subtenant Borrower's sub-subleasehold interest in and to the SMT Units), and all modifications, extensions and renewals of each SMT Master Sublease and all credits, deposits (including, without limitation, any deposit of cash or securities or any other property which may be held to secure Master Subtenant Borrower's performance of its obligations under each such SMT Master Sublease), options, privileges and rights under each SMT Master Sublease, including, but not limited to, the right, if any, to renew or extend each such SMT Master Sublease for a succeeding term or terms, and all the estate, right, title, claim or demand whatsoever created thereunder either in law or in equity, in possession or expectancy of, in and to the Premises and Improvements or any part thereof; and

(q)    any and all proceeds and products of any of the foregoing.

Borrower acknowledges and agrees, as partial consideration for Lender's agreement to make the Loan to Borrower in accordance with the terms and provisions of the Loan Agreement, among other reasons, that the Prime Master Lease, the Base Master Sublease, each SMT Master Lease and each SMT Master Sublease, and all of Borrower's respective rights, title and interests thereunder and its respective leasehold and/or subleasehold interests in the Premises, Improvements and other Mortgaged Property shall in all respects be subject and subordinate to the Debt and to the lien of this Deed of Trust and to all of the other Loan Documents and the liens and security interests created thereunder.

TO HAVE AND TO HOLD the above granted and described Mortgaged Property unto and to the use and benefit of Trustee, and the successors and assigns of Trustee, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note and this Deed of Trust and shall pay all other sums due under the Loan Agreement or any other Loan Document, these presents and the estate hereby granted shall cease, terminate and be void;

AND Borrower represents and warrants to and covenants and agrees with Lender and Trustee as follows:

1.    Payment of Debt and Incorporation of Covenants, Conditions and Agreements. Borrower shall pay the Debt at the time and in the manner provided in the Note, the Loan Agreement and in this Deed of Trust. Borrower will duly and punctually perform all of the covenants, conditions and agreements contained in the Note, the Loan Agreement, this Deed of Trust and the other Loan Documents all of which covenants, conditions and agreements are hereby made a part of this Deed of Trust to the same extent and with the same force as if fully set forth herein.

2.    Warranty of Title.    Borrower warrants that (i) Owner Borrower has a good, marketable and insurable fee simple interest in the Mortgaged Property and has the right to mortgage, give, grant, bargain, sell, alien, enfeoff, convey, confirm, pledge, assign and hypothecate the Mortgaged Property and that Owner Borrower possesses unencumbered ownership in the Improvements and an unencumbered fee simple estate in the Mortgaged Property and that it owns, leases or subleases the Mortgaged Property owned, leased or subleased by it free and clear of all liens, encumbrances and charges whatsoever except for the Permitted Encumbrances; and (ii) each of

6

Master Tenant Borrower and Master Subtenant Borrower has good, marketable and insurable leasehold and/or subleasehold title to the Mortgaged Property and has the right to mortgage, give, grant, bargain, sell, alien, enfeoff, convey, confirm, pledge, assign and hypothecate the same and that each of Master Tenant Borrower and Master Subtenant Borrower possesses an unencumbered leasehold and/or subleasehold estate in the Premises and the Improvements and that it owns, leases or subleases the Mortgaged Property owned, leased or subleased by it free and clear of all liens, encumbrances and charges whatsoever except for the Permitted Encumbrances. Borrower represents and warrants that none of the Permitted Encumbrances will materially and adversely affect (i) Borrower's ability to pay in full in a timely manner its obligations, including, without limitation, the Debt, (ii) the use of the Mortgaged Property for the use currently being made thereof, (iii) the operation of the Mortgaged Property, or (iv) the value of the Mortgaged Property. Borrower shall forever warrant, defend and preserve such title and the validity and priority of the lien of this Deed of Trust and shall forever warrant and defend the same to Lender and Trustee against the claims of all persons whomsoever.

3.     Insurance. (a) Borrower, at its sole cost and expense, shall maintain or cause to be maintained insurance with respect to the Mortgaged Property for the mutual benefit of Borrower and Lender as required by Section 5.4 of the Loan Agreement.

(b)     If the Mortgaged Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (an "Insured Casualty"), Borrower shall give immediate notice thereof to Lender and to the insurance carrier. Subject to the terms of the Loan Agreement, Borrower shall promptly repair, replace or rebuild the Mortgaged Property in accordance with, and all amounts paid with respect to such Insured Casualty under all insurance policies maintained by Borrower shall be governed by, the terms and conditions of Section 5.5 of the Loan Agreement. The expenses incurred by Lender in the adjustment and collection of insurance proceeds shall become part of the Debt and shall be secured hereby and shall be reimbursed by Borrower to Lender upon demand.

4.     Payment of Impositions and Other Charges. Subject to Borrower's right to contest set forth in Section 5.3(B) of the Loan Agreement and the provisions of Section 5 below, Borrower shall cause to be paid all Impositions now or hereafter levied or assessed or imposed against the Mortgaged Property or any part thereof as the same become due and payable. Borrower shall promptly pay for all utility services provided to the Mortgaged Property. Borrower shall furnish to Lender or its designee receipts for the payment of the Impositions prior to the date the same shall become delinquent (provided, however, that Borrower shall not be required to furnish such receipts for payment of Impositions in the event that such Impositions are to be paid by Lender pursuant to Section 5 hereof).

5.     Impositions and Insurance Reserve. Borrower shall make monthly deposits into the Impositions and Insurance Reserve of amounts sufficient to pay Impositions and Insurance Premiums in accordance with the terms of Article VI of the Loan Agreement.

6.     Condemnation. Borrower shall promptly give Lender written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Mortgaged Property or any portion thereof and shall deliver to Lender copies of any and all papers

served in connection with such proceedings. Subject to the terms of Section 5.5 of the Loan Agreement, Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment for said condemnation or eminent domain and to make any compromise or settlement in connection with such proceeding. Notwithstanding any taking by any public or quasi public authority through eminent domain or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Loan Agreement. Subject to the terms of the Loan Agreement, Borrower shall cause the award or payment made in any condemnation or eminent domain proceeding, which is payable to Borrower, to be paid directly to Lender. The application of any such award or payment shall be governed by the applicable provisions of the Loan Agreement.

7.    Maintenance of Mortgaged Property. Borrower shall cause the Mortgaged Property to be operated and maintained in a good and safe condition and repair and in keeping with the condition and repair of properties of a similar use, value, age, nature and construction. Borrower shall not use, maintain or operate the Mortgaged Property in any manner which constitutes a public or private nuisance or which makes void, voidable, or cancelable, or increases the premium of, any insurance then in force with respect thereto. The Improvements and the Equipment shall not be removed or demolished and no Material Alterations shall be made thereto (except for normal replacement or disposal of the Equipment and except as otherwise expressly permitted in the Loan Agreement) without the consent of Lender. Borrower shall promptly comply in all material respects with all laws, orders and ordinances affecting the Mortgaged Property, or the use thereof.

8.    Use of Mortgaged Property. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Mortgaged Property or any part thereof, nor shall Borrower initiate, join in, acquiesce in, or consent to any zoning change or zoning matter affecting the Mortgaged Property, which in any of the foregoing cases could reasonably be expected to result in a Material Adverse Effect. If under applicable zoning provisions the use of all or any portion of the Mortgaged Property is or shall become a nonconforming use, Borrower will not cause or permit such nonconforming use to be discontinued or abandoned without the express written consent of Lender, which consent shall not be unreasonably withheld. Borrower shall not permit or suffer to occur any waste on or to the Mortgaged Property or to any portion thereof and shall not take any steps whatsoever to convert the Mortgaged Property, or any portion thereof, to a condominium or cooperative form of management. Borrower will not install or permit to be installed on the Premises any underground storage tank or above-ground storage tank in violation of the Environmental Laws.

9.    Transfer or Encumbrance of the Mortgaged Property. (a) Borrower acknowledges that Lender has examined and relied on the creditworthiness and experience of Borrower in owning and operating properties such as the Mortgaged Property in agreeing to make the Loan, and that Lender will continue to rely on Borrower's ownership of the Mortgaged Property as a means of maintaining the value of the Mortgaged Property as security for repayment of the Debt. Except as expressly permitted under this Deed of Trust, the Loan Agreement or under the other Loan Documents, Borrower shall not cause or suffer to occur or exist, directly or indirectly, voluntarily or



involuntarily, by operation of law or otherwise, any sale, transfer, mortgage, pledge, lien or encumbrance (other than Permitted Encumbrances) (collectively, "Transfers") of (i) all or any part of the Mortgaged Property or any interest therein, or (ii) any direct or indirect beneficial ownership interest (in whole or in part) in Borrower, irrespective of the number of tiers of ownership, without the prior written consent of Lender.

(b)    The occurrence of any Transfer in violation of this Section 9 shall constitute an Event of Default hereunder, whereupon Lender at its option, without being required to demonstrate any actual impairment of its security or any increased risk of default hereunder, may declare the Debt immediately due and payable.

(c)    Lender's consent to any Transfer of the Mortgaged Property or any interest in Borrower shall not be deemed to be a waiver of Lender's right to require such consent to any future occurrence of same. Any attempted or purported Transfer of the Mortgaged Property or of any direct or indirect interest in Borrower, if made in contravention of this Section 9, shall be null and void and of no force or effect.

10.    Taxes on Security; Documentary Stamps; Intangibles Tax. (a) Borrower shall pay all taxes, charges, filing, registration and recording fees, excises and levies payable with respect to the Note, this Deed of Trust or the liens created or secured by the Loan Documents, other than income, franchise and doing business taxes imposed on Lender. If there shall be enacted any law (i) deducting the Loan from the value of the Mortgaged Property for the purpose of taxation, (ii) affecting any lien on the Mortgaged Property, or (iii) changing existing laws of taxation of mortgages, deeds of trust, security deeds, or debts secured by real property, or changing the manner of collecting any such taxes, Borrower shall promptly pay to Lender, on demand, all taxes, costs and charges for which Lender is or may be liable as a result thereof; however, if such payment would be prohibited by law or would render the Loan usurious, then instead of collecting such payment, Lender may declare all amounts owing under the Loan Documents to be immediately due and payable.

(b)    If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note or this Deed of Trust, or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any. Borrower hereby agrees that, in the event that it is determined that additional documentary stamp tax or intangible tax is due hereon or any mortgage, deed of trust or promissory note executed in connection herewith (including, without limitation, the Note), Borrower shall indemnify and hold harmless Lender for all such documentary stamp tax and/or intangible tax, including all penalties and interest assessed or charged in connection therewith. Borrower shall pay same within ten (10) days after demand of payment from Lender and the payment of such sums shall be secured by this Deed of Trust and such sums shall bear interest at the Default Rate (as defined in the Note) from and after the eleventh (11th) day after demand until paid in full.

(c)    Borrower shall hold harmless and indemnify Lender, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of this Deed of Trust.

9

11.    No Credits on Account of the Debt. Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Impositions assessed against the Mortgaged Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Mortgaged Property, or any part thereof, for real estate tax purposes by reason of this Deed of Trust or the Debt. In the event such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

12:    Performance of Other Agreements. Borrower shall duly and punctually observe and perform each and every material term, provision, condition, and covenant to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument (including all instruments comprising the Permitted Encumbrances) affecting or pertaining to the Mortgaged Property, and will not suffer or permit any default or event of default (after giving effect to any applicable notice requirements and cure periods) to exist under any of the foregoing.

13.    Further Acts; Secondary Market Transactions. (a) Borrower will, at its sole cost and expense, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, Uniform Commercial Code financing statements or continuation statements, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, pledged, assigned and hypothecated or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust. Borrower, on demand, will execute and deliver and, upon Borrower's failure to do so within five (5) Business Days after Lender's request therefor, hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or other instruments, to evidence more effectively the security interest of Lender in the Mortgaged Property. Upon foreclosure or the appointment of a receiver, Borrower will, at its sole cost and expense, cooperate fully and completely to effect the assignment or transfer of any license, permit, agreement or any other right necessary or useful to the operation of the Mortgaged Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including, without limitation, such rights and remedies available to Lender pursuant to this Section.

(b)    Subject to the terms and conditions set forth in the Loan Agreement, Lender shall have the right to engage in one or more Secondary Market Transactions and, in connection therewith, Lender may transfer its obligations under this Deed of Trust, the Note, the Loan Agreement and under the other Loan Documents (or may transfer the portion thereof corresponding to the transferred portion of the Obligations), and thereafter Lender shall be relieved of any obligations hereunder and under the other Loan Documents arising after the date of said transfer with respect to the transferred interest.

10

14.    <u>Recording of Deed of Trust, Etc.</u> Upon the execution and delivery of this Deed of Trust and thereafter, from time to time, Borrower will cause this Deed of Trust, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Mortgaged Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest hereof upon, and the interest of Lender in, the Mortgaged Property. Borrower will pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgment of this Deed of Trust, any mortgage supplemental hereto, any security instrument with respect to the Mortgaged Property and any instrument of further assurance, and all federal, state, county and municipal, taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Deed of Trust, any deed of trust supplemental hereto, any security instrument with respect to the Mortgaged Property or any instrument of further assurance, except where prohibited by law so to do.

15.    <u>Reporting Requirements.</u> Borrower agrees to give prompt notice to Lender of the insolvency or bankruptcy filing of Borrower or the death, insolvency or bankruptcy filing of any Guarantor.

16.    <u>Intentionally Deleted.</u>

17.    <u>Remedies.</u> Upon the occurrence and during the continuance of an Event of Default, Lender may, at Lender's option, by Lender itself, or otherwise, *do any one or more of the following:*

(a)    <u>Right to Perform Borrower's Covenants.</u> If Borrower has failed to keep or perform any covenant whatsoever contained in this Deed of Trust or the other Loan Documents, Lender may, but shall not be obligated to do so, perform or attempt to perform said covenant; and any payment made or expense incurred in the performance or attempted performance of any such covenant, together with any sum expended by Lender that is chargeable to Borrower or subject to reimbursement by Borrower under the Loan Documents, shall be and become a part of the Debt, and Borrower promises, upon demand, to pay to Lender, at the place where the Note is payable, all sums so incurred, paid or expended by Lender, with interest from the date when paid, incurred or expended by Lender at the Default Rate (as defined in the Note).

(b)    <u>Right of Entry.</u> Lender or Trustee may, prior or subsequent to the institution of any foreclosure proceedings, enter upon the Mortgaged Property, or any part thereof, and take exclusive possession of the Mortgaged Property and of all books, records, and accounts relating thereto and to exercise without interference from Borrower any and all rights which Borrower has with respect to the management, possession, operation, protection, or preservation of the Mortgaged Property, including, without limitation, the right to rent the same for the account of Borrower and to deduct from such Rents all costs, expenses, and liabilities of every character incurred by the Lender or Trustee in collecting such Rents and in managing, operating, maintaining, protecting, or preserving the Mortgaged Property and to apply the remainder of such Rents on the Debt in such manner as Lender may elect. All such costs, expenses, and liabilities incurred by Lender or Trustee in collecting such Rents and in managing, operating, maintaining, protecting, or preserving the Mortgaged Property, if not paid out of Rents as hereinabove provided, *shall constitute a demand*

11

obligation owing by Borrower and shall bear interest from the date of expenditure until paid at the Default Rate as specified in the Note, all of which shall constitute a portion of the Debt. If Lender or Trustee elects to enter the Mortgaged Property as provided for herein, Lender or Trustee may invoke any and all legal remedies to dispossess Borrower, including specifically one or more actions for forcible entry and detainer, trespass to try title, and restitution. In connection with any action taken by the Lender or Trustee pursuant to this subsection, Lender and Trustee shall not be liable for any loss sustained by Borrower resulting from any failure to let the Mortgaged Property, or any part thereof, or from any other act or omission of Lender or Trustee in managing the Mortgaged Property unless such loss is caused by the willful misconduct or gross negligence of Lender or Trustee, their agents, employees or officers, nor shall Lender or Trustee be obligated to perform or discharge any obligation, duty, or liability under any Lease or under or by reason hereof or the exercise of rights or remedies hereunder. Borrower shall and does hereby agree to indemnify, defend and hold harmless the Indemnified Parties (as defined in Section 23 below) from and against, any and all liability, claim, demand, loss, damage, cost or expense (including, without limitation, reasonable attorneys' fees and disbursements) which may or might be suffered or incurred by any Indemnified Party under any such Lease or under or by reason hereof or the exercise of rights or remedies hereunder, or by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any such Lease as and to the extent provided under Section 23 below. Nothing in this subsection shall impose any duty, obligation, or responsibility upon any Indemnified Party for the control, care, management, leasing, or repair of the Mortgaged Property, nor for the carrying out of any of the terms and conditions of any such Lease prior to the transfer of title to the Mortgaged Property to any Indemnified Party by foreclosure, deed-in-lieu thereof, exercise of power of sale or otherwise. Borrower hereby assents to, ratifies, and confirms any and all actions of the Lender or Trustee with respect to the Mortgaged Property taken under this subsection.

(c)    Right to Accelerate. Lender may, without notice or demand, declare the entire unpaid balance of the Debt immediately due and payable.

(d)    Lender's Judicial Remedies. Lender or Trustee may proceed by suit or suits, at law or in equity, to enforce the payment of the Debt to foreclose the liens and security interests of this Deed of Trust as against all or any part of the Mortgaged Property, and to have all or any part of the Mortgaged Property sold under the judgment or decree of a court of competent jurisdiction. This remedy shall be cumulative of any other nonjudicial remedies available to the Lender under this Deed of Trust or the other Loan Documents. Proceeding with a request or receiving a judgment for legal relief shall not be or be deemed to be an election of remedies or bar any available nonjudicial remedy of the Lender.

(e)    Lender's Right to Appointment of Receiver. Lender or Trustee, as a matter of right and (i) without regard to the sufficiency of the security for repayment of the Debt and without notice to Borrower, (ii) without any showing of insolvency, fraud, or mismanagement on the part of Borrower, (iii) without the necessity of filing any judicial or other proceeding other than the proceeding for appointment of a receiver, and (iv) without regard to the then value of the Mortgaged Property, shall be entitled to the appointment of a receiver or receivers for the protection, possession, control, management and operation of the Mortgaged Property, including (without limitation), the power to collect the Rents, enforce this Deed of Trust and, in case of a sale and deficiency, during



the full statutory period of redemption (if any), whether there be a redemption or not, as well as during any further times when Borrower, except for the intervention of such receiver, would be entitled to collection of such Rents. Borrower hereby irrevocably consents to the appointment of a receiver or receivers. Any receiver appointed pursuant to the provisions of this subsection shall have the usual powers and duties of receivers in such matters.

      (f)    <u>Lender's Uniform Commercial Code Remedies.</u> Lender may exercise its rights of enforcement under the Uniform Commercial Code in effect in the state in which the Mortgaged Property is located.

      (g)    <u>Other Rights.</u> Lender (i) may surrender the insurance policies maintained pursuant to the Loan Agreement or any part thereof, and upon receipt of the proceeds shall apply the unearned Insurance Premiums as a credit on the Debt, and, in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such Insurance Premiums; (ii) may apply the Impositions and Insurance Reserve and/or any other Reserves held pursuant to this Deed of Trust or the other Loan Documents, and any other funds held by Lender toward payment of the Debt; and (iii) shall have and may exercise any and all other rights and remedies which Lender may have at law or in equity, or by virtue of any of the Loan Documents, or otherwise.

      (h)    <u>Discontinuance of Remedies.</u> If Lender shall have proceeded to invoke any right, remedy, or recourse permitted under the Loan Documents and shall thereafter elect to discontinue or abandon same for any reason, Lender shall have the unqualified right so to do and, in such event, Borrower and Lender shall be restored to their former positions with respect to the Debt, the Loan Documents, the Mortgaged Property or otherwise, and the rights, remedies, recourses and powers of Lender shall continue as if same had never been invoked.

      (i)    <u>Remedies Cumulative.</u> All rights, remedies, and recourses of Lender and Trustee granted in the Note, this Deed of Trust, the Loan Agreement and the other Loan Documents, any other pledge of collateral, or otherwise available at law or equity: (i) shall be cumulative; (ii) may be pursued separately, successively, or concurrently against Borrower, the Mortgaged Property, or any one or more of them, at such time and in such order as Lender may determine in its sole discretion; (iii) may be exercised as often as occasion therefor shall arise, it being agreed by Borrower that the exercise or failure to exercise any of same shall in no event be construed as a waiver or release thereof or of any other right, remedy, or recourse; (iv) shall be nonexclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Deed of Trust, the Loan Agreement or the other Loan Documents, or otherwise available at law or in equity; (v) shall not be conditioned upon Lender exercising or pursuing any remedy in relation to the Mortgaged Property prior to Lender bringing suit to recover the Debt; and (vi) in the event Lender elects to bring suit on the Debt and obtains a judgment against Borrower prior to exercising any remedies in relation to the Mortgaged Property, all liens and security interests, including the lien of this Deed of Trust, shall remain in full force and effect and may be exercised thereafter at Lender's option.

(j)    Election of Remedies. Lender may release, regardless of consideration, any part of the Mortgaged Property without, as to the remainder, in any way impairing, affecting, subordinating, or releasing the lien or security interests evidenced by this Deed of Trust or the other Loan Documents or affecting the obligations of Borrower or any other party to pay the Debt. For payment of the Debt, Lender may resort to any collateral securing the payment of the Debt in such order and manner as Lender may elect. No collateral taken by Lender shall in any manner impair or affect the lien or security interests given pursuant to the Loan Documents, and all collateral shall be taken, considered, and held as cumulative.

(k)    Bankruptcy Acknowledgment. If the Mortgaged Property or any portion thereof or any interest therein becomes property of any bankruptcy estate or subject to any state or federal insolvency proceeding, or in the event of the filing of any voluntary or involuntary petition under the Bankruptcy Code by or against Borrower then Lender shall immediately become entitled, in addition to all other relief to which Lender may be entitled under this Deed of Trust, to obtain (i) an order from any bankruptcy court or other appropriate court granting immediate relief from the automatic stay pursuant to § 362 of the Bankruptcy Code so as to permit Lender to pursue its rights and remedies against Borrower as provided under this Deed of Trust and all other rights and remedies of Lender at law and in equity under applicable state law, and (ii) an order from the Bankruptcy Court prohibiting Borrower's use of all "cash collateral" as defined under § 363 of the Bankruptcy Code. Borrower shall not assert or request any other party to assert, that the automatic stay under § 362 of the Bankruptcy Code operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights it has by virtue of this Deed of Trust, or any other rights that Lender has, whether now or hereafter acquired, against any guarantor of the Debt. Borrower shall not seek a supplemental stay or any other relief, whether injunctive or otherwise, pursuant to § 105 of the Bankruptcy Code or any other provision therein to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights it has by virtue of this Deed of Trust against any guarantor of the Debt. Any bankruptcy petition or other action taken by Borrower to stay, condition, or inhibit Lender from exercising its remedies are hereby admitted by Borrower to be in bad faith and Borrower further admits that Lender would have just cause for relief from the automatic stay in order to take such actions authorized under state law.

(l)    Application of Proceeds. The proceeds from any sale, lease, sublease or other disposition made pursuant to this Deed of Trust, or the proceeds from the surrender of any insurance policies pursuant hereto, or any Rents collected by Lender from the Mortgaged Property or the Impositions and Insurance Reserve or other Reserves under the Loan Agreement or sums received pursuant to Section 6 hereof, or proceeds from insurance which Lender elects to apply to the Debt pursuant to Section 3 hereof, shall be applied by Lender to the Debt in such order, priority and proportions as Lender in its sole discretion shall determine.

18.    Security Agreement. This Deed of Trust is both a real property deed of trust and a "security agreement" within the meaning of the Uniform Commercial Code. The Mortgaged Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Mortgaged Property. Borrower by executing and delivering this Deed of Trust has granted and hereby grants to Lender, as security for the Debt, a security interest in the Mortgaged Property to the full extent that the Mortgaged Property may be subject to

14



the Uniform Commercial Code (said portion of the Mortgaged Property so subject to the Uniform Commercial Code being called in this Section 18 the "Collateral"). Borrower hereby agrees to execute and deliver to Lender, in form and substance reasonably satisfactory to Lender, such financing statements and such further assurances as Lender may from time to time reasonably consider necessary to create, perfect, and preserve Lender's security interest herein granted. This Deed of Trust shall also constitute a "fixture filing" for the purposes of the Uniform Commercial Code as to all or any part of the Mortgaged Property which now or hereafter constitute "fixtures" under the Uniform Commercial Code. Information concerning the security interest herein granted may be obtained from the parties at the addresses of the parties set forth in the first paragraph of this Deed of Trust. If an Event of Default shall occur, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Lender, Borrower shall at its expense assemble the Collateral and make it available to Lender at a convenient place acceptable to Lender. Borrower shall pay to Lender on demand any and all expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting the interest in the Collateral and in enforcing the rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by Lender with respect to the Collateral sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper. In the event of any change in name, identity or structure of any Borrower, such Borrower shall notify Lender thereof and promptly after Lender's request shall execute, file and record such Uniform Commercial Code forms as are necessary to maintain the priority of Lender's lien upon and security interest in the Collateral, and shall pay all expenses and fees in connection with the filing and recording thereof. If Lender shall require the filing or recording of additional Uniform Commercial Code forms or continuation statements, Borrower shall, promptly after request, execute, file and record such Uniform Commercial Code forms or continuation statements as Lender shall deem necessary, and shall pay all expenses and fees in connection with the filing and recording thereof, it being understood and agreed, however, that no such additional documents shall increase Borrower's obligations under the Note, this Deed of Trust and the other Loan Documents. Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest upon Borrower's failure to do so within five (5) Business Days after request by Lender, to file with the appropriate public office on its behalf any financing or other statements signed only by Lender, as Borrower's attorney-in-fact, in connection with the Collateral covered by this Deed of Trust. Notwithstanding the foregoing, Borrower shall appear and defend in any action or proceeding which affects or purports to affect the Mortgaged Property and any interest or right therein, whether such proceeding affects title or any other rights in the Mortgaged Property (and in conjunction therewith, Borrower shall fully cooperate with Lender in the event Lender is a party to such action or proceeding).

19.    Actions and Proceedings. Upon the occurrence and during the continuance of an Event of Default, Lender has the right to appear in and defend any action or proceeding brought with

15

respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Mortgaged Property. Lender shall, at its option, be subrogated to the lien of any mortgage or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

20.   Waiver of Setoff and Counterclaim, Marshalling, Statute of Limitations, Automatic or Supplemental Stay, Etc. (a) All amounts due under this Deed of Trust, the Note and the other Loan Documents shall be payable without setoff, counterclaim or any deduction whatsoever. Borrower hereby waives the right to assert a setoff, counterclaim or deduction in any action or proceeding in which Lender is a participant, or arising out of or in any way connected with this Deed of Trust, the Note, any of the other Loan Documents, or the Debt.

(b)   Borrower hereby expressly, irrevocably, and unconditionally waives and releases, to the extent permitted by law (i) the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling, sale in the inverse order of alienation, or any other right to direct in any manner the order or sale of any of the Mortgaged Property in the event of any sale hereunder of the Mortgaged Property or any part thereof or any interest therein; (ii) any and all rights of redemption from sale under any order or decree of foreclosure of this Deed of Trust on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Mortgaged Property subsequent to the date of this Deed of Trust and on behalf of all persons to the extent permitted by applicable law; and (iii) all benefits that might accrue to Borrower by virtue of any present or future law exempting the Mortgaged Property from attachment, levy or sale on execution or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption, or extension of time for payment. Lender shall not be under any obligation to marshal any assets in favor of any Person or against or in payment of any or all of the Obligations.

(c)   To the extent permitted by applicable law, Lender's rights hereunder shall continue even to the extent that a suit for collection of the Debt, or part thereof, is barred by a statute of limitations. Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt.

21.   Recovery of Sums Required to Be Paid. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

22.   Handicapped Access. (a) Borrower agrees that the Mortgaged Property shall at all times comply in all material respects with applicable requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively "Access Laws").

(b) Borrower agrees to give prompt notice to Lender of the receipt by Borrower of any complaints related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws but only to the extent that such complaints, proceedings or investigations, if adversely determined, could have a Material Adverse Effect.

23.     Indemnification. In addition to the payment of expenses as required elsewhere herein and in the other Loan Documents, Borrower agrees to indemnify, defend, protect, pay and hold Lender, its successors and assigns (including, without limitation, the trustee and/or the trust under any trust agreement executed in connection with any Securitization backed in whole or in part by the Loan and any other person which may hereafter be the holder of the Note or any interest therein), and the officers, directors, stockholders, partners, members, employees, agents, and Affiliates of Lender and such successors and assigns (collectively, the "Indemnified Parties") harmless from and against any and all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including without limitation reasonable attorneys' fees and expenses) (collectively, the "Indemnified Claims"), imposed upon or incurred by or asserted against any Indemnified Party by reason of any of the following (to the extent that insurance proceeds paid to the applicable Indemnified Party on account of the following shall be inadequate): (i) ownership of the Deed of Trust, the Mortgaged Property or any interest therein or receipt of any rents; (ii) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Mortgaged Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (iii) any use, nonuse or condition in, on or about the Mortgaged Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (iv) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any part thereof; (v) any failure of the Premises or the Improvements to comply with any applicable law, statute, code, ordinance, rule or regulation; (vi) any Event of Default by Borrower under this Deed of Trust, the Loan Agreement or any other Loan Documents; (vii) any actions taken by any Indemnified Party in the enforcement of this Deed of Trust and the other Loan Documents in accordance with their respective terms; (viii) any failure to act on the part of any Indemnified Party hereunder; (ix) any representation or warranty made in the Note, this Deed of Trust or any of the other Loan Documents being false or misleading in any material respect as of the date such representation or warranty was made; (x) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Mortgaged Property or any part thereof under any legal requirement or any liability asserted against Lender with respect thereto; and (xi) the claims of any lessee of any or any portion of the Mortgaged Property or any person acting through or under any lessee or otherwise arising under or as a consequence of any Lease. Notwithstanding the foregoing, Borrower shall not be liable for any Indemnified Claims arising (A) from the gross negligence or willful misconduct of any Indemnified Party or (B) under clauses (i) – (v) above to the extent the facts, events or circumstances giving rise to such Indemnified Claim arise after the date that any Indemnified Party takes title to the Mortgaged Property by foreclosure, deed-in-lieu thereof, the exercise of any power of sale or otherwise. Any amounts payable to an Indemnified Party by reason of the application of this Section 23 shall be secured by this Deed of Trust shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by such Indemnified Party until paid. The obligations and liabilities of Borrower under this

17



paragraph shall survive the termination, satisfaction, or assignment of this Deed of Trust and the exercise by Lender of any of its rights or remedies hereunder, including, but not limited to, the acquisition of the Mortgaged Property by foreclosure or a conveyance in lieu of foreclosure.

24.    Notices. Any notice, demand, statement, request or consent made hereunder shall be in writing, addressed to the intended recipient at its address set forth in the Loan Agreement, and shall be made and deemed given in accordance with the terms of the Loan Agreement.

25.    Authority. (a) Borrower (and the undersigned representative of Borrower, if any) has full power, authority and right to execute, deliver and perform its obligations pursuant to this Deed of Trust, and to mortgage, give, grant, bargain, sell, alien, enfeoff, convey, confirm, warrant, pledge, hypothecate and assign the Mortgaged Property pursuant to the terms hereof and to keep and observe all of the terms of this Deed of Trust on Borrower's part to be performed; and (b) Borrower represents and warrants that Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations.

26.    Waiver of Notice. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Deed of Trust or the Loan Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Deed of Trust or the Loan Agreement do not specifically and expressly provide for the giving of notice by Lender to Borrower.

27.    Remedies of Borrower. In the event that a claim or adjudication is made that Lender has acted unreasonably or unreasonably delayed acting in any case where by law or under the Note, this Deed of Trust or the other Loan Documents, it has an obligation to act reasonably or promptly, Lender shall not be liable for any monetary damages, and Borrower's remedies shall be limited to injunctive relief or declaratory judgment.

28.    Sole Discretion of Lender. Whenever pursuant to this Deed of Trust or the other Loan Documents, Lender exercises any right given to it to consent, approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to consent, approve or disapprove, or to decide that arrangements or terms are satisfactory or not satisfactory shall be in the sole discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein. Notwithstanding anything to the contrary contained herein, it shall be understood and agreed that any such consent, approval, or disapproval may be conditioned, among other things, upon Lender obtaining confirmation by the Rating Agencies that the action or other matter subject to Lender's consent, approval, or disapproval shall not adversely affect the rating of any securities issued or to be issued in connection with any Secondary Market Transaction, notwithstanding that such condition may not be expressly set forth in the provision or provisions of the Loan Documents which require that Lender's consent be obtained.

29.    <u>Non-Waiver.</u> The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Deed of Trust. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (a) the failure of Lender to comply with any request of Borrower or Guarantor to take any action to foreclose this Deed of Trust or otherwise enforce any of the provisions hereof or of the Note or other Loan Documents, (b) the release, regardless of consideration, of the whole or any part of the Mortgaged Property, or of any person liable for the Debt or any portion thereof, or (c) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Deed of Trust, or the other Loan Documents. Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclosure this Deed of Trust. The rights and remedies of Lender under this Deed of Trust shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

30.    <u>Liability.</u> Subject to the provisions hereof requiring Lender's consent to any transfer of the Mortgaged Property, this Deed of Trust shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.  All representations, warranties, covenants (both affirmative and negative) and all other obligations hereunder and under the Loan Documents shall be the joint and several obligation of each person or entity comprising the Borrower and any default hereunder or under the Loan Documents by any such person or entity shall be deemed a default by all such entities and the Borrower.  The representations, covenants and warranties contained herein and in the Loan Documents shall be read to apply to each of the individual persons and entities comprising the Borrower when the context so requires, but a breach of any such representation, covenant or warranty shall be deemed a breach by all such persons and entities and the Borrower, entitling Lender to exercise all of its rights and remedies hereunder and under applicable law.

31.    <u>Inapplicable Provisions.</u> If any term, covenant or condition of this Deed of Trust is held to be invalid, illegal or unenforceable in any respect, this Deed of Trust shall be construed without such provision.

32.    <u>Headings, Etc.</u> The headings and captions of various Sections of this Deed of Trust are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

33.    <u>Counterparts.</u> This Deed of Trust may be executed in any number of counterparts each of which shall be deemed to be an original but all of which when taken together shall constitute one agreement.

34.    <u>Definitions.</u> Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Deed of Trust may be used interchangeably in

singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Mortgaged Property or any part thereof or any interest therein," the word "Trustee" shall mean "Trustee and any replacement or additional trustee as Lender may appoint from time to time," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Debt" shall mean "the Note and any other evidence of indebtedness secured by this Deed of Trust," the word "person" shall include an individual, corporation, partnership, trust, unincorporated association, government, governmental authority, and any other entity, and the words "Mortgaged Property" shall include any portion of the Mortgaged Property and any interest therein and the words "attorneys' fees" shall include any and all reasonable attorneys' fees, paralegal and law clerk fees, including, but not limited to, fees at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Mortgaged Property and Collateral and enforcing its rights hereunder. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

35.    **Homestead.** Borrower hereby waives and renounces all homestead and exemption rights provided by the constitution and the laws of the United States and of any state, in and to the Mortgaged Property as against the collection of the Debt, or any part hereof.

36.    **Assignments.** Lender shall have the right to assign or transfer its rights under this Deed of Trust and the other Loan Documents without limitation, including, without limitation, the right to assign or transfer its rights to a servicing agent. Any assignee or transferee shall be entitled to all the benefits afforded Lender under this Deed of Trust and the other Loan Documents. Lender agrees to provide Borrower with notice of any such assignment; provided, however, that Borrower's consent shall not be required in connection with any such assignment and no delay or failure by Lender to provide such notice shall limit the effectiveness of such assignment.

37.    **Survival of Obligations; Survival of Warranties and Representations.** Each and all of the covenants, obligations, representations and warranties of Borrower shall survive the execution and delivery of the Loan Documents and the transfer or assignment of this Deed of Trust (including, *without limitation, any transfer of the Deed of Trust by Lender of any of its rights, title and interest in and to the Mortgaged Property to any party, whether or not affiliated with Lender*).

38.    **Covenants Running with the Land.** All covenants, conditions, warranties, representations and other obligations contained in this Deed of Trust and the other Loan Documents are intended by Borrower and Lender to be, and shall be construed as, covenants running with the Mortgaged Property until the lien of this Deed of Trust has been fully released by Lender, pursuant to the terms hereof.

39.    **Governing Law; Jurisdiction.** THIS MORTGAGE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THE STATE OF NEW YORK AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT TO



THIS MORTGAGE SHALL BE GOVERNED BY THE LAWS OF THE STATE IN WHICH THE MORTGAGED PROPERTY IS LOCATED.

40.    Time of Essence. Time is of the essence as to all of the terms, covenants and condition of this Deed of Trust and the other Loan Documents.

41.    No Third-Party Beneficiaries. The provisions of this Deed of Trust and the other Loan Documents are for the benefit of Borrower and Lender and shall not inure to the benefit of any third party (other than any successor or assignee of Lender or permitted assignee of Borrower). This Deed of Trust and the other Loan Documents shall not be construed as creating any rights, claims or causes of action against Lender or any of its officers, directors, agents or employees in favor of any party other than Borrower including but not limited to any claims to any sums held in the Impositions and Insurance Reserve or any other Reserves.

42.    Relationship of Parties. The relationship of Lender and Borrower is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with the Borrower, and no term or condition of any of the Loan Documents shall be construed to be other than that of debtor and creditor. Borrower represents and acknowledges that neither the Loan Documents nor any course of dealing between the parties creates any partnership or joint venture between Borrower and Lender or any other person, nor does it provide for any shared appreciation rights or other equity participation interest.

43.    Successors and Assigns. This Deed of Trust shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that Borrower may not assign its rights or obligations hereunder except as expressly provided in Section 9 hereof or as permitted under the Loan Agreement.

44.    Investigations. Any and all representations, warranties, covenants and agreements made in this Deed of Trust (and/or in other Loan Documents) shall survive any investigation or inspection made by or on behalf of Lender.

45.    Assignment of Leases. (a) Borrower acknowledges and confirms that it has executed and delivered to Lender the Assignment of Leases and Rents (the "Assignment of Leases") intending that such instrument create a present, absolute assignment to Lender of the Leases and Rents. Without limiting the intended benefits or the remedies provided under the Assignment of Leases, Borrower hereby assigns to Lender, as further security for the Debt and the Obligations, the Leases and Rents. While any Event of Default exists, Lender shall be entitled to exercise any or all of the remedies provided in the Assignment of Leases and in Section 17 hereof, including, without limitation, the right to have a receiver appointed. If any conflict or inconsistency exists between the assignment of the Leases and Rents in this Deed of Trust and the absolute assignment of the Leases and the Rents in the Assignment of Leases, the terms of the Assignment of Leases shall control.

(b)    So long as any part of the Debt and the Obligations secured hereby remain unpaid and undischarged, the fee and leasehold estates to the Mortgaged Property shall not merge,

21

but shall remain separate and distinct, notwithstanding the union of such estates either in Borrower, Lender, any lessee or any third party by purchase or otherwise.

46.    Waiver of Right to Trial by Jury. EACH OF BORROWER AND LENDER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS DEED OF TRUST OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH OF BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

47.    Expenses and Attorneys' Fees. Borrower agrees to promptly pay all reasonable fees, costs and expenses incurred by Lender in connection with any matters contemplated by or arising out of this Deed of Trust and the other Loan Documents, including, without limitation, reasonable fees, costs and expenses (including reasonable attorneys' fees and fees of other professionals retained by Lender) incurred in any action to enforce this Deed of Trust or the other Loan Documents or to collect any payments due from Borrower under this Deed of Trust, the Loan Agreement, the Note or any other Loan Document or incurred in connection with any refinancing or restructuring of the credit arrangements provided under this Deed of Trust incurred in connection with a "workout" or in connection with any insolvency or bankruptcy proceedings with respect to Borrower, and all such fees, costs and expenses shall be part of the Obligations, payable on demand.

48.    Amendments and Waivers. Except as otherwise provided herein, no amendment, modification, termination or waiver of any provision of this Deed of Trust, the Note or any other Loan Document, or consent to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and any other party to be charged. Each amendment, modification, termination or waiver shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances.

49.    Servicer. Lender shall have the right at any time throughout the term of the Loan to designate or appoint one or more Servicers (as defined in the Loan Agreement) to administer this Deed of Trust and the other Loan Documents, and to change or replace any Servicer. All of Lender's rights under this Deed of Trust and the other Loan Documents may be exercised by any such Servicer designated by Lender. Any such Servicer shall be entitled to the benefit of all obligations of Borrower in favor of Lender.

50.    Copy of Deed of Trust. MORTGAGOR REPRESENTS AND WARRANTS THAT IT HAS RECEIVED A TRUE COPY OF THIS MORTGAGE WITHOUT CHARGE.


51.    _Limitation on Recourse._ The obligations of Borrower hereunder are subject to limitations on recourse as provided in Article XII of the Loan Agreement.

52.    _Conflict._ The terms and provisions of this Deed of Trust shall be construed to the extent possible consistently with those of the Loan Agreement as being in addition to and supplementing the provisions of the Loan Agreement and the other Loan Documents; however, in the event that notwithstanding such construction there is an irresolvable conflict between the provisions of this Deed of Trust and the provisions of the Loan Agreement, the provisions of the Loan Agreement shall govern and control.

53.    _Trustee._ Trustee accepts this trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law. Trustee waives any statutory fee and shall accept reasonable compensation from Lender in lieu thereof for any services rendered by it in accordance with the terms hereof. Upon receipt by Trustee of instructions from Lender at any time or from time to time, Trustee shall give any notice or direction or exercise any right, remedy or power hereunder or in respect of any part or all of the Mortgaged Property as shall be specified in such instructions. Trustee may, but need not, take any of such actions in the absence of such instructions. At any time or from time to time, upon request of Lender and without affecting the liability of any person for payment of the indebtedness secured by this Deed of Trust, Trustee shall reconvey all or any part of the Mortgaged Property, consent to the making of any map or plat thereof, join in granting any easement thereon, or join in any extension agreement or any agreement subordinating the lien and estate hereof. If there are joint trustees, either Trustee may act on behalf of both Trustees. Trustee may resign at any time upon giving not less than thirty (30) day's prior notice to Lender, but shall continue to act as trustee until its successor shall have been chosen and qualified. In the event of the death, removal, resignation or refusal or inability of Trustee to act, or for any reason at any time, Lender shall have the irrevocable power, with or without cause, without prior notice of any kind, and without applying to any court, to select and appoint a successor trustee. Each such appointment and substitution shall be made by notice to Borrower, Trustee and successor trustee and by recording notice of such in the office in which this Deed of Trust is recorded. Such notice shall be executed and acknowledged by Lender and shall be conclusive proof of proper appointment of the successor trustee. Such successor shall not be required to give bond for the faithful performance of its duties unless required by Lender. Lender shall notify Trustee of payment in full of the indebtedness secured by this Deed of Trust and shall, upon Borrower's payment of the Reconveyance Fee (defined below), surrender this Deed of Trust to Trustee for reconveyance. Upon receipt of such notification and upon payment by Borrower of Trustee's expenses, Lender shall reconvey without warranty or covenant any portion of the Mortgaged Property then held hereunder to Borrower or to the person or persons legally entitled thereto by an instrument duly acknowledged in form for recording.  The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. "Reconveyance Fee" shall mean a nominal fee charged by Trustee in connection with the reconveyance of the Premises; provided, however, that no Reconveyance Fee shall be due if Lender or an affiliate of Lender makes a loan to Borrower to repay the Debt.

54.    _Special Texas Law Provisions._ The following provisions are included in this Deed of Trust specifically to comply with provisions of Texas law or custom, and in the event of any conflict



between the terms and provisions of this <u>Section 54</u> and any other terms and provisions of this Deed of Trust, the terms and provisions of this <u>Section 54</u> shall prevail and control.

(a) <u>Rights Pertaining to Sales</u>. If Borrower shall fail to perform faithfully any covenant or agreement herein contained, Lender may require Trustee to sell all or part of the Mortgaged Property, at public auction, to the highest bidder for cash, at the location designated by the Commissioner's Court of the county in which the Mortgaged Property is located, pursuant to Section 51.002, Texas Property Code, Vernon's Texas Codes Annotated, as amended from time to time or, if no such designation has been made, at a door of the county courthouse of the county in Texas in which such Mortgaged Property or any part thereof is situated, between the hours of 10:00 A.M. and 4:00 P.M. on the first Tuesday of any month, after giving notice of the time (the sale taking place within three (3) hours after the stated time), place, and terms of said sale and of the property to be sold by posting written notice of the sale at the courthouse door, and by filing a copy of the notice in the office of the county clerk of the county in which the sale is to be made at least twenty-one (21) days preceding the date of the sale. If the Mortgaged Property to be sold is situated in more than one county, a notice shall be posted at the courthouse door and filed with the county clerk in each county in which the property to be sold is situated, the Mortgaged Property may be sold in any one of such counties at the designated place therein, and such notices will identify the county and the location therein where the Mortgaged Property will be sold. In addition, Borrower shall, at least twenty-one (21) days preceding the date of sale, serve written notice of the proposed sale by certified mail on each debtor obligated to pay the debt secured hereby according to the records of Lender. Service of such notice shall be completed upon deposit of the notice, enclosed in a postpaid wrapper, properly addressed to such debtor at the most recent address as shown by the records of Lender, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of the service. Any notice that is required or permitted to be given to Borrower may be addressed to Borrower at the address as stated herein. Any notice that is to be given by certified mail to any other debtor may, if no address for such other debtor is shown by the records of Lender, be addressed to such other debtor at the address of Borrower as is shown by the records of Lender. Notwithstanding the foregoing provisions of this paragraph, notice of such sale given in accordance with the requirements of the applicable laws of the State of Texas in effect at the time of such sale shall constitute sufficient notice of such sale. Trustee may sell all or any portion of the Mortgaged Property, together or in lots or parcels, and may execute and deliver to the purchaser or purchasers of such property good and sufficient documents of conveyances with covenants of general warranty made on behalf of Borrower. In no event shall Trustee be required to exhibit, present, or display at any such sale any of the personalty described herein to be sold at such sale. Trustee making such sale shall receive the proceeds thereof and shall apply the same as follows: (i) first, he shall pay the reasonable expenses of Trustee in connection with advertising the sale and conveyance of the Mortgaged Property and a reasonable Trustee's fee or commission; (ii) second, he shall pay, so far as may be possible, the obligations secured hereby, discharging first that portion of the indebtedness arising under the covenants or agreements herein contained and not evidenced by a promissory note; and (iii) third, he shall pay the residue, if any, to the persons legally entitled thereto. Payment of the purchase price to Trustee shall satisfy the obligation of the purchaser at such sale therefor, and such purchaser shall not be responsible for the application thereof. The sale or sales by Trustee of less than the whole of the Mortgaged Property shall not exhaust the power of sale herein



granted, and Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Mortgaged Property shall be sold; and, if the proceeds of such sale or sales of less than the whole of the Mortgaged Property shall be less than the aggregate of the obligations secured hereby, including any expenses relating thereto, this Deed of Trust and the lien, security interest, and assignment hereof shall remain in full force and effect as to the unsold portion of the Mortgaged Property just as though no sale or sales had been made; provided, however, that Borrower shall never have any right to require the sale or sales of less than the whole of the Mortgaged Property, but Lender shall have the right, at its sole election, to request Trustee to sell less than the whole of the Mortgaged Property. If an Event of Default occurs hereunder, Lender shall have the option to proceed with foreclosure in satisfaction of such item either through judicial proceedings or by directing Trustee to proceed as if under a full foreclosure, conducting the sale as herein provided without declaring the entire indebtedness due, and if sale is made because of an Event of Default caused by failure to pay an installment, or a part of an installment, such sale may be made subject to the unmatured part of the indebtedness; and it is agreed that such sale, if so made, shall not in any manner affect the unmatured part of the indebtedness, but as to such unmatured part this Deed of Trust shall remain in full force and effect as though no sale had been made under the provisions of this paragraph. Several sales may be made hereunder without exhausting the right of sale for any unmatured part of any indebtedness. At any such sale (A) Borrower hereby agrees, in Borrower's behalf and in behalf of Borrower's successors and assigns, that any and all recitals made in any deed of conveyance given by Trustee with respect to the identity of Lender, the occurrence or existence of any default, the acceleration of the maturity of any of the indebtedness secured hereby, the request to sell, the notice of sale, the giving of notice to all debtors legally entitled thereto, the time, place, terms, and manner of sale, and receipt, distribution, and application of the money realized therefrom, or the due and proper appointment of a substitute Trustee, and, without being limited by the foregoing, with respect to any other act or thing having been duly done by Lender or by Trustee hereunder, shall be taken by all courts of law and equity as prima facie evidence that the statements or recitals state facts and are without further question to be so accepted, and Borrower hereby ratifies and confirms every act that Trustee or any substitute Trustee hereunder may lawfully do in respect of the Mortgaged Property by virtue hereof, and (B) the purchaser may disaffirm any easement granted, or rental, lease, sublease or other contract made, in violation of any provision of this Deed of Trust, and may take immediate possession of the Mortgaged Property free from, and despite the terms of, such grant of easement and rental, lease, sublease or other contract. Lender may bid and become the purchaser of all or any part of the property at any trustee's or foreclosure sale hereunder, and the amount of Lender's successful bid may be credited on the indebtedness. In the event of a trustee's sale hereunder and if at the time of such sale Borrower or any other party occupies the portion of the Mortgaged Property so sold or any part thereof, such occupant shall immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day to day, terminable at the will of either tenant or landlord, at a reasonable rental per day based upon the value of the portion of the Mortgaged Property so occupied. Borrower hereby ratifies and confirms any and all acts which Trustee, or his successor or substitute in this trust, shall do lawfully by virtue hereof.

(b)    Waiver of Deficiency Statute Protections/Fair Market Value for Calculating Deficiencies.

25

(i)    Notwithstanding the provisions of Section 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Borrower agrees that Lender shall be entitled to seek a deficiency judgment from Borrower and any other party obligated on the obligations secured hereby equal to the difference between the amount of the obligations secured hereby and the amount for which the Mortgaged Property was sold pursuant to a judicial or nonjudicial foreclosure sale. Borrower expressly recognizes that this section constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Borrower and other persons against whom recovery of deficiencies is sought or guarantors independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Mortgaged Property as of the date of foreclosure and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Borrower further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Mortgaged Property for purposes of calculating deficiencies owed by Borrower, guarantors, and others against whom recovery of a deficiency is sought.

(ii)    Alternatively, in the event this waiver is determined by a court of competent jurisdiction to be unenforceable, the following shall be considered competent evidence for the finder of fact's determination of the fair market value of the Mortgaged Property as of the date of the foreclosure sale in proceedings governed by sections 51.003, 51.004, and 51.005 of the Texas Property Code (as amended from time to time):

(A)    The Mortgaged Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Mortgaged Property will be repaired or improved in any manner before a resale of the Mortgaged Property after foreclosure;

(B)    The valuation shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Mortgaged Property for cash promptly (but no later than twelve months) following the foreclosure sale;

(C)    All expenses to be incurred when Lender resells the Mortgaged Property (including reasonable closing costs customarily borne by the seller in a commercial real estate transaction) should be added to the obligations secured hereby, including, without limitation, brokerage commissions, title insurance, a survey of the Premises and the Improvements, tax prorations, attorneys' fees, and marketing costs;

(D)    The gross fair market value of the Mortgaged Property shall be further discounted to account for any estimated holding costs associated with maintaining the Mortgaged Property pending sale, including, without limitation, utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in (C) above), and other maintenance expenses.

(E)     Any expert opinion testimony given or considered in connection with a determination of the fair market value of the Mortgaged Property must be given by persons having at least five years experience in appraising improved property in the vicinity where the Mortgaged Property is located and who are actively engaged therein at the time of such testimony.

(c)     ENTIRE AGREEMENT. THIS DEED OF TRUST AND THE LOAN DOCUMENTS TOGETHER CONSTITUTE A WRITTEN AGREEMENT AND REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(d)     DTPA Waiver. Borrower hereby waives all rights, remedies, claims, demands and causes of action based upon or related to the Texas Deceptive Trade Practices-Consumer Protection Act as described in V.T.C.A., Business & Commerce Code, Sections 17.41 et. seq. as the same pertains or may pertain to this Deed of Trust, the Loan Documents, any of the transactions contemplated herein or therein, or the Mortgaged Property. In furtherance of said waiver, Borrower hereby represents and warrants to Lender that (a) Borrower is represented by legal counsel in connection with the negotiation, execution and delivery of this Deed of Trust and the Loan Documents; (b) Borrower has a choice other than to enter into said waiver in that it can obtain financing from another institution; and (c) Borrower does not consider itself to be in a significantly disparate bargaining position relative to the Lender with respect to this Deed of Trust and the Loan Documents.

(e)     NOTICE OF INDEMNIFICATION. THE PARTIES TO THIS DEED OF TRUST HEREBY ACKNOWLEDGE AND AGREE THAT THIS DEED OF TRUST CONTAINS INDEMNIFICATION OBLIGATIONS PURSUANT TO SECTION 23 HEREOF.

55.     Liability. All covenants, obligations and liabilities of Borrower hereunder shall be the joint and several covenants, obligations and liabilities of each Borrower and each entity making up Borrower. Any default by any such entity shall be deemed a default by all such entities and Borrower. The obligations contained herein shall be read to apply to the individual entities comprising Borrower when the context so requires but a breach of any obligation hereunder shall be deemed a breach by all such entities and Borrower, entitling Lender to exercise all of its rights and remedies hereunder and under the other Loan Documents and under applicable law.

56.     Future SMT Borrower. Pursuant to Section 11.4 of the Loan Agreement, one or more SMT Borrowers not a signatory to this Deed of Trust on the date hereof may assume, on a joint and several basis, the obligations of the Borrower under the Loan Documents. Any and all such future SMT Borrower shall automatically become a "Borrower" under this Deed of Trust and such Borrower shall be deemed a Borrower hereunder and jointly and severally liable under this Deed of Trust, and each existing Borrower hereby irrevocably consents thereto.

27

IN WITNESS WHEREOF, Borrower has executed this instrument as of the day and year first above written.

**BORROWER:**

**IPofA WEST OAKS MALL, LP,**
**a Texas limited partnership**

By:   IPofA WestOaks Mall GP, LLC,
       a Delaware limited liability company, its General Partner

       By:   IPofA Fund Manager, LLC,
           a Virginia limited liability company, its Manager

           By:
           Name:  *Edward H. Okun*
           Its:   Manager

*not personally found*

**IPofA WOM MASTER LEASECO, LP,**
**a Texas limited partnership**

By:   IPofA WOM MLC GP, LLC,
       a Delaware limited liability company, its General Partner

       By:   IPofA Fund Manager, LLC,
           a Virginia limited liability company, its Manager

           By:
           Name:  *Edward H. Okun*
           Its:   Manager

**IPofA WEST OAKS MALL LEASECO, LP,**
**a Texas limited partnership**

By:   IPofA WOM LeaseCo GP, LLC,
       a Delaware limited liability company, its General Partner

       By:   IPofA Fund Manager, LLC,
           a Virginia limited liability company, its Manager

           By:
           Name:  *Edward H. Okun*
           Its:   Manager

West Oaks – Deed of Trust

**ACKNOWLEDGMENT**

STATE OF *Florida* )
                                        ) ss.:
COUNTY OF *Miami-Dade* )

    The foregoing instrument was acknowledged before me this *19th* day of
*June*, 2006, by *Edward HOkun*, the Manager of IPofA Fund Manager, LLC, a
Virginia limited liability company, the Manager of IPofA West Oaks Mall GP, LLC, a Delaware
limited liability company, the general partner of IPofA WEST OAKS MALL, LP, a Texas limited
partnership.

                                    *Mayling Diaz Clark*
                        Notary Public *Mayling Diaz-Clark*

                        State of   *Florida*

My commission expires:

  *7/1/2006*

                                 MAYLING DIAZ-CLARK
                                MY COMMISSION # DD 096563
                                EXPIRES: July 1, 2006
                                Bonded Thru Notary Public Underwriters

West Oaks – Deed of Trust

# ACKNOWLEDGMENT

STATE OF *Florida*  )
                             ) ss.:
COUNTY OF *Miami-Dade* )


    The foregoing instrument was acknowledged before me this *15* day of *June*, 20*06*, by *Edward Okun*, the Manager of IPofA Fund Manager, LLC, a Virginia limited liability company, the Manager of IPofA WOM MLC GP, LLC, a Delaware limited liability company, the general partner of IPofA WOM MASTER LEASECO, LP, a Texas limited partnership.

*Mayling Clark*
Notary Public    *Mayling Diaz-Clark*

State of    *Florida*


My commission expires:

*7/1/2006*

MAYLING DIAZ-CLARK
MY COMMISSION # DD 096563
EXPIRES: July 1, 2006
Bonded Thru Notary Public Underwriters

West Oaks – Deed of Trust

**ACKNOWLEDGMENT**

STATE OF *Florida* )
                              ) ss.:
COUNTY OF *Miami-Dade* )

  The foregoing instrument was acknowledged before me this *15th* day of
*June*, 20*06*, by *Edward Okun*, the Manager of IPofA Fund Manager, LLC, a
Virginia limited liability company, the Manager of IPofA WOM LeaseCo GP, LLC, a Delaware
limited liability company, the general partner of IPofA WEST OAKS MALL LEASECO, LP, a
Texas limited partnership.

                              *Mayling Diaz-Clark*
                              Notary Public  *Mayling Diaz-Clark*

                              State of ___*Florida*___

My commission expires:

___*7/1/2006*___

_____

West Oaks – Deed of Trust

## EXHIBIT A

### Legal Description of Premises

[See Attached]

G. F. No. 1017000799

## Exhibit A

PARCEL I (MALL PARCEL):
REAL PROPERTY IN THE COUNTY OF HARRIS, STATE OF TEXAS, DESCRIBED AS FOLLOWS:

TRACT I
DESCRIPTION OF A 38.469 ACRE (1,675,719 SQUARE FEET) TRACT OF LAND BEING THE SAME
CALLED 38.4692 ACRE TRACT DESCRIBED AS "TRACT I" IN A DEED TO TCW REALTY FUND VIA
HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY
CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM
BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE
106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO.
321, HARRIS COUNTY, TEXAS, SAID 38.469 ACRE TRACT BEING MORE PARTICULARLY
DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY
LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST
ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE
SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M.1093), (A 120 FOOT WIDE RIGHT-
OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS)
WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180 FOOT WIDE
RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED
RESERVE "A" AND THE NORTHEAST CORNER OF A CALLED 18.3543 ACRE TRACT DESCRIBED IN
A DEED TO PRIMARY PROPERTIES CORPORATION AS RECORDED UNDER HARRIS COUNTY
CLERK'S FILE NO. M961378;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY RIGHT-
OF-WAY LINE OF SAID STATE HIGHWAY NO. 6 AND ALONG THE EASTERLY LINE OF SAID
RESTRICTED RESERVE "A" AND THE CALLED 18.3543 ACRE TRACT, A DISTANCE OF 1,212.01
FEET TO A "PK" NAIL FOUND FOR THE POINT OF BEGINNING OF THIS HEREIN DESCRIBED
38.469 ACRE TRACT, AND ALSO BEING THE SOUTHEASTERLY CORNER OF SAID 18.3543 ACRE
TRACT;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE
WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6, A DISTANCE OF 78.50 FEET
TO A POINT FOR NORTHEAST CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF WEST
OAKS COMMERCIAL CENTER ACCORDING TO THE PLAT THEREOF RECORDED IN FILM CODE
NO. 353032 OF THE HARRIS COUNTY MAP RECORDS, FROM WHICH A FOUND 5/8 INCH IRON
ROD BEARS NORTH 10 DEGREES 44 MINUTES 00 SECONDS EAST, A DISTANCE OF 0.39 FOOT;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, DEPARTING THE WESTERLY
RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6 ALONG THE NORTHERLY LINE OF SAID
RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER, A DISTANCE OF 318.17 FEET
TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF SAID RESTRICTED
RESERVE "A" OF WEST OAKS COMMERCIAL CENTER, SAID POINT BEING IN THE ARC OF A
CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A"
OF WEST OAKS COMMERCIAL CENTER AND ALONG SAID CURVE TO THE LEFT, HAVING A
RADIUS OF 350.00 FEET, THROUGH A CENTRAL ANGLE OF 14 DEGREES 35 MINUTES 46
SECONDS (THE CHORD BEARS SOUTH 31 DEGREES 33 MINUTES 58 SECONDS WEST, A
DISTANCE OF 88.92 FEET) AN ARC DISTANCE OF 89.16 FEET TO AN "X" CUT IN CONCRETE
FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 24 DEGREES 16 MINUTES 05 SECONDS WEST, CONTINUING ALONG THE

WESTERLY LINE OF SAID RESTRICTED RESERVE "A", PASSING AT 20.50 FEET THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "A" AND THE NORTHWEST CORNER OF RESTRICTED RESERVE "B" OF SAID WEST OAKS COMMERCIAL CENTER, PASSING AT 156.14 FEET THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "B" OF WEST OAKS COMMERCIAL CENTER, AND CONTINUING FOR A TOTAL DISTANCE OF 479.57 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF OLIVE COAST SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN FILM CODE NO. 357058 OF THE HARRIS COUNTY MAP RECORDS AND ALSO BEING THE SOUTHWESTERLY CORNER OF A CALLED 3.3710 ACRE TRACT DESCRIBED IN A DEED TO STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION AND JEFFREY KRAMER, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. N427319;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF SAID OLIVE COAST SUBDIVISION A DISTANCE OF 75.69 FEET TO A 5/8 INCH IRON ROD FOUND IN A NORTHWESTERLY LINE OF RESERVE "B" (UNRESTRICTED) OF SAID TOM BROWN SUBDIVISION FOR CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 42 DEGREES 59 MINUTES 15 SECONDS WEST, CONTINUING ALONG A NORTHWESTERLY LINE OF SAID RESERVE "B" (UNRESTRICTED), A DISTANCE OF 167.14 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 15 SECONDS WEST, ALONG A NORTHERLY LINE OF SAID RESERVE "B" (UNRESTRICTED), A DISTANCE OF 303.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE MOST WESTERLY NORTHWEST CORNER OF SAID RESERVE "B" (UNRESTRICTED) AND ALSO BEING A NORTHEASTERLY CORNER OF A CALLED 1.026 ACRE TRACT DESCRIBED AS "OUT PARCEL IV" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, DEPARTING SAID NORTHERLY LINE OF RESERVE "B" (UNRESTRICTED) ALONG THE EASTERLY LINE OF THE SAID 1.026 ACRE TRACT A DISTANCE OF 5.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE, SOUTH 87 DEGREES 58 MINUTES 53 SECONDS WEST, WITH THE NORTHERLY LINE OF SAID 1.026 ACRE TRACT, A DISTANCE OF 0.56 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE NORTHERLY LINE OF SAID 1.026 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 225.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 10 MINUTES 38 SECONDS (THE CHORD BEARS SOUTH 84 DEGREES 23 MINUTES 34 SECONDS WEST, A DISTANCE OF 28.17 FEET) AN ARC DISTANCE OF 28.18 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG SAID NORTHERLY LINE AND ALONG SAID COMPOUND CURVE TO THE LEFT, HAVING A RADIUS OF 229.18 FEET, THROUGH A CENTRAL ANGLE 15 DEGREES 14 MINUTES 31 SECONDS (THE CHORD BEARS SOUTH 67 DEGREES 09 MINUTES 20 SECONDS WEST, A DISTANCE OF 60.79 FEET) AN ARC DISTANCE OF 60.97 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 59 DEGREES 32 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHERLY LINE, A DISTANCE OF 42.94 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG SAID NORTHERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 220.37 FEET, THROUGH A CENTRAL ANGLE OF 28



DEGREES 11 MINUTES 24 SECONDS (THE CHORD BEARS SOUTH 73 DEGREES 37 MINUTES 46 SECONDS WEST, A DISTANCE OF 107.33 FEET) AN ARC DISTANCE OF 108.42 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST CONTINUING ALONG SAID NORTHERLY LINE, A DISTANCE OF 18.50 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 71 DEGREES 58 MINUTES 31 SECONDS (THE CHORD BEARS SOUTH 51 DEGREES 44 MINUTES 13 SECONDS WEST, A DISTANCE OF 29.38 FEET) AN ARC DISTANCE OF 31.41 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY IN THE WESTERLY LINE OF SAID 1.026 ACRE TRACT;

THENCE, SOUTH 15 DEGREES 44 MINUTES 57 SECONDS WEST, ALONG THE WESTERLY LINE OF SAID 1.026 ACRE TRACT, A DISTANCE OF 76.40 FEET TO A POINT IN THE NORTHERLY RIGHT-OF-WAY LINE OF RICHMOND AVENUE (112 FOOT WIDE RIGHT-OF-WAY AT THIS POINT RECORDED IN VOLUME 310, PAGE 106, HARRIS COUNTY MAP RECORDS) AND THE MOST SOUTHERLY LINE OF RESTRICTED RESERVE "A", BLOCK 1 OF SAID TOM BROWN SUBDIVISION, SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT, AND FROM WHICH AN "X" FOUND CUT IN CONCRETE BEARS NORTH 50 DEGREES 42 MINUTES 00 SECONDS WEST, A DISTANCE OF 0.20 FOOT;

THENCE, NORTHWESTERLY, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,938.00 FEET THROUGH A CENTRAL ANGLE OF 00 DEGREES 21 MINUTES 17 SECONDS (THE CHORD BEARS NORTH 74 DEGREES 57 MINUTES 39 SECONDS WEST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER HEREIN DESCRIBED TRACT;

THENCE, DEPARTING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, AND ALONG THE PERIMETER OF A CALLED 14.0173 ACRE TRACT DESCRIBED IN A DEED TO DILLARD TEXAS OPERATING LIMITED PARTNERSHIP AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. R771407 THE FOLLOWING 38 COURSES AND DISTANCES:

1) NORTH 15 DEGREES 44 MINUTES 57 SECONDS EAST, A DISTANCE OF 111.83 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

2) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 42.77 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

3) NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 200.37 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 11 MINUTES 24 SECONDS (THE CHORD BEARS NORTH 73 DEGREES 37 MINUTES 46 SECONDS EAST, A DISTANCE OF 97.59 FEET) AN ARC DISTANCE OF 98.58 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

4) NORTH 59 DEGREES 32 MINUTES 04 SECONDS EAST, A DISTANCE OF 42.94 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

5) NORTHEASTERLY, ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 249.18 FEET, THROUGH A CENTRAL ANGLE OF 29 DEGREES 04 MINUTES 39 SECONDS (THE CHORD BEARS NORTH 74 DEGREES 04 MINUTES 23 SECONDS EAST, A DISTANCE OF 125.11 FEET) AN ARC DISTANCE OF 126.46 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY.

6) NORTH 88 DEGREES 36 MINUTES 43 SECONDS EAST, A DISTANCE OF 119.59 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

7) NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 252.84 FEET, THROUGH A CENTRAL ANGLE OF 64 DEGREES 20 MINUTES 38 SECONDS (THE CHORD BEARS NORTH 56 DEGREES 26 MINUTES 24 SECONDS EAST, A DISTANCE OF 269.26 FEET) AN ARC DISTANCE OF 283.94 FEED TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

8) NORTH 24 DEGREES 16 MINUTES 05 SECONDS EAST, A DISTANCE OF 98.45 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 283.47 FEET TO A "PK" NAIL FOUND FOR CORNER IN DESCRIBED TRACT;

10) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 187.81 FEET TO "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

12) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 161.18 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

13) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 62.74 FEET TO AN "X" CUT IN CONCRETE SET FOR CORNER OF THE HEREIN DESCRIBED TRACT,

14) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 51.64 FEET TO AN "X" CUT IN CONCRETE SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

15) NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 12.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 69 DEGREES 46 MINUTES 32 SECONDS WEST, A DISTANCE OF 9.18 FEET) AN ARC DISTANCE OF 9.42 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

16) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, DISTANCE OF 91.00 FEET TO AN "X" IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

17) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 90.79 FEET TO A "X" IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

18) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 244.17 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

19) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 91.42 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

20) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

21) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 4.24 FEET TO AN "X" CUT IN CONCRETE SET FOR CORNER OF THE HEREIN DESCRIBED TRACT,

22) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 48.20 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

23) SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 5.00 FEET THROUGH A CENTRAL ANGLE OF 70 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 52 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 5.74 FEET) AN ARC

DISTANCE OF 6.11 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

24) SOUTH 17 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 93.82 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

25) NORTH 72 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 16.12 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT,

26) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 207.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT

27) SOUTH 67 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 30.33 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

28) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 267.74 FEET TO A "PK" NAIL SET IN THE ARC OF A CURVE TO THE LEFT;

29) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 162.91 FEET, THROUGH A CENTRAL ANGLE OF 05 DEGREES 26 MINUTES 35 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 03 MINUTES 49 SECONDS EAST, A DISTANCE OF 15.47 FEET) AN ARC DISTANCE OF 15.48 FEET TO A "PK" NAIL FOUND FOR A POINT OF REVERSE CURVATURE OF A CURVE TO THE RIGHT;

30) SOUTHEASTERLY, ALONG SAID REVERSE CURVE TO THE RIGHT, HAVING A RADIUS OF 240.84 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 32 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 31 MINUTES 07 SECONDS EAST, A DISTANCE OF 85.85 FEET) AN ARC DISTANCE OF 86.31 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE RIGHT;

31) SOUTHEASTERLY, ALONG SAID COMPOUND CURVE TO THE RIGHT, HAVING A RADIUS OF 161.77 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 06 MINUTES 03 SECONDS (THE CHORD BEARS SOUTH 46 DEGREES 42 MINUTES 05 SECONDS EAST, A DISTANCE OF 70.30 FEET) AN ARC DISTANCE OF 70.87 FEET TO A "PK" NAIL FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

32) SOUTHEASTERLY, ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 127.67 FEET, THROUGH A CENTRAL ANGLE OF 29 DEGREES 13 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 48 DEGREES 45 MINUTES 56 SECONDS EAST, A DISTANCE OF 64.43 FEET) AN ARC DISTANCE OF 65.13 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

33) SOUTH 63 DEGREES 22 MINUTES 48 SECONDS EAST, A DISTANCE OF 80.96 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

34) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 263.33 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 53 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 131.40 FEET) AN ARC DISTANCE OF 132.80 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

35) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 159.04 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

36) SOUTH 15 DEGREES 44 MINUTES 57 SECONDS WEST, A DISTANCE OF 100.12 FEET TO AN "X" CUT IN CONCRETE SET ON THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF RESTRICTED RESERVE "A" OF SAID TOM BROWN SUBDIVISION, SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,938.00 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 21 MINUTES 17 SECONDS (THE CHORD BEARS NORTH 73 DEGREES 32 MINUTES 26 SECONDS WEST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO AN "X" CUT IN CONCRETE SET FOR THE MOST EASTERLY SOUTHEAST CORNER OF A CALLED 1.188 ACRE TRACT DESCRIBED AS "OUT PARCEL VII" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, NORTH 15 DEGREES 44 MINUTES 57 SECONDS EAST, ALONG THE MOST EASTERLY LINE OF SAID 1.188 ACRE TRACT, DEPARTING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, A DISTANCE OF 40.61 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 108 DEGREES 01 MINUTES 29 SECONDS (THE CHORD BEARS NORTH 38 DEGREES 15 MINUTES 47 SECONDS WEST, A DISTANCE OF 40.46 FEET) AN ARC DISTANCE OF 47.13 FEET TO A "PK" NAIL FOUND IN THE NORTHERLY LINE OF SAID 1.188 ACRE TRACT FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 105.49 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG A NORTHEASTERLY LINE OF SAID 1.188 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 283.33 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 53 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 77 DEGREES 49 MINUTES 40 SECONDS WEST, A DISTANCE OF 141.38 FEET) AN ARC DISTANCE OF 142.89 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 63 DEGREES 22 MINUTES 48 SECONDS WEST, CONTINUING ALONG A NORTHEASTERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 80.96 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 147.67 FEET, THROUGH A CENTRAL ANGLE OF 29 DEGREES 13 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 48 DEGREES 45 MINUTES 56 SECONDS WEST, A DISTANCE OF 74.52 FEET) AN ARC DISTANCE OF 75.33 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 141.77 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 06 MINUTES 03 SECONDS (THE CHORD BEARS NORTH 46 DEGREES 42 MINUTES 05 SECONDS WEST, A DISTANCE OF 61.61 FEET) AN ARC DISTANCE OF 62.11 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID COMPOUND CURVE TO THE LEFT, HAVING A RADIUS OF 220.84 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 32 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 69 DEGREES 31 MINUTES 07 SECONDS WEST, A DISTANCE OF 78.72 FEET) AN ARC DISTANCE OF 79.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE RIGHT, HAVING A RADIUS OF 182.91 FEET, THROUGH A


CENTRAL ANGLE OF 25 DEGREES 13 MINUTES 03 SECONDS (THE CHORD BEARS NORTH 67 DEGREES 10 MINUTES 36 SECONDS WEST, A DISTANCE OF 79.86 FEET) AN ARC DISTANCE OF 80.50 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY,

THENCE, NORTH 54 DEGREES 34 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 48.57 FEET TO AN 1/2 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,156.24 FEET, THROUGH A CENTRAL ANGLE OF 06 DEGREES 01 MINUTE 59 SECONDS (THE CHORD BEARS NORTH 51 DEGREES 33 MINUTES 04 SECONDS WEST, A DISTANCE OF 121.69 FEET) AN ARC DISTANCE OF 121.75 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 48 DEGREES 32 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 47.85 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT,

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 152.11 FEET, THROUGH A CENTRAL ANGLE OF 57 DEGREES 59 MINUTES 52 SECONDS (THE CHORD BEARS NORTH 19 DEGREES 32 MINUTES 08 SECONDS WEST, A DISTANCE OF 147.48 FEET) AN ARC DISTANCE OF 153.97 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 172.39 FEET, THROUGH A CENTRAL ANGLE OF 56 DEGREES 37 MINUTES 22 SECONDS (THE CHORD BEARS NORTH 18 DEGREES 50 MINUTES 53 SECONDS WEST, A DISTANCE OF 163.52 FEET) AN ARC DISTANCE OF 170.37 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 12.87 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE NORTHWESTERLY LINE OF SAID 1.188 ACRE TRACT;

THENCE, SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHWESTERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 127.42 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT AND THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 39 DEGREES 12 MINUTES 26 SECONDS (THE CHORD BEARS SOUTH 23 DEGREES 07 MINUTES 15 SECONDS WEST, A DISTANCE OF 16.78 FEET) AN ARC DISTANCE OF 17.11 FEET TO A 5/8 INCH IRON ROD ON THE NORTHEASTERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF TOM BROWN SUBDIVISION;

THENCE, NORTH 49 DEGREES 35 MINUTES 36 SECONDS WEST, ALONG THE SOUTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND THE NORTHEASTERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, A DISTANCE OF 70.09 FEET TO AN "X" CUT IN CONCRETE FOUND



FOR THE MOST SOUTHERLY CORNER OF A CALLED 3.035 ACRE TRACT DESCRIBED AS "OUT PARCEL V" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AND ALSO BEING THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT (RADIUS POINT BEARS NORTH 12 DEGREES 43 MINUTES 39 SECONDS WEST);

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY LINE OF THE SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 34 DEGREES 32 MINUTES 54 SECONDS (THE CHORD BEARS NORTH 59 DEGREES 59 MINUTES 54 SECONDS EAST, A DISTANCE OF 14.85 FEET) AN ARC DISTANCE OF 15.07 FEET TO AN "X" CUT IN CONCRETE SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 41 DEGREES 50 MINUTES 49 SECONDS EAST, CONTINUING ALONG THE SOUTHEASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 131.89 FEET TO A FOUND "X" IN CONCRETE FOR THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT (RADIUS POINT BEARS NORTH 47 DEGREES 16 MINUTES 30 SECONDS WEST);

THENCE, NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 02 DEGREES 16 MINUTES 30 SECONDS WEST, A DISTANCE OF 35.38 FEET) AN ARC DISTANCE OF 39.27 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT;

THENCE, NORTH 47 DEGREES 16 MINUTES 30 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 49.70 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 34 DEGREES 46 MINUTES 32 SECONDS WEST, A DISTANCE OF 86.58 FEET) AN ARC DISTANCE OF 87.27 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 22 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG AN EASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 291.34 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG AN EASTERLY LINE OF SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 12 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 69.48 FEET) AN ARC DISTANCE OF 69.81 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, CONTINUING ALONG SAID EASTERLY LINE, A DISTANCE OF 2.82 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE EASTERN MOST NORTHERLY CORNER OF SAID 3.035 ACRE TRACT;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 64.70 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT, SAID POINT ALSO BEING THE MOST EASTERLY CORNER OF RESERVE "C" (UNRESTRICTED) OF THE SAID TOM BROWN SUBDIVISION;

THENCE, NORTH 49 DEGREES 35 MINUTES 36 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID RESERVE "C", A DISTANCE OF 164.58 FEET TO A 5/8 INCH IRON ROD FOUND ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AT THE MOST NORTHERLY CORNER OF SAID. RESERVE "C" AND THE NORTHERN MOST WESTERLY CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT MARKS THE BEGINNING OF A CURVE TO THE

RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 01 DEGREES 13 MINUTES 51 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 06 MINUTES 19 SECONDS EAST, A DISTANCE OF 50.00 FEET) AN ARC DISTANCE OF 50.00 FEET TO A 1/2 INCH IRON ROD FOUND FOR THE MOST WESTERLY CORNER OF A CALLED 7.1050 ACRE TRACT DESCRIBED IN A DEED TO MERVYN'S AS RECORDED UNDER HARRIS COUNTY CLERKS FILE NO. J607907;

THENCE DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE PERIMETER OF SAID MERVYN'S TRACT, THE FOLLOWING 9 COURSES AND DISTANCES:

1) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 46.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

2) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 130.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, A DISTANCE OF 99.50 FEET) AN ARC DISTANCE OF 102.10 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

3) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 5.53 FEET TO A 5/8 INCH IRON ROD FOUND FOR AN ANGLE POINT;

4) NORTH 72 DEGREES 39 MINUTES 06 SECONDS EAST, A DISTANCE OF 84.14 FEET TO A "PK" NAIL FOUND FOR AN ANGLE POINT.

5) NORTH 51 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 110.42 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 444.55 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 414.58 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 100.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 370.59 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT, SAID POINT ALSO BEING THE MOST EASTERLY CORNER OF SAID MERVYN'S TRACT AND ALSO BEING IN THE SOUTHWESTERLY LINE OF A CALLED 3.415 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, SOUTH 62 DEGREES 16 MINUTES 32 SECONDS EAST, DEPARTING THE EASTERLY LINE OF SAID MERVYN'S TRACT AND CONTINUING ALONG THE SOUTHWESTERLY LINE OF THE SAID 3.415 ACRE TRACT, A DISTANCE OF 107.12 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 25.88 FEET) AN ARC DISTANCE OF 26.18 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY IN THE



MOST SOUTHERLY LINE OF SAID 3.415 ACRE TRACT;

THENCE, NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, ALONG THE MOST SOUTHERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 70.00 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY IN THE EASTERLY LINE OF SAID 3.415 ACRE TRACT;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 470.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 64.03 FEET) AN ARC DISTANCE OF 64.08 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 59.36 FEET TO AN "X" CUT IN CONCRETE SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING ON THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 17 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 79 DEGREES 19 MINUTES 17 SECONDS EAST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO A "PK" NAIL SET FOR THE MOST NORTHERLY NORTHWEST CORNER OF A CALLED 6.0175 ACRE TRACT DESCRIBED IN A DEED TO J.C. PENNEY COMPANY, INC. AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M826922;

THENCE, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE PERIMETER OF SAID J. C. PENNEY'S TRACT, THE FOLLOWING 19 COURSES AND DISTANCES:

1) SOUTH 10 DEGREES 05 MINUTES 16 SECONDS EAST, A DISTANCE OF 59.48 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

2) SOUTHEASTERLY, ALONG SAID CURVE TO THE RIGHT LINING A RADIUS OF 482.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 65.67 FEET) AN ARC DISTANCE OF 65.72 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

3) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 285.86 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

4) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 189.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

5) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 101.80 FEET TO A "PK"

NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 243.16 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 110.94 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 260.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

10) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 295.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 260.00 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

12) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 122.06 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

13) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 243.16 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

14) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

15) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 101.80 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

16) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 189.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

17) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 285.86 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

18) NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 518.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 70.57 FEET) AN ARC DISTANCE OF 70.63 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY,

19) NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, A DISTANCE OF 59.49 FEET TO A "PK" NAIL SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING ON THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 17 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 80 DEGREES 30 MINUTES 11 SECONDS EAST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OR 12.00 FEET TO A "PK" NAIL SET FOR THE NORTHWEST CORNER A CALLED 2.828 ACRE TRACT DESCRIBED AS "OUT PARCEL II" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;



THENCE, SOUTH 10 DEGREES 05 MINUTES 16 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 59.37 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT,

THENCE, SOUTHEASTERLY, CONTINUING ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 530.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 72.21 FEET) AN ARC DISTANCE OF 72.26 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL FOUND FOR POINT OF TANGENCY IN THE SOUTHERLY LINE OF SAID 2.826 ACRE TRACT;

THENCE, NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, ALONG THE SOUTHERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 77.52 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 49 DEGREES 46 MINUTES 29 SECONDS (THE CHORD BEARS NORTH 62 DEGREES 50 MINUTES 13 SECONDS EAST, A DISTANCE OF 42.08 FEET) AN ARC DISTANCE OF 43.44 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE SOUTHEASTERLY LINE OF SAID 2.826 ACRE TRACT;

THENCE, NORTH 37 DEGREES 57 MINUTES 01 SECONDS EAST, ALONG THE SOUTHEASTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 275.21 FEET TO A "PK" NAIL FOUND FOR THE MOST WESTERLY CORNER OF THE SAID 18.3543 ACRE TRACT;

THENCE, IN A GENERALLY SOUTHEASTERLY DIRECTION, ALONG THE SOUTHWESTERLY LINE OF SAID 18.3543 ACRE TRACT, THE FOLLOWING 13 COURSES AND DISTANCES:

1) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 88.72 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

2) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

3) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 280.76 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

4) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 237.61 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

5) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 467.58 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 56.09 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 107.71 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 215.20 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

10) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 44.13 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 98.79 TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

12) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 112.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, A DISTANCE OF 85.72 FEET) AN ARC DISTANCE OF 87.96 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

13) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 46.15 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 38.469 ACRES (1,675,719 SQUARE FEET) OF LAND.

### TRACT II (OUT PARCEL I)

DESCRIPTION OF A 3.415 ACRE (148,775 SQUARE FEET) TRACT OF LAND BEING THE SAME 3.4154 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 3.415 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093), (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180 FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A";

THENCE, SOUTH 87 DEGREES 24 MINUTES 24 SECONDS WEST, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", A DISTANCE OF 976.98 FEET TO A CONCRETE MONUMENT WITH BRASS DISK FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESERVE "A" AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 08 DEGREES 14 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 83 DEGREES 17 MINUTES 24 SECONDS WEST, A DISTANCE OF 334.17 FEET) AN ARC DISTANCE OF 334.45 FEET TO AN "X" CUT IN CONCRETE FOUND FOR NORTHEAST CORNER AND THE POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 10 DEGREES 05 MINUTES 16 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD, AND ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 59.36 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHEASTERLY, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 470.00, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 64.03 FEET) AN ARC DISTANCE OF 64.08 TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, THROUGH, A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY,

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE SOUTHERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 70.00 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 77 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 25.88 FEET) AN ARC DISTANCE OF 26.18 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 62 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG A SOUTHWESTERLY LINE OF SAID 3.415 ACRE TRACT, PASSING AT 107.12 FEET A "PK" NAIL FOUND AT THE NORTHEAST CORNER OF A CALLED 7.1050 ACRE TRACT DESCRIBED IN A DEED TO MERVYN'S, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. J607907 AND CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID MERVYN'S TRACT FOR A TOTAL DISTANCE OF 218.40 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID MERVYN'S TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 350.00 FEET, THROUGH A CENTRAL ANGLE OF 75 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 80 DEGREES 13 MINUTES 28 SECONDS WEST, A DISTANCE OF 426.13 FEET) AN ARC DISTANCE OF 458.15 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE MOST EASTERLY CORNER OF A CALLED 1.8695 ACRE TRACT DESCRIBED AS "OUT PARCEL VI" IN THE AFORESAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074 AND THE SOUTHWEST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, DEPARTING THE NORTHERLY LINE OF SAID MERVYNS TRACT, NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID 1.870 ACRE TRACT AND THE MOST SOUTHWESTERLY LINE OF THIS HEREIN DESCRIBED TRACT, A DISTANCE OF 88.55 FEET TO A 5/8 INCH IRON ROD FOUND ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT;



THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 26 MINUTES 05 SECONDS (THE CHORD BEARS NORTH 68 DEGREES 57 MINUTES 22 SECONDS EAST, A DISTANCE OF 825.72 FEET) AN ARC DISTANCE OF 830.11 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED 3.415 ACRES (148,775 SQUARE FEET) OF LAND.

**LESS AND EXCEPT**
THE FOLLOWING DESCRIBED 0.301 ACRE TRACT OUT OF A 3.415 ACRE (148,775 SQUARE FEET):

TRACT OF LAND BEING THE SAME 3.4154 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 0.301 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION);

COMMENCING AT A 5/8 INCH IRON ROD FOUND ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WHICH MARKS THE MOST NORTHERLY CORNER OF RESERVE "C" (UNRESTRICTED) OF THE SAID PLAT OF TOM BROWN SUBDIVISION AND A WESTERLY CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT MARKS THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 01 DEGREE 58 MINUTES 10 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 28 MINUTES 28 SECONDS EAST, A DISTANCE OF 80.00 FEET) AN ARC DISTANCE OF 80.00 FEET TO A "PK" NAIL FOUND FOR CORNER;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND CONTINUING ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 15 DEGREES 16 MINUTES 47 SECONDS (THE CHORD BEARS NORTH 51 DEGREES 05 MINUTES 57 SECONDS EAST, A DISTANCE OF 618.86 FEET) AN ARC DISTANCE OF 620.70 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE AND POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

THENCE, NORTHEASTERLY, CONTINUING ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND CONTINUING ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 3 DEGREES 51 MINUTES 15 SECONDS (THE CHORD BEARS NORTH 60 DEGREES 40 MINUTES 51 SECONDS EAST, A DISTANCE OF 156.54 FEET) AN ARC DISTANCE OF 156.57 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE, LEAVING THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD ALONG THE SOUTHEASTERLY LINE OF WESTHEIMER ROAD ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 80.00 FEET A LENGTH OF 31.34 FEET AND A DELTA OF 22

DEGREES 26 MINUTES 52 SECONDS WITH A CHORD BEARING SOUTH 88 DEGREES 15 MINUTES 39 SECONDS EAST, 31.14 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE SOUTH 47 DEGREES 31 MINUTES 12 SECONDS EAST, A DISTANCE OF 21.28 FEET TO A 5/8 INCH IRON ROD SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE SOUTHEASTERLY, ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 70.00 FEET, THROUGH A CENTRAL ANGLE OF 19 DEGREES 25 MINUTES 33 SECONDS (THE CHORD BEARS SOUTH 58 DEGREES 22 MINUTES 46 SECONDS EAST, A DISTANCE OF 23.62 FEET) AN ARC DISTANCE OF 23.73 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE SOUTH 48 DEGREES 39 MINUTES 58 SECONDS EAST, A DISTANCE OF 22.24 FEET TO A SET 5/8 INCH IRON ROD FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 350.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 18 MINUTES 57 SECONDS (THE CHORD BEARS SOUTH 57 DEGREES 52 MINUTES 54 SECONDS WEST, A DISTANCE OF 183.04 FEET) AN ARC DISTANCE OF 185.19 FEET TO A SET 5/8 INCH IRON ROD FOR CORNER;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 88.55 FEET TO POINT OF BEGINNING.

TRACT III (OUT PARCEL II)
DESCRIPTION OF A 2.826 ACRE (123,102 SQUARE FEET) TRACT OF LAND BEING THE SAME CALLED 2.8260 ACRE TRACT DESCRIBED AS "OUT PARCEL II" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074 AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BIAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 2.826 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093), (A 120-FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180-FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A";

THENCE, SOUTH 87 DEGREES 24 MINUTES 24 SECONDS WEST, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", A DISTANCE OF 799.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE MOST NORTHERLY NORTHWEST CORNER OF A CALLED 18.3543 ACRE TRACT DESCRIBED IN A DEED TO PRIMARY PROPERTIES CORPORATION (THE "FOLEY'S TRACT") AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M961378, SAID POINT ALSO BEING THE NORTHEAST CORNER AND POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 02 DEGREES 35 MINUTES 36 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG A WESTERLY LINE OF THE SAID FOLEY'S TRACT, A DISTANCE OF 58.14 FEET TO AN "X" CUT IN CONCRETE FOUND FOR A POINT ON THE ARC OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG A NORTHWESTERLY LINE OF SAID FOLEY'S TRACT AND ALONG THE ARC OF SAID CURVE TO THE LEFT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 16 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 45 DEGREES 57 MINUTES 01 SECONDS WEST, A DISTANCE OF 55.67 FEET) AN ARC DISTANCE OF 55.85 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, SOUTH 37 DEGREES 57 MINUTES 01 SECONDS WEST, ALONG THE SOUTHEASTERLY LINE OF THIS TRACT AND CONTINUING ALONG THE NORTHWESTERLY LINE OF SAID FOLEY'S TRACT, PASSING AT 120.92 FEET A "PK" NAIL SET FOR THE MOST WESTERLY CORNER OF THE AFORESAID FOLEY'S TRACT AND A NORTHERLY CORNER OF A CALLED 38.4692 ACRE TRACT DESCRIBED AS "TRACT I" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB, AND CONTINUING ALONG A NORTHWESTERLY LINE OF SAID 38.4692 ACRE TRACT FOR A TOTAL DISTANCE OF 396.13 TO AN "X" CUT IN CONCRETE SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 49 DEGREES 46 MINUTES 29 SECONDS (THE CHORD BEARS SOUTH 62 DEGREES 50 MINUTES 31 SECONDS WEST, A DISTANCE OF 42.09 FEET) AN ARC DISTANCE OF 43.44 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG A NORTHERLY LINE OF SAID 38.4692 ACRE TRACT, A DISTANCE OF 77.52 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG AN EASTERLY LINE OF SAID 38.4692 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG AN EASTERLY LINE OF SAID 38.4692 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 530.00, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 72.21 FEET) AN ARC DISTANCE OF 72.26 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY,

THENCE, NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, CONTINUING ALONG THE AFORESAID LINES, A DISTANCE OF 59.36 FEET TO A "PK" NAIL SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT ALSO BEING IN THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 06 DEGREES 45 MINUTES 22 SECONDS (THE CHORD BEARS NORTH 84 DEGREES 01 MINUTES 43 SECONDS EAST, A DISTANCE OF 274.29 FEET) AN ARC DISTANCE OF 274.45 FEET TO A CONCRETE MONUMENT WITH BRASS DISK FOUND FOR THE POINT OF TANGENCY

THENCE, NORTH 87 DEGREES 24 MINUTES 24 SECONDS EAST, CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF

SAID RESTRICTED RESERVE "A", A DISTANCE OF 176.98 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 2.826 ACRES (123,102 SQUARE FEET) OF LAND.

**TRACT VII**
EASEMENT RIGHTS AS SET FORTH IN DEED RECORDED IN HARRIS COUNTY CLERK'S FILE NO. P513119 AND REFILED IN HARRIS COUNTY CLERK'S FILE NO. P525425.

**TRACT VIII**
DESCRIPTION OF A 2.473 ACRE (107,731 SQUARE FEET) TRACT OF LAND OUT OF RESERVE "B" (UNRESTRICTED), BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, ALSO BEING A PORTION OF A CALLED 8.4993 ACRE TRACT DESCRIBED AS "TRACT IX" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, IN HARRIS COUNTY, TEXAS, SAID 2.473 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

BEGINNING AT A 5/8 INCH IRON ROD FOUND ON THE NORTHERLY RIGHT-OF-WAY LINE OF RICHMOND AVENUE (A 100 FOOT WIDE RIGHT-OF-WAY) WHICH MARKS THE SOUTHWEST CORNER OF SAID RESERVE "B" AND A SOUTHEASTERLY CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF SAID TOM BROWN SUBDIVISION;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE WESTERLY LINE OF SAID RESERVE "B" AND AN EASTERLY LINE OF SAID RESTRICTED RESERVE "A" SAID LINE ALSO BEING THE EASTERLY LINE OF A CALLED 1.026 ACRE TRACT DESCRIBED AS "OUT PARCEL IV" IN THE AFORESAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB, A DISTANCE OF 232.52 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF SAID RESERVE "B" AND AN INTERIOR CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN A SOUTHERLY LINE OF A CALLED 38.469 ACRE TRACT DESCRIBED AS "TRACT I" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, NORTH 87 DEGREES 59 MINUTES 15 SECONDS EAST, ALONG THE NORTHERLY LINE OF SAID RESERVE "B" AND A SOUTHERLY LINE OF THE SAID 38.469 ACRE TRACT, A DISTANCE OF 303.14 FEET TO A "PK" NAIL FOUND FOR AN ANGLE POINT;

THENCE, NORTH 42 DEGREES 59 MINUTES 15 SECONDS EAST, ALONG A SOUTHEASTERLY LINE OF THE SAID 38.469 ACRE TRACT AND A NORTHWESTERLY LINE OF SAID RESERVE "B", A DISTANCE OF 167.14 FEET TO A 5/8 INCH IRON ROD FOUND IN THE WESTERLY LINE OF RESTRICTED RESERVE "A", BLOCK 1, OF OLIVE COAST SUBDIVISION AS RECORDED IN FILM CODE NO. 357058 OF THE HARRIS COUNTY MAP RECORDS. SAID POINT MARKS THE NORTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF OLIVE COAST SUBDIVISION AND THE MOST EASTERLY LINE OF THIS TRACT, A DISTANCE OF 214.32 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "A". SAID POINT BEING IN THE NORTHERLY LINE OF A CALLED 2.1516 ACRE TRACT DESCRIBED AS A "SAVE AND EXCEPT" TRACT OUT OF THE 8.4993 ACRE TRACT DESCRIBED IN THE AFORESAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB, SAID POINT MARKS THE MOST EASTERLY SOUTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 15 SECONDS WEST ALONG THE NORTHERLY LINE OF SAID 2.1516 ACRE TRACT, A DISTANCE OF 23.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR

THE NORTHWEST CORNER OF SAID 2.1516 ACRE TRACT;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID 2.1516 ACRE TRACT AND AN EASTERLY LINE OF THIS BEING DESCRIBED TRACT, A DISTANCE OF 155.00 FEET TO A 5/8 INCH IRON ROD FOUND ON THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B" WHICH MARKS THE SOUTHWEST CORNER OF THE SAID 2.1516 ACRE TRACT AND THE MOST SOUTHERLY SOUTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 15 SECONDS WEST, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B", A DISTANCE OF 130.21 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,950.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 55 MINUTES 19 SECONDS (THE CHORD BEARS NORTH 88 DEGREES 03 MINUTES 06 SECONDS WEST, A DISTANCE OF 269.40 FEET) AN ARC DISTANCE OF 269.61 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 2.473 ACRES (107,731 SQUARE FEET) OF LAND.

## TRACT IX
EASEMENT RIGHTS IN THE FOLLOWING INSTRUMENTS: (I) EASEMENT, RESTRICTION AND OPERATING AGREEMENT DATED JULY 28, 1982, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. H650941, AS SUBSEQUENTLY AMENDED UNDER COUNTY CLERK'S FILE NO. M983356, AS FURTHER AMENDED UNDER COUNTY CLERK'S FILE NO. R583954, AS ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON JULY 28, 2003, UNDER COUNTY CLERK'S FILE NOS. W871134 AND W871140, AS FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER COUNTY CLERK'S FILE NO. Y779115, FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER COUNTY CLERK'S FILE NO. Y779118, (II) RECIPROCAL COVENANTS AND EASEMENT DATED DECEMBER 19, 1991, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. N752716 (III) EASEMENT AGREEMENT DATED OCTOBER 14, 1993, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. P513118, REFILED UNDER COUNTY CLERK'S FILE NO. P525424 AND (IV) AGREEMENT DATED AS OF JUNE 24, 1981, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. H029950, ASSIGNED UNDER HARRIS COUNTY CLERK'S FILE NO. N967757, ALL IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

## PARCEL II (MERVYN'S PARCEL):

## TRACT I
DESCRIPTION OF A TRACT OR PARCEL OF LAND CONTAINING 7.1050 ACRES (309,493 SQUARE FEET) OUT OF THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, AND BEING A PORTION OF THAT CERTAIN 102.6024 ACRE TRACT OF LAND KNOWN AS BLOCK ONE, RESERVE "A" OF THE TOM BROWN SUBDIVISION AS RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS THIS 7.1050 ACRE TRACT IS MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT THE POINT OF INTERSECTION OF THE EXTENDED NORTHERLY RIGHT OF WAY LINE OF RICHMOND AVENUE (100 FOOT WIDE RIGHT OF WAY) WITH THE EXTENDED SOUTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (F.M. 1093 - 120 FOOT WIDE RIGHT OF WAY);

THENCE NORTH 40 DEGREES 24 MINUTES 24 SECONDS EAST, ALONG THE SOUTHERLY RIGHT

OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093), FOR A DISTANCE OF 288.00 FEET TO A 5/8 INCH IRON ROD FOUND AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE CONTINUING ALONG THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) AND ALONG SAID CURVE TO THE RIGHT, HAVING A CENTRAL ANGLE OF 02 DEGREES 18 MINUTES 51 SECONDS, A RADIUS OF 2327.50 FEET, AN ARC LENGTH OF 94.00 FEET, (CHORD BEARS NORTH 41 DEGREES 33 MINUTES 50 SECOND EAST, 93.99 FEET) TO A P.K. NAIL IN ASPHALT SET FOR THE POINT OF BEGINNING OF THE HEREIN DESCRIBED 7.1050 ACRE TRACT;

THENCE CONTINUING ALONG THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) AND ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 00 DEGREES 44 MINUTES 19 SECONDS, A RADIUS OF 2327.50 FEET, AN ARCH LENGTH OF 30.00 FEET, (CHORD BEARS NORTH 43 DEGREES 05 MINUTES 14 SECONDS EAST, 30.00 FEET) TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 47 DEGREES 16 MINUTES 32 SECOND EAST, LEAVING THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) FOR A DISTANCE OF 45.95 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT HAVING A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 100.00 FEET, AN ARC LENGTH OF 78.54 FEET, (CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, 76.54 FEET) TO A CUT "X" IN CONCRETE SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 5.53 FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER OF THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT, HAVING A CENTRAL ANGLE OF 36 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 75.00 FEET, AN ARC LENGTH OF 47.12 FEET, (CHORD BEARS NORTH 69 DEGREES 43 MINUTES 28 SECONDS EAST, 46.35 FEET) TO A CUT "X" IN CONCRETE SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 51 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 209.42 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT HAVING A CENTRAL ANGLE OF 09 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 350.00 FEET, AN ARC LENGTH OF 54.98 FEET, (CHORD BEARS NORTH 47 DEGREES 13 MINUTES 28 SECONDS EAST, 54.92 FEET) TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 276.17 FEET, TO A CUT "X" IN CONCRETE SET AT THE POINT OF CURVATURE OF A CURE TO THE RIGHT;

THENCE, ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 75 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 350.00 FEET, AN ARC LENGTH OF 458.15 FEET, (CHORD BEARS NORTH 80 DEGREES 13 MINUTES 28 SECONDS EAST, 426.13 FEET) TO P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE RIGHT;

THENCE SOUTH 62 DEGREES 16 MINUTES 32 SECONDS EAST, FOR A DISTANCE OF 111.28

FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 370.59 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, FOR A DISTANCE OF 100.00 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 414.58 FEET, TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, FOR A DISTANCE OF 444.55 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 51 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 110.42 FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 72 DEGREES 39 MINUTES 06 SECONDS WEST, FOR A DISTANCE OF 84.14 FEET, TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE SOUTH 87 DEGREES 43 MINUTES 23 SECONDS WEST OF A DISTANCE OF 5.53 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 130.00 FEET, AN ARC LENGTH OF 102.10 FEET. (CHORD BEARS NORTH 69 DEGREES 46 MINUTES 32 SECONDS WEST, 99.50 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE RIGHT;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, FOR A DISTANCE OF 46.14 FEET TO THE POINT OF BEGINNING AND CONTAINING WITHIN THESE METES AND BOUNDS 7.1050 ACRES (309,493 SQUARE FEET) OF LAND AREA.

TOGETHER WITH ABUTTERS RIGHTS OF INGRESS AND EGRESS TO AND FROM WESTHEIMER ROAD, A PHYSICALLY OPEN STREET.

TRACT II
ALL THOSE CERTAIN EASEMENT RIGHTS CREATED BY EASEMENT, RESTRICTION AND OPERATING AGREEMENT DATED JULY 26, 1982, BY AND BETWEEN FEDERATED STORES REALTY, INC., ET AL, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS, UNDER HARRIS COUNTY CLERK'S FILE NO. H650941, AS AMENDED BY THAT CERTAIN FIRST AMENDMENT TO EASEMENT, RESTRICTION AND OPERATING AGREEMENT WEST OAKS MALL DATED AS OF JANUARY 2, 1991, BY AND BETWEEN WEST OAKS ASSOCIATES, LTD., ET AL., FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. M963356, AS FURTHER MODIFIED BY THAT CERTAIN DECLARATION MADE BY WEST OAKS ASSOCIATES, LTD. DATED AS OF MAY 30, 1995, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. R583954, AS ASSIGNED BY MERVYN'S LLC TO MDS TEXAS REALTY I, LP, BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION AGREEMENT DATED AS OF SEPTEMBER 2, 2004, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. X930146, AS FURTHER ASSIGNED BY MDS REALTY I, LP, TO WOM OUT PARCEL, LP, BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION OF OPERATING AGREEMENTS DATED AS OF AUGUST 8, 2005, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. Y698789, AS FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER CLERK'S FILE

NO. Y779115, FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER CLERK'S FILE NO. Y779118 ALL IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

NOTE: The Company does not represent that the above acreage or square footage calculations are correct.

PARCEL III:

ALL THOSE CERTAIN RIGHTS AND BENEFITS CREATED BY SUPPLEMENTAL AGREEMENT DATED _____, 2006 BETWEEN IP OF A WEST OAKS MALL, LP AND IP OF A WOM JCP, LP RECORDED AT _____ IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.



**Rent Roll**
**FINMARC MANAGEMENT, INC. - ANGLETON**
**As of September 30, 2006**

November 8, 2006
10:28 am

03025 1319

| Unit | Tenant Name | Lease Dates/Term/Type | Unit Square Feet and Percent of Total | | Current Rent | Rent Per Square Foot |
|------|-------------|----------------------|-------|------|------|------|
| A-01 | IMPRESSIONS MARKETING GROUP, INC. | 10/21/2003 to 10/31/2013<br>Term: 10 Years<br>Office | 110,000 | 100.0000% | Monthly: 70,019.40<br>Annual: 840,232.80 | 0.6365<br>7.6385 |
| | **Property Totals**<br>Total Deposits: $0.00 | | 110,000 | | Monthly: 70,019.40<br>Annual: 840,232.80 | 0.6365<br>7.6385 |

Dimension Name:  GLA

| | | | |
|---|---|---|---|
| Vacant: | 0 Square Feet | Unit Total: | 110000 Square Feet |
| Vacancy Percentage: | 0% | Property Total: | 110000 Square Feet |
| Occupied: | 110000 Square Feet | | |
| Occupied Percentage: | 100% | Difference: | 0 Square Feet |
| | | Percent of Total: | 100% |

# EXHIBIT D

## EXCEPTIONS TO NON-RECOURSE GUARANTY

This EXCEPTIONS TO NON-RECOURSE GUARANTY (this "Guaranty") is entered into as of June 22, 2006, by EDWARD H. OKUN, an individual, having an address at c/o Investment Properties of America, LLC, 10800 Midlothian Turnpike, Suite 309, Richmond, Virginia 23235 (the "Guarantor"), for the benefit of GREENWICH CAPITAL FINANCIAL PRODUCTS, INC., a Delaware corporation ("Lender").

### RECITALS

A.    (i) IPofA WEST OAKS MALL, LP, a Texas limited partnership ("Owner Borrower"), (ii) IPofA WOM MASTER LEASECO, LP, a Texas limited partnership ("Master Tenant Borrower") and (iii) IPofA WEST OAKS MALL LEASECO, LP, a Texas limited partnership ("Master Subtenant Borrower"; Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower are, together with each SMT Borrower, as defined and referred to in the Loan Agreement referred to below, collectively referred to herein as "Borrower"; references herein to "Borrower" shall mean each Person comprising Borrower, and also all of them collectively, jointly and severally), have requested that Lender make a loan to Borrower in the amount of $86,000,000.00 (the "Loan"). The Loan will be evidenced by that certain Promissory Note, dated of the date of this Guaranty, made by Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower to Lender (as amended or modified from time to time, the "Note"), and a Loan and Security Agreement by and between Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower and Lender (as amended or modified from time to time, the "Loan Agreement"). The Note will be secured by, among other things, that certain Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated the same date as the Note (the "Mortgage"), encumbering Borrower's fee simple and leasehold interest in certain real property and other property described in the Mortgage (collectively, the "Property"). As used herein, the term "Loan Documents" shall mean the Note, the Loan Agreement, the Mortgage, and any other documents or instruments given by Borrower or others and accepted by Lender for the purposes of evidencing, securing, or guaranteeing the Loan, together with any amendments, modifications, supplements, renewals or replacements to any of the foregoing. All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

B.    As a condition to making the Loan to Borrower, Lender requires that Guarantor execute this Guaranty.

C.    Guarantor will derive substantial benefits from Lender's making the Loan to Borrower.

NOW, THEREFORE, in order to induce Lender to make the Loan to Borrower, and in consideration thereof, Guarantor agrees as follows:

1.    As used herein, "Indebtedness" shall mean the Loan and all the other Obligations.

2.    Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the full and prompt payment when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, and the full and prompt performance when due, of all of the following:

(a)    The Indebtedness in the event of (i) a voluntary bankruptcy filing or other similar event by any Borrower; (ii) any Involuntary Borrower Party Bankruptcy which is solicited, procured, consented to or acquiesced in by any Borrower Party or any Affiliate of any of them, except for any such action brought by Lender as set forth in clause (iii) below; (iii) subsequent to the commencement of any bankruptcy or similar proceeding with respect to any Borrower, any involuntary bankruptcy proceeding is brought by Lender against one or more of the Borrower(s)(which may include any or all of Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower) and any Borrower Party or any Affiliate of any of them files any motion contesting the same; (iv) any Borrower Party or any Affiliate of any of them contests or in any way challenges, directly or indirectly, the enforceability of any of the Master Lease or Master Sublease or the characterization of the interests established thereby as other than the lease and sublease structure described therein; (v) in the absence of Lender's prior written consent, such Borrower enters into or consents to any termination of the Management Agreement; (vi) any Borrower fails to enter into any workout plan or modification of the Loan upon the occurrence of an Event of Default that has been approved by SMT Borrowers the SMT Relative Percentages of which aggregate to 51% of more at the time of such Event of Default; (vii) breach of Article IX of the Loan Agreement or Article XI of the Loan Agreement; or (viii) the failure of Borrower to pay to Lender the first regularly scheduled installment of principal and interest on the Loan on the First Payment Date;

(b)    without limiting the provisions of Section 2(a) above, the amount of (i) any insurance proceeds, condemnation awards or other sums or payments relating to the Property or the insurance required hereunder which are not applied by any Borrower Party or any Affiliate thereof in accordance with the provisions of the Loan Documents, or which are otherwise misappropriated by any Borrower Party or any Affiliate thereof; (ii) any rents, profits, issues, products and income of the Property, Security Deposits, Lease termination payments or recoveries upon Leases, rents collected in advance or any other funds received or collected by or on behalf of Borrower or any other Borrower Party or any Affiliate thereof which are not applied by any Borrower Party or any Affiliate thereof in accordance with the Loan Documents, or which are otherwise misappropriated by any Borrower Party or any Affiliate thereof, including without limitation any failure or refusal to deliver Security Deposits to Lender (including any failure to cause, if an Event of Default occurs, the re-issuance or transfer into the name of Lender or its designee, as beneficiary, of any letters of credit issued by tenants); (iii) any payments made by Borrower to any Affiliate thereof in violation of the Loan Documents after the occurrence and during the continuance of an Event of Default; and (iv) all reasonable costs and expenses, including attorneys' fees and expenses, incurred in collecting any amount due under the Loan Documents which, as to any Borrower, is a recourse obligation of any Borrower as described in

2

Section 12.2 of the Loan Agreement or, as to Guarantor, is a recourse obligation of Guarantor under this Guaranty, or is an obligation of Borrower and/or Guarantor under the Environmental Indemnity;

(c)    without limiting the provisions of Sections 2(a) and 2(b) above, any liability, loss, damage, cost or expense (including, without limitation, attorneys' fees and expenses) suffered or incurred by Lender resulting from any and all of the following: (i) the occurrence of any of the events described in the foregoing Sections 2(a) and 2(b); (ii) fraud or intentional misrepresentation by any Borrower Party or any Affiliate thereof in the Loan Agreement or any other Loan Document or otherwise in connection with the Loan; (iii) any act of arson to the Property by any Borrower Party, its agents, Affiliates, officers, employees or property manager; (iv) any removal or disposal of any portion of the Property by any Borrower Party, its agents, Affiliates, officers, employees or property manager to the extent such Property is not replaced by the Primary Borrower Parties with like property of equivalent value; (v) waste of the Property; (vi) any Borrower Party or any Affiliate of any of them contests or in any way interferes with, directly or indirectly, any foreclosure action or sale commenced by Lender or with any other enforcement of Lender's rights, powers or remedies under any of the Loan Documents or under any document evidencing, securing or otherwise relating to the Property or any other collateral for the Obligations (whether by making any motion, bringing any counterclaim, claiming any defense, seeking any injunction or other restraint, commencing any action seeking to consolidate any such foreclosure or other enforcement with any other action, or otherwise), other than contests brought in good faith by any such Borrower upon which such Borrower ultimately prevails pursuant to a final, non-appealable judgment entered against Lender; (vii) the seizure or forfeiture of the Property, or any portion thereof, or Lender's interest therein, resulting from criminal wrongdoing by Borrower (or any of them), its agents, Affiliates, officers or employees; (viii) any claims for payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the Closing and funding of the Loan; (ix) Borrower's failure to pay transfer fees and charges due Lender under the Loan Documents in connection with any transfer of all or any part of the Property, or any interest therein, from Borrower to Borrower's transferee, or transfer of any beneficial interest in Borrower; (x) failure by Borrower to comply with the covenants, obligations, liabilities, warranties and representations contained in the Environmental Indemnity or otherwise pertaining to environmental matters; (xi) in the event Lender has waived (or Borrower has failed to pay) the monthly collection for real and personal property taxes, assessments, insurance premiums, or ground rents, then failure by Borrower to pay any or all such taxes, assessments, premiums and rents; (xii) in the event that an Affiliate of Borrower is the Manager, then any management fee taken by such Manager after the occurrence and during the continuation of an Event of Default unless otherwise approved by Lender in writing; (xiv) any claim, damages, offset or defense asserted by any tenant against Lender or any affiliate of Lender based on any act or omission (including any representation or other obligation) of Borrower (or any of them) or any agent, manager or other person employed by or acting on behalf of Borrower; or (xv) gross negligence or willful misconduct by Borrower (or any of them), its agents, Affiliates, officers or employees which causes or results in a material diminution, or material loss of value, of the Property that is not reimbursed by insurance or which gross negligence or willful misconduct exposes Lender to claims, liability or costs of defense in any litigation or other legal proceeding; and

3

(d)    *All costs and expenses, including reasonable fees and out of pocket expenses of attorneys and expert witnesses, incurred by Lender in enforcing its rights under this Guaranty.*

For purposes of determining Guarantor's liability under this Guaranty, all payments made by Borrower with respect to the Indebtedness and all amounts received by Lender from the enforcement of its rights under the Mortgage shall be applied first to the portion of the Indebtedness for which neither Borrower nor Guarantor has personal liability.

Guarantor hereby promises to pay and perform, as and when due (whether by acceleration, at maturity, or otherwise) and at all times thereafter, each and all of the items and obligations which are stated to be guaranteed hereunder but which are obligations for which Guarantor is primarily liable or are not obligations of others. Guarantor hereby agrees that any such sums shall accrue interest at the Default Rate until paid if not paid as and when due and that such sums, together with any accrued interest thereon, shall become part of Guarantor's obligations hereunder.

3.    The obligations of Guarantor under this Guaranty shall survive any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, any release of record of the Mortgage and any repayment or discharge of the Indebtedness and will not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the obligations of Guarantor under this Guaranty.

4.    Guarantor's obligations under this Guaranty constitute an unconditional guaranty of payment and not merely a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective after any attempted revocation by Guarantor.

5.    The obligations of Guarantor under this Guaranty shall be performed without demand by Lender and shall be unconditional irrespective of the genuineness, validity, regularity or enforceability of any of the Loan Documents, and without regard to any other circumstance which might otherwise constitute a legal or equitable discharge of a surety or a guarantor. Guarantor shall be liable even if Borrower had no liability at the time of execution of the Loan Documents, or thereafter ceases to be liable. Guarantor hereby agrees that Guarantor's liability may be larger in amount and more burdensome than that of Borrower. Guarantor hereby waives the benefit of all principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty and agrees that Guarantor's obligations shall not be affected by any circumstances, whether or not referred to in this Guaranty, which might otherwise constitute a legal or equitable discharge of a surety or a guarantor. Guarantor hereby waives the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of sureties and guarantors thereunder. Without limiting the generality of the foregoing, Guarantor hereby waives, to the fullest extent permitted by law, diligence in collecting the Indebtedness, presentment, demand for payment, protest, all notices with respect to the Note, the Loan Agreement, this Guaranty, or any other Loan Document which may be required by statute, rule of law or otherwise to preserve Lender's rights against Guarantor under this Guaranty, including, but not limited to, notice of acceptance, notice of any amendment of the Loan Documents, notice of the occurrence of any default, notice of

4

intent to accelerate, notice of acceleration, notice of dishonor, notice of foreclosure, notice of protest, and notice of the incurring by Borrower of any obligation or indebtedness. Guarantor also waives, to the fullest extent permitted by law, all rights to require Lender to (a) proceed against Borrower or any other guarantor of Borrower's payment or performance with respect to the Indebtedness (an "**Other Guarantor**"), (b) if Borrower or any Other Guarantor is a partnership, proceed against any general partner of Borrower or the Other Guarantor, (c) proceed against or exhaust any collateral held by Lender to secure the repayment of the Indebtedness, (d) pursue any other remedy it may now or hereafter have against Borrower (or, if Borrower is a partnership, any general partner of Borrower) or (e) resort to any other means of obtaining payment of Guarantor's obligations under this Guaranty.

6.      Guarantor understands that the exercise by Lender of certain rights and remedies contained in the Loan Agreement and the Mortgage (such as a nonjudicial foreclosure sale) may affect or eliminate Guarantor's right of subrogation against Borrower and that Guarantor may therefore incur a partially or totally nonreimbursable liability under this Guaranty. Nevertheless, Guarantor hereby authorizes and empowers Lender to exercise, in its sole and absolute discretion, any right or remedy, or any combination thereof, which may then be available, since it is the intent and purpose of Guarantor that the obligations under this Guaranty shall be absolute, independent and unconditional under any and all circumstances. Guarantor expressly waives any defense (which defense, if Guarantor had not given this waiver, Guarantor might otherwise have) to a judgment against Guarantor by reason of a judicial or nonjudicial foreclosure. Without limiting the generality of the foregoing, Guarantor hereby expressly waives any and all benefits under any applicable law which, if Guarantor had not given this waiver, (i) would otherwise limit Guarantor's liability after a foreclosure sale to the difference between the obligations of Guarantor under this Guaranty and the fair market value of the property or interests sold at such nonjudicial foreclosure sale, (ii) would otherwise limit Lender's right to recover a deficiency judgment after a foreclosure sale, and (iii) would otherwise require Lender to exhaust all of its security before a personal judgment could be obtained for a deficiency. Notwithstanding any foreclosure of the lien of the Mortgage, whether by the exercise of the power of sale contained in the Mortgage, by an action for judicial foreclosure or by Lender's acceptance of a deed in lieu of foreclosure, Guarantor shall remain bound under this Guaranty. Guarantor waives all rights and defenses that Guarantor may have because Borrower's obligations are secured by real property. This means, among other things:

(a)     Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower or others; and

(b)     If Lender forecloses on any real property collateral pledged by Borrower or others: (i) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (ii) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses that Guarantor may have because Borrower's obligations are secured by real property.

5

7.     Guarantor also waives any right or defense based upon an election of remedies by Lender, even though such election (*e.g.*, nonjudicial foreclosure with respect to any collateral held by Lender to secure repayment of the Indebtedness) destroys or otherwise impairs the subrogation rights of Guarantor or the right of Guarantor (after payment of the obligations guaranteed by Guarantor under this Guaranty) to proceed against Borrower for reimbursement, or both.

8.     Guarantor shall have no right to assert or exercise, or attempt to assert or exercise, and hereby waives any right to assert or attempt to assert any claim for, subrogation, reimbursement, indemnification, and contribution against Borrower and against any general partner, member or other constituent of Borrower, and against any other person or any collateral or security for the Indebtedness, until the Indebtedness has been indefeasibly paid and satisfied in full, all obligations owed to Lender under the Loan Documents have been fully performed, and Lender has released, transferred or disposed of all of its right, title and interest in such collateral or security, and there has expired the maximum possible period thereafter during which any payment made by Borrower or others to Lender with respect to the Indebtedness could be deemed a preference under the United States Bankruptcy Code (the "Code").

9.     It is the intention of the parties that Guarantor shall not be deemed a "creditor" or "creditors" (as defined in Section 101 of the Code) of Borrower, or any Other Guarantor, by reason of the existence of this Guaranty, in the event that Borrower or any Other Guarantor becomes a debtor in any proceeding under the Code, and in connection herewith, Guarantor hereby waives any such right as a "creditor" under the Code. After the Indebtedness has been satisfied in full, this waiver shall be deemed terminated.

10.     At any time or from time to time and any number of times, without notice to Guarantor and without affecting the liability of Guarantor hereunder, (a) the time for payment of the principal of or interest on the Indebtedness may be extended or the Indebtedness may be renewed in whole or in part; (b) the time for Borrower's performance of or compliance with any covenant or agreement contained in the Note, the Loan Agreement, the Mortgage or any other Loan Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived; (c) the maturity of the Indebtedness may be accelerated as provided in the Note, the Loan Agreement, the Mortgage, or any other Loan Document; (d) the Note, the Loan Agreement, the Mortgage, or any other Loan Document may be modified or amended by Lender and Borrower in any respect, including, but not limited to, an increase in the principal amount; and (e) any security or guaranty for the Indebtedness may be modified, exchanged, surrendered or otherwise dealt with or additional security may be pledged or mortgaged for the Indebtedness.

11.     If more than one person executes this Guaranty, the obligations of those persons under this Guaranty shall be joint and several. Lender, in its sole and absolute discretion, may (a) bring suit against Guarantor, or any one or more of the persons constituting Guarantor, and any Other Guarantor, jointly and severally, or against any one or more of them; (b) compromise or settle with any one or more of the persons constituting Guarantor for such consideration as Lender may deem proper; (c) release one or more of the persons constituting Guarantor, or any

6

Other Guarantor, from liability; and (d) otherwise deal with Guarantor and any Other Guarantor, or any one or more of them, in any manner, and no such action shall impair the rights of Lender to collect from Guarantor any amount guaranteed by Guarantor under this Guaranty. Nothing contained in this paragraph shall in any way affect or impair the rights or obligations of Guarantor with respect to any Other Guarantor.

12.    Any indebtedness of Borrower held by any Guarantor now or in the future is and shall be subordinated to the Indebtedness and any such indebtedness of Borrower shall be collected, enforced and received by such Guarantor, as trustee for Lender, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

13.    If any payment by Borrower is held to constitute a preference under any applicable bankruptcy, insolvency, or similar laws, or if for any other reason Lender is required to refund any sums to Borrower, such refund shall not constitute a release of any liability of Guarantor under this Guaranty. It is the intention of Lender and Guarantor that Guarantor's obligations under this Guaranty shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

14.    Guarantor shall from time to time, upon request by Lender, deliver to Lender such financial statements as Lender may reasonably require.

15.    Guarantor represents and warrants to Lender as follows:

(a)    Guarantor is the owner of a direct or indirect interest in Owner Borrower, Master Tenant Borrower and Master Subtenant Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty.

(b)    Guarantor is familiar with, and has independently reviewed books and records regarding the financial condition of Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

(c)    Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

(d)    As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is, and will be, solvent, and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

(e)    All representations and warranties made by Guarantor herein shall survive the execution hereof.

(f)    Guarantor has examined all of the Loan Documents.

7

(g)    Except as otherwise disclosed to Lender, there are no proceedings pending or, so far as Guarantor knows, threatened before any court or administrative agency which, if decided adversely to Guarantor, would materially adversely affect the financial condition of Guarantor or the authority of Guarantor to enter into, or the validity or enforceability of, this Guaranty.

(h)    Guarantor has filed all required federal, state and local tax returns and has paid all taxes as shown on such returns as they have become due. No claims have been assessed and are unpaid with respect to such taxes.

(i)    This Guaranty has been duly executed and delivered by Guarantor and constitutes the valid and binding obligation of Guarantor, and is enforceable against Guarantor in accordance with its terms. No approval, consent, order or authorization of any governmental authority and no designation, registration, declaration or filing with any governmental authority is required in connection with the execution and delivery of this Guaranty by Guarantor. Guarantor has no defense or offset to the enforcement of this Guaranty. The execution and delivery of this Guaranty will not violate or contravene in any way the articles of incorporation or bylaws or partnership agreement, articles of organization or operating agreement, as the case may be, of Guarantor or any indenture, agreement or instrument to which Guarantor is a party or by which it or its property may be bound, or be in conflict with, result in a breach of or constitute a default under any such indenture, agreement or other instrument, result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Guarantor, except as contemplated by the provisions of the Loan Documents, and no action or approval with respect thereto by any third person is required.

16.    Lender may assign its rights under this Guaranty in whole or in part and, upon any such assignment, all the terms and provisions of this Guaranty shall inure to the benefit of such assignee to the extent so assigned. The terms used to designate any of the parties herein shall be deemed to include the heirs, legal representatives, successors and assigns of such parties; and the term "Lender" shall include, in addition to Lender, any lawful owner, holder or pledgee of the Note.

17.    This Guaranty and the other Loan Documents represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements. There are no unwritten oral agreements between the parties. All prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Guaranty and the other Loan Documents. Guarantor acknowledges that it has received copies of the Note, the Loan Agreement, the Mortgage and all other Loan Documents. Neither this Guaranty nor any of its provisions may be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in that agreement.

18.    Lender may, at any time, sell, transfer or assign the Note, the Loan Agreement, the Mortgage and the Loan Documents, or any part thereof, and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private

8

placement (the "Securities"). In connection with any of the foregoing, promptly following request from Lender, Guarantor shall furnish and certify as true and complete, such information concerning Guarantor as Lender may reasonably request. Without limitation, Guarantor agrees that it will be reasonable to request (and Guarantor shall furnish) resumes, financial statements, tax returns, key principal questionnaires, and credit reports. Guarantor authorizes Lender to forward the same to any purchaser, transferee, assignee, servicer, participant, investor in such Securities or any rating agency rating such Securities (singularly, an "Investor," and collectively, the "Investors") and each prospective Investor.

19.     No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

20.     Guarantor by its execution hereof acknowledges receipt of true copies of all of the Loan Documents, the terms and conditions of which are hereby incorporated herein by reference.

21.     This Guaranty is in addition to any and all other guaranties relating to the Indebtedness or any portion thereof.  To the extent Guarantor may become liable under this Guaranty and one or more other guarantors may become liable under the terms of any other guaranty made in favor of Lender with respect to the Indebtedness, Lender shall be entitled to exercise any and all of its remedies against Guarantor under this Guaranty as well any and all of its remedies against any one or more guarantors under such other guaranties jointly and severally.

22.     Any notice, demand, statement, request or consent made hereunder shall be in writing and shall be deemed to be received by the addressee on the day such notice is tendered to a nationally recognized overnight delivery service or on the third day following the day such notice is deposited with the United States Postal Service first class certified mail, return receipt requested, in either instance, addressed to the address, as set forth below, of the party to whom such notice is to be given, or to such other address as either party shall in like manner designate in writing. The addresses of the parties hereto are as follows:

Guarantor:

Edward H. Okun
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike
Suite 309
Richmond, Virginia 23235
Attn: Ed Okun
Facsimile: (804) 594-3550

With a copy to:

Kutak Rock LLP
The Omaha Building
1650 Farnam Street
Omaha, Nebraska 68102-2186
Attn. Joseph O. Kavan
Facsimile: (402) 346-1148

Lender:

Greenwich Capital Financial Products, Inc.
600 Steamboat Road
Greenwich, Connecticut 06830
Attn: Mortgage Loan Department

With a copy to:

Greenwich Capital Financial Products, Inc.
600 Steamboat Road
Greenwich, Connecticut 06830
Attn: Legal Department
Facsimile: (203) 629-5718

Any party may change the address at which it is to receive notices to another address in the United States at which business is conducted (and not a post office box or other similar receptacle), by giving notice of such change of address in accordance with the foregoing. This provision shall not invalidate or impose additional requirements for the delivery or effectiveness of any notice (i) given in accordance with applicable statutes or rules of court, or (ii) by service of process in accordance with applicable law. If there is any assignment or transfer of Lender interest in the Loan, then the new Lender may give notice to the parties in accordance with this Section, specifying the addresses at which the new Lender shall receive notice, such new Lender shall be entitled to notice at such address in accordance with this Section.

23.    Guarantor agrees that this Guaranty and the obligations arising hereunder shall be governed by and construed in accordance with the laws of the State of New York ("**State of Jurisdiction**") and any applicable laws of the United States of America. The state and federal courts and authorities with jurisdiction in the State of Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Guaranty. Guarantor irrevocably consents to service, jurisdiction, and venue of such courts for any

litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

24.    GUARANTOR AND LENDER EACH (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS GUARANTY OR THE RELATIONSHIP BETWEEN THE PARTIES AS GUARANTOR AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY, WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

[SIGNATURE PAGE FOLLOWS]

11

**IN WITNESS WHEREOF,** Guarantor has executed and delivered this Guaranty as of the date first written above.

**GUARANTOR:**

_____

EDWARD H. OKUN, an individual

# EXHIBIT E

### ASSIGNMENT OF
### FEE AND LEASEHOLD DEED OF TRUST,
### ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

**GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.**, a Delaware corporation, whose address is 600 Steamboat Road, Greenwich, Connecticut 06830 ("Assignor"), as the holder of the instrument hereinafter described and for valuable consideration hereby endorses, assigns, sells, transfers and delivers to the person or entity described on Exhibit B attached hereto ("Assignee"), having an address set forth on Exhibit B attached hereto, its successors, participants and assigns, without recourse or warranty, all right, title and interest of Assignor in and to that certain Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing by IPofA WEST OAKS MALL, LP, a Texas limited partnership, IPofA WEST OAKS MASTER LEASECO, LP, a Texas limited partnership and IPofA WEST OAKS MALL LEASECO, LP, a Texas limited partnership (collectively, "Borrower") dated as of June 22, 2006 and recorded on June 26, 2006 in the Harris County Clerk's Office, in Liber – – , on Page – X – , (as the same have heretofore been amended, modified, restated, supplemented, renewed or extended), securing payment of a Promissory Note of even date therewith, in the original principal amount of EIGHTY SIX MILLION AND NO/100 DOLLARS ($86,000,000) made by the Borrower, payable to the order of Assignor, and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof. Instr. # Z402124

Together with any and all notes and obligations therein described, the debt and claims secured thereby and all sums of money due and to become due thereon, with interest provided for therein, and hereby irrevocably appoints Assignee hereunder its attorney to collect and receive such debt, and to foreclose, enforce and satisfy the foregoing the same as it might or could have done were these presents not executed, but at the cost and expense of Assignee.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

This Assignment shall be governed in all respects by the laws of the State of Texas and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

[SIGNATURE ADDENDUM ON THE FOLLOWING PAGE]

- 1 -

CHI 3544565v.3

IN WITNESS WHEREOF, Assignor has caused this instrument to be executed by its duly authorized officer on this 22 of June , 2006.

GREENWICH CAPITAL FINANCIAL
PRODUCTS, INC.,
  a Delaware corporation

By: _____
Name: Steve Kay
Title: Managing Director

- 2 -

STATE OF _Illinois_

COUNTY OF _Cook_


On the _26_ day of _June_ in the year _2006_ before me, the undersigned, personally appeared _Steve Kay_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me the he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

```
"OFFICIAL SEAL"
Michelle Birdsong
Notary Public, State of Illinois
My Commission Expires 10-21-2006
```

_M. Birdsong_
Notary Public

*27.*
*ASSGN*
*O*

20070351046
06/08/2007  RP3  $120.00

**ASSIGNMENT OF**
**FEE AND LEASEHOLD DEED OF TRUST,**
**ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE**
**FILING**

GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.
(Assignor)
to

LaSalle Bank N.A.

the person or entity described on <u>Exhibit B</u> attached hereto

(Assignee)

*(4)*
*1cc*

Dated: as of June 22, 2006

County of Harris
State of Texas

DOCUMENT PREPARED BY *i*

Rosa M. Soto
LaSalle Bank N.A.
2571 Busse Rd. Suite 300
Elk Grove Village, IL 60007
GCCF6GG7/ 335-1185 -000

Debtor Address: 10800 Midlothian Turnpe
Suite 309
Richmond, VA 23235

RETURN TO:
✓✓

Marissa Janolo
UCC Direct Services
330 N. Brand, #700
Glendale, CA 91203   1/316592

FILED FOR RECORD
8:00 AM

JUN - 8 2007

*Beverly R. Kaufman*
County Clerk, Harris County, Texas

CHI 3544565v.1

RP 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

G. F. No. 1017000789

## Exhibit A

**PARCEL I (MALL PARCEL):**
REAL PROPERTY IN THE COUNTY OF HARRIS, STATE OF TEXAS, DESCRIBED AS FOLLOWS:

**TRACT I**
DESCRIPTION OF A 38.469 ACRE (1,675,719 SQUARE FEET) TRACT OF LAND BEING THE SAME CALLED 38.4692 ACRE TRACT DESCRIBED AS "TRACT I" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 38.469 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M.1093), (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180 FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A" AND THE NORTHEAST CORNER OF A CALLED 18.3543 ACRE TRACT DESCRIBED IN A DEED TO PRIMARY PROPERTIES CORPORATION AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M961378;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6 AND ALONG THE EASTERLY LINE OF SAID RESTRICTED RESERVE "A" AND THE CALLED 18.3543 ACRE TRACT, A DISTANCE OF 1,212.01 FEET TO A "PK" NAIL FOUND FOR THE POINT OF BEGINNING OF THIS HEREIN DESCRIBED 38.469 ACRE TRACT, AND ALSO BEING THE SOUTHEASTERLY CORNER OF SAID 18.3543 ACRE TRACT;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6, A DISTANCE OF 78.50 FEET TO A POINT FOR NORTHEAST CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF WEST OAKS COMMERCIAL CENTER ACCORDING TO THE PLAT THEREOF RECORDED IN FILM CODE NO. 353032 OF THE HARRIS COUNTY MAP RECORDS, FROM WHICH A FOUND 5/8 INCH IRON ROD BEARS NORTH 10 DEGREES 44 MINUTES 00 SECONDS EAST, A DISTANCE OF 0.39 FOOT;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, DEPARTING THE WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6 ALONG THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER, A DISTANCE OF 318.17 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF SAID RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER, SAID POINT BEING IN THE ARC OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 350.00 FEET, THROUGH A CENTRAL ANGLE OF 14 DEGREES 35 MINUTES 46 SECONDS (THE CHORD BEARS SOUTH 31 DEGREES 33 MINUTES 58 SECONDS WEST, A DISTANCE OF 88.92 FEET) AN ARC DISTANCE OF 89.16 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 24 DEGREES 16 MINUTES 05 SECONDS WEST, CONTINUING ALONG THE

WESTERLY LINE OF SAID RESTRICTED RESERVE "A", PASSING AT 20.50 FEET THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "A" AND THE NORTHWEST CORNER OF RESTRICTED RESERVE "B" OF SAID WEST OAKS COMMERCIAL CENTER, PASSING AT 156.14 FEET THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "B" OF WEST OAKS COMMERCIAL CENTER, AND CONTINUING FOR A TOTAL DISTANCE OF 479.57 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF OLIVE COAST SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN FILM CODE NO. 357058 OF THE HARRIS COUNTY MAP RECORDS AND ALSO BEING THE SOUTHWESTERLY CORNER OF A CALLED 3.3710 ACRE TRACT DESCRIBED IN A DEED TO STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION AND JEFFREY KRAMER, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. N427319;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF SAID OLIVE COAST SUBDIVISION A DISTANCE OF 75.89 FEET TO A 5/8 INCH IRON ROD FOUND IN A NORTHWESTERLY LINE OF RESERVE "B" (UNRESTRICTED) OF SAID TOM BROWN SUBDIVISION FOR CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 42 DEGREES 59 MINUTES 15 SECONDS WEST, CONTINUING ALONG A NORTHWESTERLY LINE OF SAID RESERVE "B" (UNRESTRICTED), A DISTANCE OF 167.14 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 15 SECONDS WEST, ALONG A NORTHERLY LINE OF SAID RESERVE "B" (UNRESTRICTED), A DISTANCE OF 303.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE MOST WESTERLY NORTHWEST CORNER OF SAID RESERVE "B" (UNRESTRICTED) AND ALSO BEING A NORTHEASTERLY CORNER OF A CALLED 1.026 ACRE TRACT DESCRIBED AS "OUT PARCEL IV" IN THE SAID DEED TO TCW REALTY FUND VIIA HOLDING COMPANY AND TCW REALTY FUND VIIB;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, DEPARTING SAID NORTHERLY LINE OF RESERVE "B" (UNRESTRICTED) ALONG THE EASTERLY LINE OF THE SAID 1.026 ACRE TRACT A DISTANCE OF 5.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE, SOUTH 87 DEGREES 58 MINUTES 53 SECONDS WEST, WITH THE NORTHERLY LINE OF SAID 1.026 ACRE TRACT, A DISTANCE OF 0.56 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE NORTHERLY LINE OF SAID 1.026 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 225.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 10 MINUTES 38 SECONDS (THE CHORD BEARS SOUTH 84 DEGREES 23 MINUTES 34 SECONDS WEST, A DISTANCE OF 28.17 FEET) AN ARC DISTANCE OF 28.18 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG SAID NORTHERLY LINE AND ALONG SAID COMPOUND CURVE TO THE LEFT; HAVING A RADIUS OF 229.18 FEET, THROUGH A CENTRAL ANGLE 15 DEGREES 14 MINUTES 31 SECONDS (THE CHORD BEARS SOUTH 67 DEGREES 09 MINUTES 20 SECONDS WEST, A DISTANCE OF 60.79 FEET) AN ARC DISTANCE OF 60.97 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 59 DEGREES 32 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHERLY LINE, A DISTANCE OF 42.94 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG SAID NORTHERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 220.37 FEET, THROUGH A CENTRAL ANGLE OF 28

DEGREES 11 MINUTES 24 SECONDS (THE CHORD BEARS SOUTH 73 DEGREES 37 MINUTES 46 SECONDS WEST, A DISTANCE OF 107.33 FEET) AN ARC DISTANCE OF 108.42 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST CONTINUING ALONG SAID NORTHERLY LINE, A DISTANCE OF 18.50 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 71 DEGREES 58 MINUTES 31 SECONDS (THE CHORD BEARS SOUTH 51 DEGREES 44 MINUTES 13 SECONDS WEST, A DISTANCE OF 29.38 FEET) AN ARC DISTANCE OF 31.41 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY IN THE WESTERLY LINE OF SAID 1.026 ACRE TRACT;

THENCE, SOUTH 15 DEGREES 44 MINUTES 57 SECONDS WEST, ALONG THE WESTERLY LINE OF SAID 1.026 ACRE TRACT, A DISTANCE OF 76.40 FEET TO A POINT IN THE NORTHERLY RIGHT-OF-WAY LINE OF RICHMOND AVENUE (112 FOOT WIDE RIGHT-OF-WAY AT THIS POINT RECORDED IN VOLUME 310, PAGE 106, HARRIS COUNTY MAP RECORDS) AND THE MOST SOUTHERLY LINE OF RESTRICTED RESERVE "A", BLOCK 1 OF SAID TOM BROWN SUBDIVISION, SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT, AND FROM WHICH AN "X" FOUND CUT IN CONCRETE BEARS NORTH 50 DEGREES 42 MINUTES 00 SECONDS WEST, A DISTANCE OF 0.20 FOOT;

THENCE, NORTHWESTERLY, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,938.00 FEET THROUGH A CENTRAL ANGLE OF 00 DEGREES 21 MINUTES 17 SECONDS (THE CHORD BEARS NORTH 74 DEGREES 57 MINUTES 39 SECONDS WEST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER HEREIN DESCRIBED TRACT;

THENCE, DEPARTING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, AND ALONG THE PERIMETER OF A CALLED 14.0173 ACRE TRACT DESCRIBED IN A DEED TO DILLARD TEXAS OPERATING LIMITED PARTNERSHIP AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. R771407 THE FOLLOWING 36 COURSES AND DISTANCES:

1) NORTH 15 DEGREES 44 MINUTES 57 SECONDS EAST, A DISTANCE OF 111.83 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

2) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 42.77 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

3) NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 200.37 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 11 MINUTES 24 SECONDS (THE CHORD BEARS NORTH 73 DEGREES 37 MINUTES 46 SECONDS EAST, A DISTANCE OF 97.59 FEET) AN ARC DISTANCE OF 98.58 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

4) NORTH 59 DEGREES 32 MINUTES 04 SECONDS EAST, A DISTANCE OF 42.94 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

5) NORTHEASTERLY, ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 249.18 FEET, THROUGH A CENTRAL ANGLE OF 29 DEGREES 04 MINUTES 39 SECONDS (THE CHORD BEARS NORTH 74 DEGREES 04 MINUTES 23 SECONDS EAST, A DISTANCE OF 125.11 FEET) AN ARC DISTANCE OF 126.46 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY.

6) NORTH 88 DEGREES 36 MINUTES 43 SECONDS EAST, A DISTANCE OF 119.59 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

7) NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 252.84 FEET, THROUGH A CENTRAL ANGLE OF 64 DEGREES 20 MINUTES 38 SECONDS (THE CHORD BEARS NORTH 56 DEGREES 26 MINUTES 24 SECONDS EAST, A DISTANCE OF 269.26 FEET) AN ARC DISTANCE OF 283.94 FEED TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

8) NORTH 24 DEGREES 16 MINUTES 05 SECONDS EAST, A DISTANCE OF 98.45 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 283.47 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN IN DESCRIBED TRACT;

10) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 187.81 FEET TO "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

12) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 161.18 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

13) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 62.74 FEET TO AN "X" CUT IN CONCRETE SET FOR CORNER OF THE HEREIN DESCRIBED TRACT,

14) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 51.64 FEET TO AN "X" CUT IN CONCRETE SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

15) NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 12.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 69 DEGREES 46 MINUTES 32 SECONDS WEST, A DISTANCE OF 9.18 FEET) AN ARC DISTANCE OF 9.42 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

16) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, DISTANCE OF 91.00 FEET TO AN "X" IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

17) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 90.79 FEET TO A "X" IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

18) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 244.17 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

19) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 91.42 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

20) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

21) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 4.24 FEET TO AN "X" CUT IN CONCRETE SET FOR CORNER OF THE HEREIN DESCRIBED TRACT,

22) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 48.20 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

23) SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 5.00 FEET THROUGH A CENTRAL ANGLE OF 70 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 52 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 5.74 FEET) AN ARC

DISTANCE OF 6.11 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

24) SOUTH 17 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 93.82 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

25) NORTH 72 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 16.12 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT.

26) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 207.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT

27) SOUTH 67 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 30.33 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

28) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 267.74 FEET TO A "PK" NAIL SET IN THE ARC OF A CURVE TO THE LEFT;

29) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 162.91 FEET, THROUGH A CENTRAL ANGLE OF 05 DEGREES 26 MINUTES 35 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 03 MINUTES 49 SECONDS EAST, A DISTANCE OF 15.47 FEET) AN ARC DISTANCE OF 15.48 FEET TO A "PK" NAIL FOUND FOR A POINT OF REVERSE CURVATURE OF A CURVE TO THE RIGHT;

30) SOUTHEASTERLY, ALONG SAID REVERSE CURVE TO THE RIGHT, HAVING A RADIUS OF 240.84 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 32 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 31 MINUTES 07 SECONDS EAST, A DISTANCE OF 85.85 FEET) AN ARC DISTANCE OF 86.31 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE RIGHT;

31) SOUTHEASTERLY, ALONG SAID COMPOUND CURVE TO THE RIGHT, HAVING A RADIUS OF 161.77 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 06 MINUTES 03 SECONDS (THE CHORD BEARS SOUTH 46 DEGREES 42 MINUTES 05 SECONDS EAST, A DISTANCE OF 70.30 FEET) AN ARC DISTANCE OF 70.87 FEET TO A "PK" NAIL FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

32) SOUTHEASTERLY, ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 127.67 FEET, THROUGH A CENTRAL ANGLE OF 29 DEGREES 13 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 48 DEGREES 45 MINUTES 56 SECONDS EAST, A DISTANCE OF 64.43 FEET) AN ARC DISTANCE OF 65.13 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

33) SOUTH 63 DEGREES 22 MINUTES 40 SECONDS EAST, A DISTANCE OF 80.96 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

34) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 263.33 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 53 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 131.40 FEET) AN ARC DISTANCE OF 132.80 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

35) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 159.04 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

36) SOUTH 15 DEGREES 44 MINUTES 57 SECONDS WEST, A DISTANCE OF 100.12 FEET TO AN "X" CUT IN CONCRETE SET ON THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF RESTRICTED RESERVE "A" OF SAID TOM BROWN SUBDIVISION, SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,938.00 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 21 MINUTES 17 SECONDS (THE CHORD BEARS NORTH 73 DEGREES 32 MINUTES 26 SECONDS WEST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO AN "X" CUT IN CONCRETE SET FOR THE MOST EASTERLY SOUTHEAST CORNER OF A CALLED 1.188 ACRE TRACT DESCRIBED AS "OUT PARCEL VII" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, NORTH 15 DEGREES 44 MINUTES 57 SECONDS EAST, ALONG THE MOST EASTERLY LINE OF SAID 1.188 ACRE TRACT, DEPARTING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, A DISTANCE OF 40.61 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 108 DEGREES 01 MINUTES 29 SECONDS (THE CHORD BEARS NORTH 38 DEGREES 15 MINUTES 47 SECONDS WEST, A DISTANCE OF 40.46 FEET) AN ARC DISTANCE OF 47.13 FEET TO A "PK" NAIL FOUND IN THE NORTHERLY LINE OF SAID 1.188 ACRE TRACT FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 105.49 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG A NORTHEASTERLY LINE OF SAID 1.188 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 283.33 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 53 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 77 DEGREES 49 MINUTES 40 SECONDS WEST, A DISTANCE OF 141.38 FEET) AN ARC DISTANCE OF 142.89 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 63 DEGREES 22 MINUTES 48 SECONDS WEST, CONTINUING ALONG A NORTHEASTERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 80.96 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 147.67 FEET, THROUGH A CENTRAL ANGLE OF 29 DEGREES 13 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 48 DEGREES 45 MINUTES 56 SECONDS WEST, A DISTANCE OF 74.52 FEET) AN ARC DISTANCE OF 75.33 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 141.77 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 06 MINUTES 03 SECONDS (THE CHORD BEARS NORTH 46 DEGREES 42 MINUTES 05 SECONDS WEST, A DISTANCE OF 61.61 FEET) AN ARC DISTANCE OF 62.11 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID COMPOUND CURVE TO THE LEFT, HAVING A RADIUS OF 220.84 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 32 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 69 DEGREES 31 MINUTES 07 SECONDS WEST, A DISTANCE OF 78.72 FEET) AN ARC DISTANCE OF 79.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE RIGHT, HAVING A RADIUS OF 182.91 FEET, THROUGH A

CENTRAL ANGLE OF 25 DEGREES 13 MINUTES 03 SECONDS (THE CHORD BEARS NORTH 67 DEGREES 10 MINUTES 36 SECONDS WEST, A DISTANCE OF 79.86 FEET) AN ARC DISTANCE OF 80.50 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 54 DEGREES 34 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 48.57 FEET TO AN 1/2 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,156.24 FEET, THROUGH A CENTRAL ANGLE OF 06 DEGREES 01 MINUTE 58 SECONDS (THE CHORD BEARS NORTH 51 DEGREES 33 MINUTES 04 SECONDS WEST, A DISTANCE OF 121.69 FEET) AN ARC DISTANCE OF 121.75 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 48 DEGREES 32 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 47.85 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 152.11 FEET, THROUGH A CENTRAL ANGLE OF 57 DEGREES 59 MINUTES 52 SECONDS (THE CHORD BEARS NORTH 19 DEGREES 32 MINUTES 08 SECONDS WEST, A DISTANCE OF 147.48 FEET) AN ARC DISTANCE OF 153.97 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 172.39 FEET, THROUGH A CENTRAL ANGLE OF 56 DEGREES 37 MINUTES 22 SECONDS (THE CHORD BEARS NORTH 18 DEGREES 50 MINUTES 53 SECONDS WEST, A DISTANCE OF 163.52 FEET) AN ARC DISTANCE OF 170.37 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 12.87 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE NORTHWESTERLY LINE OF SAID 1.188 ACRE TRACT;

THENCE, SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHWESTERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 127.42 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT AND THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 39 DEGREES 12 MINUTES 26 SECONDS (THE CHORD BEARS SOUTH 23 DEGREES 07 MINUTES 15 SECONDS WEST, A DISTANCE OF 16.78 FEET) AN ARC DISTANCE OF 17.11 FEET TO A 5/8 INCH IRON ROD ON THE NORTHEASTERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF TOM BROWN SUBDIVISION;

THENCE, NORTH 49 DEGREES 35 MINUTES 36 SECONDS WEST, ALONG THE SOUTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND THE NORTHEASTERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, A DISTANCE OF 70.09 FEET TO AN "X" CUT IN CONCRETE FOUND

FOR THE MOST SOUTHERLY CORNER OF A CALLED 3.035 ACRE TRACT DESCRIBED AS "OUT PARCEL V" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AND ALSO BEING THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT (RADIUS POINT BEARS NORTH 12 DEGREES 43 MINUTES 39 SECONDS WEST);

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY LINE OF THE SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 34 DEGREES 32 MINUTES 54 SECONDS (THE CHORD BEARS NORTH 59 DEGREES 59 MINUTES 54 SECONDS EAST, A DISTANCE OF 14.85 FEET) AN ARC DISTANCE OF 15.07 FEET TO AN "X" CUT IN CONCRETE SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 41 DEGREES 50 MINUTES 49 SECONDS EAST, CONTINUING ALONG THE SOUTHEASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 131.89 FEET TO A FOUND "X" IN CONCRETE FOR THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT (RADIUS POINT BEARS NORTH 47 DEGREES 16 MINUTES 30 SECONDS WEST);

THENCE, NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 02 DEGREES 16 MINUTES 30 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT;

THENCE, NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 49.70 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT,

THENCE, NORTHWESTERLY, CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 34 DEGREES 46 MINUTES 32 SECONDS WEST, A DISTANCE OF 86.58 FEET) AN ARC DISTANCE OF 87.27 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 22 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG AN EASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 291.34 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG AN EASTERLY LINE OF SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 12 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 69.46 FEET) AN ARC DISTANCE OF 69.81 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, CONTINUING ALONG SAID EASTERLY LINE, A DISTANCE OF 2.82 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE EASTERN MOST NORTHERLY CORNER OF SAID 3.035 ACRE TRACT;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 64.70 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT, SAID POINT ALSO BEING THE MOST EASTERLY CORNER OF RESERVE "C" (UNRESTRICTED) OF THE SAID TOM BROWN SUBDIVISION;

THENCE, NORTH 49 DEGREES 35 MINUTES 36 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID RESERVE "C", A DISTANCE OF 164.58 FEET TO A 5/8 INCH IRON ROD FOUND ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AT THE MOST NORTHERLY CORNER OF SAID. RESERVE "C" AND THE NORTHERN MOST WESTERLY CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT MARKS THE BEGINNING OF A CURVE TO THE

RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 01 DEGREES 13 MINUTES 51 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 06 MINUTES 19 SECONDS EAST, A DISTANCE OF 50.00 FEET) AN ARC DISTANCE OF 50.00 FEET TO A 1/2 INCH IRON ROD FOUND FOR THE MOST WESTERLY CORNER OF A CALLED 7.1050 ACRE TRACT DESCRIBED IN A DEED TO MERVYN'S AS RECORDED UNDER HARRIS COUNTY CLERKS FILE NO. J607807;

THENCE DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE PERIMETER OF SAID MERVYN'S TRACT, THE FOLLOWING 9 COURSES AND DISTANCES:

1) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 46.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

2) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 130.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, A DISTANCE OF 99.50 FEET) AN ARC DISTANCE OF 102.10 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

3) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 5.53 FEET TO A 5/8 INCH IRON ROD FOUND FOR AN ANGLE POINT;

4) NORTH 72 DEGREES 39 MINUTES 06 SECONDS EAST, A DISTANCE OF 84.14 FEET TO A "PK" NAIL FOUND FOR AN ANGLE POINT,

5) NORTH 51 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 110.42 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 444.55 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 414.58 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 100.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 370.59 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT, SAID POINT ALSO BEING THE MOST EASTERLY CORNER OF SAID MERVYN'S TRACT AND ALSO BEING IN THE SOUTHWESTERLY LINE OF A CALLED 3.415 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, SOUTH 62 DEGREES 16 MINUTES 32 SECONDS EAST, DEPARTING THE EASTERLY LINE OF SAID MERVYN'S TRACT AND CONTINUING ALONG THE SOUTHWESTERLY LINE OF THE SAID 3.415 ACRE TRACT, A DISTANCE OF 107.12 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 25.88 FEET) AN ARC DISTANCE OF 26.18 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY IN THE

MOST SOUTHERLY LINE OF SAID 3.415 ACRE TRACT;

THENCE, NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, ALONG THE MOST SOUTHERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 70.00 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY IN THE EASTERLY LINE OF SAID 3.415 ACRE TRACT;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 470.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 64.03 FEET) AN ARC DISTANCE OF 64.08 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 59.36 FEET TO AN "X" CUT IN CONCRETE SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING ON THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 17 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 79 DEGREES 19 MINUTES 17 SECONDS EAST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO A "PK" NAIL SET FOR THE MOST NORTHERLY NORTHWEST CORNER OF A CALLED 6.0175 ACRE TRACT DESCRIBED IN A DEED TO J.C. PENNEY COMPANY, INC. AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M826922;

THENCE, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE PERIMETER OF SAID J. C. PENNEY'S TRACT, THE FOLLOWING 19 COURSES AND DISTANCES:

1) SOUTH 10 DEGREES 05 MINUTES 16 SECONDS EAST, A DISTANCE OF 59.48 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

2) SOUTHEASTERLY, ALONG SAID CURVE TO THE RIGHT HAVING A RADIUS OF 482.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 65.67 FEET) AN ARC DISTANCE OF 65.72 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

3) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 285.86 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

4) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 189.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

5) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 101.80 FEET TO A "PK"

NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 243.16 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 110.94 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 260.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

10) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 295.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 260.00 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

12) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 122.06 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

13) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST; A DISTANCE OF 243.16 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT.

14) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

15) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 101.80 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

16) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 189.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

17) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 285.86 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

18) NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 518.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 70.57 FEET) AN ARC DISTANCE OF 70.63 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

19) NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, A DISTANCE OF 59.49 FEET TO A "PK" NAIL SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A". SAID POINT BEING ON THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 17 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 80 DEGREES 30 MINUTES 11 SECONDS EAST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OR 12.00 FEET TO A "PK" NAIL SET FOR THE NORTHWEST CORNER A CALLED 2.826 ACRE TRACT DESCRIBED AS "OUT PARCEL II" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, SOUTH 10 DEGREES 05 MINUTES 18 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 59.37 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT,

THENCE, SOUTHEASTERLY, CONTINUING ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 530.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 72.21 FEET) AN ARC DISTANCE OF 72.26 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL FOUND FOR POINT OF TANGENCY IN THE SOUTHERLY LINE OF SAID 2.826 ACRE TRACT;

THENCE, NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, ALONG THE SOUTHERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 77.52 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 49 DEGREES 46 MINUTES 29 SECONDS (THE CHORD BEARS NORTH 62 DEGREES 50 MINUTES 13 SECONDS EAST, A DISTANCE OF 42.08 FEET) AN ARC DISTANCE OF 43.44 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE SOUTHEASTERLY LINE OF SAID 2.826 ACRE TRACT;

THENCE, NORTH 37 DEGREES 57 MINUTES 01 SECONDS EAST, ALONG THE SOUTHEASTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 275.21 FEET TO A "PK" NAIL FOUND FOR THE MOST WESTERLY CORNER OF THE SAID 18.3543 ACRE TRACT;

THENCE, IN A GENERALLY SOUTHEASTERLY DIRECTION, ALONG THE SOUTHWESTERLY LINE OF SAID 18.3543 ACRE TRACT, THE FOLLOWING 13 COURSES AND DISTANCES:

1) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 88.72 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

2) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

3) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 280.76 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

4) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 237.61 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

5) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 467.58 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 56.09 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 107.71 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 215.20 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

10) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 44.13 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 98.79 TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

12) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 112.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, A DISTANCE OF 85.72 FEET) AN ARC DISTANCE OF 87.96 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

13) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 46.15 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 38.469 ACRES (1,675,719 SQUARE FEET) OF LAND.

TRACT II (OUT PARCEL I)
DESCRIPTION OF A 3.415 ACRE (148,775 SQUARE FEET) TRACT OF LAND BEING THE SAME 3.4154 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 3.415 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093), (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180 FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A";

THENCE, SOUTH 87 DEGREES 24 MINUTES 24 SECONDS WEST, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", A DISTANCE OF 975.98 FEET TO A CONCRETE MONUMENT WITH BRASS DISK FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESERVE "A" AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 08 DEGREES 14 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 83 DEGREES 17 MINUTES 24 SECONDS WEST, A DISTANCE OF 334.17 FEET) AN ARC DISTANCE OF 334.45 FEET TO AN "X" CUT IN CONCRETE FOUND FOR NORTHEAST CORNER AND THE POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 10 DEGREES 05 MINUTES 16 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD, AND ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 59.36 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHEASTERLY, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 470.00, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 64.03 FEET) AN ARC DISTANCE OF 64.08 TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, THROUGH, A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY.

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE SOUTHERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 70.00 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 77 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 25.88 FEET) AN ARC DISTANCE OF 26.18 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 62 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG A SOUTHWESTERLY LINE OF SAID 3.415 ACRE TRACT, PASSING AT 107.12 FEET A "PK" NAIL FOUND AT THE NORTHEAST CORNER OF A CALLED 7.1050 ACRE TRACT DESCRIBED IN A DEED TO MERVYN'S, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. J607907 AND CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID MERVYN'S TRACT FOR A TOTAL DISTANCE OF 218.40 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID MERVYN'S TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 350.00 FEET, THROUGH A CENTRAL ANGLE OF 75 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 80 DEGREES 13 MINUTES 28 SECONDS WEST, A DISTANCE OF 426.13 FEET) AN ARC DISTANCE OF 458.15 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE MOST EASTERLY CORNER OF A CALLED 1.8695 ACRE TRACT DESCRIBED AS "OUT PARCEL VI" IN THE AFORESAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074 AND THE SOUTHWEST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, DEPARTING THE NORTHERLY LINE OF SAID MERVYNS TRACT, NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID 1.870 ACRE TRACT AND THE MOST SOUTHWESTERLY LINE OF THIS HEREIN DESCRIBED TRACT, A DISTANCE OF 88.55 FEET TO A 5/8 INCH IRON ROD FOUND ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 26 MINUTES 05 SECONDS (THE CHORD BEARS NORTH 68 DEGREES 57 MINUTES 22 SECONDS EAST, A DISTANCE OF 825.72 FEET) AN ARC DISTANCE OF 830.11 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED 3.415 ACRES (148,775 SQUARE FEET) OF LAND.

**LESS AND EXCEPT**
THE FOLLOWING DESCRIBED 0.301 ACRE TRACT OUT OF A 3.415 ACRE (148,775 SQUARE FEET):

TRACT OF LAND BEING THE SAME 3.4154 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 108 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 0.301 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION);

COMMENCING AT A 5/8 INCH IRON ROD FOUND ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WHICH MARKS THE MOST NORTHERLY CORNER OF RESERVE "C" (UNRESTRICTED) OF THE SAID PLAT OF TOM BROWN SUBDIVISION AND A WESTERLY CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT MARKS THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 01 DEGREE 58 MINUTES 10 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 28 MINUTES 28 SECONDS EAST, A DISTANCE OF 80.00 FEET) AN ARC DISTANCE OF 80.00 FEET TO A "PK" NAIL FOUND FOR CORNER;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND CONTINUING ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 15 DEGREES 16 MINUTES 47 SECONDS (THE CHORD BEARS NORTH 51 DEGREES 05 MINUTES 57 SECONDS EAST, A DISTANCE OF 618.88 FEET) AN ARC DISTANCE OF 620.70 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE AND POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

THENCE, NORTHEASTERLY, CONTINUING ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND CONTINUING ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 3 DEGREES 51 MINUTES 15 SECONDS (THE CHORD BEARS NORTH 60 DEGREES 40 MINUTES 51 SECONDS EAST, A DISTANCE OF 156.54 FEET) AN ARC DISTANCE OF 156.57 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE, LEAVING THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD ALONG THE SOUTHEASTERLY LINE OF WESTHEIMER ROAD ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 80.00 FEET A LENGTH OF 31.34 FEET AND A DELTA OF 22

DEGREES 26 MINUTES 52 SECONDS WITH A CHORD BEARING SOUTH 86 DEGREES 15 MINUTES 39 SECONDS EAST, 31.14 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE SOUTH 47 DEGREES 31 MINUTES 12 SECONDS EAST, A DISTANCE OF 21.28 FEET TO A 5/8 INCH IRON ROD SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE SOUTHEASTERLY, ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 70.00 FEET, THROUGH A CENTRAL ANGLE OF 19 DEGREES 25 MINUTES 33 SECONDS (THE CHORD BEARS SOUTH 58 DEGREES 22 MINUTES 46 SECONDS EAST, A DISTANCE OF 23.62 FEET) AN ARC DISTANCE OF 23.73 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE SOUTH 48 DEGREES 39 MINUTES 58 SECONDS EAST, A DISTANCE OF 22.24 FEET TO A SET 5/8 INCH IRON ROD FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 350.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 18 MINUTES 57 SECONDS (THE CHORD BEARS SOUTH 57 DEGREES 52 MINUTES 54 SECONDS WEST, A DISTANCE OF 183.04 FEET) AN ARC DISTANCE OF 185.19 FEET TO A SET 5/8 INCH IRON ROD FOR CORNER;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 88.55 FEET TO POINT OF BEGINNING.

**TRACT III (OUT PARCEL II)**
DESCRIPTION OF A 2.826 ACRE (123,102 SQUARE FEET) TRACT OF LAND BEING THE SAME CALLED 2.8260 ACRE TRACT DESCRIBED AS "OUT PARCEL II" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074 AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BIAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 2.826 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093), (A 120-FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180-FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A";

THENCE, SOUTH 87 DEGREES 24 MINUTES 24 SECONDS WEST, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", A DISTANCE OF 799.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE MOST NORTHERLY NORTHWEST CORNER OF A CALLED 18.3543 ACRE TRACT DESCRIBED IN A DEED TO PRIMARY PROPERTIES CORPORATION (THE "FOLEY'S TRACT") AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M961378, SAID POINT ALSO BEING THE NORTHEAST CORNER AND POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 02 DEGREES 35 MINUTES 36 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG A WESTERLY LINE OF THE SAID FOLEY'S TRACT, A DISTANCE OF 58.14 FEET TO AN "X" CUT IN CONCRETE FOUND FOR A POINT ON THE ARC OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG A NORTHWESTERLY LINE OF SAID FOLEY'S TRACT AND ALONG THE ARC OF SAID CURVE TO THE LEFT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 16 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 45 DEGREES 57 MINUTES 01 SECONDS WEST, A DISTANCE OF 55.67 FEET) AN ARC DISTANCE OF 55.86 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, SOUTH 37 DEGREES 57 MINUTES 01 SECONDS WEST, ALONG THE SOUTHEASTERLY LINE OF THIS TRACT AND CONTINUING ALONG THE NORTHWESTERLY LINE OF SAID FOLEY'S TRACT, PASSING AT 120.92 FEET A "PK" NAIL SET FOR THE MOST WESTERLY CORNER OF THE AFORESAID FOLEY'S TRACT AND A NORTHERLY CORNER OF A CALLED 38.4692 ACRE TRACT DESCRIBED AS "TRACT I" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB, AND CONTINUING ALONG A NORTHWESTERLY LINE OF SAID 38.4692 ACRE TRACT FOR A TOTAL DISTANCE OF 396.13 TO AN "X" CUT IN CONCRETE SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 49 DEGREES 46 MINUTES 29 SECONDS (THE CHORD BEARS SOUTH 62 DEGREES 50 MINUTES 31 SECONDS WEST, A DISTANCE OF 42.09 FEET) AN ARC DISTANCE OF 43.44 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG A NORTHERLY LINE OF SAID 38.4692 ACRE TRACT, A DISTANCE OF 77.52 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG AN EASTERLY LINE OF SAID 38.4692 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG AN EASTERLY LINE OF SAID 38.4692 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 530.00, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 72.21 FEET) AN ARC DISTANCE OF 72.26 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, CONTINUING ALONG THE AFORESAID LINES, A DISTANCE OF 59.36 FEET TO A "PK" NAIL SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT ALSO BEING IN THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 06 DEGREES 45 MINUTES 22 SECONDS (THE CHORD BEARS NORTH 84 DEGREES 01 MINUTES 43 SECONDS EAST, A DISTANCE OF 274.29 FEET) AN ARC DISTANCE OF 274.45 FEET TO A CONCRETE MONUMENT WITH BRASS DISK FOUND FOR THE POINT OF TANGENCY

THENCE, NORTH 87 DEGREES 24 MINUTES 24 SECONDS EAST, CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF

SAID RESTRICTED RESERVE "A", A DISTANCE OF 176.98 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 2.826 ACRES (123,102 SQUARE FEET) OF LAND.

**TRACT VII**
EASEMENT RIGHTS AS SET FORTH IN DEED RECORDED IN HARRIS COUNTY CLERK'S FILE NO. P513119 AND REFILED IN HARRIS COUNTY CLERK'S FILE NO. P525425.

**TRACT VIII**
DESCRIPTION OF A 2.473 ACRE (107,731 SQUARE FEET) TRACT OF LAND OUT OF RESERVE "B" (UNRESTRICTED), BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, ALSO BEING A PORTION OF A CALLED 8.4993 ACRE TRACT DESCRIBED AS "TRACT IX" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, IN HARRIS COUNTY, TEXAS, SAID 2.473 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

BEGINNING AT A 5/8 INCH IRON ROD FOUND ON THE NORTHERLY RIGHT-OF-WAY LINE OF RICHMOND AVENUE (A 100 FOOT WIDE RIGHT-OF-WAY) WHICH MARKS THE SOUTHWEST CORNER OF SAID RESERVE "B" AND A SOUTHEASTERLY CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF SAID TOM BROWN SUBDIVISION;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE WESTERLY LINE OF SAID RESERVE "B" AND AN EASTERLY LINE OF SAID RESTRICTED RESERVE "A" SAID LINE ALSO BEING THE EASTERLY LINE OF A CALLED 1.026 ACRE TRACT DESCRIBED AS "OUT PARCEL IV" IN THE AFORESAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB, A DISTANCE OF 232.52 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF SAID RESERVE "B" AND AN INTERIOR CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN A SOUTHERLY LINE OF A CALLED 38.469 ACRE TRACT DESCRIBED AS "TRACT I" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, NORTH 87 DEGREES 59 MINUTES 15 SECONDS EAST, ALONG THE NORTHERLY LINE OF SAID RESERVE "B" AND A SOUTHERLY LINE OF THE SAID 38.469 ACRE TRACT, A DISTANCE OF 303.14 FEET TO A "PK" NAIL FOUND FOR AN ANGLE POINT;

THENCE, NORTH 42 DEGREES 59 MINUTES 15 SECONDS EAST, ALONG A SOUTHEASTERLY LINE OF THE SAID 38.469 ACRE TRACT AND A NORTHWESTERLY LINE OF SAID RESERVE "B", A DISTANCE OF 167.14 FEET TO A 5/8 INCH IRON ROD FOUND IN THE WESTERLY LINE OF RESTRICTED RESERVE "A", BLOCK 1, OF OLIVE COAST SUBDIVISION AS RECORDED IN FILM CODE NO. 357058 OF THE HARRIS COUNTY MAP RECORDS, SAID POINT MARKS THE NORTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF OLIVE COAST SUBDIVISION AND THE MOST EASTERLY LINE OF THIS TRACT, A DISTANCE OF 214.32 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN THE NORTHERLY LINE OF A CALLED 2.1516 ACRE TRACT DESCRIBED AS A "SAVE AND EXCEPT" TRACT OUT OF THE 8.4993 ACRE TRACT DESCRIBED IN THE AFORESAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB, SAID POINT MARKS THE MOST EASTERLY SOUTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 15 SECONDS WEST ALONG THE NORTHERLY LINE OF SAID 2.1516 ACRE TRACT, A DISTANCE OF 23.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR

THE NORTHWEST CORNER OF SAID 2.1516 ACRE TRACT;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID 2.1516 ACRE TRACT AND AN EASTERLY LINE OF THIS BEING DESCRIBED TRACT, A DISTANCE OF 155.00 FEET TO A 5/8 INCH IRON ROD FOUND ON THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B" WHICH MARKS THE SOUTHWEST CORNER OF THE SAID 2.1516 ACRE TRACT AND THE MOST SOUTHERLY SOUTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 15 SECONDS WEST, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B", A DISTANCE OF 130.21 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,950.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 55 MINUTES 19 SECONDS (THE CHORD BEARS NORTH 88 DEGREES 03 MINUTES 06 SECONDS WEST, A DISTANCE OF 269.40 FEET) AN ARC DISTANCE OF 269.61 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 2.473 ACRES (107,731 SQUARE FEET) OF LAND.

TRACT IX
EASEMENT RIGHTS IN THE FOLLOWING INSTRUMENTS: (I) EASEMENT, RESTRICTION AND OPERATING AGREEMENT DATED JULY 26, 1982, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. H650941, AS SUBSEQUENTLY AMENDED UNDER COUNTY CLERK'S FILE NO. M963356, AS FURTHER AMENDED UNDER COUNTY CLERK'S FILE NO. R583954, AS ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON JULY 28, 2003, UNDER COUNTY CLERK'S FILE NOS. W871134 AND W871140, AS FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER COUNTY CLERK'S FILE NO. Y779115, FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER COUNTY CLERK'S FILE NO. Y779118, (II) RECIPROCAL COVENANTS AND EASEMENT DATED DECEMBER 19, 1991, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. N752716 (III) EASEMENT AGREEMENT DATED OCTOBER 14, 1993, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. P513118, REFILED UNDER COUNTY CLERK'S FILE NO. P525424 AND (IV) AGREEMENT DATED AS OF JUNE 24, 1981, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. H029950, ASSIGNED UNDER HARRIS COUNTY CLERK'S FILE NO. N967757, ALL IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

PARCEL II (MERVYN'S PARCEL):

TRACT I
DESCRIPTION OF A TRACT OR PARCEL OF LAND CONTAINING 7.1050 ACRES (309,493 SQUARE FEET) OUT OF THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, AND BEING A PORTION OF THAT CERTAIN 102.6024 ACRE TRACT OF LAND KNOWN AS BLOCK ONE, RESERVE "A" OF THE TOM BROWN SUBDIVISION AS RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS SAID 7.1050 ACRE TRACT IS MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT THE POINT OF INTERSECTION OF THE EXTENDED NORTHERLY RIGHT OF WAY LINE OF RICHMOND AVENUE (100 FOOT WIDE RIGHT OF WAY) WITH THE EXTENDED SOUTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (F.M. 1093 - 120 FOOT WIDE RIGHT OF WAY);

THENCE NORTH 40 DEGREES 24 MINUTES 24 SECONDS EAST, ALONG THE SOUTHERLY RIGHT

OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093), FOR A DISTANCE OF 286.00 FEET TO A 5/8 INCH IRON ROD FOUND AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE CONTINUING ALONG THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) AND ALONG SAID CURVE TO THE RIGHT, HAVING A CENTRAL ANGLE OF 02 DEGREES 18 MINUTES 51 SECONDS, A RADIUS OF 2327.50 FEET, AN ARC LENGTH OF 94.00 FEET, (CHORD BEARS NORTH 41 DEGREES 33 MINUTES 50 SECOND EAST, 93.99 FEET) TO A P.K. NAIL IN ASPHALT SET FOR THE POINT OF BEGINNING OF THE HEREIN DESCRIBED 7.1050 ACRE TRACT;

THENCE CONTINUING ALONG THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) AND ALONG SAID CURVE TO THE RIGHT HAVING CENTRAL ANGLE OF 00 DEGREES 44 MINUTES 19 SECONDS, A RADIUS OF 2327.50 FEET, AN ARCH LENGTH OF 30.00 FEET, (CHORD BEARS NORTH 43 DEGREES 05 MINUTES 14 SECONDS EAST, 30.00 FEET) TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 47 DEGREES 16 MINUTES 32 SECOND EAST, LEAVING THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) FOR A DISTANCE OF 45.95 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT HAVING A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 100.00 FEET, AN ARC LENGTH OF 78.54 FEET, (CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, 76.54 FEET) TO A CUT "X" IN CONCRETE SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 5.53 FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER OF THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT, HAVING A CENTRAL ANGLE OF 36 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 75.00 FEET, AN ARC LENGTH OF 47.12 FEET, (CHORD BEARS NORTH 69 DEGREES 43 MINUTES 28 SECONDS EAST, 46.35 FEET) TO A CUT "X" IN CONCRETE SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 51 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 209.42 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT HAVING A CENTRAL ANGLE OF 09 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 350.00 FEET, AN ARC LENGTH OF 54.98 FEET, (CHORD BEARS NORTH 47 DEGREES 13 MINUTES 28 SECONDS EAST, 54.92 FEET) TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 276.17 FEET, TO A CUT "X" IN CONCRETE SET AT THE POINT OF CURVATURE OF A CURE TO THE RIGHT;

THENCE, ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 75 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 350.00 FEET, AN ARC LENGTH OF 458.15 FEET, (CHORD BEARS NORTH 80 DEGREES 13 MINUTES 28 SECONDS EAST, 426.13 FEET) TO P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE RIGHT;

THENCE SOUTH 62 DEGREES 16 MINUTES 32 SECONDS EAST, FOR A DISTANCE OF 111.28

FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 370.59 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, FOR A DISTANCE OF 100.00 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 414.58 FEET, TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, FOR A DISTANCE OF 444.55 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 51 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 110.42 FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 72 DEGREES 39 MINUTES 06 SECONDS WEST, FOR A DISTANCE OF 84.14 FEET, TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE SOUTH 87 DEGREES 43 MINUTES 23 SECONDS WEST OF A DISTANCE OF 5.53 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 130.00 FEET, AN ARC LENGTH OF 102.10 FEET. (CHORD BEARS NORTH 69 DEGREES 46 MINUTES 32 SECONDS WEST, 99.50 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE RIGHT;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, FOR A DISTANCE OF 46.14 FEET TO THE POINT OF BEGINNING AND CONTAINING WITHIN THESE METES AND BOUNDS 7.1050 ACRES (309,493 SQUARE FEET) OF LAND AREA.

TOGETHER WITH ABUTTERS RIGHTS OF INGRESS AND EGRESS TO AND FROM WESTHEIMER ROAD, A PHYSICALLY OPEN STREET.

TRACT II
ALL THOSE CERTAIN EASEMENT RIGHTS CREATED BY EASEMENT, RESTRICTION AND OPERATING AGREEMENT DATED JULY 26, 1982, BY AND BETWEEN FEDERATED STORES REALTY, INC., ET AL, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS, UNDER HARRIS COUNTY CLERK'S FILE NO. H650941, AS AMENDED BY THAT CERTAIN FIRST AMENDMENT TO EASEMENT, RESTRICTION AND OPERATING AGREEMENT WEST OAKS MALL DATED AS OF JANUARY 2, 1991, BY AND BETWEEN WEST OAKS ASSOCIATES, LTD., ET AL., FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. M963356, AS FURTHER MODIFIED BY THAT CERTAIN DECLARATION MADE BY WEST OAKS ASSOCIATES, LTD. DATED AS OF MAY 30, 1995, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. R583954, AS ASSIGNED BY MERVYN'S LLC TO MDS TEXAS REALTY I, LP, BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION AGREEMENT DATED AS OF SEPTEMBER 2, 2004, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. X930146, AS FURTHER ASSIGNED BY MDS REALTY I, LP, TO WOM OUT PARCEL, LP, BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION OF OPERATING AGREEMENTS DATED AS OF AUGUST 8, 2005, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. Y698789, AS FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER CLERK'S FILE

NO. Y779115, FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER CLERK'S FILE NO. Y779118 ALL IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

NOTE: The Company does not represent that the above acreage or square footage calculations are correct.

PARCEL III:

ALL THOSE CERTAIN RIGHTS AND BENEFITS CREATED BY SUPPLEMENTAL AGREEMENT DATED 10·22, 2006 BETWEEN IP OF A WEST OAKS MALL, LP AND IP OF A WOM JCP, LP RECORDED AT Z462134 IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

<u>EXHIBIT B</u>

ASSIGNEE

LASALLE BANK NATIONAL ASSOCIATION, IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF GREENWICH CAPITAL COMMERCIAL FUNDING CORP., COMMERCIAL MORTGAGE TRUST 2006-GG7, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-GG7, WHOSE OFFICE IS LOCATED AT 135 SOUTH LASALLE STREET, SUITE 1625, CHICAGO, ILLINOIS 60603

RECORDER'S MEMORANDUM:
At the time of recordation, this instrument was found to be inadequate for the best photographic reproduction because of illegibility, carbon or photo copy, discolored paper, etc. All blockouts additions and changes were present at the time the instrument was filed and recorded.

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in the number Sequence on the date and at the time stamped hereon by me and was duly RECORDED, in the Official Public Records of Real Property of Harris County Texas on

JUN - 8 2007

COUNTY CLERK
HARRIS COUNTY, TEXAS

# EXHIBIT F

2007049**5072**
08/13/2007  RP3  $112.00

## ASSIGNMENT OF DEED OF TRUST
## AND OTHER LOAN DOCUMENTS

FOR VALUE RECEIVED, the receipt and sufficiency of which are hereby acknowledged, LaSalle Bank National Association, in its capacity as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2006-GG7, Commercial Mortgage Pass-Through Certificates, Series 2006-GG7 ("**Assignor**"), having a mailing address of c/o LNR Partners, Inc., 1601 Washington Avenue, Suite 800, Miami Beach, Florida 33139, does hereby grant, bargain, sell, assign, deliver, convey, transfer and set over unto GCCFC 2006-GG7 WESTHEIMER MALL, LLC, a Texas limited liability company ("**Assignee**"), having a mailing address of c/o LNR Partners, Inc., 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139, all of the Assignor's right, title and interest in and to the following deed of trust and other loan documents, as each such instrument may have been amended and assigned:

1.     That certain Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of June 22, 2006 made by, IPOFA WEST OAKS MALL, LP, a Texas limited partnership, IPOFA WOM MASTER LEASECO, LP, a Texas limited partnership, IPOFA WEST OAKS MALL LEASECO LP, a Texas limited partnership, and each SMT Borrower (as defined in that certain Loan and Security Agreement dated as of June 22, 2006) (collectively, "**Borrower**"), in favor of LandAmerica Charter Title Company, a Texas corporation, as trustee for the benefit of Greenwich Capital Financial Products, Inc., a Delaware corporation ("**Original Lender**"), recorded on June 26, 2006 as Instrument No. Z402124 in the Real Estate Records of Harris County, Texas (the "**Records**"), securing a certain promissory note payable by Borrower as more particularly described therein, as assigned by Original Lender to Assignor by instrument dated as of June 22, 2006 and recorded in the Records as Document No. 20070351046.

2.     That certain Absolute Assignment of Leases and Rents dated as of June 22, 2006, made by Borrower in favor of Original Lender, recorded on June 26, 2006 as Instrument No. Z402126 in the Records.

TOGETHER WITH all sums and other obligations described therein and in the promissory note referred to therein.

The deed of trust and other loan documents assigned hereby encumber the real property legally described on Exhibit "A" annexed hereto and incorporated herein by reference.

**THIS ASSIGNMENT IS MADE WITHOUT RECOURSE AND WITHOUT REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR BY OPERATION OF LAW, OF ANY KIND AND NATURE WHATSOEVER.**

*(signature appears on following page)*

IN WITNESS WHEREOF, this Assignment has been duly executed on behalf of Assignor as of the _9th_ day of August, 2007.

**LASALLE BANK NATIONAL ASSOCIATION, IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF GREENWICH CAPITAL COMMERCIAL FUNDING CORP., COMMERCIAL MORTGAGE TRUST 2006-GG7, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-GG7**

By:  LNR PARTNERS, INC., a Florida corporation, its attorney-in-fact under Limited Power of Attorney dated July 21, 2007 to be recorded in the Real Estate Records of Harris County Texas, contemporaneously herewith

By: _____
Susan K. Chapman
Vice President

STATE OF FLORIDA            )
                            ) SS:
COUNTY OF MIAMI-DADE        )

The foregoing instrument was acknowledged before me this _9th_ day of August, 2007, by Susan K. Chapman, as Vice President of LNR PARTNERS, INC., a Florida corporation, on behalf of such corporation as Attorney-in-Fact on behalf of LaSalle Bank National Association, in its capacity as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2006-GG7, Commercial Mortgage Pass-Through Certificates, Series 2006-GG7; such individual is personally known to me or has produced a driver's license as identification.

My Commission Expires:

[NOTARIAL SEAL].

CARIDAD E. LAIRE
Comm# DD0410986
Expires 7/23/2009
Bonded thru (800)432-4264
Florida Notary Assn., Inc

Signature _Caridad E. Laire_
Print Name: _CARIDAD E. LAIRE_
NOTARY PUBLIC, State of Florida

-2-

**<u>EXHIBIT "A"</u>**

Property Description

(see attachment)

## Exhibit A

**PARCEL I (MALL PARCEL):**
REAL PROPERTY IN THE COUNTY OF HARRIS, STATE OF TEXAS, DESCRIBED AS FOLLOWS:

**TRACT I**
DESCRIPTION OF A 38.469 ACRE (1,675,719 SQUARE FEET) TRACT OF LAND BEING THE SAME CALLED 38.4692 ACRE TRACT DESCRIBED AS "TRACT I" IN A DEED TO TCW REALTY FUND VIIA HOLDING COMPANY AND TCW REALTY FUND VIIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 105 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 324, HARRIS COUNTY, TEXAS, SAID 38.469 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093), (A 124 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2559 PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180 FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A" AND THE NORTHEAST CORNER OF A CALLED 13.843 ACRE TRACT DESCRIBED IN A DEED TO PRIMARY PROPERTIES CORPORATION AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M961376;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6 AND ALONG THE EASTERLY LINE OF SAID RESTRICTED RESERVE "A" AND THE CALLED 18.3543 ACRE TRACT, A DISTANCE OF 1,212.01 FEET TO A "PK" NAIL FOUND FOR THE POINT OF BEGINNING OF THIS HEREIN DESCRIBED 38.469 ACRE TRACT, AND ALSO BEING THE SOUTHEASTERLY CORNER OF SAID 18.3543 ACRE TRACT;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6, A DISTANCE OF 78.50 FEET TO A POINT FOR NORTHEAST CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF WEST OAKS COMMERCIAL CENTER ACCORDING TO THE PLAT THEREOF RECORDED IN FILM CODE NO. 353082 OF THE HARRIS COUNTY MAP RECORDS, FROM WHICH A FOUND 5/8 INCH IRON ROD BEARS NORTH 10 DEGREES 44 MINUTES 00 SECONDS EAST, A DISTANCE OF 0.39 FOOT;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, DEPARTING THE WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6 ALONG THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER, A DISTANCE OF 348.17 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF SAID RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER, SAID POINT BEING IN THE ARC OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 360.00 FEET, THROUGH A CENTRAL ANGLE OF 14 DEGREES 35 MINUTES 46 SECONDS (THE CHORD BEARS SOUTH 31 DEGREES 33 MINUTES 58 SECONDS WEST, A DISTANCE OF 88.92 FEET) AN ARC DISTANCE OF 89.16 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 24 DEGREES 16 MINUTES 05 SECONDS WEST, CONTINUING ALONG THE

WESTERLY LINE OF SAID RESTRICTED RESERVE "A", PASSING AT 20.50 FEET THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "A" AND THE NORTHWEST CORNER OF RESTRICTED RESERVE "B" OF SAID WEST OAKS COMMERCIAL CENTER, PASSING AT 166.14 FEET THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "B" OF WEST OAKS COMMERCIAL CENTER, AND CONTINUING FOR A TOTAL DISTANCE OF 410.07 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF OLIVE COAST SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN FILM CODE NO. _____ OF THE HARRIS COUNTY MAP RECORDS AND ALSO BEING THE SOUTHWESTERLY CORNER OF A CALLED 3.5740 ACRE TRACT DESCRIBED IN A DEED TO STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION AND JEFFREY KRAMER, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. N427319;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF SAID OLIVE COAST SUBDIVISION A DISTANCE OF 76.69 FEET TO A 5/8 INCH IRON ROD FOUND IN A NORTHWESTERLY LINE OF RESERVE "B" (UNRESTRICTED) OF SAID TOM BROWN SUBDIVISION FOR CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 42 DEGREES 59 MINUTES 15 SECONDS WEST, CONTINUING ALONG A NORTHWESTERLY LINE OF SAID RESERVE "B" (UNRESTRICTED) A DISTANCE OF 167.14 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 18 SECONDS WEST, ALONG A NORTHERLY LINE OF SAID RESERVE "B" (UNRESTRICTED), A DISTANCE OF 303.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE MOST WESTERLY NORTHWEST CORNER OF SAID RESERVE "B" (UNRESTRICTED) AND ALSO BEING A NORTHEASTERLY CORNER OF A CALLED 1.028 ACRE TRACT DESCRIBED AS "OUT PARCEL IV" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIII;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, DEPARTING SAID NORTHERLY LINE OF RESERVE "B" (UNRESTRICTED) ALONG THE EASTERLY LINE OF THE SAID 1.028 ACRE TRACT, A DISTANCE OF 6.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE, SOUTH 87 DEGREES 59 MINUTES 53 SECONDS WEST, WITH THE NORTHERLY LINE OF SAID 1.028 ACRE TRACT, A DISTANCE OF 0.56 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE NORTHERLY LINE OF SAID 1.028 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 225.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 10 MINUTES 38 SECONDS (THE CHORD BEARS SOUTH 84 DEGREES 23 MINUTES 34 SECONDS WEST, A DISTANCE OF 28.17 FEET) AN ARC DISTANCE OF 28.19 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG SAID NORTHERLY LINE AND ALONG SAID COMPOUND CURVE TO THE LEFT, HAVING A RADIUS OF 229.18 FEET, THROUGH A CENTRAL ANGLE 15 DEGREES 14 MINUTES 31 SECONDS (THE CHORD BEARS SOUTH 67 DEGREES 09 MINUTES 20 SECONDS WEST, A DISTANCE OF 60.76 FEET) AN ARC DISTANCE OF 60.97 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 59 DEGREES 32 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHERLY LINE, A DISTANCE OF 42.94 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG SAID NORTHERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 220.37 FEET, THROUGH A CENTRAL ANGLE OF 28

DEGREES 11 MINUTES 24 SECONDS (THE CHORD BEARS SOUTH 78 DEGREES 37 MINUTES 46 SECONDS WEST, A DISTANCE OF 107.39 FEET) AN ARC DISTANCE OF 108.42 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 45 MINUTES 38 SECONDS WEST CONTINUING ALONG SAID NORTHERLY LINE, A DISTANCE OF 16.50 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 77 DEGREES 33 MINUTES 34 SECONDS (THE CHORD BEARS SOUTH 61 DEGREES 55 MINUTES 31 SECONDS WEST, A DISTANCE OF 31.33 FEET) AN ARC DISTANCE OF 33.84 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY IN THE WESTERLY LINE OF SAID 5.958 ACRE TRACT;

THENCE, SOUTH 15 DEGREES 14 MINUTES 57 SECONDS WEST, ALONG THE WESTERLY LINE OF SAID 1.078 ACRE TRACT, A DISTANCE OF 16.40 FEET TO A POINT IN THE NORTHERLY RIGHT-OF-WAY LINE OF RICHMOND AVENUE (112 FOOT WIDE RIGHT-OF-WAY AT THIS POINT RECORDED IN VOLUME 310, PAGE 106, HARRIS COUNTY MAP RECORDS) AND THE MOST SOUTHERLY LINE OF RESTRICTED RESERVE "A", BLOCK 1 OF SAID TOM BROWN SUBDIVISION, SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT, AND FROM WHICH AN "X" FOUND CUT IN CONCRETE BEARS NORTH 50 DEGREES 42 MINUTES 08 SECONDS WEST, A DISTANCE OF 0.20 FOOT;

THENCE, NORTHWESTERLY, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,988.00 FEET THROUGH A CENTRAL ANGLE OF 00 DEGREES 21 MINUTES 17 SECONDS (THE CHORD BEARS NORTH 74 DEGREES 17 MINUTES 35 SECONDS WEST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET, TO AN "X" CUT IN CONCRETE FOUND FOR CORNER HEREIN DESCRIBED TRACT;

THENCE, DEPARTING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, AND ALONG THE PERIMETER OF A CALLED 14.5179 ACRE TRACT, DESCRIBED IN A DEED TO DILLARD TEXAS OPERATING LIMITED PARTNERSHIP, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. R771407 THE FOLLOWING 36 COURSES AND DISTANCES:

1) NORTH 15 DEGREES 44 MINUTES 57 SECONDS EAST, A DISTANCE OF 111.83 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

2) NORTH 87 DEGREES 45 MINUTES 38 SECONDS EAST, A DISTANCE OF 42.77 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

3) NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 200.37 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 11 MINUTES 24 SECONDS (THE CHORD BEARS NORTH 73 DEGREES 37 MINUTES 46 SECONDS EAST, A DISTANCE OF 97.59 FEET) AN ARC DISTANCE OF 98.58 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

4) NORTH 59 DEGREES 32 MINUTES 04 SECONDS EAST, A DISTANCE OF 42.84 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

5) NORTHEASTERLY, ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 249.18 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 04 MINUTES 39 SECONDS (THE CHORD BEARS NORTH 73 DEGREES 04 MINUTES 23 SECONDS EAST, A DISTANCE OF 125.11 FEET) AN ARC DISTANCE OF 126.46 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

6) NORTH 85 DEGREES 38 MINUTES 43 SECONDS EAST, A DISTANCE OF 119.59 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

7) NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 252.84 FEET, THROUGH A CENTRAL ANGLE OF 64 DEGREES 20 MINUTES 33 SECONDS (THE CHORD BEARS NORTH 56 DEGREES 26 MINUTES 24 SECONDS EAST, A DISTANCE OF 269.08 FEET) AN ARC DISTANCE OF 283.94 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

8) NORTH 24 DEGREES 16 MINUTES 05 SECONDS EAST, A DISTANCE OF 98.45 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 263.47 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN IN DESCRIBED TRACT;

10) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 187.81 FEET TO "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

12) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 161.18 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

13) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 82.74 FEET TO AN "X" CUT IN CONCRETE SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

14) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 81.64 FEET TO AN "X" CUT IN CONCRETE SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

15) NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 12.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 69 DEGREES 46 MINUTES 32 SECONDS WEST, A DISTANCE OF 9.18 FEET) AN ARC DISTANCE OF 9.42 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

16) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, DISTANCE OF 91.00 FEET TO AN "X" IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

17) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 60.79 FEET TO A "X" IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

18) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 244.17 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

19) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 91.42 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

20) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

21) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 4.24 FEET TO AN "X" CUT IN CONCRETE SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

22) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 48.20 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

23) SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 5.00 FEET, THROUGH A CENTRAL ANGLE OF 70 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 52 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 5.74 FEET) AN ARC

Exhibit "A" Legal Description                     Page 4 of 22

DISTANCE OF 6.11 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

24) SOUTH 17 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 93.62 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

25) NORTH 72 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 16.12 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

26) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 207.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT

27) SOUTH 67 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 30.33 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

28) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 267.74 FEET TO A "PK" NAIL SET IN THE ARC OF A CURVE TO THE LEFT;

29) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 162.61 FEET, THROUGH A CENTRAL ANGLE OF 05 DEGREES 26 MINUTES 36 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 03 MINUTES 49 SECONDS EAST, A DISTANCE OF 15.47 FEET) AN ARC DISTANCE OF 15.48 FEET TO A "PK" NAIL FOUND FOR A POINT OF REVERSE CURVATURE OF A CURVE TO THE RIGHT;

30) SOUTHEASTERLY, ALONG SAID REVERSE CURVE TO THE RIGHT, HAVING A RADIUS OF 240.54 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 32 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 31 MINUTES 07 SECONDS EAST, A DISTANCE OF 85.85 FEET) AN ARC DISTANCE OF 86.31 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE RIGHT;

31) SOUTHEASTERLY, ALONG SAID COMPOUND CURVE TO THE RIGHT, HAVING A RADIUS OF 161.77 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 05 MINUTES 08 SECONDS (THE CHORD BEARS SOUTH 46 DEGREES 42 MINUTES 02 SECONDS EAST, A DISTANCE OF 70.30 FEET) AN ARC DISTANCE OF 70.87 FEET TO A "PK" NAIL FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

32) SOUTHEASTERLY, ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 127.67 FEET, THROUGH A CENTRAL ANGLE OF 29 DEGREES 13 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 48 DEGREES 46 MINUTES 56 SECONDS EAST, A DISTANCE OF 64.43 FEET) AN ARC DISTANCE OF 65.13 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

33) SOUTH 63 DEGREES 22 MINUTES 48 SECONDS EAST, A DISTANCE OF 60.98 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

34) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 263.33 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 53 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 131.40 FEET) AN ARC DISTANCE OF 132.80 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

35) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 159.04 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

36) SOUTH 16 DEGREES 44 MINUTES 57 SECONDS WEST, A DISTANCE OF 100.12 FEET TO AN "X" CUT IN CONCRETE SET ON THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF RESTRICTED RESERVE "A" OF SAID TOM BROWN SUBDIVISION, SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,484.00 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 21 MINUTES 17 SECONDS (THE CHORD BEARS NORTH 73 DEGREES 32 MINUTES 26 SECONDS WEST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO AN "X" CUT IN CONCRETE SET FOR THE MOST EASTERLY SOUTHEAST CORNER OF A CALLED 1.188 ACRE TRACT DESCRIBED AS "OUT PARCEL VII" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VII;

THENCE, NORTH 15 DEGREES 44 MINUTES 57 SECONDS EAST, ALONG THE MOST EASTERLY LINE OF SAID 1.188 ACRE TRACT, DEPARTING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, A DISTANCE OF 40.61 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 108 DEGREES 01 MINUTES 29 SECONDS (THE CHORD BEARS NORTH 38 DEGREES 15 MINUTES 47 SECONDS WEST, A DISTANCE OF 40.46 FEET) AN ARC DISTANCE OF 47.13 FEET TO A "PK" NAIL FOUND IN THE NORTHERLY LINE OF SAID 1.188 ACRE TRACT FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 109.49 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG A NORTHEASTERLY LINE OF SAID 1.188 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 228.33 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 53 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 77 DEGREES 49 MINUTES 40 SECONDS WEST, A DISTANCE OF 141.38 FEET) AN ARC DISTANCE OF 142.36 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 63 DEGREES 22 MINUTES 48 SECONDS WEST, CONTINUING ALONG A NORTHEASTERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 80.36 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 147.67 FEET, THROUGH A CENTRAL ANGLE OF 29 DEGREES 13 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 48 DEGREES 45 MINUTES 56 SECONDS WEST, A DISTANCE OF 74.82 FEET) AN ARC DISTANCE OF 75.33 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 141.77 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 06 MINUTES 03 SECONDS (THE CHORD BEARS NORTH 46 DEGREES 42 MINUTES 05 SECONDS WEST, A DISTANCE OF 61.61 FEET) AN ARC DISTANCE OF 62.11 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID COMPOUND CURVE TO THE LEFT, HAVING A RADIUS OF 220.84 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 32 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 69 DEGREES 31 MINUTES 07 SECONDS WEST, A DISTANCE OF 78.72 FEET) AN ARC DISTANCE OF 79.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE RIGHT, HAVING A RADIUS OF 162.01 FEET, THROUGH A

014728.0438 WEST 6124395 v1

CENTRAL ANGLE OF 25 DEGREES 13 MINUTES 03 SECONDS (THE CHORD BEARS NORTH 67 DEGREES 10 MINUTES 36 SECONDS WEST, A DISTANCE OF 79.88 FEET) AN ARC DISTANCE OF 80.53 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 54 DEGREES 34 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 48.57 FEET TO AN 1/2 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,166.24 FEET, THROUGH A CENTRAL ANGLE OF 05 DEGREES 01 MINUTE 59 SECONDS (THE CHORD BEARS NORTH 51 DEGREES 33 MINUTES 04 SECONDS WEST, A DISTANCE OF 121.69 FEET) AN ARC DISTANCE OF 121.75 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 49 DEGREES 32 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 47.85 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT.

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 182.11 FEET, THROUGH A CENTRAL ANGLE OF 57 DEGREES 59 MINUTES 32 SECONDS (THE CHORD BEARS NORTH 19 DEGREES 32 MINUTES 08 SECONDS WEST, A DISTANCE OF 147.06 FEET) AN ARC DISTANCE OF 153.57 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 172.09 FEET, THROUGH A CENTRAL ANGLE OF 56 DEGREES 37 MINUTES 22 SECONDS (THE CHORD BEARS NORTH 18 DEGREES 50 MINUTES 53 SECONDS WEST, A DISTANCE OF 163.52 FEET) AN ARC DISTANCE OF 170.07 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 47 DEGREES 19 MINUTES 32 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 12.87 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE NORTHWESTERLY LINE OF SAID 1.166 ACRE TRACT;

THENCE, SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHWESTERLY LINE OF SAID 1.166 ACRE TRACT, A DISTANCE OF 127.42 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT AND THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 39 DEGREES 12 MINUTES 26 SECONDS (THE CHORD BEARS SOUTH 23 DEGREES 07 MINUTES 15 SECONDS WEST, A DISTANCE OF 16.78 FEET) AN ARC DISTANCE OF 17.11 FEET TO A 5/8 INCH IRON ROD ON THE NORTHEASTERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF TOM BROWN SUBDIVISION;

THENCE, NORTH 49 DEGREES 35 MINUTES 35 SECONDS WEST, ALONG THE SOUTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND THE NORTHEASTERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, A DISTANCE OF 70.09 FEET TO AN "X" CUT IN CONCRETE FOUND

014728.0438 WEST  6124395 v1

FOR THE MOST SOUTHERLY CORNER OF A CALLED 3.035 ACRE TRACT DESCRIBED AS "OUT PARCEL VI" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AND ALSO BEING THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT (RADIUS POINT BEARS NORTH 12 DEGREES 43 MINUTES 39 SECONDS WEST);

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY LINE OF THE SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 34 DEGREES 32 MINUTES 54 SECONDS (THE CHORD BEARS NORTH 59 DEGREES 59 MINUTES 54 SECONDS EAST, A DISTANCE OF 14.85 FEET) AN ARC DISTANCE OF 15.07 FEET TO AN 'X' CUT IN CONCRETE SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 41 DEGREES 50 MINUTES 49 SECONDS EAST, CONTINUING ALONG THE SOUTHEASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 131.69 FEET TO A FOUND 'X' IN CONCRETE FOR THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT (RADIUS POINT BEARS NORTH 47 DEGREES 18 MINUTES 30 SECONDS WEST);

THENCE, NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 02 DEGREES 18 MINUTES 30 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO AN 'X' CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT;

THENCE, NORTH 47 DEGREES 18 MINUTES 32 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 49.70 FEET TO A 'PK' NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 34 DEGREES 48 MINUTES 32 SECONDS WEST, A DISTANCE OF 86.58 FEET) AN ARC DISTANCE OF 87.27 FEET TO A 'PK' NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 22 DEGREES 18 MINUTES 32 SECONDS WEST, ALONG AN EASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 291.34 FEET TO AN 'X' CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG AN EASTERLY LINE OF SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 12 DEGREES 18 MINUTES 32 SECONDS WEST, A DISTANCE OF 69.46 FEET) AN ARC DISTANCE OF 69.81 FEET TO AN 'X' CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 02 DEGREES 18 MINUTES 32 SECONDS WEST, CONTINUING ALONG SAID EASTERLY LINE, A DISTANCE OF 2.67 FEET TO AN 'X' CUT IN CONCRETE FOUND FOR THE EASTERN MOST NORTHERLY CORNER OF SAID 3.035 ACRE TRACT;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 84.70 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT, SAID POINT ALSO BEING THE MOST EASTERLY CORNER OF RESERVE "G" (UNRESTRICTED) OF THE SAID TOM BROWN SUBDIVISION;

THENCE, NORTH 49 DEGREES 35 MINUTES 35 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID RESERVE "G", A DISTANCE OF 184.59 FEET TO A 5/8 INCH IRON ROD FOUND ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AT THE MOST NORTHERLY CORNER OF SAID RESERVE "G" AND THE NORTHERN MOST WESTERLY CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT MARKS THE BEGINNING OF A CURVE TO THE

RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET; THROUGH A CENTRAL ANGLE OF 01 DEGREES 13 MINUTES 51 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 08 MINUTES 19 SECONDS EAST, A DISTANCE OF 50.00 FEET) AN ARC DISTANCE OF 50.00 FEET TO A 1/2 INCH IRON ROD FOUND FOR THE MOST WESTERLY CORNER OF A CALLED 7.1050 ACRE TRACT DESCRIBED IN A DEED TO MERVYN'S AS RECORDED UNDER HARRIS COUNTY CLERKS FILE NO. J807907;

THENCE DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE PERIMETER OF SAID MERVYN'S TRACT, THE FOLLOWING 9 COURSES AND DISTANCES:

1) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 46.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

2) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 130.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, A DISTANCE OF 99.50 FEET) AN ARC DISTANCE OF 102.10 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

3) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 5.53 FEET TO A 5/8 INCH IRON ROD FOUND FOR AN ANGLE POINT;

4) NORTH 72 DEGREES 39 MINUTES 08 SECONDS EAST, A DISTANCE OF 84.14 FEET TO A "PK" NAIL FOUND FOR AN ANGLE POINT;

5) NORTH 51 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 110.42 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 444.65 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 414.56 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 100.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 370.59 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT, SAID POINT ALSO BEING THE MOST EASTERLY CORNER OF SAID MERVYN'S TRACT AND ALSO BEING IN THE SOUTHWESTERLY LINE OF A CALLED 3.415 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, SOUTH 62 DEGREES 16 MINUTES 32 SECONDS EAST, DEPARTING THE EASTERLY LINE OF SAID MERVYN'S TRACT AND CONTINUING ALONG THE SOUTHWESTERLY LINE OF THE SAID 3.415 ACRE TRACT, A DISTANCE OF 197.12 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 25.88 FEET) AN ARC DISTANCE OF 26.18 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY IN THE

Exhibit "A" Legal Description                    Page 9 of 22

MOST SOUTHERLY LINE OF SAID 3.415 ACRE TRACT;

THENCE, NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, ALONG THE MOST SOUTHERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 70.00 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 45 MINUTES 28 SECONDS EAST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY IN THE EASTERLY LINE OF SAID 3.415 ACRE TRACT;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 470.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 48 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 64.03 FEET) AN ARC DISTANCE OF 64.08 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 59.86 FEET TO AN "X" CUT IN CONCRETE SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING ON THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 17 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 79 DEGREES 19 MINUTES 17 SECONDS EAST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO A "PK" NAIL SET FOR THE MOST NORTHERLY CORNER OF A CALLED 6.0176 ACRE TRACT DESCRIBED IN A DEED TO J.C. PENNEY COMPANY, INC. AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M628922;

THENCE, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE PERIMETER OF SAID J. C. PENNEY'S TRACT, THE FOLLOWING 19 COURSES AND DISTANCES:

1) SOUTH 10 DEGREES 5 MINUTES 16 SECONDS EAST, A DISTANCE OF 69.46 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

2) SOUTHEASTERLY, ALONG SAID CURVE TO THE RIGHT, LINING A RADIUS OF 482.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 65.67 FEET) AN ARC DISTANCE OF 65.72 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

3) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 285.86 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

4) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 189.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

5) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 101.80 FEET TO A "PK"

Exhibit "A" Legal Description                              Page 10 of 22

NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 243.16 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 110.34 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 260.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

10) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 265.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 260.00 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

12) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 122.06 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

13) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 243.16 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

14) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 57.00 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

15) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 101.80 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

16) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 169.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

17) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 285.86 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

18) NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 516.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 70.57 FEET) AN ARC DISTANCE OF 70.63 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

19) NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, A DISTANCE OF 89.49 FEET TO A "PK" NAIL SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING ON THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 17 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 80 DEGREES 39 MINUTES 11 SECONDS EAST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO A "PK" NAIL SET FOR THE NORTHWEST CORNER A CALLED 2.826 ACRE TRACT DESCRIBED AS "OUT PARCEL II" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

Exhibit "A" Legal Description                                    Page 11 of 22

THENCE, SOUTH 10 DEGREES 06 MINUTES 16 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 58.37 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHEASTERLY, CONTINUING ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 550.50 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 49 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 72.21 FEET) AN ARC DISTANCE OF 72.25 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL FOUND FOR POINT OF TANGENCY IN THE SOUTHERLY LINE OF SAID 2.826 ACRE TRACT;

THENCE, NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, ALONG THE SOUTHERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 77.52 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 49 DEGREES 46 MINUTES 29 SECONDS (THE CHORD BEARS NORTH 62 DEGREES 50 MINUTES 13 SECONDS EAST, A DISTANCE OF 42.08 FEET) AN ARC DISTANCE OF 43.44 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE SOUTHEASTERLY LINE OF SAID 2.826 ACRE TRACT;

THENCE, NORTH 37 DEGREES 57 MINUTES 01 SECONDS EAST, ALONG THE SOUTHEASTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 275.21 FEET TO A "PK" NAIL FOUND FOR THE MOST WESTERLY CORNER OF THE SAID 18.3543 ACRE TRACT;

THENCE, IN A GENERALLY SOUTHEASTERLY DIRECTION, ALONG THE SOUTHWESTERLY LINE OF SAID 18.3543 ACRE TRACT, THE FOLLOWING 13 COURSES AND DISTANCES:

1) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 68.72 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

2) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

3) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 280.76 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

4) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 237.81 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

5) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 467.58 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 56.09 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 107.71 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 215.20 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

10) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 44.13 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 98.79 TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

12) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 112.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, A DISTANCE OF 85.72 FEET) AN ARC DISTANCE OF 87.96 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

13) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 48.15 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 38.489 ACRES (1,676,719 SQUARE FEET) OF LAND.

TRACT II (OUT PARCEL I)
DESCRIPTION OF A 3.415 ACRE (148,776 SQUARE FEET) TRACT OF LAND BEING THE SAME 3.4154 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN A DEED TO TGW REALTY FUND VIA HOLDING COMPANY, AND TGW REALTY FUND VIA AS RECORDED UNDER HARRIS COUNTY CLERKS FILE NO. V257074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 3.415 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION);

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093); (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2562, PAGE 378 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 160 FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A";

THENCE, SOUTH 87 DEGREES 24 MINUTES 24 SECONDS WEST, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", A DISTANCE OF 975.98 FEET TO A CONCRETE MONUMENT WITH BRASS DISK FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESERVE "A" AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 08 DEGREES 14 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 83 DEGREES 17 MINUTES 24 SECONDS WEST, A DISTANCE OF 334.17 FEET) AN ARC DISTANCE OF 334.45 FEET TO AN "X" CUT IN CONCRETE FOUND FOR NORTHEAST CORNER AND THE POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

Exhibit "A" Legal Description                    Page 13 of 22

THENCE, SOUTH 10 DEGREES 05 MINUTES 19 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD, AND ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 59.68 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHEASTERLY, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 470.00, THROUGH A CENTRAL ANGLE OF 07 DEGREES 49 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 24 SECONDS EAST, A DISTANCE OF 64.03 FEET) AN ARC DISTANCE OF 64.08 TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, THROUGH, A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE SOUTHERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 70.00 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 77 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 25.88 FEET) AN ARC DISTANCE OF 26.18 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 62 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG A SOUTHWESTERLY LINE OF SAID 3.415 ACRE TRACT, PASSING AT 107.12 FEET A "PK" NAIL FOUND AT THE NORTHEAST CORNER OF A CALLED 1.4080 ACRE TRACT DESCRIBED IN A DEED TO MERVYN'S, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. J607907 AND CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID MERVYN'S TRACT FOR A TOTAL DISTANCE OF 216.40 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID MERVYN'S TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 350.00 FEET, THROUGH A CENTRAL ANGLE OF 76 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 80 DEGREES 16 MINUTES 28 SECONDS WEST, A DISTANCE OF 426.13 FEET) AN ARC DISTANCE OF 468.15 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE MOST EASTERLY CORNER OF A CALLED 1.8695 ACRE TRACT DESCRIBED AS "OUT PARCEL VI" IN THE AFORESAID DEED TO TGW REALTY FUND VIA HOLDING COMPANY AND TGW REALTY FUND VIB RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074 AND THE SOUTHWEST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, DEPARTING THE NORTHERLY LINE OF SAID MERVYN'S TRACT, NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID 1.870 ACRE TRACT AND THE MOST SOUTHWESTERLY LINE OF THIS HEREIN DESCRIBED TRACT, A DISTANCE OF 88.65 FEET TO A 5/8 INCH IRON ROD FOUND ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT;

Exhibit "A" Legal Description                    Page 14 of 22

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.60 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 25 MINUTES 09 SECONDS (THE CHORD BEARS NORTH 68 DEGREES 57 MINUTES 12 SECONDS EAST, A DISTANCE OF 825.75 FEET) AN ARC DISTANCE OF 830.11 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED 3.415 ACRES (148,775 SQUARE FEET) OF LAND.

**LESS AND EXCEPT:**
THE FOLLOWING DESCRIBED 0.301 ACRE TRACT OUT OF A 3.415 ACRE (148,775 SQUARE FEET):

TRACT OF LAND BEING THE SAME 3.4154 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN A DEED TO TGW REALTY FUND VIB HOLDING COMPANY AND TGW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 4, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 324, HARRIS COUNTY, TEXAS, SAID 0.301 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION);

COMMENCING AT A 5/8 INCH IRON ROD FOUND ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WHICH MARKS THE MOST NORTHERLY CORNER OF RESERVE "C" (UNRESTRICTED) OF THE SAID PLAT OF TOM BROWN SUBDIVISION AND A WESTERLY CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT MARKS THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.60 FEET, THROUGH A CENTRAL ANGLE OF 01 DEGREE 58 MINUTES 10 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 26 MINUTES 28 SECONDS EAST, A DISTANCE OF 80.00 FEET) AN ARC DISTANCE OF 80.00 FEET TO A "PK" NAIL FOUND FOR CORNER;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND CONTINUING ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.60 FEET, THROUGH A CENTRAL ANGLE OF 15 DEGREES 16 MINUTES 47 SECONDS (THE CHORD BEARS NORTH 51 DEGREES 05 MINUTES 57 SECONDS EAST, A DISTANCE OF 618.86 FEET) AN ARC DISTANCE OF 620.70 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE AND POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

THENCE, NORTHEASTERLY, CONTINUING ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND CONTINUING ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.60 FEET, THROUGH A CENTRAL ANGLE OF 3 DEGREES 51 MINUTES 15 SECONDS (THE CHORD BEARS NORTH 60 DEGREES 40 MINUTES 51 SECONDS EAST, A DISTANCE OF 156.54 FEET) AN ARC DISTANCE OF 156.57 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE, LEAVING THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD ALONG THE SOUTHEASTERLY LINE OF WESTHEIMER ROAD ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 80.00 FEET A LENGTH OF 31.34 FEET AND A DELTA OF 22

Exhibit "A" Legal Description                          Page 18 of 22

DEGREES 26 MINUTES 52 SECONDS WITH A CHORD BEARING SOUTH 85 DEGREES 15 MINUTES 39 SECONDS EAST, 31.14 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE SOUTH 47 DEGREES 31 MINUTES 12 SECONDS EAST, A DISTANCE OF 21.28 FEET TO A 5/8 INCH IRON ROD SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE SOUTHEASTERLY, ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 70.00 FEET, THROUGH A CENTRAL ANGLE OF 19 DEGREES 25 MINUTES 33 SECONDS (THE CHORD BEARS SOUTH 58 DEGREES 22 MINUTES 46 SECONDS EAST, A DISTANCE OF 23.62 FEET) AN ARC DISTANCE OF 23.73 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE SOUTH 48 DEGREES 39 MINUTES 58 SECONDS EAST, A DISTANCE OF 22.24 FEET TO A SET 5/8 INCH IRON ROD FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 350.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 16 MINUTES 57 SECONDS (THE CHORD BEARS SOUTH 57 DEGREES 52 MINUTES 54 SECONDS WEST, A DISTANCE OF 183.04 FEET) AN ARC DISTANCE OF 185.19 FEET TO A SET 5/8 INCH IRON ROD FOR CORNER;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 88.56 FEET TO POINT OF BEGINNING.

TRACT III (OUT PARCEL II)
DESCRIPTION OF A 2.826 ACRE (123,102 SQUARE FEET) TRACT OF LAND BEING THE SAME CALLED 2.8260 ACRE TRACT DESCRIBED AS "OUT PARCEL II" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074 AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE SIAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 2.826 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093), (A 120-FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180-FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A";

THENCE, SOUTH 87 DEGREES 24 MINUTES 24 SECONDS WEST, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", A DISTANCE OF 799.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE MOST NORTHERLY NORTHWEST CORNER OF A CALLED 18.3543 ACRE TRACT DESCRIBED IN A DEED TO PRIMARY PROPERTIES CORPORATION (THE "FOLEY'S TRACT") AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M961378, SAID POINT ALSO BEING THE NORTHEAST CORNER AND POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 02 DEGREES 35 MINUTES 36 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG A WESTERLY LINE OF THE SAID FOLEY'S TRACT, A DISTANCE OF 58.14 FEET TO AN "X" CUT IN CONCRETE FOUND FOR A POINT ON THE ARC OF A CURVE TO THE LEFT;

Exhibit "A" Legal Description                              Page 16 of 22

THENCE, SOUTHWESTERLY, ALONG A NORTHWESTERLY LINE OF SAID FOLEY'S TRACT AND ALONG THE ARC OF SAID CURVE TO THE LEFT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 16 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 45 DEGREES 57 MINUTES 01 SECONDS WEST, A DISTANCE OF 55.57 FEET) AN ARC DISTANCE OF 55.85 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, SOUTH 37 DEGREES 57 MINUTES 01 SECONDS WEST, ALONG THE SOUTHEASTERLY LINE OF THIS TRACT AND CONTINUING ALONG THE NORTHWESTERLY LINE OF SAID FOLEY'S TRACT, PASSING AT 120.92 FEET A "PK" NAIL SET FOR THE MOST WESTERLY CORNER OF THE AFORESAID FOLEY'S TRACT AND A NORTHERLY CORNER OF A CALLED 88.4692 ACRE TRACT DESCRIBED AS "TRACT I" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB, AND CONTINUING ALONG A NORTHWESTERLY LINE OF SAID 88.4692 ACRE TRACT FOR A TOTAL DISTANCE OF 396.13 TO AN "X" CUT IN CONCRETE SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 49 DEGREES 46 MINUTES 29 SECONDS (THE CHORD BEARS SOUTH 62 DEGREES 50 MINUTES 31 SECONDS WEST, A DISTANCE OF 42.09 FEET) AN ARC DISTANCE OF 43.44 FEET TO A "PK" NAIL SET FOR THE POINT OR TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 29 SECONDS WEST, ALONG A NORTHERLY LINE OF SAID 88.4692 ACRE TRACT, A DISTANCE OF 77.52 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 35.27 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG AN EASTERLY LINE OF SAID 88.4692 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG AN EASTERLY LINE OF SAID 88.4692 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 530.00, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 72.21 FEET) AN ARC DISTANCE OF 72.26 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 10 DEGREES 05 MINUTES 18 SECONDS WEST, CONTINUING ALONG THE AFORESAID LINES, A DISTANCE OF 59.38 FEET TO A "PK" NAIL SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT ALSO BEING IN THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 06 DEGREES 45 MINUTES 22 SECONDS (THE CHORD BEARS NORTH 84 DEGREES 01 MINUTES 43 SECONDS EAST, A DISTANCE OF 274.29 FEET) AN ARC DISTANCE OF 274.45 FEET TO A CONCRETE MONUMENT WITH BRASS DISK FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 87 DEGREES 24 MINUTES 24 SECONDS EAST, CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF

SAID RESTRICTED RESERVE "A" A DISTANCE OF 178.96 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 2.823 ACRES (123,102 SQUARE FEET) OF LAND.

**TRACT VII.**
EASEMENT RIGHTS AS SET FORTH IN DEED RECORDED IN HARRIS COUNTY CLERK'S FILE NO. F513119 AND REFILED IN HARRIS COUNTY CLERK'S FILE NO. F525426.

**TRACT VIII.**
DESCRIPTION OF A 2.473 ACRE (107,751 SQUARE FEET) TRACT OF LAND OUT OF RESERVE "B" (UNRESTRICTED), BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, ALSO BEING A PORTION OF A CALLED 8.4983 ACRE TRACT DESCRIBED AS "TRACT IX" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, IN HARRIS COUNTY, TEXAS, SAID 2.473 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 18 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

BEGINNING AT A 5/8 INCH IRON ROD FOUND ON THE NORTHERLY RIGHT-OF-WAY LINE OF RICHMOND AVENUE (A 100 FOOT WIDE RIGHT-OF-WAY WHICH MARKS THE SOUTHWEST CORNER OF SAID RESERVE "B" AND A SOUTHEASTERLY CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF SAID TOM BROWN SUBDIVISION;

THENCE, NORTH 02 DEGREES 18 MINUTES 32 SECONDS WEST, ALONG THE WESTERLY LINE OF SAID RESERVE "B" AND AN EASTERLY LINE OF SAID RESTRICTED RESERVE "A" SAID LINE ALSO BEING THE EASTERLY LINE OF A CALLED 1.028 ACRES TRACT DESCRIBED AS "OUT PARCEL IV" IN THE AFORESAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB, A DISTANCE OF 232.32 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF SAID RESERVE "B" AND AN INTERIOR CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN A SOUTHERLY LINE OF A CALLED 38.469 ACRE TRACT DESCRIBED AS "TRACT I" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, NORTH 87 DEGREES 59 MINUTES 15 SECONDS EAST, ALONG THE NORTHERLY LINE OF SAID RESERVE "B" AND A SOUTHERLY LINE OF THE SAID 38.469 ACRE TRACT, A DISTANCE OF 303.14 FEET TO A "PK" NAIL FOUND FOR AN ANGLE POINT;

THENCE, NORTH 42 DEGREES 59 MINUTES 15 SECONDS EAST, ALONG A SOUTHEASTERLY LINE OF THE SAID 38.469 ACRE TRACT AND A NORTHWESTERLY LINE OF SAID RESERVE "B", A DISTANCE OF 197.14 FEET TO A 5/8 INCH IRON ROD FOUND IN THE WESTERLY LINE OF RESTRICTED RESERVE "A", BLOCK 1, OF OLIVE COAST SUBDIVISION AS RECORDED IN FILM CODE NO. 367068 OF THE HARRIS COUNTY MAP RECORDS, SAID POINT MARKS THE NORTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 02 DEGREES 18 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF OLIVE COAST SUBDIVISION AND THE MOST EASTERLY LINE OF THIS TRACT, A DISTANCE OF 214.32 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN THE NORTHERLY LINE OF A CALLED 2.1516 ACRE TRACT DESCRIBED AS A "SAVE AND EXCEPT" TRACT OUT OF THE 8.4983 ACRE TRACT DESCRIBED IN THE AFORESAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB, SAID POINT MARKS THE MOST EASTERLY SOUTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 15 SECONDS WEST ALONG THE NORTHERLY LINE OF SAID 2.1516 ACRE TRACT, A DISTANCE OF 23.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR

THE NORTHWEST CORNER OF SAID 2.1516 ACRE TRACT;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID 2.1516 ACRE TRACT AND AN EASTERLY LINE OF THIS BEING DESCRIBED TRACT, A DISTANCE OF 155.00 FEET TO A 5/8 INCH IRON ROD FOUND ON THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B" WHICH MARKS THE SOUTHWEST CORNER OF THE SAID 2.1516 ACRE TRACT AND THE MOST SOUTHERLY SOUTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 50 MINUTES 15 SECONDS WEST, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B", A DISTANCE OF 180.21 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1350.00 FEET, THROUGH A CENTRAL ANGLE OF 02 DEGREES 33 MINUTES 19 SECONDS THE CHORD BEARS NORTH 89 DEGREES 03 MINUTES 05 SECONDS WEST, A DISTANCE OF 269.10 FEET, AN ARC DISTANCE OF 269.61 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 2.473 ACRES (107,731 SQUARE FEET) OF LAND.

TRACT IX
EASEMENT RIGHTS IN THE FOLLOWING INSTRUMENTS: (I) EASEMENT, RESTRICTION AND OPERATING AGREEMENT DATED JULY 25, 1982, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. H850941; AS SUBSEQUENTLY AMENDED UNDER COUNTY CLERK'S FILE NO. M963359, AS FURTHER AMENDED UNDER COUNTY CLERK'S FILE NO. R589954, AS ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON JULY 28, 2003, UNDER COUNTY CLERK'S FILE NOS. W871184 AND W871140, AS FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER COUNTY CLERK'S FILE NO. Y776115, FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER COUNTY CLERK'S FILE NO. Y776118, (II) RECIPROCAL COVENANTS AND EASEMENT DATED DECEMBER 19, 1991, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. N762716 (III) EASEMENT AGREEMENT DATED OCTOBER 14, 1993, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. P513118, REFILED UNDER COUNTY CLERK'S FILE NO. P525424 AND (IV) AGREEMENT DATED AS OF JUNE 24, 1991, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. N029350, ASSIGNED UNDER HARRIS COUNTY CLERK'S FILE NO. N987757, ALL IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

PARCEL II (MERVYN'S PARCEL):

TRACT I
DESCRIPTION OF A TRACT OR PARCEL OF LAND CONTAINING 7.1050 ACRES (309,493 SQUARE FEET) OUT OF THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, AND BEING A PORTION OF THAT CERTAIN 102.6074 ACRE TRACT OF LAND KNOWN AS BLOCK ONE, RESERVE "A" OF THE TOM BROWN SUBDIVISION AS RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS. SAID 7.1050 ACRE TRACT IS MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT THE POINT OF INTERSECTION OF THE EXTENDED NORTHERLY RIGHT OF WAY LINE OF RICHMOND AVENUE (100 FOOT WIDE RIGHT OF WAY) WITH THE EXTENDED SOUTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (F.M. 1093 - 120 FOOT WIDE RIGHT OF WAY);

THENCE NORTH 40 DEGREES 24 MINUTES 24 SECONDS EAST, ALONG THE SOUTHERLY RIGHT

OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093), FOR A DISTANCE OF 288.00 FEET TO A 5/8 INCH IRON ROD FOUND AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE CONTINUING ALONG THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) AND ALONG SAID CURVE TO THE RIGHT, HAVING A CENTRAL ANGLE OF 02 DEGREES 19 MINUTES 51 SECONDS, A RADIUS OF 2327.50 FEET, AN ARC LENGTH OF 94.80 FEET, (CHORD BEARS NORTH 41 DEGREES 33 MINUTES 50 SECOND EAST, 93.99 FEET) TO A P.K. NAIL IN ASPHALT SET FOR THE POINT OF BEGINNING OF THE HEREIN DESCRIBED 7.1050 ACRE TRACT;

THENCE CONTINUING ALONG THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) AND ALONG SAID CURVE TO THE RIGHT, HAVING A CENTRAL ANGLE OF 00 DEGREES 44 MINUTES 19 SECONDS, A RADIUS OF 2327.50 FEET, AN ARCH LENGTH OF 30.00 FEET, (CHORD BEARS NORTH 43 DEGREES 05 MINUTES 14 SECONDS EAST, 30.00 FEET) TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 47 DEGREES 16 MINUTES 32 SECOND EAST, LEAVING THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) FOR A DISTANCE OF 46.96 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT, HAVING A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 100.00 FEET, AN ARC LENGTH OF 78.54 FEET, (CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, 76.54 FEET) TO A CUT "X" IN CONCRETE SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 5.53 FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER OF THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT, HAVING A CENTRAL ANGLE OF 36 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 75.00 FEET, AN ARC LENGTH OF 47.12 FEET, (CHORD BEARS NORTH 69 DEGREES 43 MINUTES 28 SECONDS EAST, 46.35 FEET) TO A CUT "X" IN CONCRETE SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 51 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 209.42 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT, HAVING A CENTRAL ANGLE OF 09 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 350.00 FEET, AN ARC LENGTH OF 54.98 FEET, (CHORD BEARS NORTH 47 DEGREES 13 MINUTES 28 SECONDS EAST, 54.92 FEET) TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 276.17 FEET, TO A CUT "X" IN CONCRETE SET AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE ALONG SAID CURVE TO THE RIGHT, HAVING A CENTRAL ANGLE OF 76 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 350.00 FEET, AN ARC LENGTH OF 498.16 FEET, (CHORD BEARS NORTH 80 DEGREES 43 MINUTES 28 SECONDS EAST, 426.13 FEET) TO P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE RIGHT;

THENCE SOUTH 62 DEGREES 16 MINUTES 32 SECONDS EAST, FOR A DISTANCE OF 111.28

Exhibit "A" Legal Description                    Page 20 of 22

FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 370.59 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, FOR A DISTANCE OF 100.00 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 414.58 FEET, TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, FOR A DISTANCE OF 444.55 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 51 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 110.42 FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 72 DEGREES 39 MINUTES 06 SECONDS WEST, FOR A DISTANCE OF 84.14 FEET, TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE SOUTH 87 DEGREES 43 MINUTES 23 SECONDS WEST OF A DISTANCE OF 5.53 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 130.00 FEET, AN ARC LENGTH OF 102.10 FEET, (CHORD BEARS NORTH 69 DEGREES 46 MINUTES 32 SECONDS WEST, 99.50 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE RIGHT;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, FOR A DISTANCE OF 46.14 FEET TO THE POINT OF BEGINNING AND CONTAINING WITHIN THESE METES AND BOUNDS 7.1050 ACRES (309,493 SQUARE FEET) OF LAND AREA.

TOGETHER WITH ABUTTERS RIGHTS OF INGRESS AND EGRESS TO AND FROM WESTHEIMER ROAD, A PHYSICALLY OPEN STREET.

TRACT II

ALL THOSE CERTAIN EASEMENT RIGHTS CREATED BY EASEMENT, RESTRICTION AND OPERATING AGREEMENT DATED JULY 26, 1982, BY AND BETWEEN FEDERATED STORES REALTY, INC., ET AL, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS, UNDER HARRIS COUNTY CLERK'S FILE NO. H350841, AS AMENDED BY THAT CERTAIN FIRST AMENDMENT TO EASEMENT, RESTRICTION AND OPERATING AGREEMENT WEST OAKS MALL DATED AS OF JANUARY 2, 1991, BY AND BETWEEN WEST OAKS ASSOCIATES, LTD., ET AL, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. M363366, AS FURTHER MODIFIED BY THAT CERTAIN DECLARATION MADE BY WEST OAKS ASSOCIATES, LTD. DATED AS OF MAY 30, 1997, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. R835884, AS ASSIGNED BY MERVYN'S LLC TO MDS TEXAS REALTY I, LP, BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION AGREEMENT DATED AS OF SEPTEMBER 2, 2004, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. X930148, AS FURTHER ASSIGNED BY MDS REALTY I, LP, TO WOM OUT PARCEL, LP, BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION OF OPERATING AGREEMENTS DATED AS OF AUGUST 8, 2005, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. Y898789, AS FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER CLERK'S FILE

Exhibit "A" Legal Description                    Page 21 of 22

NO. Y779116, FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT, FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER CLERK'S FILE NO. Y779116 ALL IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

NOTE: The Company does not represent that the above acreage or square footage calculations are correct.

PARCEL III:

ALL THOSE CERTAIN RIGHTS AND BENEFITS CREATED BY SUPPLEMENTAL AGREEMENT DATED _____ 2006 BETWEEN IE OF A WEST OAKS MALL, LP. AND IE OF A WOM JCP, LP. RECORDED _____ IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

FILED
2007 AUG 13 PM 1:46
COUNTY CLERK
HARRIS COUNTY, TEXAS

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in file number Sequence on the date and at time stamped hereon by me and was duly RECORDED, in the Official Public Records of Real Property of Harris County Texas on

AUG 13 2007

COUNTY CLERK
HARRIS COUNTY, TEXAS

Exhibit "A", Legal Description                    Page 22 of 22

**RECORDER'S MEMORANDUM:**
At the time of recordation, this instrument was found to be inadequate for the best photographic reproduction because of illegibility, carbon or photo copy, discolored paper, etc. All blockouts additions and changes were present at the time the instrument was filed and recorded.

014728.0438 WEST 6124395 v1

## ALLONGE

THIS ALLONGE IS TO BE ATTACHED to that certain Promissory Note dated as of June 22, 2006, payable by IPOFA WEST OAKS MALL, LP, a Texas limited partnership, IPOFA WOM MASTER LEASECO, LP, a Texas limited partnership, IPOFA WEST OAKS MALL LEASECO LP, a Texas limited partnership, and each SMT Borrower (as defined in that certain Loan and Security Agreement dated as of June 22, 2006), to the order of GREENWICH CAPITAL FINANCIAL PRODUCTS, INC., a Delaware corporation in the original principal amount of Eighty Six Million and No/100 Dollars ($86,000,000.00).

PAY TO THE ORDER OF GCCFC 2006-GG7 WESTHEIMER MALL, LLC, a Texas limited liability company.

WITHOUT RECOURSE AND WITHOUT REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR BY OPERATION OF LAW, OF ANY KIND AND NATURE WHATSOEVER.

Dated: August __9__, 2007.

LASALLE BANK NATIONAL ASSOCIATION, IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF GREENWICH CAPITAL COMMERCIAL FUNDING CORP., COMMERCIAL MORTGAGE TRUST 2006-GG7, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-GG7

By:    LNR Partners, Inc., a Florida corporation, its attorney-in-fact under Limited Power of Attorney dated July 21, 2007

By:_____
        Susan K. Chapman, Vice President

# EXHIBIT G

# AKIN GUMP
# STRAUSS HAUER & FELD LLP
Attorneys at Law

MARK L. PATTERSON
(214) 969-4249/Fax: (214) 969-4343
mlpatterson@akingump.com

July 27, 2007

*VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED,*
*FEDEX, AND TELECOPY (804) 594-3550*

IPOFA WEST OAKS MALL, LP
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 3 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 8 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM MASTER LEASECO,
LP
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 4 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 10 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WEST OAKS MALL
LEASECO, LP
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 5 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 11 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 1 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 6 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 12 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 2 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 7 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 13 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

**AKIN GUMP**
**STRAUSS HAUER & FELD** LLP
_____ Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
July 27, 2007
Page 2

IPOFA WOM PL 14 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 17 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 20 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 15 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 18 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 16 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 19 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

## DEMAND FOR PAYMENT AND NOTICE OF INTENT TO ACCELERATE

Re:    Matter:        West Oaks Mall
                      1000 West Oaks Mall
                      Houston, TX  77082

       Loan Number:   M030256880
       Pool:          GCCFC 2006-GG7

Dear Sir or Madam:

This firm represents LaSalle Bank National Association, in its capacity as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2006-GG7, Commercial Mortgage Pass-Through Certificates, Series 2006-GG7 ("**Holder**"), acting by and through its Special Servicer, LNR Partners, Inc., and its Master Servicer, Midland Loan Services, Inc. (together, "**Servicer**"), in connection with the loan (the "**Loan**") evidenced by the documents and instruments described as follows:

**AKIN GUMP**
**STRAUSS HAUER & FELD** LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
July 27, 2007
Page 3

Promissory Note (the "**Note**"), dated June 22, 2006, executed by IPofA West Oaks Mall, LP, a Texas limited partnership, IPofA WOM Master Leaseco, LP, a Texas limited partnership, IPofA West Oaks Mall Leaseco, LP, a Texas limited partnership and each SMT Borrower (as defined in Loan Agreement, defined below) (collectively, "**Borrower**"), payable to the order of Greenwich Capital Financial Products, Inc., ("**Original Lender**"), in the original stated principal amount of Eighty Six Million and No/100 Dollars ($86,000,000.00); and

Secured by, among other instruments, (i) a Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "**Deed of Trust**"), dated as of June 22, 2006, executed by Borrower for the benefit of Original Lender, and covering the real and personal property more particularly described therein commonly known as West Oaks Mall and located at 1000 West Oaks Mall, Houston, Harris County, Texas 77082 (the "**Property**"), recorded as Instrument No. Z402124 of the Real Property Records of Harris County, Texas (the "**Records**"); (ii) an Absolute Assignment of Leases and Rents (the "**Assignment**"), dated as of June 22, 2006, executed by Borrower for the benefit of Original Lender, recorded as Instrument No. Z402126, of the Records; and (iii) a Loan and Security Agreement (the "**Loan Agreement**") dated as of June 22, 2006 executed by Borrower and Original Lender.

The Note, the Deed of Trust, the Assignment, the Loan Agreement and all other documents and instruments securing or evidencing the Loan are hereinafter, collectively, referred to as the "Loan Documents". All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Loan Agreement and/or Deed of Trust.

The lien and security interest of the Deed of Trust and Assignment, and the Note, Loan Agreement and all other Loan Documents were transferred and assigned to, and are currently held by, Holder.

According to the records of Holder and Servicer, Borrower is in default under the terms of the Note and Deed of Trust in that, among other things, Borrower has failed to pay certain amounts of interest and/or principal when due, which failure continued beyond all applicable notice and cure periods (the "**Current Defaults**").

On behalf of Holder and Servicer, we hereby demand payment of all amounts due and outstanding under the Loan Documents and further notify you that unless all Current Defaults are fully cured on or before 2:00 p.m., Dallas, Texas time, on Monday. August 6, 2007, Holder

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━━━━━━━ Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
July 27, 2007
Page 4

intends to and will accelerate the maturity of the Note and declare the unpaid principal balance, accrued and unpaid interest and all other amounts payable under the Loan Documents immediately due and payable in their entirety. In that event Holder intends to exercise any or all of the remedies provided in the Loan Documents or at law or in equity, which remedies may include: (1) commencing non-judicial foreclosure proceedings pursuant to the power of sale provisions under the Deed of Trust, (2) enforcing payment of the Note against Borrower and each other person or entity obligated therefor, to the extent the Note is not a non-recourse obligation or to the extent liability is not otherwise limited by contract, (3) revoking Borrower's license to collect rent to the extent provided in the Assignment and applicable law, and demanding that all such sums be paid to Holder pursuant thereto, and (4) commencing an action for the immediate appointment of a receiver to, among other things, collect the rents and income from the Property. You may obtain a statement of the amounts currently due and payable under the Loan Documents by contacting Mr. Job Warshaw, Senior Vice President, LNR Partners, Inc., 1601 Washington Ave., Suite 700, Miami Beach, Florida 33139, (305) 695-5092.

Payment to Holder in an amount less than the total delinquent sums, or any other partial cure of the Current Defaults, should not be construed as an accord and satisfaction or as Holder's agreement to accept a lesser amount as payment in full of the delinquent sums. Holder's acceptance of any endorsement or statement on any check evidencing a payment or letter accompanying a payment may not be deemed to be an accord and satisfaction. Holder may accept any such payment or check without prejudice to its rights to receive the balance of all amounts due under the Loan Documents or to pursue any remedy thereunder or at law or in equity.

Neither this letter nor any statement by or on behalf of Holder or Servicer as to the amount due and owing under the Loan Documents shall constitute a waiver of any rights of Holder to collect any additional amounts to which Holder may be lawfully entitled pursuant to the terms of the Loan Documents or otherwise at law or in equity. The specific enumeration of defaults and/or obligations contained in this letter shall not constitute a waiver of any other default now or hereafter existing under the Loan Documents.

No communication, written or oral, that Borrower has had or may have with Holder or Servicer concerning the obligations evidenced or secured by the Loan Documents, including any concerning a modification or restructure of the Loan Documents or a forbearance in the exercise of any of Lender's remedies, in any way modifies this letter or constitutes consent to the non-payment or a waiver of any of the remedies described herein. There are currently no forbearance, modification, renewal, extension or settlement agreements between Borrower and

**AKIN GUMP**
**STRAUSS HAUER & FELD** LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
July 27, 2007
Page 5

Holder with regard to the Loan or the Loan Documents, and all proposals made by Borrower to Holder relating to the foregoing are rejected.

To the extent your obligations have been discharged, dismissed, or are subject to an automatic stay of a bankruptcy order under Title 11 of the United States Code, this notice is for compliance and information purposes only, and does not constitute a demand for payment or any attempt to collect any such obligation. This notice is given pursuant to 11 U.S.C. Section 362(b)11, if applicable. In addition, all of Holder's claims, demands and accruals with respect to the Loan Documents, whenever made, and whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with all applicable usury laws, and are accordingly limited so that all applicable usury laws are not violated.

Very truly yours,

AKIN GUMP STRAUSS HAUER & FELD LLP

By:  _Mark L. Patterson_

Mark L. Patterson

cc:   Mr. Job Warshaw, Senior Vice President        *VIA EMAIL:* <u>*jwarshaw@lnrproperty.com*</u>

Mr. Urosh Tomovich, Analyst              *VIA EMAIL:* <u>*utomovich@lnrproperty.com*</u>

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━ Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
July 27, 2007
Page 6

## FOR NOTICE PURPOSES ONLY

| | |
|---|---|
| IPOFA WEST OAKS MALL GP, LLC<br>(GP of IPofA West Oaks Mall, LP)<br>c/o Investment Properties of America, LLC<br>10800 Midlothian Turnpike, Suite 309<br>Richmond, Virginia 23235<br>Attn: Edward H. Okun | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |
| IPOFA WOM MLC GP, LLC<br>(GP of IPofA WOM Master LeaseCo, LP)<br>c/o Investment Properties of America, LLC<br>10800 Midlothian Turnpike, Suite 309<br>Richmond, Virginia 23235<br>Attn: Edward H. Okun | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |
| IPOFA WOM LEASECO, GP, LLC<br>(GP of IPofA West Oaks Mall LeaseCo, LP)<br>c/o Investment Properties of America, LLC<br>10800 Midlothian Turnpike, Suite 309<br>Richmond, Virginia 23235<br>Attn: Edward H. Okun | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |
| Edward H. Okun<br>(Guarantor and Environmental Indemnitor)<br>c/o Investment Properties of America, LLC<br>10800 Midlothian Turnpike, Suite 309<br>Richmond, VA 23235 | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |
| Ronald Letizia (SMT Guarantor)<br>2 Wellhouse Lane<br>Mamaroneck, NY 10543 | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |
| IPOFA WOM PL 1, LLC (SMT Borrower)<br>Attn: Investor Services<br>10800 Midlothian Turnpike, Suite 309<br>Richmond, VA 23235 | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
July 27, 2007
Page 7


Zeneth Eidel (SMT Guarantor)             *VIA FIRST CLASS CERTIFIED MAIL RETURN*
7 Lodge Road                             *RECEIPT REQUESTED AND FEDEX*
Briarcliff Manor, NY 10510

IPOFA WOM PL 2, LLC (SMT Borrower)       *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn: Investor Services                  *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Doris Eidel (SMT Guarantor)              *VIA FIRST CLASS CERTIFIED MAIL RETURN*
7 Lodge Road                             *RECEIPT REQUESTED AND FEDEX*
Briarcliff Manor, NY 10510

IPOFA WOM PL 3, LLC (SMT Borrower)       *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn: Investor Services                  *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Jean I. Singrin (SMT Guarantor)          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
8580 Warren Road                         *RECEIPT REQUESTED AND FEDEX*
Paso Robles, CA 93446

IPOFA WOM PL 4, LLC (SMT Borrower)       *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn: Investor Services                  *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Charles H. Shorley (SMT Guarantor)       *VIA FIRST CLASS CERTIFIED MAIL RETURN*
10126 Silver Point Lane                  *RECEIPT REQUESTED AND FEDEX*
Ocean City, MD 21842

IPOFA WOM PL 5, LLC (SMT Borrower)       *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn: Investor Services                  *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Catherine G. Meeks (SMT Guarantor)       *VIA FIRST CLASS CERTIFIED MAIL RETURN*
1718 E. Shadowcreek Drive                *RECEIPT REQUESTED AND FEDEX*
Fresno, CA 93720

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
July 27, 2007
Page 8

IPOFA WOM PL 6, LLC (SMT Borrower)          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                              *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Keith Sperling (SMT Guarantor)               *VIA FIRST CLASS CERTIFIED MAIL RETURN*
13771 Wheeler Ave.                            *RECEIPT REQUESTED AND FEDEX*
Sylmar, CA 91342

IPOFA WOM PL 7, LLC (SMT Borrower)          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                              *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Charles D. Bradley (SMT Guarantor)           *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Kim M. Bradley (SMT Guarantor)               *RECEIPT REQUESTED AND FEDEX*
18538 Flume Rd.
Sanger, CA 93657

IPOFA WOM PL 8, LLC (SMT Borrower)          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                              *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Maury Duff Peck (SMT Guarantor)              *VIA FIRST CLASS CERTIFIED MAIL RETURN*
10357 N. Doheny                               *RECEIPT REQUESTED AND FEDEX*
Fresno, CA 93720

IPOFA WOM PL 10, LLC (SMT Borrower)         *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                              *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Eugene Brughelli, Jr. (SMT Guarantor)         *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Patricia Brughelli (SMT Guarantor)            *RECEIPT REQUESTED AND FEDEX*
21546 So. Valentine Avenue
Riverdale, CA 93656

A K I N  G U M P
S T R A U S S  H A U E R  &  F E L D LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
July 27, 2007
Page 9

IPOFA WOM PL 11, LLC (SMT Borrower)
Attn:  Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Martha A. Olivares-Sperling (SMT Guarantor)
Keith Sperling (SMT Guarantor)
13771 Wheeler Ave.
Sylmar, CA  91342

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 12, LLC (SMT Borrower)
Attn:  Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Antonette Volpe (SMT Guarantor)
198 Spring Street
Staten Island, NY  10304

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 13, LLC (SMT Borrower)
Attn:  Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Robert Volpe (SMT Guarantor)
198 Spring Street
Staten Island, NY  10304

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 14, LLC (SMT Borrower)
Attn:  Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Michael Sokobin (SMT Guarantor)
8020 Links Way
Port St. Lucie, FL  34986

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 15, LLC (SMT Borrower)
Attn:  Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia  23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

A K I N  G U M P
S T R A U S S  H A U E R  &  F E L D LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
July 27, 2007
Page 10


Helene Sokobin (SMT Guarantor)                    *VIA FIRST CLASS CERTIFIED MAIL RETURN*
8020 Links Way                                    *RECEIPT REQUESTED AND FEDEX*
Port St. Lucie, FL  34986

IPOFA WOM PL 16, LLC (SMT Borrower)               *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                          *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

Carolyn Lee Daniel (SMT Guarantor)                *VIA FIRST CLASS CERTIFIED MAIL RETURN*
9560 North Nash Street                            *RECEIPT REQUESTED AND FEDEX*
Middlesex, NC  27557

IPOFA WOM PL 17, LLC (SMT Borrower)               *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                          *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

Norma E. Register (SMT Guarantor)                 *VIA FIRST CLASS CERTIFIED MAIL RETURN*
139 Great Oak Drive                               *RECEIPT REQUESTED AND FEDEX*
Hampstead, NC  28443

IPOFA WOM PL 18, LLC (SMT Borrower)               *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                          *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

Jeanette E. Newman (SMT Guarantor)                *VIA FIRST CLASS CERTIFIED MAIL RETURN*
103 Inlet Drive                                   *RECEIPT REQUESTED AND FEDEX*
Hampstead, NC  28443

IPOFA WOM PL 19, LLC (SMT Borrower)               *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                          *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

Dawn A. Dunbar (SMT Guarantor)                    *VIA FIRST CLASS CERTIFIED MAIL RETURN*
21 Terrier Place                                  *RECEIPT REQUESTED AND FEDEX*
Kendall Park, NJ  08824

A K I N   G U M P
S T R A U S S   H A U E R   &   F E L D LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
July 27, 2007
Page 11


IPOFA WOM PL 20, LLC (SMT Borrower)          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                              *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

IPOFA WEST OAKS MALL PM, LP                  *VIA FIRST CLASS CERTIFIED MAIL RETURN*
(Property Manager)                                   *RECEIPT REQUESTED AND FEDEX*
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235
Attn:  Edward H. Okun

IPOFA WOM PM GP, LLC                         *VIA FIRST CLASS CERTIFIED MAIL RETURN*
(General Partner of Property Manager)               *RECEIPT REQUESTED AND FEDEX*
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235
Attn:  Edward H. Okun

IPOFA WEST OAKS MALL, LP                     *VIA FIRST CLASS CERTIFIED MAIL RETURN*
(Environmental Indemnitor)                          *RECEIPT REQUESTED AND FEDEX*
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235
Attn:  Edward H. Okun

IPOFA WOM MASTER LEASECO, LP               *VIA FIRST CLASS CERTIFIED MAIL RETURN*
(Environmental Indemnitor)                          *RECEIPT REQUESTED AND FEDEX*
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235
Attn:  Edward H. Okun

IPOFA WEST OAKS MALL LEASECO, LP          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
(Environmental Indemnitor)                          *RECEIPT REQUESTED AND FEDEX*
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235
Attn:  Edward H. Okun


014728.0438 WEST  6113183 v2

**AKIN GUMP**
**STRAUSS HAUER & FELD** LLP
━━━━━━━━━ Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
July 27, 2007
Page 12

Kutak Rock LLP                          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
The Omaha Building                      *RECEIPT REQUESTED, FEDEX AND TELECOPY:*
1650 Farnam Street                      *(402) 346-1148*
Omaha, Nebraska 68102-2186
Attn: Joseph O. Kavan

# EXHIBIT H

# AKIN GUMP
# STRAUSS HAUER & FELD LLP

**Attorneys at Law**

**MARK L. PATTERSON**
(214) 969-4249/Fax: (214) 969-4343
mlpatterson@akingump.com

August 13, 2007

*VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED,*
*FEDERAL EXPRESS, AND TELECOPY (804) 594-3556*

IPOFA WEST OAKS MALL, LP
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM MASTER LEASECO,
LP
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WEST OAKS MALL
LEASECO, LP
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 1 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 2 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 3 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 4 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 5 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 6 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 7 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 8 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Attn: Edward H. Okun

IPOFA WOM PL 10 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 11 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 12 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 13 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

**AKIN GUMP**
**STRAUSS HAUER & FELD** LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL, LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
August 13, 2007
Page 2

IPOFA WOM PL 14 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 17 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 20 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 15 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 18 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 16 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 19 LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

## ACCELERATION OF DEBT AND NOTICE OF FORECLOSURE SALE

Re:    Matter:         West Oaks Mall
                       1000 West Oaks Mall
                       Houston, TX 77082
       Loan Number:    M030256880
       Pool:           GCCFC 2006-GG7

Dear Sir or Madam:

This firm represents GCCFC 2006-GG7 Westheimer Mall, LLC, a Texas limited liability company ("**Holder**"), acting by and through its Special Servicer, LNR Partners, Inc., and its Master Servicer, Midland Loan Services, Inc. (together, "**Servicer**"), in connection with the loan (the "**Loan**") evidenced by the documents and instruments described as follows:

Promissory Note (the "**Note**"), dated June 22, 2006, executed by IPofA West Oaks Mall, LP, a Texas limited partnership, IPofA WOM Master LeaseCo, LP, a Texas limited partnership, IPofA West Oaks Mall LeaseCo, LP, a Texas limited partnership, and each SMT Borrower (as defined in Loan Agreement, defined below) (collectively,

AKIN GUMP
STRAUSS HAUER & FELD LLP
——— Attorneys at Law ———

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
August 13, 2007
Page 3

"**Borrower**"), payable to the order of Greenwich Capital Financial Products, Inc., a Delaware corporation ("**Original Lender**"), in the original stated principal amount of Eighty-Six Million and No/100 Dollars ($86,000,000.00); and

Secured and/or evidenced by, among other instruments, (i) a Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "**Deed of Trust**"), dated as of June 22, 2006, executed by Borrower for the benefit of Original Lender, and covering the real and personal property more particularly described therein commonly known as West Oaks Mall and located at 1000 West Oaks Mall, Houston, Harris County, Texas (the "**Property**"), recorded as Document No. Z402124 of the Real Property Records of Harris County, Texas (the "**Records**"); (ii) an Absolute Assignment of Leases and Rents (the "**Assignment**"), dated as of June 22, 2006, executed by Borrower for the benefit of Original Lender, recorded as Document No. Z402126, of the Records; and (iii) a Loan and Security Agreement (the "**Loan Agreement**") dated as of June 22, 2006, executed by Borrower and Original Lender.

The Note, the Deed of Trust, the Assignment, the Loan Agreement, and all other documents and instruments securing or evidencing the Loan are hereinafter, collectively, referred to as the "**Loan Documents**". All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Loan Agreement and/or Deed of Trust.

The Note and the lien and security interest of the Deed of Trust, the Assignment, the Loan Agreement and all other Loan Documents were transferred and assigned to, and are currently held by, Holder pursuant to that certain Assignment of Deed of Trust and Other Loan Documents dated as of August 9, 2007 executed by LaSalle Bank National Association, in its capacity as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2006-GG7, Commercial Mortgage Pass-Through Certificates, Series 2006-GG7, for the benefit of Holder and recorded as Document No. 20070495072 on August 13, 2007 in the Records.

By letter to you, dated July 27, 2007, this firm, on behalf of Holder's predecessor as holder of the Note, notified you of the existence of one or more defaults (the "**Defaults**") under the Loan Documents for, among other things, failure to make certain payments of principal and/or interest when due, which failure continued beyond any and all applicable notice and cure periods. That notice demanded payment of unpaid past due amounts then owing under the Note and Deed of

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
August 13, 2007
Page 4

Trust, and Borrower was advised of the noteholder's intention to accelerate the maturity of the Note if the Defaults were not cured.

According to the records of Holder and Servicer, Borrower has failed to cure the Defaults and continues to be in default in the payment of sums due and payable under the Loan Documents. Based on the Defaults, Holder, pursuant to its right under the Loan Documents, has accelerated the Note's maturity and hereby declares the entire indebtedness evidenced by the Loan Documents immediately due and payable. On behalf of Holder and Servicer, this letter is formal notice to you of such acceleration and demand that you pay immediately all of the outstanding principal and accrued and unpaid interest under the Note, in its entirety, together with all applicable charges and all costs, expenses and attorneys fees incurred by Holder in connection with the collection of the indebtedness evidenced by the Note, and any other amounts lawfully due and payable under the terms of the Loan Documents. Further, the license granted to Borrower under the terms of the Assignment to collect rents from the Property has been revoked, and all rents from the Property received by Borrower should be immediately forwarded to Holder. Holder reserves the right to exercise, in such order as Holder elects, any one or more of the remedies available to Holder pursuant to the Loan Documents or, otherwise at law or in equity (including, without limitation, actions for the immediate appointment of a receiver to, among other things, collect the rents and other income from the Property), and nothing contained in this letter shall constitute a waiver of any rights of Holder to pursue such rights and remedies. Please be further advised that no past or future delay or omission in the exercise of any right or remedy accruing to Holder as a result of any default is intended to constitute a waiver of any right or remedy accruing to Holder as a result of that default or any other default.

Payment to Holder in an amount less than the total delinquent sums, or any other partial cure of the Defaults, should not be construed as an accord and satisfaction or as Holder's agreement to accept a lesser amount as payment in full of the delinquent sums. Holder's acceptance of any endorsement or statement on any check evidencing a payment or letter accompanying a payment may not be deemed to be an accord and satisfaction. Holder may accept any such payment or check without prejudice to its rights to receive the balance of all amounts due under the Loan Documents or to pursue any remedy thereunder or at law or in equity.

Neither this letter nor any statement by or on behalf of Holder or Servicer as to the amount due and owing under the Loan Documents shall constitute a waiver of any rights of Holder to collect any additional amounts to which Holder may be lawfully entitled pursuant to the terms of the Loan Documents or otherwise at law or in equity. The specific enumeration of defaults and/or obligations contained in this letter shall not constitute a waiver of any other default now or hereafter existing under the Loan Documents.

**AKIN GUMP**
**STRAUSS HAUER & FELD** LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
August 13, 2007
Page 5

No communication, written or oral, that Borrower has had or may have with Holder or Servicer concerning the obligations evidenced or secured by the Loan Documents, including any concerning a modification or restructure of the Loan Documents or a forbearance in the exercise of any of Lender's remedies, in any way modifies this letter or constitutes consent to the non-payment or a waiver of any of the remedies described herein. There are currently no forbearance, modification, renewal, extension or settlement agreements between Borrower and Holder with regard to the Loan or the Loan Documents, and all proposals made by Borrower to Holder relating to the foregoing are rejected.

To the extent your obligations have been discharged, dismissed, or are subject to an automatic stay of a bankruptcy order under Title 11 of the United States Code, this notice is for compliance and information purposes only, and does not constitute a demand for payment or any attempt to collect any such obligation. This notice is given pursuant to 11 U.S.C. Section 362(b)11, if applicable. In addition, all of Holder's claims, demands and accruals with respect to the Loan Documents, whenever made, and whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with all applicable usury laws, and are accordingly limited so that all applicable usury laws are not violated.

Holder has instructed Mark L. Patterson, Jeffrey J. Zissa, Jennifer Wilson Davis, Beverly A. Houston, Dana K. Roland, Tessa Fisher, Jeff Leva, Sandy Dasigenis and Steve Leva, and each of them acting alone, as Substitute Trustees, to sell the Property at a non-judicial foreclosure sale ("**Foreclosure Sale**"). A copy of the Notice of Substitute Trustee's Sale (the "**Notice**") specifying the date, time, place, and terms of the Foreclosure Sale is enclosed with this letter. The Notice has been posted at the Family Law Center, 1115 Congress, Houston, Harris County, Texas, in accordance with Section 51.002 of the Texas Property Code and the provisions of the Deed of Trust. If all amounts due and owing have not been paid by the Foreclosure Sale, Substitute Trustees, or any of them acting alone, will conduct the Foreclosure Sale on the date and at the time and place specified in the Notice, as authorized by and in accordance with the provisions of the Deed of Trust and applicable law.

Servicer is representing Holder pursuant to a servicing agreement with Holder which covers the Loan. The name and address of Holder are: c/o LNR Partners, Inc., 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139, Attn: Mr. Job Warshaw.

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
August 13, 2007
Page 6

Very truly yours,

AKIN GUMP STRAUSS HAUER & FELD LLP

By: _____
        Mark L. Patterson

cc:    Mr. Job Warshaw, Senior Vice President        *VIA EMAIL: jwarshaw@lnrproperty.com*

       Mr. Urosh Tomovich                            *VIA EMAIL: utomovich@lnrproperty.com*

**AKIN GUMP**
**STRAUSS HAUER & FELD** LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
August 13, 2007
Page 7

## FOR NOTICE PURPOSES ONLY

IPOFA WEST OAKS MALL GP, LLC
(GP of IPofA West Oaks Mall, LP)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM MLC GP, LLC
(GP of IPofA WOM Master LeaseCo, LP)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM LEASECO, GP, LLC
(GP of IPofA West Oaks Mall LeaseCo, LP)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Edward H. Okun
(Guarantor and Environmental Indemnitor)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Ronald Letizia (SMT Guarantor)
2 Wellhouse Lane
Mamaroneck, NY 10543

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 1, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

# AKIN GUMP
## STRAUSS HAUER & FELD LLP
#### Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
August 13, 2007
Page 8

Zeneth Eidel (SMT Guarantor)            *VIA FIRST CLASS CERTIFIED MAIL RETURN*
7 Lodge Road                            *RECEIPT REQUESTED AND FEDEX*
Briarcliff Manor, NY 10510

IPOFA WOM PL 2, LLC (SMT Borrower)      *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Doris Eidel (SMT Guarantor)             *VIA FIRST CLASS CERTIFIED MAIL RETURN*
7 Lodge Road                            *RECEIPT REQUESTED AND FEDEX*
Briarcliff Manor, NY 10510

IPOFA WOM PL 3, LLC (SMT Borrower)      *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Jean I. Singrin (SMT Guarantor)         *VIA FIRST CLASS CERTIFIED MAIL RETURN*
8580 Warren Road                        *RECEIPT REQUESTED AND FEDEX*
Paso Robles, CA 93446

IPOFA WOM PL 4, LLC (SMT Borrower)      *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Charles H. Shorley (SMT Guarantor)      *VIA FIRST CLASS CERTIFIED MAIL RETURN*
10126 Silver Point Lane                 *RECEIPT REQUESTED AND FEDEX*
Ocean City, MD 21842

IPOFA WOM PL 5, LLC (SMT Borrower)      *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Catherine G. Meeks (SMT Guarantor)      *VIA FIRST CLASS CERTIFIED MAIL RETURN*
1718 E. Shadowcreek Drive               *RECEIPT REQUESTED AND FEDEX*
Fresno, CA 93720

**AKIN GUMP**
**STRAUSS HAUER & FELD** LLP
Attorneys at Law.

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
August 13, 2007
Page 9

| | |
|---|---|
| IPOFA WOM PL 6, LLC (SMT Borrower)<br>Attn: Investor Services<br>10800 Midlothian Turnpike, Suite 309<br>Richmond, VA 23235. | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |
| Keith Sperling (SMT Guarantor)<br>13771 Wheeler Ave.<br>Sylmar, CA 91342 | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |
| IPOFA WOM PL 7, LLC (SMT Borrower)<br>Attn: Investor Services<br>10800 Midlothian Turnpike, Suite 309<br>Richmond, VA 23235 | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |
| Charles D. Bradley (SMT Guarantor)<br>Kim M. Bradley (SMT Guarantor)<br>18538 Flume Rd.<br>Sanger, CA 93657 | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |
| IPOFA WOM PL 8, LLC (SMT Borrower)<br>Attn: Investor Services<br>10800 Midlothian Turnpike, Suite 309<br>Richmond, VA 23235 | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |
| Maury Duff Peck (SMT Guarantor)<br>10357 N. Doheny<br>Fresno, CA 93720 | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |
| IPOFA WOM PL 10, LLC (SMT Borrower)<br>Attn: Investor Services<br>10800 Midlothian Turnpike, Suite 309<br>Richmond, VA 23235 | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |
| Eugene Brughelli, Jr. (SMT Guarantor)<br>Patricia Brughelli (SMT Guarantor)<br>21546 So. Valentine Avenue<br>Riverdale, CA 93656 | *VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX* |

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
August 13, 2007
Page 10

IPOFA WOM PL 11, LLC (SMT Borrower)          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn: Investor Services                      *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Martha A. Olivares-Sperling (SMT Guarantor)  *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Keith Sperling (SMT Guarantor)               *RECEIPT REQUESTED AND FEDEX*
13771 Wheeler Ave.
Sylmar, CA 91342

IPOFA WOM PL 12, LLC (SMT Borrower)          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn: Investor Services                      *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Antonette Volpe (SMT Guarantor)              *VIA FIRST CLASS CERTIFIED MAIL RETURN*
198 Spring Street                            *RECEIPT REQUESTED AND FEDEX*
Staten Island, NY 10304

IPOFA WOM PL 13, LLC (SMT Borrower)          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn: Investor Services                      *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Robert Volpe (SMT Guarantor)                 *VIA FIRST CLASS CERTIFIED MAIL RETURN*
198 Spring Street                            *RECEIPT REQUESTED AND FEDEX*
Staten Island, NY 10304

IPOFA WOM PL 14, LLC (SMT Borrower)          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn: Investor Services                      *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

Michael Sokobin (SMT Guarantor)             *VIA FIRST CLASS CERTIFIED MAIL RETURN*
8020 Links Way                               *RECEIPT REQUESTED AND FEDEX*
Port St. Lucie, FL 34986

IPOFA WOM PL 15, LLC (SMT Borrower)          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn: Investor Services                      *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
August 13, 2007
Page 11

Helene Sokobin (SMT Guarantor)
8020 Links Way
Port St. Lucie, FL 34986

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 16, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Carolyn Lee Daniel (SMT Guarantor)
9560 North Nash Street
Middlesex, NC 27557

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 17, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Norma E. Register (SMT Guarantor)
139 Great Oak Drive
Hampstead, NC 28443

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 18, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Jeanette E. Newman (SMT Guarantor)
103 Inlet Drive
Hampstead, NC 28443

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 19, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Dawn A. Dunbar (SMT Guarantor)
21 Terrier Place
Kendall Park, NJ 08824

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

**AKIN GUMP**
**STRAUSS HAUER & FELD** LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
August 13, 2007
Page 12

IPOFA WOM PL 20, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WEST OAKS MALL PM, LP
(Property Manager)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235
Attn: Edward H. Okun

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PM GP, LLC
(General Partner of Property Manager)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235
Attn: Edward H. Okun

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WEST OAKS MALL, LP
(Environmental Indemnitor)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235
Attn: Edward H. Okun

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM MASTER LEASECO, LP
(Environmental Indemnitor)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235
Attn: Edward H. Okun

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WEST OAKS MALL LEASECO, LP
(Environmental Indemnitor)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235
Attn: Edward H. Okun

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
August 13, 2007
Page 13

Kutak Rock LLP
The Omaha Building
1650 Farnam Street
Omaha, Nebraska 68102-2186
Attn: Joseph O. Kavan, Esq.

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED, FEDEX AND TELECOPY: (402) 346-1148*

Kluger Peretz Kaplan & Berlin
201 S. Biscayne Blvd., Suite 1700
Miami, Florida 33131
Attn: Eliot C. Abbot, Esq.

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED, FEDEX AND TELECOPY: (305) 379-3428*

DLA Piper US LLP
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, Pennsylvania 19103
Attn: Michael L. Eidel, Esq.

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED, FEDEX AND TELECOPY: (215) 606-3318*

Dexter Perry, Esq.
The Providence Group of North Carolina
1400 Crescent Green, Suite G100
Cary, North Carolina 27518

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED, FEDEX AND TELECOPY: (919) 816-9241*

Okun Holdings, Inc.
6301 East 10th Avenue
Hialeah, Florida 33013
Attn: Richard B. Simring, Esq.

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED, FEDEX AND TELECOPY: (786) 587-1099*

## NOTICE OF SUBSTITUTE TRUSTEE'S SALE

STATE OF TEXAS       §
                        §
COUNTY OF HARRIS   §

| | |
|---|---|
| Date: | August 10, 2007 |
| Borrower and Borrower's Address: | **IPOFA WEST OAKS MALL, LP**, a Texas limited partnership, **IPOFA WOM MASTER LEASECO, LP**, a Texas limited partnership, **IPOFA WEST OAKS MALL LEASECO, LP**, a Texas limited partnership, each c/o 10800 Midlothian Turnpike, Suite 309 Richmond, VA 23235 Attn: Edward H. Okun |
| | and each SMT Borrower as shown on Exhibit "B", attached hereto (and as defined in the Loan and Security Agreement, dated as of June 22, 2006, by and between Borrower and Original Lender, as herein defined) |
| Holder: | **GCCFC 2006-GG7 WESTHEIMER MALL, LLC**, a Texas limited liability company |
| Holder's Address: | c/o LNR Partners, Inc. 1601 Washington Avenue, Suite 700 Miami Beach, Florida 33139 |
| Mortgage Servicer: | LNR Partners, Inc., a Florida corporation |
| Mortgage Servicer's Address: | 1601 Washington Avenue, Suite 700 Miami Beach, Florida 33139 |
| Substitute Trustees: | Mark L. Patterson, Jeffrey J. Zissa, Jennifer Wilson Davis, Beverly A. Houston, Dana K. Roland, Tessa Fisher, Jeff Leva, Sandy Dasigenis and Steve Leva, and each of them acting alone |
| Substitute Trustees' Address: | c/o Akin Gump Strauss Hauer & Feld LLP 1700 Pacific Avenue, Suite 4100 Dallas, Texas 75201 Attention: Mark L. Patterson |
| Deed of Trust: | Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing |

014728.0438 WEST 6116775 v1

| | |
|---|---|
| Date: | as of June 22, 2006 |
| Grantor: | IPofA West Oaks Mall, LP, a Texas limited partnership, IPofA WOM Master LeaseCo, LP, a Texas limited partnership, IPofA West Oaks Mall LeaseCo, LP, a Texas limited partnership, and each SMT Borrower |
| Original Lender: | Greenwich Capital Financial Products, Inc., a Delaware corporation |
| Trustee: | LandAmerica Charter Title Company, a Texas corporation |
| Secures: | Obligations under the Promissory Note ("**Note**"), dated as of June 22, 2006, in the original principal amount of $86,000,000.00, executed by Grantor, payable to the order of Original Lender and currently held by Holder |
| Recording: | Recorded on June 26, 2006, in the Real Estate Records of Harris County, Texas (the "**Records**"), as Document No. Z402124, as assigned by Original Lender to LaSalle Bank National Association, in its capacity as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2006-GG7, Commercial Mortgage Pass-Through Certificates, Series 2006-GG7 ("**LaSalle**") recorded in the Records on June 8, 2007 as Document No. 20070351046, and as further assigned by LaSalle to Holder by instrument dated as of August 9, 2007 and recorded in the Records on August _13_, 2007 as Document No. 200704 95072 |
| Property: | The real property described on <u>Exhibit "A"</u>, attached hereto and made a part hereof for all purposes, together with all improvements and personal property described in the Deed of Trust. |

## Foreclosure Sale

| | |
|---|---|
| <u>Date of Sale</u>: | Tuesday, September 4, 2007 |
| <u>Time of Sale</u>: | The Sale of the Property will take place between the hours of 10:00 a.m. and 4:00 p.m. local time; the earliest time at which the sale will take place is 10:00 a.m. and the sale will commence within three hours of such time. |
| <u>Place of Sale</u>: | In the area northwest of the stairwell railing, on the first floor of The Family Law Center, 1115 Congress, Houston, TX |

Holder, acting by and through Mortgage Servicer, has appointed Substitute Trustees, and each of them acting alone, as Substitute Trustees under the Deed of Trust upon the contingency and in the manner outlined by the Deed of Trust and in accordance with Chapter 51 of the Texas Property Code. Default has occurred pursuant to the provisions of the Deed of Trust and the other documents evidencing the Note. The indebtedness evidenced by the Note is now wholly due. Holder, acting by and through Mortgage Servicer, has instructed Substitute Trustees, and each of them acting alone, to sell the Property toward the satisfaction of the Note.

The Deed of Trust may encumber both real and personal property. Notice is hereby given of Holder's election to proceed against and sell both the real property and any personal property described in the Deed of Trust in accordance with the Holder's rights and remedies under the Deed of Trust and Section 9.604 of the Texas Business and Commerce Code.

Notice is hereby given that on the Date of Sale, Substitute Trustees, or any of them acting alone, will offer the Property for sale at public auction at the Place of Sale, to the highest bidder for cash, "AS IS" and further subject to any valid leases of the Property, which leases shall not terminate as a result of the sale. THERE WILL BE NO WARRANTY RELATING TO TITLE, POSSESSION OR QUIET ENJOYMENT OR THE LIKE FOR THE PERSONAL PROPERTY INCLUDED IN THE SALE. Holder may bid by credit against the indebtedness secured by the Deed of Trust.

The Foreclosure Sale is being administered by Mortgage Servicer. Mortgage Servicer is representing Holder under a servicing agreement.

_____

**MARK L. PATTERSON**

STATE OF TEXAS            §
                          §
COUNTY OF DALLAS          §

Before me, the undersigned authority, on the ____ day of August, 2007, personally appeared Mark L. Patterson, known to me to be the person whose name is subscribed to the foregoing instrument, and he acknowledged to me that he executed the same in the capacity therein stated.

[SEAL]

MARY ALLEN
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 4-13-2010

_____
Notary Public in and for the State of Texas

Mary Allen
_____
Printed Name

My Commission Expires:

_____

After recording return to:

Mark L. Patterson
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas  75201

## EXHIBIT "A"

Property Description

(see attachment)

A-1

## Exhibit A

**PARCEL I (MALL PARCEL):**
REAL PROPERTY IN THE COUNTY OF HARRIS, STATE OF TEXAS, DESCRIBED AS FOLLOWS:

**TRACT I**
DESCRIPTION OF A 38.469 ACRE (1,675,719 SQUARE FEET) TRACT OF LAND BEING THE SAME CALLED 38.4692 ACRE TRACT DESCRIBED AS "TRACT I" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TCM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 324, HARRIS COUNTY, TEXAS, SAID 38.469 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093), (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2553, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180 FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A" AND THE NORTHEAST CORNER OF A CALLED 16.3545 ACRE TRACT DESCRIBED IN A DEED TO PRIMARY PROPERTIES CORPORATION AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M991378;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6 AND ALONG THE EASTERLY LINE OF SAID RESTRICTED RESERVE "A" AND THE CALLED 16.3545 ACRE TRACT, A DISTANCE OF 1,212.01 FEET TO A PK NAIL FOUND FOR THE POINT OF BEGINNING OF THIS HEREIN DESCRIBED 38.469 ACRE TRACT, AND ALSO BEING THE SOUTHEASTERLY CORNER OF SAID 16.3545 ACRE TRACT;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6, A DISTANCE OF 79.50 FEET TO A POINT FOR NORTHEAST CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF WEST OAKS COMMERCIAL CENTER ACCORDING TO THE PLAT THEREOF RECORDED IN FILM CODE NO. 353432 OF THE HARRIS COUNTY MAP RECORDS, FROM WHICH A FOUND 5/8 INCH IRON ROD BEARS NORTH 10 DEGREES 44 MINUTES 00 SECONDS EAST, A DISTANCE OF 0.39 FOOT;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, DEPARTING THE WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6 ALONG THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER, A DISTANCE OF 318.17 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF SAID RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER, SAID POINT BEING IN THE ARC OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 950.00 FEET, THROUGH A CENTRAL ANGLE OF 14 DEGREES 35 MINUTES 46 SECONDS (THE CHORD BEARS SOUTH 31 DEGREES 33 MINUTES 58 SECONDS WEST, A DISTANCE OF 89.92 FEET) AN ARC DISTANCE OF 89.16 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 24 DEGREES 16 MINUTES 05 SECONDS WEST, CONTINUING ALONG THE

WESTERLY LINE OF SAID RESTRICTED RESERVE "A", PASSING AT 20.50 FEET THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "A" AND THE NORTHWEST CORNER OF RESTRICTED RESERVE "B" OF SAID WEST OAKS COMMERCIAL CENTER, PASSING AT 166.14 FEET THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "B" OF WEST OAKS COMMERCIAL CENTER, AND CONTINUING FOR A TOTAL DISTANCE OF 419.57 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF OLIVE COAST SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN FILM CODE NO. _____ OF THE HARRIS COUNTY MAP RECORDS AND ALSO BEING THE SOUTHWESTERLY CORNER OF A CALLED 0.2740 ACRE TRACT DESCRIBED IN A DEED TO STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION AND JEFFREY KRAMER, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. N427319;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF SAID OLIVE COAST SUBDIVISION A DISTANCE OF 76.69 FEET TO A 5/8 INCH IRON ROD FOUND IN A NORTHWESTERLY LINE OF RESERVE "B" (UNRESTRICTED) OF SAID TOM BROWN SUBDIVISION FOR CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 42 DEGREES 59 MINUTES 15 SECONDS WEST, CONTINUING ALONG A NORTHWESTERLY LINE OF SAID RESERVE "B" (UNRESTRICTED) A DISTANCE OF 187.14 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 56 MINUTES 15 SECONDS WEST, ALONG A NORTHERLY LINE OF SAID RESERVE "B" (UNRESTRICTED) A DISTANCE OF 303.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE MOST WESTERLY NORTHWEST CORNER OF SAID RESERVE "B" (UNRESTRICTED) AND ALSO BEING A NORTHEASTERLY CORNER OF A CALLED 1.026 ACRE TRACT DESCRIBED AS "OUT PARCEL IV" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIII;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, DEPARTING SAID NORTHERLY LINE OF RESERVE "B" (UNRESTRICTED) ALONG THE EASTERLY LINE OF THE SAID 1.026 ACRE TRACT A DISTANCE OF 5.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE, SOUTH 87 DEGREES 56 MINUTES 55 SECONDS WEST, WITH THE NORTHERLY LINE OF SAID 1.026 ACRE TRACT, A DISTANCE OF 0.55 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE NORTHERLY LINE OF SAID 1.026 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 226.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 10 MINUTES 39 SECONDS (THE CHORD BEARS SOUTH 84 DEGREES 23 MINUTES 34 SECONDS WEST, A DISTANCE OF 28.17 FEET) AN ARC DISTANCE OF 28.18 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG SAID NORTHERLY LINE AND ALONG SAID COMPOUND CURVE TO THE LEFT, HAVING A RADIUS OF 229.16 FEET, THROUGH A CENTRAL ANGLE 15 DEGREES 14 MINUTES 31 SECONDS (THE CHORD BEARS SOUTH 67 DEGREES 09 MINUTES 20 SECONDS WEST, A DISTANCE OF 60.79 FEET) AN ARC DISTANCE OF 60.97 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 59 DEGREES 32 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHERLY LINE, A DISTANCE OF 42.84 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG SAID NORTHERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 220.37 FEET, THROUGH A CENTRAL ANGLE OF 28

014728.0438 WEST  6124395 v1

DEGREES 11 MINUTES 24 SECONDS (THE CHORD BEARS SOUTH 78 DEGREES 37 MINUTES 46 SECONDS WEST, A DISTANCE OF 97.59 FEET) AN ARC DISTANCE OF 108.42 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST CONTINUING ALONG SAID NORTHERLY LINE, A DISTANCE OF 16.50 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 71 DEGREES 44 MINUTES 21 SECONDS (THE CHORD BEARS SOUTH 51 DEGREES 44 MINUTES 18 SECONDS WEST, A DISTANCE OF 29.85 FEET) AN ARC DISTANCE OF 31.31 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY IN THE WESTERLY LINE OF SAID 1.226 ACRE TRACT;

THENCE, SOUTH 15 DEGREES 44 MINUTES 57 SECONDS WEST, ALONG THE WESTERLY LINE OF SAID 1.226 ACRE TRACT, A DISTANCE OF 76.40 FEET TO A POINT IN THE NORTHERLY RIGHT-OF-WAY LINE OF RICHMOND AVENUE (112 FOOT WIDE RIGHT-OF-WAY AT THIS POINT AS DESCRIBED IN VOLUME 310, PAGE 108, HARRIS COUNTY MAP RECORDS) AND THE MOST SOUTHERLY LINE OF RESTRICTED RESERVE "A", BLOCK 1 OF SAID TOM BROWN SUBDIVISION, SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT, AND FROM WHICH AN "X" FOUND CUT IN CONCRETE BEARS NORTH 50 DEGREES 42 MINUTES 08 SECONDS WEST, A DISTANCE OF 0.20 FOOT;

THENCE, NORTHWESTERLY, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,888.00 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 21 MINUTES 17 SECONDS (THE CHORD BEARS NORTH 74 DEGREES 53 MINUTES 39 SECONDS WEST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER HEREIN DESCRIBED TRACT;

THENCE, DEPARTING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, AND ALONG THE PERIMETER OF A CALLED 14.447 HARRIS TRACT DESCRIBED IN A DEED TO DILLARD TEXAS OPERATING LIMITED PARTNERSHIP AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. P778407 THE FOLLOWING 38 COURSES AND DISTANCES:

1) NORTH 15 DEGREES 44 MINUTES 57 SECONDS EAST, A DISTANCE OF 111.83 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

2) NORTH 62 DEGREES 33 MINUTES 28 SECONDS EAST, A DISTANCE OF 42.77 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

3) NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 200.37 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 04 MINUTES 11 MINUTES 24 SECONDS (THE CHORD BEARS NORTH 74 DEGREES 37 MINUTES 46 SECONDS EAST, A DISTANCE OF 97.59 FEET) AN ARC DISTANCE OF 98.59 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

4) NORTH 59 DEGREES 32 MINUTES 04 SECONDS EAST, A DISTANCE OF 42.94 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

5) NORTHEASTERLY, ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 249.18 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 04 MINUTES 39 SECONDS (THE CHORD BEARS NORTH 76 DEGREES 04 MINUTES 23 SECONDS EAST, A DISTANCE OF 125.11 FEET) AN ARC DISTANCE OF 126.46 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

6) NORTH 88 DEGREES 43 MINUTES 43 SECONDS EAST, A DISTANCE OF 119.59 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

7) NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 252.84 FEET, THROUGH A CENTRAL ANGLE OF 64 DEGREES 20 MINUTES 38 SECONDS (THE CHORD BEARS NORTH 56 DEGREES 26 MINUTES 24 SECONDS EAST, A DISTANCE OF 269.03 FEET) AN ARC DISTANCE OF 283.84 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

8) NORTH 24 DEGREES 16 MINUTES 05 SECONDS EAST, A DISTANCE OF 99.45 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 283.47 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN IN DESCRIBED TRACT;

10) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 187.81 FEET TO "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

12) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 161.19 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

13) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 82.74 FEET TO AN "X" CUT IN CONCRETE SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

14) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 51.64 FEET TO AN "X" CUT IN CONCRETE SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

15) NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 12.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 69 DEGREES 46 MINUTES 32 SECONDS WEST, A DISTANCE OF 9.18 FEET) AN ARC DISTANCE OF 9.42 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

16) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, DISTANCE OF 91.00 FEET TO AN "X" IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

17) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 90.70 FEET TO A "X" IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

18) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 244.17 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

19) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 91.42 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

20) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

21) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 4.24 FEET TO AN "X" CUT IN CONCRETE SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

22) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 46.20 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

23) SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 5.00 FEET THROUGH A CENTRAL ANGLE OF 70 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 52 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 5.74 FEET) AN ARC

Exhibit "A" Legal Description                    Page 4 of 22

DISTANCE OF 6.11 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

24) SOUTH 17 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 93.62 FEET TO A "PK" NAIL FOUND FOR CORNER OR THE HEREIN DESCRIBED TRACT;

25) NORTH 72 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 18.12 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

26) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 207.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT

27) SOUTH 67 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 30.33 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

28) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 267.74 FEET TO A "PK" NAIL SET IN THE ARC OF A CURVE TO THE LEFT;

29) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 162.91 FEET, THROUGH A CENTRAL ANGLE OF 05 DEGREES 03 MINUTES 35 SECONDS (THE CHORD BEARS SOUTH 72 DEGREES 03 MINUTES 49 SECONDS EAST, A DISTANCE OF 15.47 FEET) AN ARC DISTANCE OF 15.48 FEET TO A "PK" NAIL FOUND FOR A POINT OF REVERSE CURVATURE OF A CURVE TO THE RIGHT;

30) SOUTHEASTERLY, ALONG SAID REVERSE CURVE TO THE RIGHT, HAVING A RADIUS OF 240.84 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 32 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 59 DEGREES 31 MINUTES 07 SECONDS EAST, A DISTANCE OF 85.88 FEET) AN ARC DISTANCE OF 86.31 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE RIGHT;

31) SOUTHEASTERLY, ALONG SAID COMPOUND CURVE TO THE RIGHT, HAVING A RADIUS OF 161.72 FEET, THROUGH A CENTRAL ANGLE OF 24 DEGREES 56 MINUTES 08 SECONDS (THE CHORD BEARS SOUTH 46 DEGREES 47 MINUTES 02 SECONDS EAST, A DISTANCE OF 70.30 FEET) AN ARC DISTANCE OF 70.87 FEET TO A "PK" NAIL FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

32) SOUTHEASTERLY, ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 127.67 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 13 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 48 DEGREES 46 MINUTES 50 SECONDS EAST, A DISTANCE OF 64.43 FEET) AN ARC DISTANCE OF 65.13 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

33) SOUTH 63 DEGREES 22 MINUTES 48 SECONDS EAST, A DISTANCE OF 80.98 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

34) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 263.33 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 53 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 131.40 FEET) AN ARC DISTANCE OF 132.80 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

35) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 159.04 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

36) SOUTH 15 DEGREES 44 MINUTES 57 SECONDS WEST, A DISTANCE OF 100.12 FEET TO AN "X" CUT IN CONCRETE SET ON THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF RESTRICTED RESERVE "A" OF SAID TOM BROWN SUBDIVISION, SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, AND THE SOUTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,958.00 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 21 MINUTES 07 SECONDS (THE CHORD BEARS NORTH 73 DEGREES 32 MINUTES 28 SECONDS WEST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO AN "X" CUT IN CONCRETE SET FOR THE MOST EASTERLY SOUTHEAST CORNER OF A CALLED 1.188 ACRE TRACT DESCRIBED AS "OUT PARCEL VII" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, NORTH 15 DEGREES 44 MINUTES 57 SECONDS EAST, ALONG THE MOST EASTERLY LINE OF SAID 1.188 ACRE TRACT, DEPARTING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, A DISTANCE OF 40.61 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO A LEFT;

THENCE, NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 108 DEGREES 01 MINUTES 29 SECONDS (THE CHORD BEARS NORTH 38 DEGREES 15 MINUTES 47 SECONDS WEST, A DISTANCE OF 40.48 FEET) AN ARC DISTANCE OF 47.13 FEET TO A "PK" NAIL FOUND IN THE NORTHERLY LINE OF SAID 1.188 ACRE TRACT FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 105.49 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG A NORTHEASTERLY LINE OF SAID 1.188 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 98.88 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 63 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 77 DEGREES 49 MINUTES 40 SECONDS WEST, A DISTANCE OF 141.34 FEET) AN ARC DISTANCE OF 142.88 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 63 DEGREES 22 MINUTES 48 SECONDS WEST, CONTINUING ALONG A NORTHEASTERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 80.96 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 147.67 FEET, THROUGH A CENTRAL ANGLE OF 29 DEGREES 18 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 48 DEGREES 45 MINUTES 56 SECONDS WEST, A DISTANCE OF 74.82 FEET) AN ARC DISTANCE OF 75.33 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 141.77 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 06 MINUTES 03 SECONDS (THE CHORD BEARS NORTH 46 DEGREES 42 MINUTES 05 SECONDS WEST, A DISTANCE OF 61.61 FEET) AN ARC DISTANCE OF 62.11 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID COMPOUND CURVE TO THE LEFT, HAVING A RADIUS OF 220.84 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 32 MINUTES 40 SECONDS (THE CHORD BEARS NORTH 69 DEGREES 31 MINUTES 07 SECONDS WEST, A DISTANCE OF 78.74 FEET) AN ARC DISTANCE OF 79.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE RIGHT, HAVING A RADIUS OF 152.91 FEET, THROUGH A

CENTRAL ANGLE OF 25 DEGREES 18 MINUTES 03 SECONDS (THE CHORD BEARS NORTH 67 DEGREES 10 MINUTES 28 SECONDS WEST, A DISTANCE OF 79.88 FEET) AN ARC DISTANCE OF 80.59 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 54 DEGREES 34 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 48.67 FEET TO AN 1/2 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,158.24 FEET, THROUGH A CENTRAL ANGLE OF 06 DEGREES 01 MINUTE 69 SECONDS (THE CHORD BEARS NORTH 51 DEGREES 33 MINUTES 04 SECONDS WEST, A DISTANCE OF 121.69 FEET) AN ARC DISTANCE OF 121.75 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 48 DEGREES 32 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 47.85 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 182.11 FEET, THROUGH A CENTRAL ANGLE OF 31 DEGREES 58 MINUTES 22 SECONDS (THE CHORD BEARS NORTH 43 DEGREES 32 MINUTES 08 SECONDS WEST, A DISTANCE OF 147.49 FEET) AN ARC DISTANCE OF 151.97 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 172.39 FEET, THROUGH A CENTRAL ANGLE OF 54 DEGREES 37 MINUTES 22 SECONDS (THE CHORD BEARS NORTH 19 DEGREES 50 MINUTES 53 SECONDS WEST, A DISTANCE OF 163.52 FEET) AN ARC DISTANCE OF 170.37 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 47 DEGREES 18 MINUTES 32 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 12.67 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE NORTHWESTERLY LINE OF SAID 1.168 ACRE TRACT;

THENCE, SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHWESTERLY LINE OF SAID 1.168 ACRE TRACT, A DISTANCE OF 127.42 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT AND THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 39 DEGREES 12 MINUTES 28 SECONDS (THE CHORD BEARS SOUTH 23 DEGREES 07 MINUTES 15 SECONDS WEST, A DISTANCE OF 16.78 FEET) AN ARC DISTANCE OF 17.11 FEET TO A 5/8 INCH IRON ROD ON THE NORTHEASTERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF TOM BROWN SUBDIVISION;

THENCE, NORTH 49 DEGREES 35 MINUTES 36 SECONDS WEST, ALONG THE SOUTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND THE NORTHEASTERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, A DISTANCE OF 70.09 FEET TO AN "X" CUT IN CONCRETE FOUND

FOR THE MOST SOUTHERLY CORNER OF A CALLED 3.035 ACRE TRACT DESCRIBED AS "OUT PARCEL X" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AND ALSO BEING THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT (RADIUS POINT BEARS NORTH 12 DEGREES 43 MINUTES 39 SECONDS WEST);

THENCE NORTHEASTERLY, ALONG THE SOUTHEASTERLY LINE OF THE SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 34 DEGREES 32 MINUTES 54 SECONDS (THE CHORD BEARS NORTH 59 DEGREES 59 MINUTES 54 SECONDS EAST, A DISTANCE OF 14.85 FEET) AN ARC DISTANCE OF 15.07 FEET TO AN "X" CUT IN CONCRETE SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 41 DEGREES 50 MINUTES 49 SECONDS EAST, CONTINUING ALONG THE SOUTHEASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 151.69 FEET TO A FOUND "X" IN CONCRETE FOR THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT (RADIUS POINT BEARS NORTH 47 DEGREES 16 MINUTES 30 SECONDS WEST);

THENCE, NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 02 DEGREES 16 MINUTES 30 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 40.70 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 34 DEGREES 46 MINUTES 32 SECONDS WEST, A DISTANCE OF 86.58 FEET) AN ARC DISTANCE OF 87.27 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE NORTH 22 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG AN EASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 291.34 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG AN EASTERLY LINE OF SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 12 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 69.46 FEET) AN ARC DISTANCE OF 69.81 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, CONTINUING ALONG SAID EASTERLY LINE, A DISTANCE OF 2.82 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE EASTERN MOST NORTHERLY CORNER OF SAID 3.035 ACRE TRACT;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 64.74 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT, SAID POINT ALSO BEING THE MOST EASTERLY CORNER OF RESERVE "G" (UNRESTRICTED) OF THE SAID TOM BROWN SUBDIVISION;

THENCE, NORTH 49 DEGREES 35 MINUTES 38 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID RESERVE "C", A DISTANCE OF 161.59 FEET TO A 5/8 INCH IRON ROD FOUND ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTREINER ROAD AT THE MOST NORTHERLY CORNER OF SAID RESERVE "C" AND THE NORTHERN MOST WESTERLY CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT MARKS THE BEGINNING OF A CURVE TO THE

RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET; THROUGH A CENTRAL ANGLE OF 01 DEGREES 13 MINUTES 51 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 08 MINUTES 18 SECONDS EAST, A DISTANCE OF 50.00 FEET) AN ARC DISTANCE OF 50.00 FEET TO A 1/2 INCH IRON ROD FOUND FOR THE MOST WESTERLY CORNER OF A CALLED 7.1050 ACRE TRACT DESCRIBED IN A DEED TO MERVYN'S AS RECORDED UNDER HARRIS COUNTY CLERKS FILE NO. J607807;

THENCE DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE PERIMETER OF SAID MERVYN'S TRACT, THE FOLLOWING 9 COURSES AND DISTANCES:

1) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 46.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

2) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 130.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 30 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, A DISTANCE OF 99.50 FEET) AN ARC DISTANCE OF 102.10 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

3) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 5.53 FEET TO A 5/8 INCH IRON ROD FOUND FOR AN ANGLE POINT;

4) NORTH 72 DEGREES 39 MINUTES 08 SECONDS EAST, A DISTANCE OF 84.14 FEET TO A "PK" NAIL FOUND FOR AN ANGLE POINT;

5) NORTH 51 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 110.42 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 444.55 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 414.58 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 100.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 370.59 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT, SAID POINT ALSO BEING THE MOST EASTERLY CORNER OF SAID MERVYN'S TRACT AND ALSO BEING IN THE SOUTHWESTERLY LINE OF A CALLED 3.416 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, SOUTH 62 DEGREES 16 MINUTES 32 SECONDS EAST, DEPARTING THE EASTERLY LINE OF SAID MERVYN'S TRACT AND CONTINUING ALONG THE SOUTHWESTERLY LINE OF THE SAID 3.416 ACRE TRACT, A DISTANCE OF 197.12 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 25.88 FEET) AN ARC DISTANCE OF 26.18 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY IN THE

Exhibit "A" Legal Description                    Page 9 of 22

MOST SOUTHERLY LINE OF SAID 3.415 ACRE TRACT;

THENCE, NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, ALONG THE MOST SOUTHERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 70.00 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY IN THE EASTERLY LINE OF SAID 3.415 ACRE TRACT;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 240.88 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 470.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 49 MINUTES 48 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 52 SECONDS WEST, A DISTANCE OF 64.03 FEET) AN ARC DISTANCE OF 64.48 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 59.36 FEET TO AN "X" CUT IN CONCRETE SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING ON THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 17 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 79 DEGREES 19 MINUTES 17 SECONDS EAST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO A "PK" NAIL SET FOR THE MOST NORTHERLY NORTHWEST CORNER OF A CALLED 6.0175 ACRE TRACT DESCRIBED IN A DEED TO J.C. PENNEY COMPANY, INC. AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M628922;

THENCE, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE PERIMETER OF SAID J.C. PENNEY'S TRACT, THE FOLLOWING 19 COURSES AND DISTANCES;

1) SOUTH 10 DEGREES 05 MINUTES 16 SECONDS EAST, A DISTANCE OF 69.48 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

2) SOUTHEASTERLY, ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 482.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 49 MINUTES 48 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 65.67 FEET) AN ARC DISTANCE OF 65.72 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

3) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 285.86 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

4) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 189.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

5) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 101.89 FEET TO A "PK"

NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 243.16 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 110.94 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 260.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

10) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 295.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 260.00 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

12) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 122.08 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

13) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 243.16 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT,

14) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

15) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 101.80 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

16) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 189.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

17) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 285.66 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

18) NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 518.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 70.62 FEET) AN ARC DISTANCE OF 70.69 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

19) NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, A DISTANCE OF 59.48 FEET TO A "PK" NAIL SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING ON THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 17 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 80 DEGREES 38 MINUTES 11 SECONDS EAST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO A "PK" NAIL SET FOR THE NORTHWEST CORNER A CALLED 2.826 ACRE TRACT DESCRIBED AS "OUT PARCEL II" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

Exhibit "A" Legal Description

THENCE, SOUTH 10 DEGREES 06 MINUTES 16 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 59.37 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHEASTERLY, CONTINUING ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 530.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 72.21 FEET) AN ARC DISTANCE OF 72.28 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL FOUND FOR POINT OF TANGENCY IN THE SOUTHERLY LINE OF SAID 2.826 ACRE TRACT;

THENCE, NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, ALONG THE SOUTHERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 77.52 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 49 DEGREES 46 MINUTES 28 SECONDS (THE CHORD BEARS NORTH 62 DEGREES 50 MINUTES 13 SECONDS EAST, A DISTANCE OF 42.08 FEET) AN ARC DISTANCE OF 43.44 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE SOUTHEASTERLY LINE OF SAID 2.826 ACRE TRACT;

THENCE, NORTH 87 DEGREES 57 MINUTES 01 SECONDS EAST, ALONG THE SOUTHEASTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 275.21 FEET TO A "PK" NAIL FOUND FOR THE MOST WESTERLY CORNER OF THE SAID 19.3543 ACRE TRACT;

THENCE, IN A GENERALLY SOUTHEASTERLY DIRECTION, ALONG THE SOUTHWESTERLY LINE OF SAID 19.3543 ACRE TRACT, THE FOLLOWING 13 COURSES AND DISTANCES:

1) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 88.72 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

2) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

3) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 280.76 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

4) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 237.61 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

5) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 467.58 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 56.09 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

014728.0438 WEST  6124395 v1

7) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 107.71 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 215.20 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

10) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 44.13 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 98.79 TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

12) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 112.00 FEET, THROUGH A CENTRAL ANGLE OF 44 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, A DISTANCE OF 85.72 FEET) AN ARC DISTANCE OF 87.96 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

13) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 46.15 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 38.489 ACRES (1,676,719 SQUARE FEET) OF LAND.

TRACT II (OUT PARCEL I)
DESCRIPTION OF A 3.416 ACRE (148.778 SQUARE FEET) TRACT OF LAND BEING THE SAME 3.4164 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN A DEED TO TGW REALTY FUND VIA HOLDING COMPANY AND TGW REALTY FUND VIA AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT, THEREOF RECORDED IN VOLUME 310, PAGE 166 OF THE HARRIS COUNTY MAP RECORDS, IN THE ELIAS RIVERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS; SAID 3.416 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093), (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2562, PAGE 376 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180 FOOT WIDE RIGHT-OF-WAY); SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A";

THENCE, SOUTH 87 DEGREES 24 MINUTES 24 SECONDS WEST, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", A DISTANCE OF 976.98 FEET TO A CONCRETE MONUMENT WITH BRASS DISK FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESERVE "A" AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 08 DEGREES 14 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 83 DEGREES 17 MINUTES 24 SECONDS WEST, A DISTANCE OF 334.17 FEET) AN ARC DISTANCE OF 334.45 FEET TO AN "X" CUT IN CONCRETE FOUND FOR NORTHEAST CORNER AND THE POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

Exhibit "A" Legal Description                          Page 13 of 22

THENCE, SOUTH 10 DEGREES 06 MINUTES 18 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD, AND ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 53.83 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHEASTERLY, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 470.00, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 84.03 FEET) AN ARC DISTANCE OF 64.08 TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 240.68 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, THROUGH, A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE SOUTHERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 70.00 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 77 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 25.88 FEET) AN ARC DISTANCE OF 26.18 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 62 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG A SOUTHWESTERLY LINE OF SAID 3.415 ACRE TRACT, PASSING AT 107.12 FEET A "PK" NAIL FOUND AT THE NORTHEAST CORNER OF A CALLED 7.1050 ACRE TRACT DESCRIBED IN A DEED TO MERVYN'S, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. J607907 AND CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID MERVYN'S TRACT FOR A TOTAL DISTANCE OF 218.40 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID MERVYN'S TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 360.00 FEET, THROUGH A CENTRAL ANGLE OF 76 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 80 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 426.13 FEET) AN ARC DISTANCE OF 456.15 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE MOST EASTERLY CORNER OF A CALLED 1.6696 ACRE TRACT DESCRIBED AS "OUT PARCEL VF IN THE AFORESAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074 AND THE SOUTHWEST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, DEPARTING THE NORTHERLY LINE OF SAID MERVYNS TRACT, NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID 1.870 ACRE TRACT AND THE MOST SOUTHWESTERLY LINE OF THIS HEREIN DESCRIBED TRACT, A DISTANCE OF 88.66 FEET TO A 5/8 INCH IRON ROD FOUND ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT;

Exhibit "A" Legal Description                              Page 14 of 22

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 26 MINUTES 02 SECONDS (THE CHORD BEARS NORTH 68 DEGREES 57 MINUTES 52 SECONDS EAST, A DISTANCE OF 822.72 FEET) AN ARC DISTANCE OF 830.11 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED 3.415 ACRES (148,775 SQUARE FEET) OF LAND.

LESS AND EXCEPT:
THE FOLLOWING DESCRIBED 0.301 ACRE TRACT OUT OF A 3.415 ACRE (148,775 SQUARE FEET):

TRACT OF LAND BEING THE SAME 3.4154 ACRE TRACT DESCRIBED AS "OUT PARCEL," IN A DEED TO TGW REALTY FUND VIA HOLDING COMPANY AND TGW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 3.4154 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION);

COMMENCING AT A 5/8 INCH IRON ROD FOUND ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WHICH MARKS THE MOST NORTHERLY CORNER OF RESERVE "C" (UNRESTRICTED) OF THE SAID PLAT OF TOM BROWN SUBDIVISION AND A WESTERLY CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT MARKS THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 01 DEGREE 58 MINUTES 10 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 28 MINUTES 28 SECONDS EAST, A DISTANCE OF 80.00 FEET) AN ARC DISTANCE OF 80.00 FEET TO A "PK" NAIL FOUND FOR CORNER;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND CONTINUING ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 15 DEGREES 16 MINUTES 47 SECONDS (THE CHORD BEARS NORTH 51 DEGREES 05 MINUTES 57 SECONDS EAST, A DISTANCE OF 618.86 FEET) AN ARC DISTANCE OF 620.70 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE AND POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

THENCE, NORTHEASTERLY, CONTINUING ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND CONTINUING ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 3 DEGREES 51 MINUTES 15 SECONDS (THE CHORD BEARS NORTH 60 DEGREES 40 MINUTES 51 SECONDS EAST, A DISTANCE OF 156.54 FEET) AN ARC DISTANCE OF 156.57 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE, LEAVING THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD ALONG THE SOUTHEASTERLY LINE OF WESTHEIMER ROAD ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 80.00 FEET A LENGTH OF 31.34 FEET AND A DELTA OF 22;

EXHIBIT A Legal Description

DEGREES 26 MINUTES 52 SECONDS WITH A CHORD BEARING SOUTH 88 DEGREES 15 MINUTES 39 SECONDS EAST, 31.14 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE SOUTH 47 DEGREES 31 MINUTES 12 SECONDS EAST, A DISTANCE OF 21.28 FEET TO A 5/8 INCH IRON ROD SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE SOUTHEASTERLY, ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 70.00 FEET, THROUGH A CENTRAL ANGLE OF 19 DEGREES 25 MINUTES 33 SECONDS (THE CHORD BEARS SOUTH 58 DEGREES 22 MINUTES 48 SECONDS EAST, A DISTANCE OF 23.62 FEET) AN ARC DISTANCE OF 23.73 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE SOUTH 48 DEGREES 39 MINUTES 58 SECONDS EAST, A DISTANCE OF 22.24 FEET TO A SET 5/8 INCH IRON ROD FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 350.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 18 MINUTES 57 SECONDS (THE CHORD BEARS SOUTH 67 DEGREES 52 MINUTES 54 SECONDS WEST, A DISTANCE OF 183.04 FEET) AN ARC DISTANCE OF 185.19 FEET TO A SET 5/8 INCH IRON ROD FOR CORNER;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 88.55 FEET TO POINT OF BEGINNING.

TRACT III (OUT PARCEL II)
DESCRIPTION OF A 2.826 ACRE (123,102 SQUARE FEET) TRACT OF LAND BEING THE SAME CALLED 2.8260 ACRE TRACT DESCRIBED AS "OUT PARCEL II" IN A DEED TO TCW REALTY FUND VIII HOLDING COMPANY AND TCW REALTY FUND VIII AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074 AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE SIAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 2.826 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION)

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093), (A 120-FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180-FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A";

THENCE, SOUTH 87 DEGREES 24 MINUTES 24 SECONDS WEST, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", A DISTANCE OF 799.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE MOST NORTHERLY NORTHWEST CORNER OF A CALLED 18.2543 ACRE TRACT DESCRIBED IN A DEED TO PRIMARY PROPERTIES CORPORATION (THE "FOLEY'S TRACT") AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M961378, SAID POINT ALSO BEING THE NORTHEAST CORNER AND POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 02 DEGREES 36 MINUTES 38 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG A WESTERLY LINE OF THE SAID FOLEY'S TRACT, A DISTANCE OF 58.14 FEET TO AN "X" CUT IN CONCRETE FOUND FOR A POINT ON THE ARC OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG A NORTHWESTERLY LINE OF SAID FOLEY'S TRACT, AND ALONG THE ARC OF SAID CURVE TO THE LEFT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 16 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 45 DEGREES 57 MINUTES 01 SECONDS WEST, A DISTANCE OF 55.67 FEET) AN ARC DISTANCE OF 55.86 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, SOUTH 37 DEGREES 57 MINUTES 01 SECONDS WEST, ALONG THE SOUTHEASTERLY LINE OF THIS TRACT AND CONTINUING ALONG THE NORTHWESTERLY LINE OF SAID FOLEY'S TRACT, PASSING AT 120.92 FEET A "PK" NAIL SET FOR THE MOST WESTERLY CORNER OF THE AFORESAID FOLEY'S TRACT AND A NORTHERLY CORNER OF A CALLED 38.4692 ACRE TRACT DESCRIBED AS "TRACT 1" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VII, AND CONTINUING ALONG A NORTHWESTERLY LINE OF SAID 38.4692 ACRE TRACT FOR A TOTAL DISTANCE OF 396.13 TO AN "X" CUT IN CONCRETE SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 49 DEGREES 46 MINUTES 29 SECONDS (THE CHORD BEARS SOUTH 62 DEGREES 50 MINUTES 31 SECONDS WEST, A DISTANCE OF 42.09 FEET) AN ARC DISTANCE OF 43.44 FEET TO A "PK" NAIL SET FOR THE POINT OR TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 29 SECONDS WEST, ALONG A NORTHERLY LINE OF SAID 38.4692 ACRE TRACT, A DISTANCE OF 77.52 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG AN EASTERLY LINE OF SAID 38.4692 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG AN EASTERLY LINE OF SAID 38.4692 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 530.00, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 72.21 FEET) AN ARC DISTANCE OF 72.26 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, CONTINUING ALONG THE AFORESAID LINES, A DISTANCE OF 59.96 FEET TO A "PK" NAIL SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT ALSO BEING IN THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 06 DEGREES 45 MINUTES 22 SECONDS (THE CHORD BEARS NORTH 84 DEGREES 01 MINUTES 46 SECONDS EAST, A DISTANCE OF 274.28 FEET) AN ARC DISTANCE OF 274.45 FEET TO A CONCRETE MONUMENT WITH BRASS DISK FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 87 DEGREES 24 MINUTES 24 SECONDS EAST, CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF

Exhibit "A" Legal Description                              Page 17 of 22

SAID RESTRICTED RESERVE "A", A DISTANCE OF 178.96 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 2.825 ACRES (123,102 SQUARE FEET) OF LAND.

TRACT VII.
EASEMENT RIGHTS AS SET FORTH IN DEED RECORDED IN HARRIS COUNTY CLERK'S FILE NO. P513119 AND REFILED IN HARRIS COUNTY CLERK'S FILE NO. P525425.

TRACT VIII.
DESCRIPTION OF A 2.473 ACRE (107,731 SQUARE FEET) TRACT OF LAND OUT OF RESERVE "B" (UNRESTRICTED), BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 108 OF THE HARRIS COUNTY MAP RECORDS, ALSO BEING A PORTION OF A CALLED 8.4993 ACRE TRACT DESCRIBED AS "TRACT IX" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, IN THE BIAS HERRERA SURVEY, ABSTRACT NO. 321, IN HARRIS COUNTY, TEXAS. SAID 2.473 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

BEGINNING AT A 5/8 INCH IRON ROD FOUND ON THE NORTHERLY RIGHT-OF-WAY LINE OF RICHMOND AVENUE (A 100 FOOT WIDE RIGHT-OF-WAY) WHICH MARKS THE SOUTHWEST CORNER OF SAID RESERVE "B" AND A SOUTHEASTERLY CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF SAID TOM BROWN SUBDIVISION;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE WESTERLY LINE OF SAID RESERVE "B" AND AN EASTERLY LINE OF SAID RESTRICTED RESERVE "A" SAID LINE ALSO BEING THE EASTERLY LINE OF A CALLED 1.023 ACRES TRACT DESCRIBED AS "OUT" PARCEL IX" IN THE AFORESAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB, A DISTANCE OF 232.62 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF SAID RESERVE "B" AND AN INTERIOR CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN A SOUTHERLY LINE OF A CALLED 38.469 ACRE TRACT DESCRIBED AS "TRACT I" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, NORTH 87 DEGREES 59 MINUTES 59 SECONDS EAST, ALONG THE NORTHERLY LINE OF SAID RESERVE "B" AND A SOUTHERLY LINE OF THE SAID 38.469 ACRE TRACT, A DISTANCE OF 303.14 FEET TO A "PK" NAIL FOUND FOR AN ANGLE POINT;

THENCE, NORTH 42 DEGREES 59 MINUTES 15 SECONDS EAST, ALONG A SOUTHEASTERLY LINE OF THE SAID 38.469 ACRE TRACT AND A NORTHWESTERLY LINE OF SAID RESERVE "B", A DISTANCE OF 197.14 FEET TO A 5/8 INCH IRON ROD FOUND IN THE WESTERLY LINE OF RESTRICTED RESERVE "A", BLOCK 1, OF OLIVE COAST SUBDIVISION AS RECORDED IN FILM CODE NO. 367668 OF THE HARRIS COUNTY MAP RECORDS, SAID POINT MARKS THE NORTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF OLIVE COAST SUBDIVISION, AND THE MOST EASTERLY LINE OF THIS TRACT, A DISTANCE OF 214.32 FEET TO AN "X-CUT" IN CONCRETE FOUND FOR THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN THE NORTHERLY LINE OF A CALLED 2.1516 ACRE TRACT DESCRIBED AS A "SAVE AND EXCEPT" TRACT OUT OF THE 8.4993 ACRE TRACT DESCRIBED IN THE AFORESAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB, SAID POINT MARKS THE MOST EASTERLY SOUTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 15 SECONDS WEST ALONG THE NORTHERLY LINE OF SAID 2.1516 ACRE TRACT, A DISTANCE OF 23.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR

014728.0438 WEST  6124395 v1

THE NORTHWEST CORNER OF SAID 2.1516 ACRE TRACT;

THENCE, SOUTH 03 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID 2.1516 ACRE TRACT AND AN EASTERLY LINE OF THIS BEING DESCRIBED TRACT, A DISTANCE OF 155.00 FEET TO A 5/8 INCH IRON ROD FOUND ON THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B" WHICH MARKS THE SOUTHWEST CORNER OF THE SAID 2.1516 ACRE TRACT AND THE MOST SOUTHERLY, SOUTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 18 SECONDS WEST, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B", A DISTANCE OF 130.21 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B", AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,860.08 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 53 MINUTES 19 SECONDS (THE CHORD BEARS NORTH 88 DEGREES 03 MINUTES 03 SECONDS WEST, A DISTANCE OF 288.40 FEET) AN ARC DISTANCE OF 288.61 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 2.473 ACRES (107,731 SQUARE FEET) OF LAND.

**TRACT IX**
EASEMENT RIGHTS IN THE FOLLOWING INSTRUMENTS: (I) EASEMENT, RESTRICTION AND OPERATING AGREEMENT DATED JULY 28, 1982, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. H850941, AS SUBSEQUENTLY AMENDED UNDER COUNTY CLERK'S FILE NO. M963389, AS FURTHER AMENDED UNDER COUNTY CLERK'S FILE NO. R689964, AS ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON JULY 28, 2003, UNDER COUNTY CLERK'S FILE NOS. W871134 AND W871140, AS FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER COUNTY CLERK'S FILE NO. Y779115, FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER COUNTY CLERK'S FILE NO. Y779116, (II) RECIPROCAL COVENANTS AND EASEMENT DATED DECEMBER 19, 1991, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. N752716, (III) EASEMENT AGREEMENT DATED OCTOBER 14, 1993, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. P513118, REFILED UNDER COUNTY CLERK'S FILE NO. P525424 AND (IV) AGREEMENT DATED AS OF JUNE 24, 1941, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. H028950, ASSIGNED UNDER HARRIS COUNTY CLERK'S FILE NO. N987767, ALL IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

**PARCEL II (MERVYN'S PARCEL):**

**TRACT I**
DESCRIPTION OF A TRACT OR PARCEL OF LAND CONTAINING 7.1050 ACRES (309,493 SQUARE FEET) OUT OF THE BLAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, AND BEING A PORTION OF THAT CERTAIN 102.6024 ACRE TRACT OF LAND KNOWN AS BLOCK ONE, THE TOM BROWN SUBDIVISION, AS RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS. SAID 7.1050 ACRE TRACT IS MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT THE POINT OF INTERSECTION OF THE EXTENDED NORTHERLY RIGHT OF WAY LINE OF RICHMOND AVENUE (100 FOOT WIDE RIGHT OF WAY) WITH THE EXTENDED SOUTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (F.M. 1093 - 120 FOOT WIDE RIGHT OF WAY);

THENCE NORTH 40 DEGREES 24 MINUTES 24 SECONDS EAST, ALONG THE SOUTHERLY RIGHT

OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093), FOR A DISTANCE OF 285.00 FEET TO A 5/8 INCH IRON ROD FOUND AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE CONTINUING ALONG THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) AND ALONG SAID CURVE TO THE RIGHT, HAVING A CENTRAL ANGLE OF 02 DEGREES 16 MINUTES 51 SECONDS, A RADIUS OF 2327.50 FEET, AN ARC LENGTH OF 94.00 FEET, (CHORD BEARS NORTH 41 DEGREES 33 MINUTES 50 SECOND EAST, 93.99 FEET) TO A P.K. NAIL IN ASPHALT SET FOR THE POINT OF BEGINNING OF THE HEREIN DESCRIBED 7.1050 ACRE TRACT;

THENCE CONTINUING ALONG THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) AND ALONG SAID CURVE TO THE RIGHT HAVING CENTRAL ANGLE OF 00 DEGREES 44 MINUTES 16 SECONDS, A RADIUS OF 2327.50 FEET, AN ARC LENGTH OF 30.00 FEET (CHORD BEARS NORTH 43 DEGREES 05 MINUTES 14 SECONDS EAST, 30.00 FEET) TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 47 DEGREES 16 MINUTES 32 SECOND EAST, LEAVING THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) FOR A DISTANCE OF 45.96 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT HAVING A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 100.00 FEET, AN ARC LENGTH OF 78.54 FEET, (CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, 76.54 FEET) TO A CUT "X" IN CONCRETE SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 5.53 FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER OF THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT, HAVING A CENTRAL ANGLE OF 36 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 75.00 FEET, AN ARC LENGTH OF 47.12 FEET, (CHORD BEARS NORTH 69 DEGREES 43 MINUTES 28 SECONDS EAST, 46.35 FEET) TO A CUT "X" IN CONCRETE SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 51 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 909.42 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT HAVING A CENTRAL ANGLE OF 09 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 350.00 FEET, AN ARC LENGTH OF 54.98 FEET, (CHORD BEARS NORTH 47 DEGREES 13 MINUTES 28 SECONDS EAST, 54.92 FEET) TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 278.17 FEET, TO A CUT "X" IN CONCRETE SET AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 75 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 350.00 FEET, AN ARC LENGTH OF 458.15 FEET (CHORD BEARS NORTH 80 DEGREES 13 MINUTES 28 SECONDS EAST, 426.13 FEET) TO P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE RIGHT;

THENCE SOUTH 62 DEGREES 16 MINUTES 32 SECONDS EAST, FOR A DISTANCE OF 111.28

Exhibit "A" Legal Description                    Page 20 of 22

FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 970.59 FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, FOR A DISTANCE OF 100.00 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 414.58 FEET, TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, FOR A DISTANCE OF 444.55 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 61 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 110.42 FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 72 DEGREES 39 MINUTES 06 SECONDS WEST, FOR A DISTANCE OF 84.14 FEET, TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST OF A DISTANCE OF 5.63 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 130.00 FEET, AN ARC LENGTH OF 102.10 FEET, (CHORD BEARS NORTH 69 DEGREES 46 MINUTES 32 SECONDS WEST, 99.50 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE RIGHT;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, FOR A DISTANCE OF 46.14 FEET TO THE POINT OF BEGINNING AND CONTAINING WITHIN THESE METES AND BOUNDS 7.1050 ACRES (309,493 SQUARE FEET) OF LAND AREA.

TOGETHER WITH ABUTTERS RIGHTS OF INGRESS AND EGRESS TO AND FROM WESTHEIMER ROAD, A PHYSICALLY OPEN STREET.

TRACT II

ALL THOSE CERTAIN EASEMENT RIGHTS CREATED BY EASEMENT, RESTRICTION AND OPERATING AGREEMENT DATED JULY 26, 1982, BY AND BETWEEN FEDERATED STORES REALTY, INC., ET AL, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS, UNDER HARRIS COUNTY CLERK'S FILE NO. H650041, AS AMENDED BY THAT CERTAIN FIRST AMENDMENT TO EASEMENT, RESTRICTION AND OPERATING AGREEMENT WEST OAKS MALL DATED AS OF JANUARY 2, 1991, BY AND BETWEEN WEST OAKS ASSOCIATES, LTD., ET AL., FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS, UNDER COUNTY CLERK'S FILE NO. M883366, AS FURTHER MODIFIED BY THAT CERTAIN DECLARATION MADE BY WEST OAKS ASSOCIATES, LTD. DATED AS OF MAY 30, 1995, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS, UNDER COUNTY CLERK'S FILE NO. R659364, AS ASSIGNED BY MERVYN'S LLC TO MDS TEXAS REALTY I, LP, BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION AGREEMENT DATED AS OF SEPTEMBER 2, 2004, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. X030146, AS FURTHER ASSIGNED BY MDS REALTY I, LP, TO WOM OUT PARCEL, LP, BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION OF OPERATING AGREEMENTS DATED AS OF AUGUST 6, 2005, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. Y888789, AS FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER CLERK'S FILE

Exhibit "A" Legal Description                         Page 21 of 22

NO. Y779116, FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER CLERK'S FILE NO. Y779118 ALL IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

NOTE:  The Company does not represent that the above acreage or square footage calculations are correct.

PARCEL III:

ALL THOSE CERTAIN RIGHTS AND BENEFITS CREATED BY SUPPLEMENTAL AGREEMENT DATED _____, 2005 BETWEEN JCP WEST OAKS MALL, LP AND JEG/ A WON JCP, LP, RECORDED AT _____, 2005 IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

Exhibit "A" Legal Description                    Page 22 of 22

## EXHIBIT "B"

SMT Borrowers

IPOFA WOM PL 1, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 2, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 3, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 4, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 5, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 6, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 7, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 8, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 10, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 11, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 12, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 13, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 14, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 15, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235

IPOFA WOM PL 16, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 17, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 18, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 19, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 20, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

# EXHIBIT I

# AKIN GUMP
## STRAUSS HAUER & FELD LLP

Attorneys at Law

MARK L. PATTERSON
(214) 969-4248/Fax: (214) 969-4343
mlpatterson@akingump.com

September 10, 2007

*VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED,*
*FEDERAL EXPRESS, AND TELECOPY (804) 594-3556*

IPOFA WEST OAKS MALL, LP
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM MASTER LEASECO, LP
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WEST OAKS MALL LEASECO, LP
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 1, LLC
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 2, LLC
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 3, LLC
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 4, LLC
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 5, LLC
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 6, LLC
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 7, LLC
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 8, LLC
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 10, LLC
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 11, LLC
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 12, LLC
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 13, LLC
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
September 10, 2007
Page 2

IPOFA WOM PL 14, LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 17, LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 20, LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 15, LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 18, LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 16, LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

IPOFA WOM PL 19, LLC
c/o Investment Properties of America,
LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

## NOTICE OF FORECLOSURE SALE

Re:   Matter:            West Oaks Mall
                         1000 West Oaks Mall
                         Houston, TX 77082
      Loan Number:       M030256880
      Pool:              GCCFC 2006-GG7

Dear Sir or Madam:

This firm represents GCCFC 2006-GG7 Westheimer Mall, LLC, a Texas limited liability company ("**Holder**"), acting by and through its Special Servicer, LNR Partners, Inc., and its Master Servicer, Midland Loan Services, Inc. (together, "**Servicer**"), in connection with the loan (the "**Loan**") evidenced by the documents and instruments described as follows:

Promissory Note (the "**Note**"), dated June 22, 2006, executed by IPofA West Oaks Mall, LP, a Texas limited partnership, IPofA WOM Master LeaseCo, LP, a Texas limited partnership, IPofA West Oaks Mall LeaseCo, LP, a Texas limited partnership, and each SMT Borrower (as defined in the Loan Agreement, defined below) (collectively,



IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
September 10, 2007
Page 3

"**Borrower**"), payable to the order of Greenwich Capital Financial Products, Inc., a Delaware corporation ("**Original Lender**"), in the original stated principal amount of Eighty-Six Million and No/100 Dollars ($86,000,000.00); and

Secured and/or evidenced by, among other instruments, (i) a Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "**Deed of Trust**"), dated as of June 22, 2006, executed by Borrower for the benefit of Original Lender, and covering the real and personal property more particularly described therein commonly known as West Oaks Mall and located at 1000 West Oaks Mall, Houston, Harris County, Texas 77082 (the "**Property**"), recorded as Document No. Z402124 of the Real Property Records of Harris County, Texas (the "**Records**"); (ii) an Absolute Assignment of Leases and Rents (the "**Assignment**"), dated as of June 22, 2006, executed by Borrower for the benefit of Original Lender, recorded as Document No. Z402126, of the Records; and (iii) a Loan and Security Agreement (the "**Loan Agreement**") dated as of June 22, 2006, executed by Borrower and Original Lender.

The Note, the Deed of Trust, the Assignment, the Loan Agreement, and all other documents and instruments securing or evidencing the Loan are hereinafter, collectively, referred to as the "**Loan Documents**". All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Loan Agreement and/or Deed of Trust.

The Note and the lien and security interest of the Deed of Trust, the Assignment, the Loan Agreement and all other Loan Documents were transferred and assigned to, and are currently held by, Holder pursuant to that certain Assignment of Deed of Trust and Other Loan Documents dated as of August 9, 2007 executed by LaSalle Bank National Association, in its capacity as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgagee Trust 2006-GG7, Commercial Mortgage Pass-Through Certificates, Series 2006-GG7, for the benefit of Holder and recorded as Document No. 20070495072 on August 13, 2007 in the Records.

By letter to you, dated July 27, 2007, this firm, on behalf of Holder's predecessor as holder of the Note, notified you of the existence of one or more defaults (the "**Defaults**") under the Loan Documents for, among other things, failure to make certain payments of principal and/or interest when due, which failure continued beyond any and all applicable notice and cure periods. That notice demanded payment of unpaid past due amounts then owing under the Loan Documents, and Borrower was advised of the noteholder's intention to accelerate the maturity of the Note if



IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
September 10, 2007
Page 4

the Defaults were not cured. Borrower did not cure the Defaults within the required time period. Therefore, by letter to you, dated August 13, 2007, we advised you that Holder had accelerated the maturity of the Note and had posted the Property for nonjudicial foreclosure. Holder did not proceed with that posted foreclosure sale and, with Borrower, entered into that certain Forbearance Letter Agreement, dated as of August 31, 2007 (the "**Forbearance Letter Agreement**"). In the Forbearance Letter Agreement, Holder, among other things, expressly reserved the right to re-post the Property for nonjudicial foreclosure.

This letter is formal notice to you on behalf of Holder and Servicer that, since the Defaults continue and Borrower has not, among other matters, paid the accelerated indebtedness under the Note, Holder has instructed Mark L. Patterson, Jeffrey J. Zissa, Jennifer Wilson Davis, Beverly A. Houston, Dana K. Roland, Tessa Fisher, Jeff Leva, Sandy Dasigenis and Steve Leva, and each of them acting alone, as Substitute Trustees, to sell the Property at a non-judicial foreclosure sale ("**Foreclosure Sale**"). A copy of the Notice of Substitute Trustee's Sale (the "**Notice**") specifying the date, time, place, and terms of the Foreclosure Sale is enclosed with this letter. The Notice has been posted at the Family Law Center, 1115 Congress, Houston, Harris County, Texas, in accordance with Section 51.002 of the Texas Property Code and the provisions of the Deed of Trust. If all Defaults have not been cured, including, without limitation, the payment of all amounts due and owing under the Loan Documents, by the Foreclosure Sale, Substitute Trustees, or any of them acting alone, will conduct the Foreclosure Sale on the date and at the time and place specified in the Notice, as authorized by and in accordance with the provisions of the Deed of Trust and applicable law.

Holder reserves the right to exercise, in such order as Holder elects, any one or more of the remedies available to Holder pursuant to the Loan Documents or otherwise at law or in equity (including, without limitation, actions for the immediate appointment of a receiver to, among other things, collect the rents and other income from the Property), and nothing contained in this letter shall constitute a waiver of any rights of Holder to pursue such rights and remedies. Please be further advised that no past or future delay or omission in the exercise of any right or remedy accruing to Holder as a result of any default is intended to constitute a waiver of any right or remedy accruing to Holder as a result of that default or any other default.

Payment to Holder in an amount less than the total delinquent sums, or any other partial cure of the Defaults, should not be construed as an accord and satisfaction or as Holder's agreement to accept a lesser amount as payment in full of the delinquent sums or partial cure of the Defaults. Holder's acceptance of any endorsement or statement on any check evidencing a payment or letter accompanying a payment may not be deemed to be an accord and satisfaction. Holder may accept any such payment or check without prejudice to its rights to receive the balance of all

AKIN GUMP
STRAUSS HAUER & FELD L.L.P.
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
September 10, 2007
Page 5

amounts due under the Loan Documents or to pursue any remedy thereunder or at law or in equity.

Neither this letter nor any statement by or on behalf of Holder or Servicer as to the amount due and owing under the Loan Documents shall constitute a waiver of any rights of Holder to collect any additional amounts to which Holder may be lawfully entitled pursuant to the terms of the Loan Documents or otherwise at law or in equity. The specific enumeration of defaults and/or obligations contained in this letter shall not constitute a waiver of any other default now or hereafter existing under the Loan Documents.

No communication, written or oral, that Borrower has had or may have with Holder or Servicer concerning the obligations evidenced or secured by the Loan Documents, including any concerning a modification or restructure of the Loan Documents or a forbearance in the exercise of any of Lender's remedies, in any way modifies this letter or constitutes consent to the non-payment or a waiver of any of the remedies described herein. Other than as specifically set forth in that certain Forbearance Letter Agreement, there are currently no forbearance, modification, renewal, extension or settlement agreements between Borrower and Holder with regard to the Loan or the Loan Documents, and all proposals made by Borrower to Holder relating to the foregoing are rejected.

To the extent your obligations have been discharged, dismissed, or are subject to an automatic stay of a bankruptcy order under Title 11 of the United States Code, this notice is for compliance and information purposes only, and does not constitute a demand for payment or any attempt to collect any such obligation. This notice is given pursuant to 11 U.S.C. Section 362(b)11, if applicable. In addition, all of Holder's claims, demands and accruals with respect to the Loan Documents, whenever made, and whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with all applicable usury laws, and are accordingly limited so that all applicable usury laws are not violated.

Servicer is representing Holder pursuant to a servicing agreement with Holder which covers the Loan. The address of Holder is: c/o LNR Partners, Inc., 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139, Attn: Mr. Job Warshaw.



IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
September 10, 2007
Page 6


Very truly yours,

AKIN GUMP STRAUSS HAUER & FELD LLP


By:    *Mark L. Patterson*
       ———————————————
       Mark L. Patterson


cc:    Mr. Job Warshaw, Senior Vice President        *VIA EMAIL:* jwarshaw@lnrproperty.com

       Mr. Urosh Tomovich                           *VIA EMAIL:* utomovich@lnrproperty.com

A K I N  G U M P
S T R A U S S  H A U E R  &  F E L D LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
September 10, 2007
Page 7

## FOR NOTICE PURPOSES ONLY

IPOFA WEST OAKS MALL GP, LLC
(GP of IPofA West Oaks Mall, LP)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

*VIA FIRST CLASS CERTIFIED MAIL RETURN
RECEIPT REQUESTED AND FEDEX*

IPOFA WOM MLC GP, LLC
(GP of IPofA WOM Master LeaseCo, LP)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

*VIA FIRST CLASS CERTIFIED MAIL RETURN
RECEIPT REQUESTED AND FEDEX*

IPOFA WOM LEASECO GP, LLC
(GP of IPofA West Oaks Mall LeaseCo, LP)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235
Attn: Edward H. Okun

*VIA FIRST CLASS CERTIFIED MAIL RETURN
RECEIPT REQUESTED AND FEDEX*

Edward H. Okun
(Guarantor and Environmental Indemnitor)
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN
RECEIPT REQUESTED AND FEDEX*

Ronald Letizia (SMT Guarantor)
2 Wellhouse Lane
Mamaroneck, NY 10543

*VIA FIRST CLASS CERTIFIED MAIL RETURN
RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 1, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN
RECEIPT REQUESTED AND FEDEX*

AKIN GUMP
STRAUSS HAUER & FELD
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
September 10, 2007
Page 8

Zeneth Eidel (SMT Guarantor)                    *VIA FIRST CLASS CERTIFIED MAIL RETURN*
7 Lodge Road                                    *RECEIPT REQUESTED AND FEDEX*
Briarcliff Manor, NY 10510

IPOFA WOM PL 2, LLC (SMT Borrower)              *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                        *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

Doris Eidel (SMT Guarantor)                     *VIA FIRST CLASS CERTIFIED MAIL RETURN*
7 Lodge Road                                    *RECEIPT REQUESTED AND FEDEX*
Briarcliff Manor, NY  10510

IPOFA WOM PL 3, LLC (SMT Borrower)              *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                        *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

Jean I. Singrin (SMT Guarantor)                 *VIA FIRST CLASS CERTIFIED MAIL RETURN*
8580 Warren Road                                *RECEIPT REQUESTED AND FEDEX*
Paso Robles, CA 93446

IPOFA WOM PL 4, LLC (SMT Borrower)              *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                        *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

Charles H. Shorley (SMT Guarantor)             *VIA FIRST CLASS CERTIFIED MAIL RETURN*
10126 Silver Point Lane                         *RECEIPT REQUESTED AND FEDEX*
Ocean City, MD  21842

IPOFA WOM PL 5, LLC (SMT Borrower)              *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                        *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

Catherine G. Meeks (SMT Guarantor)             *VIA FIRST CLASS CERTIFIED MAIL RETURN*
1718 E. Shadowcreek Drive                       *RECEIPT REQUESTED AND FEDEX*
Fresno, CA  93720

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
September 10, 2007
Page 9

IPOFA WOM PL 6, LLC (SMT Borrower)        *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                           *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

Keith Sperling (SMT Guarantor)               *VIA FIRST CLASS CERTIFIED MAIL RETURN*
13771 Wheeler Ave.                                  *RECEIPT REQUESTED AND FEDEX*
Sylmar, CA  91342

IPOFA WOM PL 7, LLC (SMT Borrower)        *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                           *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

Charles D. Bradley (SMT Guarantor)          *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Kim M. Bradley (SMT Guarantor)              *RECEIPT REQUESTED AND FEDEX*
18538 Flume Rd.
Sanger, CA  93657

IPOFA WOM PL 8, LLC (SMT Borrower)        *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                           *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

Maury Duff Peck (SMT Guarantor)             *VIA FIRST CLASS CERTIFIED MAIL RETURN*
10357 N. Doheny                                     *RECEIPT REQUESTED AND FEDEX*
Fresno, CA  93720

IPOFA WOM PL 10, LLC (SMT Borrower)       *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                           *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

Eugene Brughelli, Jr. (SMT Guarantor)       *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Patricia Brughelli (SMT Guarantor)           *RECEIPT REQUESTED AND FEDEX*
21546 So. Valentine Avenue
Riverdale, CA  93656

014728.0438 WEST  6136800 v1



IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
September 10, 2007
Page 10

IPOFA WOM PL 11, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Martha A. Olivares-Sperling (SMT Guarantor)
Keith Sperling (SMT Guarantor)
13771 Wheeler Ave.
Sylmar, CA 91342

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 12, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Antonette Volpe (SMT Guarantor)
198 Spring Street
Staten Island, NY 10304

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 13, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Robert Volpe (SMT Guarantor)
198 Spring Street
Staten Island, NY 10304

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 14, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Michael Sokobin (SMT Guarantor)
8020 Links Way
Port St. Lucie, FL 34986

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 15, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
September 10, 2007
Page 11

Helene Sokobin (SMT Guarantor)
8020 Links Way
Port St. Lucie, FL 34986

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 16, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Carolyn Lee Daniel (SMT Guarantor)
9560 North Nash Street
Middlesex, NC 27557

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 17, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Norma E. Register (SMT Guarantor)
139 Great Oak Drive
Hampstead, NC 28443

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 18, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Jeanette E. Newman (SMT Guarantor)
103 Inlet Drive
Hampstead, NC 28443

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

IPOFA WOM PL 19, LLC (SMT Borrower)
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

Dawn A. Dunbar (SMT Guarantor)
21 Terrier Place
Kendall Park, NJ 08824

*VIA FIRST CLASS CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDEX*

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
September 10, 2007
Page 12


IPOFA WOM PL 20, LLC (SMT Borrower)    *VIA FIRST CLASS CERTIFIED MAIL RETURN*
Attn:  Investor Services                *RECEIPT REQUESTED AND FEDEX*
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235

IPOFA WEST OAKS MALL PM, LP            *VIA FIRST CLASS CERTIFIED MAIL RETURN*
(Property Manager)                      *RECEIPT REQUESTED AND FEDEX*
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235
Attn:  Edward H. Okun

IPOFA WOM PM GP, LLC                   *VIA FIRST CLASS CERTIFIED MAIL RETURN*
(General Partner of Property Manager)   *RECEIPT REQUESTED AND FEDEX*
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235
Attn:  Edward H. Okun

IPOFA WEST OAKS MALL, LP               *VIA FIRST CLASS CERTIFIED MAIL RETURN*
(Environmental Indemnitor)              *RECEIPT REQUESTED AND FEDEX*
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235
Attn:  Edward H. Okun

IPOFA WOM MASTER LEASECO, LP           *VIA FIRST CLASS CERTIFIED MAIL RETURN*
(Environmental Indemnitor)              *RECEIPT REQUESTED AND FEDEX*
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235
Attn:  Edward H. Okun

IPOFA WEST OAKS MALL LEASECO, LP       *VIA FIRST CLASS CERTIFIED MAIL RETURN*
(Environmental Indemnitor)              *RECEIPT REQUESTED AND FEDEX*
c/o Investment Properties of America, LLC
10800 Midlothian Turnpike, Suite 309
Richmond, VA  23235
Attn:  Edward H. Okun

AKIN GUMP
STRAUSS HAUER & FELD

IPofA WEST OAKS MALL, LP
IPofA WOM MASTER LEASECO, LP
IPofA WEST OAKS MALL LEASECO, LP
Each of the SMT Borrowers (as defined in the Loan Agreement)
September 10, 2007
Page 13

Kutak Rock LLP                                    *VIA FIRST CLASS CERTIFIED MAIL RETURN*
The Omaha Building                                *RECEIPT REQUESTED, FEDEX AND TELECOPY:*
1650 Farnam Street                                *(402) 346-1148*
Omaha, Nebraska  68102-2186
Attn:  Joseph O. Kavan, Esq.

Kluger Peretz Kaplan & Berlin                     *VIA FIRST CLASS CERTIFIED MAIL RETURN*
201 S. Biscayne Blvd., Suite 1700                 *RECEIPT REQUESTED, FEDEX AND TELECOPY:*
Miami, Florida 33131                              *(305) 379-3428*
Attn:  Eliot C. Abbot, Esq.

DLA Piper US LLP                                  *VIA FIRST CLASS CERTIFIED MAIL RETURN*
One Liberty Place                                 *RECEIPT REQUESTED, FEDEX AND TELECOPY:*
1650 Market Street, Suite 4900                    *(215) 606-3318*
Philadelphia, Pennsylvania 19103
Attn:  Michael L. Eidel, Esq.

Dexter Perry, Esq.                                *VIA FIRST CLASS CERTIFIED MAIL RETURN*
The Providence Group of North Carolina           *RECEIPT REQUESTED, FEDEX AND TELECOPY:*
1400 Crescent Green, Suite G100                   *(919) 816-9241*
Cary, North Carolina  27518

Okun Holdings, Inc.                               *VIA FIRST CLASS CERTIFIED MAIL RETURN*
6301 East 10th Avenue                             *RECEIPT REQUESTED, FEDEX AND TELECOPY:*
Hialeah, Florida 33013                            *(786) 587-1099*
Attn:  Richard B. Simring, Esq.

## NOTICE OF SUBSTITUTE TRUSTEE'S SALE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Date:    September 7, 2007

Borrower and Borrower's Address:

IPOFA WEST OAKS MALL, LP, a Texas limited partnership,
IPOFA WOM MASTER LEASECO, LP, a Texas limited partnership,
IPOFA WEST OAKS MALL LEASECO, LP, a Texas limited partnership,
each c/o 10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235
Attn: Edward H. Okun

and each SMT Borrower as shown on Exhibit "B", attached hereto (and as defined in the Loan and Security Agreement, dated as of June 22, 2006, by and between Borrower and Original Lender, as herein defined)

Holder:

GCCFC 2006-GG7 WESTHEIMER MALL, LLC, a Texas limited liability company

Holder's Address:

c/o LNR Partners, Inc.
1601 Washington Avenue, Suite 700
Miami Beach, Florida 33139

Mortgage Servicer:    LNR Partners, Inc., a Florida corporation

Mortgage Servicer's Address:

1601 Washington Avenue, Suite 700
Miami Beach, Florida 33139

Substitute Trustees:

Mark L. Patterson, Jeffrey J. Zissa, Jennifer Wilson Davis, Beverly A. Houston, Dana K. Roland, Tessa Fisher, Jeff Leva, Sandy Dasigenis and Steve Leva, and each of them acting alone

Substitute Trustees' Address:

c/o Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Attention: Mark L. Patterson

Deed of Trust:

Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing

014728.0438 WEST 6136828 v1

| | |
|---|---|
| Date: | as of June 22, 2006 |
| Grantor: | IPofA West Oaks Mall, LP, a Texas limited partnership, IPofA WOM Master LeaseCo, LP, a Texas limited partnership, IPofA West Oaks Mall LeaseCo, LP, a Texas limited partnership, and each SMT Borrower |
| Original Lender: | Greenwich Capital Financial Products, Inc., a Delaware corporation |
| Trustee: | LandAmerica Charter Title Company, a Texas corporation |
| Secures: | Obligations under the Promissory Note ("**Note**"), dated as of June 22, 2006, in the original principal amount of $86,000,000.00, executed by Grantor, payable to the order of Original Lender and currently held by Holder |
| Recording: | Recorded on June 26, 2006, in the Real Estate Records of Harris County, Texas (the "**Records**"), as Document No. Z402124, as assigned by Original Lender to LaSalle Bank National Association, in its capacity as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2006-GG7, Commercial Mortgage Pass-Through Certificates, Series 2006-GG7 ("**LaSalle**") recorded in the Records on June 8, 2007 as Document No. 20070351046, and as further assigned by LaSalle to Holder by instrument dated as of August 9, 2007 and recorded in the Records on August 13, 2007 as Document No. 20070495072. |

| | |
|---|---|
| Property: | The real property described on Exhibit "A", attached hereto and made a part hereof for all purposes, together with all improvements and personal property described in the Deed of Trust. |

Foreclosure Sale

| | |
|---|---|
| Date of Sale: | Tuesday, October 2, 2007 |
| Time of Sale: | The Sale of the Property will take place between the hours of 10:00 a.m. and 4:00 p.m. local time; the earliest time at which the sale will take place is 10:00 a.m. and the sale will commence within three hours of such time. |
| Place of Sale: | In the area northwest of the stairwell railing, on the first floor of The Family Law Center, 1115 Congress, Houston, TX |

Holder, acting by and through Mortgage Servicer, has appointed Substitute Trustees, and each of them acting alone, as Substitute Trustees under the Deed of Trust upon the contingency

and in the manner outlined by the Deed of Trust and in accordance with Chapter 51 of the Texas Property Code. Default has occurred pursuant to the provisions of the Deed of Trust and the other documents evidencing the Note. The indebtedness evidenced by the Note is now wholly due. Holder, acting by and through Mortgage Servicer, has instructed Substitute Trustees, and each of them acting alone, to sell the Property toward the satisfaction of the Note.

The Deed of Trust may encumber both real and personal property. Notice is hereby given of Holder's election to proceed against and sell both the real property and any personal property described in the Deed of Trust in accordance with the Holder's rights and remedies under the Deed of Trust and Section 9.604 of the Texas Business and Commerce Code.

Notice is hereby given that on the Date of Sale, Substitute Trustees, or any of them acting alone, will offer the Property for sale at public auction at the Place of Sale, to the highest bidder for cash, "AS IS" and further subject to any valid leases of the Property, which leases shall not terminate as a result of the sale. THERE WILL BE NO WARRANTY RELATING TO TITLE, POSSESSION OR QUIET ENJOYMENT OR THE LIKE FOR THE PERSONAL PROPERTY INCLUDED IN THE SALE. Holder may bid by credit against the indebtedness secured by the Deed of Trust.

The Foreclosure Sale is being administered by Mortgage Servicer. Mortgage Servicer is representing Holder under a servicing agreement.

_____
**MARK L. PATTERSON**

STATE OF TEXAS           §
                         §
COUNTY OF DALLAS         §

Before me, the undersigned authority, on the 7th day of September, 2007, personally appeared Mark L. Patterson, known to me to be the person whose name is subscribed to the foregoing instrument, and he acknowledged to me that he executed the same in the capacity therein stated.

[SEAL]   MARY ALLEN
       NOTARY PUBLIC
       STATE OF TEXAS
       My Comm. Exp. 4-13-2010

_____
Notary Public in and for the State of Texas

_____
Printed Name

My Commission Expires:
4-13-2010

After recording return to:

Mark L. Patterson
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas  75201

014728.0438 WEST 6136828 v1                    3

# EXHIBIT "A"

Property Description

(see attachment)

A-1

**Exhibit A**

**PARCEL I (MALL PARCEL):**

REAL PROPERTY IN THE COUNTY OF HARRIS, STATE OF TEXAS, DESCRIBED AS FOLLOWS:

**TRACT I**

DESCRIPTION OF A 38.459 ACRE (1,675,719 SQUARE FEET) TRACT OF LAND BEING THE SAME CALLED 38.4692 ACRE TRACT DESCRIBED AS "TRACT I" IN A DEED TO TGW REALTY FUND VIA HOLDING COMPANY AND TGW REALTY FUND VB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 105 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 324, HARRIS COUNTY, TEXAS, SAID 38.459 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093), (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2854 PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 150 FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A" AND THE NORTHEAST CORNER OF A CALLED 18.3543 ACRE TRACT DESCRIBED IN A DEED TO PRIMARY PROPERTIES CORPORATION AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M961378;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6 AND ALONG THE EASTERLY LINE OF SAID RESTRICTED RESERVE "A" AND THE CALLED 18.3543 ACRE TRACT, A DISTANCE OF 1,212.01 FEET TO A "PK" NAIL FOUND FOR THE POINT OF BEGINNING OF THIS HEREIN DESCRIBED 38.459 ACRE TRACT, AND ALSO BEING THE SOUTHEASTERLY CORNER OF SAID 18.3543 ACRE TRACT;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6, A DISTANCE OF 78.60 FEET TO A POINT FOR NORTHEAST CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF WEST OAKS COMMERCIAL CENTER ACCORDING TO THE PLAT THEREOF RECORDED IN FILM CODE NO. 363492 OF THE HARRIS COUNTY MAP RECORDS, FROM WHICH A FOUND 5/8 INCH IRON ROD BEARS NORTH 10 DEGREES 44 MINUTES 00 SECONDS EAST, A DISTANCE OF 0.39 FOOT;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, DEPARTING THE WESTERLY RIGHT-OF-WAY LINE OF SAID STATE HIGHWAY NO. 6 ALONG THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER, A DISTANCE OF 349.17 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF SAID RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER, SAID POINT BEING IN THE ARC OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF WEST OAKS COMMERCIAL CENTER AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 350.00 FEET, THROUGH A CENTRAL ANGLE OF 14 DEGREES 35 MINUTES 46 SECONDS (THE CHORD BEARS SOUTH 31 DEGREES 33 MINUTES 58 SECONDS WEST, A DISTANCE OF 88.92 FEET) AN ARC DISTANCE OF 89.16 FEET TO AN "X" OUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 24 DEGREES 16 MINUTES 05 SECONDS WEST, CONTINUING ALONG THE

WESTERLY LINE OF SAID RESTRICTED RESERVE "A", PASSING AT 20.50 FEET THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "B" AND THE NORTHWEST CORNER OF RESTRICTED RESERVE "B" OF SAID WEST OAKS COMMERCIAL CENTER, PASSING AT 166.14 FEET THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "B" OF WEST OAKS COMMERCIAL CENTER AND CONTINUING FOR A TOTAL DISTANCE OF 419.09 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF OLIVE COAST SUBDIVISION, ACCORDING TO THE PLAT THEREOF RECORDED IN FILM CODE NO. _____ OF THE HARRIS COUNTY MAP RECORDS AND ALSO BEING THE SOUTHWESTERLY CORNER OF A CALLED 3.1740 ACRE TRACT DESCRIBED IN A DEED TO STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION AND JEFFREY KRAMER, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. N427316;

THENCE, SOUTH 02 DEGREES 18 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF SAID OLIVE COAST SUBDIVISION A DISTANCE OF 75.69 FEET TO A 5/8 INCH IRON ROD FOUND IN A NORTHWESTERLY LINE OF RESERVE "B" (UNRESTRICTED) OF SAID TOM BROWN SUBDIVISION FOR CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 42 DEGREES 49 MINUTES 15 SECONDS WEST, CONTINUING ALONG A NORTHWESTERLY LINE OF SAID RESERVE "B" (UNRESTRICTED), A DISTANCE OF 187.14 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 15 SECONDS WEST, ALONG A NORTHERLY LINE OF SAID RESERVE "B" (UNRESTRICTED), A DISTANCE OF 303.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE MOST WESTERLY NORTHWEST CORNER OF SAID RESERVE "B" (UNRESTRICTED) AND ALSO BEING A NORTHEASTERLY CORNER OF A CALLED 1.028 ACRE TRACT DESCRIBED AS "OUT PARCEL IV" IN THE SAID DEED TO TGW REALTY FUND VIA HOLDING COMPANY AND TGW REALTY FUND VIII;

THENCE, NORTH 02 DEGREES 18 MINUTES 32 SECONDS WEST, DEPARTING SAID NORTHERLY LINE OF RESERVE "B" (UNRESTRICTED) ALONG THE EASTERLY LINE OF THE SAID 1.028 ACRE TRACT A DISTANCE OF 5.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE, SOUTH 87 DEGREES 59 MINUTES 59 SECONDS WEST, WITH THE NORTHERLY LINE OF SAID 1.028 ACRE TRACT, A DISTANCE OF 0.56 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE NORTHERLY LINE OF SAID 1.028 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 225.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 10 MINUTES 38 SECONDS (THE CHORD BEARS SOUTH 84 DEGREES 23 MINUTES 34 SECONDS WEST, A DISTANCE OF 28.17 FEET) AN ARC DISTANCE OF 28.18 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG SAID NORTHERLY LINE AND ALONG SAID COMPOUND CURVE TO THE LEFT, HAVING A RADIUS OF 229.18 FEET, THROUGH A CENTRAL ANGLE OF 15 DEGREES 14 MINUTES 31 SECONDS (THE CHORD BEARS SOUTH 67 DEGREES 09 MINUTES 28 SECONDS WEST, A DISTANCE OF 60.79 FEET) AN ARC DISTANCE OF 60.97 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 59 DEGREES 32 SECONDS WEST, CONTINUING ALONG SAID NORTHERLY LINE, A DISTANCE OF 42.64 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG SAID NORTHERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 220.37 FEET, THROUGH A CENTRAL ANGLE OF 28

Exhibit "A" Legal Description                    Page 2 of 22

DEGREES 11 MINUTES 24 SECONDS (THE CHORD BEARS SOUTH 73 DEGREES 37 MINUTES 46 SECONDS WEST, A DISTANCE OF 108.38 FEET) AN ARC DISTANCE OF 108.42 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 38 SECONDS WEST CONTINUING ALONG SAID NORTHERLY LINE, A DISTANCE OF 15.90 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 72 DEGREES 19 MINUTES 31 SECONDS (THE CHORD BEARS SOUTH 51 DEGREES 34 MINUTES 13 SECONDS WEST, A DISTANCE OF 29.48 FEET) AN ARC DISTANCE OF 31.54 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY IN THE WESTERN LINE OF SAID TOM BROWN TRACT;

THENCE, SOUTH 15 DEGREES 24 MINUTES 57 SECONDS WEST, ALONG THE WESTERLY LINE OF SAID TOM BROWN TRACT, A DISTANCE OF 91.40 FEET TO A POINT IN THE NORTHERLY RIGHT-OF-WAY LINE OF RICHMOND AVENUE (12 FOOT WIDE RIGHT-OF-WAY AT THIS POINT RECORDED IN VOLUME 310, PAGE 109, HARRIS COUNTY MAP RECORDS) AND THE MOST SOUTHERLY LINE OF RESTRICTED RESERVE "A", BLOCK 1 OF SAID TOM BROWN SUBDIVISION, SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT, AND FROM WHICH AN "X" FOUND CUT IN CONCRETE BEARS NORTH 50 DEGREES 42 MINUTES 06 SECONDS WEST, A DISTANCE OF 0.20 FOOT;

THENCE, NORTHWESTERLY, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,988.00 FEET THROUGH A CENTRAL ANGLE OF 00 DEGREES 21 MINUTES 17 SECONDS (THE CHORD BEARS NORTH 74 DEGREES 12 MINUTES 39 SECONDS WEST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER HEREIN DESCRIBED TRACT;

THENCE, DEPARTING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, AND ALONG THE PERIMETER OF A CALLED 10.277 ACRES TRACT DESCRIBED IN A DEED TO DILLARD TEXAS OPERATING LIMITED PARTNERSHIP, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. R774407 THE FOLLOWING 38 COURSES AND DISTANCES;

1) NORTH 15 DEGREES 41 MINUTES 57 SECONDS EAST, A DISTANCE OF 111.53 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

2) NORTH 87 DEGREES 43 MINUTES 38 SECONDS EAST, A DISTANCE OF 42.77 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

3) NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 200.37 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 11 MINUTES 24 SECONDS (THE CHORD BEARS NORTH 73 DEGREES 37 MINUTES 46 SECONDS EAST, A DISTANCE OF 97.59 FEET) AN ARC DISTANCE OF 98.58 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

4) NORTH 59 DEGREES 32 MINUTES 04 SECONDS EAST, A DISTANCE OF 42.94 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

5) NORTHEASTERLY, ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 249.18 FEET, THROUGH A CENTRAL ANGLE OF 29 DEGREES 04 MINUTES 39 SECONDS (THE CHORD BEARS NORTH 74 DEGREES 04 MINUTES 23 SECONDS EAST, A DISTANCE OF 125.11 FEET) AN ARC DISTANCE OF 126.46 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

6) NORTH 88 DEGREES 36 MINUTES 43 SECONDS EAST, A DISTANCE OF 119.59 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

Exhibit "A" Legal Description                    Page 3 of 22

7) NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 282.84 FEET, THROUGH A CENTRAL ANGLE OF 51 DEGREES 00 MINUTES 38 SECONDS (THE CHORD BEARS NORTH 50 DEGREES 26 MINUTES 24 SECONDS EAST, A DISTANCE OF 259.28 FEET) AN ARC DISTANCE OF 263.84 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

8) NORTH 24 DEGREES 16 MINUTES 05 SECONDS EAST, A DISTANCE OF 99.45 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 283.47 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

10) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 187.81 FEET TO "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

12) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 161.18 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

13) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 62.74 FEET TO AN "X" CUT IN CONCRETE SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

14) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 81.64 FEET TO AN "X" CUT IN CONCRETE SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

15) NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 12.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 69 DEGREES 46 MINUTES 32 SECONDS WEST, A DISTANCE OF 9.18 FEET) AN ARC DISTANCE OF 9.42 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

16) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, DISTANCE OF 91.00 FEET TO AN "X" IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

17) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 90.79 FEET TO A "X" IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

18) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 244.17 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

19) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 91.42 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

20) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

21) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 4.24 FEET TO AN "X" CUT IN CONCRETE SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

22) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 46.20 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

23) SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 5.00 FEET, THROUGH A CENTRAL ANGLE OF 70 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 52 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 5.74 FEET) AN ARC

Exhibit "A" Legal Description                    Page 4 of 22

DISTANCE OF 8.11 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

24) SOUTH 17 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 93.62 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

25) NORTH 72 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 16.12 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

26) SOUTH 17 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 207.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

27) SOUTH 67 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 30.33 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

28) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 287.74 FEET TO A "PK" NAIL SET IN THE ARC OF A CURVE TO THE LEFT;

29) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 162.61 FEET, THROUGH A CENTRAL ANGLE OF 05 DEGREES 26 MINUTES 35 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 03 MINUTES 49 SECONDS EAST, A DISTANCE OF 15.47 FEET) AN ARC DISTANCE OF 15.48 FEET TO A "PK" NAIL FOUND FOR A POINT OF REVERSE CURVATURE OF A CURVE TO THE RIGHT;

30) SOUTHEASTERLY, ALONG SAID REVERSE CURVE TO THE RIGHT, HAVING A RADIUS OF 240.14 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 52 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 31 MINUTES 0 SECONDS EAST, A DISTANCE OF 86.95 FEET) AN ARC DISTANCE OF 86.51 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE RIGHT;

31) SOUTHEASTERLY, ALONG SAID COMPOUND CURVE TO THE RIGHT, HAVING A RADIUS OF 165.07 FEET, THROUGH A CENTRAL ANGLE OF 24 DEGREES 06 MINUTES 06 SECONDS (THE CHORD BEARS SOUTH 46 DEGREES 32 MINUTES 58 SECONDS EAST, A DISTANCE OF 70.30 FEET) AN ARC DISTANCE OF 70.87 FEET TO A "PK" NAIL FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

32) SOUTHEASTERLY, ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 127.62 FEET, THROUGH A CENTRAL ANGLE OF 29 DEGREES 13 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 48 DEGREES 46 MINUTES 56 SECONDS EAST, A DISTANCE OF 64.43 FEET) AN ARC DISTANCE OF 65.13 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

33) SOUTH 63 DEGREES 23 MINUTES 48 SECONDS EAST, A DISTANCE OF 80.98 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

34) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 265.33 FEET, THROUGH A CENTRAL ANGLE OF 28 DEGREES 53 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 131.40 FEET) AN ARC DISTANCE OF 132.80 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

35) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 159.04 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

36) SOUTH 15 DEGREES 44 MINUTES 57 SECONDS WEST, A DISTANCE OF 180.12 FEET TO AN "X" CUT IN CONCRETE SET ON THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF RESTRICTED RESERVE "A" OF SAID TOM BROWN SUBDIVISION, SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT;

Exhibit "A" Legal Description

THENCE, NORTHWESTERLY, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID DEDICATED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,000.00 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 41 MINUTES 17 SECONDS (THE CHORD BEARS NORTH 78 DEGREES 32 MINUTES 25 SECONDS WEST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO AN "X" CUT IN CONCRETE SET FOR THE MOST EASTERLY SOUTHEAST CORNER OF A CALLED 1.188 ACRE TRACT DESCRIBED AS "OUT PARCEL VII" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, NORTH 15 DEGREES 44 MINUTES 57 SECONDS EAST, ALONG THE MOST EASTERLY LINE OF SAID 1.188 ACRE TRACT, DEPARTING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, A DISTANCE OF 40.61 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 108 DEGREES 01 MINUTES 29 SECONDS (THE CHORD BEARS NORTH 38 DEGREES 15 SECONDS WEST, A DISTANCE OF 40.48 FEET) AN ARC DISTANCE OF 47.13 FEET TO A "PK" NAIL FOUND IN THE NORTHERLY LINE OF SAID 1.188 ACRE TRACT FOR THE POINT OF TANGENCY;

THENCE, SOUTH 57 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 166.48 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG A NORTHEASTERLY LINE OF SAID 1.188 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 88.33 FEET, THROUGH A CENTRAL ANGLE OF 92 DEGREES 44 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 77 DEGREES 49 MINUTES 40 SECONDS WEST, A DISTANCE OF 128.34 FEET) AN ARC DISTANCE OF 142.96 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 63 DEGREES 22 MINUTES 48 SECONDS WEST, CONTINUING ALONG A NORTHEASTERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 80.96 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 147.67 FEET, THROUGH A CENTRAL ANGLE OF 29 DEGREES 15 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 48 DEGREES 45 MINUTES 56 SECONDS WEST, A DISTANCE OF 74.62 FEET) AN ARC DISTANCE OF 75.39 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 141.77 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 06 MINUTES 03 SECONDS (THE CHORD BEARS NORTH 46 DEGREES 42 MINUTES 05 SECONDS WEST, A DISTANCE OF 61.61 FEET) AN ARC DISTANCE OF 62.11 FEET TO A "PK" NAIL FOUND FOR THE POINT OF COMPOUND CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID COMPOUND CURVE TO THE LEFT, HAVING A RADIUS OF 220.84 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 32 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 69 DEGREES 31 MINUTES 01 SECONDS WEST, A DISTANCE OF 78.73 FEET) AN ARC DISTANCE OF 79.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE RIGHT, HAVING A RADIUS OF 162.01 FEET, THROUGH A

CENTRAL ANGLE OF 26 DEGREES 13 MINUTES 03 SECONDS (THE CHORD BEARS NORTH 67 DEGREES 10 MINUTES 38 SECONDS WEST, A DISTANCE OF 79.86 FEET) AN ARC DISTANCE OF 80.55 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY,

THENCE, NORTH 54 DEGREES 34 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 48.57 FEET TO AN 1/2 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,189.24 FEET, THROUGH A CENTRAL ANGLE OF 06 DEGREES 01 MINUTE 59 SECONDS (THE CHORD BEARS NORTH 51 DEGREES 33 MINUTES 04 SECONDS WEST, A DISTANCE OF 121.69 FEET) AN ARC DISTANCE OF 121.75 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 48 DEGREES 32 MINUTES 04 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 47.88 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 152.11 FEET, THROUGH A CENTRAL ANGLE OF 67 DEGREES 50 MINUTES 32 SECONDS (THE CHORD BEARS NORTH 13 DEGREES 32 MINUTES 06 SECONDS WEST, A DISTANCE OF 147.01 FEET) AN ARC DISTANCE OF 150.42 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF REVERSE CURVATURE OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG SAID NORTHEASTERLY LINE AND ALONG SAID REVERSE CURVE TO THE LEFT, HAVING A RADIUS OF 172.39 FEET, THROUGH A CENTRAL ANGLE OF 56 DEGREES 37 MINUTES 22 SECONDS (THE CHORD BEARS NORTH 18 DEGREES 50 MINUTES 53 SECONDS WEST, A DISTANCE OF 163.52 FEET) AN ARC DISTANCE OF 170.37 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 47 DEGREES 19 MINUTES 32 SECONDS WEST, CONTINUING ALONG SAID NORTHEASTERLY LINE, A DISTANCE OF 12.87 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE NORTHWESTERLY LINE OF SAID 1.188 ACRE TRACT;

THENCE, SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHWESTERLY LINE OF SAID 1.188 ACRE TRACT, A DISTANCE OF 127.42 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT AND THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 41 DEGREES 12 MINUTES 22 SECONDS (THE CHORD BEARS SOUTH 22 DEGREES 07 MINUTES 16 SECONDS WEST, A DISTANCE OF 17.60 FEET) AN ARC DISTANCE OF 17.91 FEET TO A 5/8 INCH IRON ROD ON THE NORTHEASTERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF TOM BROWN SUBDIVISION;

THENCE, NORTH 49 DEGREES 35 MINUTES 56 SECONDS WEST, ALONG THE SOUTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND THE NORTHEASTERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE, A DISTANCE OF 70.09 FEET TO AN "X" CUT IN CONCRETE FOUND

FOR THE MOST SOUTHERLY CORNER OF A CALLED 3.035 ACRE TRACT DESCRIBED AS "OUT PARCEL 'A'" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIA AND ALSO BEING THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT (RADIUS POINT BEARS NORTH 11 DEGREES 43 MINUTES 39 SECONDS WEST);

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY LINE OF THE SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 34 DEGREES 32 MINUTES 54 SECONDS (THE CHORD BEARS NORTH 59 DEGREES 59 MINUTES 54 SECONDS EAST, A DISTANCE OF 14.86 FEET) AN ARC DISTANCE OF 15.07 FEET TO AN "X" CUT IN CONCRETE SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 41 DEGREES 50 MINUTES 49 SECONDS EAST, CONTINUING ALONG THE SOUTHEASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 131.89 FEET TO A FOUND "X" IN CONCRETE FOR THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT (RADIUS POINT BEARS NORTH 47 DEGREES 16 MINUTES 30 SECONDS WEST);

THENCE, NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 02 DEGREES 16 MINUTES 30 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT);

THENCE, NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 10.70 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 25 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 34 DEGREES 46 MINUTES 32 SECONDS WEST, A DISTANCE OF 86.58 FEET) AN ARC DISTANCE OF 87.27 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 22 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG AN EASTERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 291.34 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, CONTINUING ALONG AN EASTERLY LINE OF SAID 3.035 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 12 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 69.46 FEET) AN ARC DISTANCE OF 69.81 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, CONTINUING ALONG SAID EASTERLY LINE, A DISTANCE OF 9.82 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE EASTERN MOST NORTHERLY CORNER OF SAID 3.035 ACRE TRACT);

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE NORTHERLY LINE OF SAID 3.035 ACRE TRACT, A DISTANCE OF 84.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT, SAID POINT ALSO BEING THE MOST EASTERLY CORNER OF RESERVE "S" (UNRESTRICTED) OF THE SAID TOM BROWN SUBDIVISION;

THENCE, NORTH 49 DEGREES 35 MINUTES 36 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID RESERVE "C", A DISTANCE OF 184.69 FEET TO A 5/8 INCH IRON ROD FOUND ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AT THE MOST NORTHERLY CORNER OF SAID RESERVE "C" AND THE NORTHERN MOST WESTERLY CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT MARKS THE BEGINNING OF A CURVE TO THE

Exhibit "A" Legal Description                    Page 8 of 22

RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.56 FEET, THROUGH A CENTRAL ANGLE OF 01 DEGREES 13 MINUTES 51 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 09 MINUTES 19 SECONDS EAST, A DISTANCE OF 50.00 FEET) AN ARC DISTANCE OF 50.00 FEET TO A 1/2-INCH IRON ROD FOUND FOR THE MOST WESTERLY CORNER OF A CALLED 7.1050 ACRE TRACT DESCRIBED IN A DEED TO MERVYN'S AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. J807907;

THENCE DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE PERIMETER OF SAID MERVYN'S TRACT, THE FOLLOWING 9 COURSES AND DISTANCES:

1) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 46.14 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

2) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 130.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, A DISTANCE OF 99.50 FEET) AN ARC DISTANCE OF 102.10 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

3) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 5.53 FEET TO A 5/8 INCH IRON ROD FOUND FOR AN ANGLE POINT;

4) NORTH 72 DEGREES 39 MINUTES 06 SECONDS EAST, A DISTANCE OF 84.14 FEET TO A "PK" NAIL FOUND FOR AN ANGLE POINT;

5) NORTH 51 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 110.42 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 444.55 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 414.58 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 100.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 370.30 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT, SAID POINT ALSO BEING THE MOST EASTERLY CORNER OF SAID MERVYN'S TRACT AND ALSO BEING IN THE SOUTHWESTERLY LINE OF A CALLED 3.415 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

THENCE, SOUTH 82 DEGREES 16 MINUTES 32 SECONDS EAST, DEPARTING THE EASTERLY LINE OF SAID MERVYN'S TRACT AND CONTINUING ALONG THE SOUTHWESTERLY LINE OF THE SAID 3.415 ACRE TRACT, A DISTANCE OF 107.12 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 77 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 25.88 FEET) AN ARC DISTANCE OF 25.18 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY IN THE

Exhibit "A" Legal Description                    Page 9 of 22

MOST SOUTHERLY LINE OF SAID 3.415 ACRE TRACT;

THENCE, NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, ALONG THE MOST SOUTHERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 70.00 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY IN THE EASTERLY LINE OF SAID 3.415 ACRE TRACT;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 240.89 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 470.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 52 MINUTES 46 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 64.63 FEET) AN ARC DISTANCE OF 64.69 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 10 DEGREES 06 MINUTES 16 SECONDS WEST, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 59.88 FEET TO AN "X" CUT IN CONCRETE SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING ON THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 17 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 79 DEGREES 19 MINUTES 17 SECONDS EAST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO A "PK" NAIL SET FOR THE MOST NORTHERLY NORTHWEST CORNER OF A CALLED 6.0176 ACRE TRACT DESCRIBED IN A DEED TO J.C. PENNEY COMPANY, INC. AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. R628922;

THENCE, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE PERIMETER OF SAID J.C. PENNEY'S TRACT, THE FOLLOWING 19 COURSES AND DISTANCES:

1) SOUTH 10 DEGREES 05 MINUTES 16 SECONDS EAST, A DISTANCE OF 59.48 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

2) SOUTHEASTERLY, ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 452.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 86.67 FEET) AN ARC DISTANCE OF 98.72 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

3) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 285.86 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

4) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 169.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

5) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 101.89 FEET TO A "PK"

NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 243.16 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 110.94 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 280.00 FEET TO AN "X" CUT IN CONCRETE FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

10) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 295.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 280.00 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

12) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 122.06 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

13) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 243.16 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

14) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 57.00 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

15) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 101.80 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

16) SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 189.00 FEET TO A "PK" NAIL SET FOR CORNER OF THE HEREIN DESCRIBED TRACT;

17) NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 285.66 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

18) NORTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 518.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 49 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 70.67 FEET) AN ARC DISTANCE OF 70.83 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

19) NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, A DISTANCE OF 50.48 FEET TO A "PK" NAIL SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING ON THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 00 DEGREES 17 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 80 DEGREES 36 MINUTES 11 SECONDS EAST, A DISTANCE OF 12.00 FEET) AN ARC DISTANCE OF 12.00 FEET TO A "PK" NAIL SET FOR THE NORTHWEST CORNER A CALLED 2.826 ACRE TRACT DESCRIBED AS "OUT PARCEL II" IN THE SAID DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB;

Exhibit "A" Legal Description                    Page 11 of 22

014728.0438 WEST 6136828 v1                    A-12

THENCE, SOUTH 10 DEGREES 06 MINUTES 16 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 59.37 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHEASTERLY, CONTINUING ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 550.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 46 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 72.21 FEET) AN ARC DISTANCE OF 73.26 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 02 DEGREES 18 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE WESTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 240.68 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 25.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 47 DEGREES 18 MINUTES 32 SECONDS EAST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL FOUND FOR POINT OF TANGENCY IN THE SOUTHERLY LINE OF SAID 2.826 ACRE TRACT;

THENCE, NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, ALONG THE SOUTHERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 77.52 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 49 DEGREES 46 MINUTES 29 SECONDS (THE CHORD BEARS NORTH 62 DEGREES 50 MINUTES 13 SECONDS EAST, A DISTANCE OF 42.08 FEET) AN ARC DISTANCE OF 43.44 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY IN THE SOUTHEASTERLY LINE OF SAID 2.826 ACRE TRACT;

THENCE, NORTH 37 DEGREES 57 MINUTES 01 SECONDS EAST, ALONG THE SOUTHEASTERLY LINE OF SAID 2.826 ACRE TRACT, A DISTANCE OF 275.21 FEET TO A "PK" NAIL FOUND FOR THE MOST WESTERLY CORNER OF THE SAID 19.3543 ACRE TRACT;

THENCE, IN A GENERALLY SOUTHEASTERLY DIRECTION, ALONG THE SOUTHWESTERLY LINE OF SAID 19.3543 ACRE TRACT, THE FOLLOWING 13 COURSES AND DISTANCES:

1) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 68.72 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

2) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 28.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

3) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 280.76 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

4) SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 237.61 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

5) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 467.56 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

6) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 56.09 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

7) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 107.71 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

8) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 25.50 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

9) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 215.20 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

10) NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 44.13 FEET TO A "PK" NAIL FOUND FOR CORNER OF THE HEREIN DESCRIBED TRACT;

11) SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, A DISTANCE OF 88.79 TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

12) SOUTHEASTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 112.00 FEET, THROUGH A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 69 DEGREES 46 MINUTES 32 SECONDS EAST, A DISTANCE OF 85.72 FEET) AN ARC DISTANCE OF 87.96 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

13) NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, A DISTANCE OF 48.15 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 38.489 ACRES (1,676,719 SQUARE FEET) OF LAND.

TRACT II (OUT PARCEL)
DESCRIPTION OF A 3.415 ACRE (148,778 SQUARE FEET) TRACT OF LAND BEING THE SAME 3.4154 ACRE TRACT DESCRIBED AS "OUT PARCEL F" IN A DEED TO TCM REALTY FUND VIA HOLDING COMPANY AND TCM REALTY FUND VIII, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TCM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 510, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE ELIAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 3.415 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 07 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TCM BROWN SUBDIVISION);

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093); (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2682, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180 FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A";

THENCE, SOUTH 07 DEGREES 24 MINUTES 24 SECONDS WEST, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", A DISTANCE OF 875.94 FEET TO A CONCRETE MONUMENT WITH BRASS DISK FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESERVE "A" AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 08 DEGREES 14 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 83 DEGREES 17 MINUTES 24 SECONDS WEST, A DISTANCE OF 334.17 FEET) AN ARC DISTANCE OF 334.45 FEET TO AN "X" CUT IN CONCRETE FOUND FOR NORTHEAST CORNER AND THE POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

Exhibit "A" Legal Description                    Page 13 of 22

THENCE, SOUTH 10 DEGREES 05 MINUTES 18 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD, AND ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 58.88 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHEASTERLY, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 470.00, THROUGH A CENTRAL ANGLE OF 07 DEGREES 43 MINUTES 44 SECONDS (THE CHORD BEARS SOUTH 06 DEGREES 13 MINUTES 26 SECONDS EAST) A DISTANCE OF 64.03 FEET) AN ARC DISTANCE OF 64.09 TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, CONTINUING ALONG THE EASTERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 240.86 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, THROUGH, A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 39.27 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE, SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG THE SOUTHERLY LINE OF SAID 3.415 ACRE TRACT, A DISTANCE OF 70.00 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 77 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 25.88 FEET) AN ARC DISTANCE OF 26.18 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE POINT OF TANGENCY;

THENCE, NORTH 62 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG A SOUTHWESTERLY LINE OF SAID 3.415 ACRE TRACT, PASSING AT 107.12 FEET A "PK" NAIL FOUND AT THE NORTHEAST CORNER OF A CALLED 2.4080 ACRE TRACT DESCRIBED IN A DEED TO MERVYN'S, AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. J607907 AND CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID MERVYN'S TRACT FOR A TOTAL DISTANCE OF 216.40 FEET TO A "PK" NAIL FOUND FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, CONTINUING ALONG THE NORTHEASTERLY LINE OF SAID MERVYN'S TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 350.00 FEET, THROUGH A CENTRAL ANGLE OF 75 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 80 DEGREES 13 MINUTES 28 SECONDS WEST, A DISTANCE OF 426.13 FEET) AN ARC DISTANCE OF 458.15 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE MOST EASTERLY CORNER OF A CALLED 1.5608 ACRE TRACT DESCRIBED AS "OUT PARCEL VI" IN THE AFORESAID DEED TO TGW REALTY FUND VIA HOLDING COMPANY AND TGW REALTY FUND VIA RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074 AND THE SOUTHWEST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, DEPARTING THE NORTHERLY LINE OF SAID MERVYN'S TRACT, NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE NORTHEASTERLY LINE OF SAID 1.870 ACRE TRACT AND THE MOST SOUTHWESTERLY LINE OF THIS HEREIN DESCRIBED TRACT, A DISTANCE OF 69.55 FEET TO A 5/8 INCH IRON ROD FOUND ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN THE ARC OF A CURVE TO THE RIGHT;

Exhibit "A" Legal Description                    Page 14 of 22

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHWESTERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 20 DEGREES 26 MINUTES 03 SECONDS (THE CHORD BEARS NORTH 56 DEGREES 57 MINUTES 52 SECONDS EAST, A DISTANCE OF 825.72 FEET) AN ARC DISTANCE OF 830.11 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED 3.415 ACRES (148,775 SQUARE FEET) OF LAND.

LESS AND EXCEPT:
THE FOLLOWING DESCRIBED 0.301 ACRE TRACT OUT OF A 3.415 ACRE (148,775 SQUARE FEET):

TRACT OF LAND BEING THE SAME 3.4164 ACRE TRACT DESCRIBED AS "OUT PARCEL I" IN A DEED TO TCW REALTY FUND VIB HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 324, HARRIS COUNTY, TEXAS, SAID 0.301 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION);

COMMENCING AT A 5/8 INCH IRON ROD FOUND ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (A 120 FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 373 OF THE HARRIS COUNTY DEED RECORDS) WHICH MARKS THE MOST NORTHERLY CORNER OF RESERVE "A" HEREINAFTER OF THE SAID PLAT OF TOM BROWN SUBDIVISION AND A WESTERLY CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT MARKS THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 01 DEGREE 58 MINUTES 10 SECONDS (THE CHORD BEARS NORTH 42 DEGREES 25 MINUTES 26 SECONDS EAST, A DISTANCE OF 80.00 FEET) AN ARC DISTANCE OF 80.00 FEET TO A "PK" NAIL FOUND FOR CORNER;

THENCE, NORTHEASTERLY, ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND CONTINUING ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 15 DEGREES 18 MINUTES 47 SECONDS (THE CHORD BEARS NORTH 51 DEGREES 05 MINUTES 57 SECONDS EAST, A DISTANCE OF 619.86 FEET) AN ARC DISTANCE OF 620.70 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE AND POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

THENCE, NORTHEASTERLY, CONTINUING ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND CONTINUING ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,327.50 FEET, THROUGH A CENTRAL ANGLE OF 3 DEGREES 51 MINUTES 15 SECONDS (THE CHORD BEARS NORTH 60 DEGREES 40 MINUTES 51 SECONDS EAST, A DISTANCE OF 156.54 FEET) AN ARC DISTANCE OF 156.57 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE, LEAVING THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD ALONG THE SOUTHEASTERLY LINE OF WESTHEIMER ROAD ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 80.00 FEET A LENGTH OF 31.54 FEET AND A DELTA OF 22

Exhibit "A" Legal Description                    Page 16 of 22

DEGREES 26 MINUTES 52 SECONDS WITH A CHORD BEARING SOUTH 88 DEGREES 16 MINUTES 39 SECONDS EAST, 31.14 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE SOUTH 47 DEGREES 31 MINUTES 12 SECONDS EAST, A DISTANCE OF 21.28 FEET TO A 5/8 INCH IRON ROD SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE SOUTHEASTERLY, ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 70.00 FEET, THROUGH A CENTRAL ANGLE OF 19 DEGREES 25 MINUTES 33 SECONDS (THE CHORD BEARS SOUTH 56 DEGREES 22 MINUTES 46 SECONDS EAST, A DISTANCE OF 23.62 FEET) AN ARC DISTANCE OF 23.73 FEET TO A "PK" NAIL FOUND FOR THE POINT OF TANGENCY;

THENCE SOUTH 48 DEGREES 39 MINUTES 58 SECONDS EAST, A DISTANCE OF 22.24 FEET TO A SET 5/8 INCH IRON ROD FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE SOUTHWESTERLY, ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 350.00 FEET, THROUGH A CENTRAL ANGLE OF 30 DEGREES 16 MINUTES 57 SECONDS (THE CHORD BEARS SOUTH 57 DEGREES 52 MINUTES 54 SECONDS WEST, A DISTANCE OF 183.04 FEET) AN ARC DISTANCE OF 185.19 FEET TO A SET 5/8 INCH IRON ROD FOR CORNER;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 88.55 FEET TO POINT OF BEGINNING.

TRACT III (OUT PARCEL II)
DESCRIPTION OF A 2.826 ACRE (123,102 SQUARE FEET) TRACT OF LAND BEING THE SAME CALLED 2.8263 ACRE TRACT DESCRIBED AS "OUT PARCEL II" IN A DEED TO TCW REALTY FUND VIA HOLDING COMPANY AND TCW REALTY FUND VIB AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074 AND BEING OUT OF RESTRICTED RESERVE "A", BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, IN THE BIAS HERRERA SURVEY, ABSTRACT NO. 321, HARRIS COUNTY, TEXAS, SAID 2.826 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

COMMENCING AT A 5/8 INCH IRON ROD FOUND FOR THE POINT OF INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (F.M. 1093), (A 120-FOOT WIDE RIGHT-OF-WAY AS RECORDED IN VOLUME 2552, PAGE 375 OF THE HARRIS COUNTY DEED RECORDS) WITH THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 6 (A 180-FOOT WIDE RIGHT-OF-WAY), SAID POINT ALSO MARKS THE NORTHEAST CORNER OF SAID RESTRICTED RESERVE "A";

THENCE, SOUTH 87 DEGREES 24 MINUTES 24 SECONDS WEST, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", A DISTANCE OF 799.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE MOST NORTHERLY NORTHWEST CORNER OF A CALLED 18.3643 ACRE TRACT DESCRIBED IN A DEED TO PRIMARY PROPERTIES CORPORATION (THE "FOLEY'S TRACT") AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. M961376, SAID POINT ALSO BEING THE NORTHEAST CORNER AND POINT OF BEGINNING OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 02 DEGREES 35 MINUTES 36 SECONDS EAST, DEPARTING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND ALONG A WESTERLY LINE OF THE SAID FOLEY'S TRACT, A DISTANCE OF 59.14 FEET TO AN "X" CUT IN CONCRETE FOUND FOR A POINT ON THE ARC OF A CURVE TO THE LEFT;

THENCE, SOUTHWESTERLY, ALONG A NORTHWESTERLY LINE OF SAID FOLEY'S TRACT AND ALONG THE ARC OF SAID CURVE TO THE LEFT, HAVING A RADIUS OF 200.00 FEET, THROUGH A CENTRAL ANGLE OF 16 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS SOUTH 45 DEGREES 57 MINUTES 01 SECONDS WEST, A DISTANCE OF 55.67 FEET) AN ARC DISTANCE OF 55.85 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, SOUTH 37 DEGREES 57 MINUTES 01 SECONDS WEST, ALONG THE SOUTHEASTERLY LINE OF THIS TRACT AND CONTINUING ALONG THE NORTHWESTERLY LINE OF SAID FOLEY'S TRACT, PASSING AT 120.92 FEET A "PK" NAIL SET FOR THE MOST WESTERLY CORNER OF THE AFORESAID FOLEY'S TRACT AND A NORTHERLY CORNER OF A CALLED 38.4692 ACRE TRACT AND TRW REALTY FUND VIII, AND CONTINUING ALONG A NORTHWESTERLY LINE OF SAID 38.4692 ACRE TRACT FOR A TOTAL DISTANCE OF 896.13 TO AN "X" CUT IN CONCRETE SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, SOUTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 49 DEGREES 48 MINUTES 29 SECONDS (THE CHORD BEARS SOUTH 62 DEGREES 50 MINUTES 31 SECONDS WEST, A DISTANCE OF 42.09 FEET) AN ARC DISTANCE OF 43.44 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST, ALONG A NORTHERLY LINE OF SAID 38.4692 ACRE TRACT, A DISTANCE OF 77.52 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE, NORTHWESTERLY, ALONG THE ARC OF SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 22.50 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS (THE CHORD BEARS NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, A DISTANCE OF 35.36 FEET) AN ARC DISTANCE OF 35.27 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY;

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG AN EASTERLY LINE OF SAID 38.4692 ACRE TRACT, A DISTANCE OF 240.88 FEET TO A "PK" NAIL SET FOR THE BEGINNING OF A CURVE TO THE LEFT;

THENCE, NORTHWESTERLY, CONTINUING ALONG AN EASTERLY LINE OF SAID 38.4692 ACRE TRACT AND ALONG SAID CURVE TO THE LEFT, HAVING A RADIUS OF 530.00, THROUGH A CENTRAL ANGLE OF 07 DEGREES 48 MINUTES 44 SECONDS (THE CHORD BEARS NORTH 06 DEGREES 10 MINUTES 54 SECONDS WEST, A DISTANCE OF 72.21 FEET) AN ARC DISTANCE OF 72.26 FEET TO A "PK" NAIL SET FOR THE POINT OF TANGENCY,

THENCE, NORTH 10 DEGREES 05 MINUTES 16 SECONDS WEST, CONTINUING ALONG THE AFORESAID LINES, A DISTANCE OF 59.38 FEET TO A "PK" NAIL SET ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A", SAID POINT ALSO BEING IN THE ARC OF A CURVE TO THE RIGHT;

THENCE, NORTHEASTERLY, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF SAID RESTRICTED RESERVE "A" AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 2,837.50 FEET, THROUGH A CENTRAL ANGLE OF 05 DEGREES 45 MINUTES 22 SECONDS (THE CHORD BEARS NORTH 84 DEGREES 01 MINUTES 48 SECONDS EAST, A DISTANCE OF 274.33 FEET) AN ARC DISTANCE OF 274.45 FEET TO A CONCRETE MONUMENT WITH BRASS DISK FOUND FOR THE POINT OF TANGENCY.

THENCE, NORTH 87 DEGREES 24 MINUTES 24 SECONDS EAST, CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD AND THE NORTHERLY LINE OF

SAID RESTRICTED RESERVE "A" A DISTANCE OF 176.96 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 2.826 ACRES (123,102 SQUARE FEET) OF LAND.

TRACT VII:
EASEMENT RIGHTS AS SET FORTH IN DEED RECORDED IN HARRIS COUNTY CLERK'S FILE NO. P513119 AND REFILED IN HARRIS COUNTY CLERK'S FILE NO. P525426.

TRACT VIII:
DESCRIPTION OF A 2.473 ACRE (107,731 SQUARE FEET) TRACT OF LAND OUT OF RESERVE "B" (UNRESTRICTED), BLOCK 1, OF TOM BROWN SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS, ALSO BEING A PORTION OF A CALLED 8.4933 ACRE TRACT DESCRIBED AS "TRACT IX" IN A DEED TO TCW REALTY FUND VIII HOLDING COMPANY AND TCW REALTY FUND VIII AS RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. V277074, IN THE BLAS HERRERA SURVEY, ABSTRACT NO. 331, IN HARRIS COUNTY, TEXAS, SAID 2.473 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY 6, CALLED AS SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST ON THE AFORESAID PLAT OF TOM BROWN SUBDIVISION):

BEGINNING AT A 5/8 INCH IRON ROD FOUND ON THE NORTHERLY RIGHT-OF-WAY LINE OF RICHMOND AVENUE (A 100 FOOT WIDE RIGHT-OF-WAY) WHICH MARKS THE SOUTHWEST CORNER OF SAID RESERVE "B" AND A SOUTHEASTERLY CORNER OF RESTRICTED RESERVE "A", BLOCK 1, OF SAID TOM BROWN SUBDIVISION:

THENCE, NORTH 02 DEGREES 16 MINUTES 32 SECONDS WEST, ALONG THE WESTERLY LINE OF SAID RESERVE "B" AND AN EASTERLY LINE OF SAID RESTRICTED RESERVE "A", SAID LINE ALSO BEING THE EASTERLY LINE OF A CALLED 1.935 ACRES TRACT DESCRIBED AS "OUT PARCEL 9C" IN THE AFORESAID DEED TO TCW REALTY FUND VIII HOLDING COMPANY AND TCW REALTY FUND VIII, A DISTANCE OF 232.52 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF SAID RESERVE "B" AND AN INTERIOR CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN A SOUTHERLY LINE OF A CALLED 38.469 ACRE TRACT DESCRIBED AS "TRACT I" IN THE SAID DEED TO TCW REALTY FUND VIII HOLDING COMPANY AND TCW REALTY FUND VIII:

THENCE, NORTH 87 DEGREES 59 MINUTES 15 SECONDS EAST, ALONG THE NORTHERLY LINE OF SAID RESERVE "B" AND A SOUTHERLY LINE OF THE SAID 38.469 ACRE TRACT, A DISTANCE OF 303.14 FEET TO A "PK" NAIL FOUND FOR AN ANGLE POINT;

THENCE, NORTH 42 DEGREES 59 MINUTES 15 SECONDS EAST, ALONG A SOUTHEASTERLY LINE OF THE SAID 38.469 ACRE TRACT AND A NORTHWESTERLY LINE OF SAID RESERVE "B", A DISTANCE OF 197.14 FEET, TO A 5/8 INCH IRON ROD FOUND IN THE WESTERLY LINE OF RESTRICTED RESERVE "A", BLOCK 1, OF OLIVE COAST SUBDIVISION AS RECORDED IN FILM CODE NO. 367869 OF THE HARRIS COUNTY MAP RECORDS, SAID POINT MARKS THE NORTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 02 DEGREES 16 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID RESTRICTED RESERVE "A" OF OLIVE COAST SUBDIVISION AND THE MOST EASTERLY LINE OF THIS TRACT, A DISTANCE OF 214.32 FEET TO AN "X" CUT IN CONCRETE FOUND FOR THE SOUTHWEST CORNER OF SAID RESTRICTED RESERVE "A", SAID POINT BEING IN THE NORTHERLY LINE OF A CALLED 2.1516 ACRE TRACT DESCRIBED AS A "SAVE AND EXCEPT" TRACT OUT OF THE 8.4933 ACRE TRACT DESCRIBED IN THE AFORESAID DEED TO TCW REALTY FUND VIII HOLDING COMPANY AND TCW REALTY FUND VIII, SAID POINT MARKS THE MOST EASTERLY SOUTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 15 SECONDS WEST ALONG THE NORTHERLY LINE OF SAID 2.1516 ACRE TRACT, A DISTANCE OF 23.00 FEET TO A 5/8 INCH IRON ROD FOUND FOR

Exhibit "A" Legal Description                         Page 18 of 22

THE NORTHWEST CORNER OF SAID 2.1516 ACRE TRACT;

THENCE, SOUTH 03 DEGREES 18 MINUTES 32 SECONDS EAST, ALONG THE WESTERLY LINE OF SAID 2.1516 ACRE TRACT AND AN EASTERLY LINE OF THIS BEING DESCRIBED TRACT, A DISTANCE OF 155.00 FEET TO A 5/8 INCH IRON ROD FOUND ON THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B" WHICH MARKS THE SOUTHWEST CORNER OF THE SAID 2.1516 ACRE TRACT AND THE MOST SOUTHERLY SOUTHEAST CORNER OF THIS HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEGREES 59 MINUTES 18 SECONDS WEST, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B", A DISTANCE OF 130.21 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE POINT OF BEGINNING OF A CURVE TO THE RIGHT;

THENCE NORTHWESTERLY, CONTINUING ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID RICHMOND AVENUE AND THE SOUTHERLY LINE OF SAID RESERVE "B", AND ALONG SAID CURVE TO THE RIGHT, HAVING A RADIUS OF 1,030.00 FEET, THROUGH A CENTRAL ANGLE OF 07 DEGREES 38 MINUTES 18 SECONDS (THE CHORD BEARS NORTH 89 DEGREES 03 MINUTES 06 SECONDS WEST, A DISTANCE OF 208.40 FEET) AN ARC DISTANCE OF 206.61 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 2.473 ACRES (107,731 SQUARE FEET) OF LAND.

TRACT IX
EASEMENT RIGHTS IN THE FOLLOWING INSTRUMENTS: (I) EASEMENT, RESTRICTION AND OPERATING AGREEMENT DATED JULY 28, 1982, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. H660941, AS SUBSEQUENTLY AMENDED UNDER COUNTY CLERK'S FILE NO. M963366, AS FURTHER AMENDED UNDER COUNTY CLERK'S FILE NO. R663964, AS ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON JULY 28, 2003, UNDER COUNTY CLERK'S FILE NOS. W871184 AND W871160, AS FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER COUNTY CLERK'S FILE NO. Y779115, FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER COUNTY CLERK'S FILE NO. Y779118, (II) RECIPROCAL COVENANTS AND EASEMENT DATED DECEMBER 18, 1991, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. N762716 (III) EASEMENT DATED OCTOBER 14, 1993, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. P513118, REFILED UNDER COUNTY CLERK'S FILE NO. P528424 AND (IV) AGREEMENT DATED AS OF JUNE 24, 1981, FILED FOR RECORD UNDER COUNTY CLERK'S FILE NO. H329950, ASSIGNED UNDER HARRIS COUNTY CLERK'S FILE NO. N587757, ALL IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

PARCEL II (MERVYN'S PARCEL):

TRACT I
DESCRIPTION OF A TRACT OR PARCEL OF LAND CONTAINING 7.1050 ACRES (309,493 SQUARE FEET) OUT OF THE BLAS HERRERA SURVEY, ABSTRACT NO. 324, HARRIS COUNTY, TEXAS, AND BEING A PORTION OF THAT CERTAIN 102.6024 ACRE TRACT OF LAND KNOWN AS BLOCK ONE, RESERVE "A" OF THE TOM BROWN SUBDIVISION AS RECORDED IN VOLUME 310, PAGE 106 OF THE HARRIS COUNTY MAP RECORDS. SAID 7.1050 ACRE TRACT IS MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT THE POINT OF INTERSECTION OF THE EXTENDED NORTHERLY RIGHT OF WAY LINE OF RICHMOND AVENUE (100 FOOT WIDE RIGHT OF WAY) WITH THE EXTENDED SOUTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (F.M. 1093 - 120 FOOT WIDE RIGHT OF WAY);

THENCE NORTH 40 DEGREES 24 MINUTES 24 SECONDS EAST, ALONG THE SOUTHERLY RIGHT

Exhibit "A" Legal Description                         Page 19 of 22

OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093), FOR A DISTANCE OF 286.00 FEET TO A 5/8 INCH IRON ROD FOUND AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE CONTINUING ALONG THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) AND ALONG SAID CURVE TO THE RIGHT, HAVING A CENTRAL ANGLE OF 02 DEGREES 19 MINUTES 51 SECONDS, A RADIUS OF 2327.50 FEET, AN ARC LENGTH OF 94.90 FEET, (CHORD BEARS NORTH 41 DEGREES 33 MINUTES 50 SECOND EAST, 93.99 FEET) TO A P.K. NAIL IN ASPHALT SET FOR THE POINT OF BEGINNING OF THE HEREIN DESCRIBED 7.1060 ACRE TRACT;

THENCE CONTINUING ALONG THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) AND ALONG SAID CURVE TO THE RIGHT HAVING CENTRAL ANGLE OF 00 DEGREES 44 MINUTES 16 SECONDS, A RADIUS OF 2327.50 FEET, AN ARC LENGTH OF 30.00 FEET, (CHORD BEARS NORTH 43 DEGREES 05 MINUTES 14 SECONDS EAST, 30.00 FEET) TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 47 DEGREES 18 MINUTES 32 SECOND EAST, LEAVING THE SOUTHERLY RIGHT OF WAY LINE OF SAID WESTHEIMER ROAD (F.M. 1093) FOR A DISTANCE OF 45.95 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT, HAVING A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 100.00 FEET, AN ARC LENGTH OF 78.54 FEET, (CHORD BEARS SOUTH 69 DEGREES 48 MINUTES 32 SECONDS EAST, 76.54 FEET) TO A CUT "X" IN CONCRETE SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 87 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 6.53 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER OF THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT, HAVING A CENTRAL ANGLE OF 36 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 75.00 FEET, AN ARC LENGTH OF 47.12 FEET, (CHORD BEARS NORTH 69 DEGREES 43 MINUTES 28 SECONDS EAST, 46.35 FEET) TO A CUT "X" IN CONCRETE SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 51 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 209.42 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE LEFT;

THENCE ALONG SAID CURVE TO THE LEFT HAVING A CENTRAL ANGLE OF 09 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 350.00 FEET, AN ARC LENGTH OF 54.98 FEET, (CHORD BEARS NORTH 47 DEGREES 13 MINUTES 28 SECONDS EAST, 54.92 FEET) TO A P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE LEFT;

THENCE NORTH 42 DEGREES 43 MINUTES 28 SECONDS EAST, FOR A DISTANCE OF 276.17 FEET TO A CUT "X" IN CONCRETE SET AT THE POINT OF CURVATURE OF A CURE TO THE RIGHT;

THENCE ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 76 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 350.00 FEET, AN ARC LENGTH OF 464.16 FEET, (CHORD BEARS NORTH 80 DEGREES 43 MINUTES 28 SECONDS EAST, 428.13 FEET) TO P.K. NAIL IN ASPHALT SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE RIGHT;

THENCE SOUTH 62 DEGREES 16 MINUTES 32 SECONDS EAST, FOR A DISTANCE OF 111.28

Exhibit "A" Legal Description                    Page 20 of 22

FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 370.59 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 47 DEGREES 16 MINUTES 32 SECONDS EAST, FOR A DISTANCE OF 100.00 FEET TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 42 DEGREES 43 MINUTES 28 SECONDS WEST, FOR A DISTANCE OF 414.58 FEET, TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, FOR A DISTANCE OF 444.55 FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 51 DEGREES 43 MINUTES 26 SECONDS WEST, FOR A DISTANCE OF 110.42 FEET, TO A P.K. NAIL IN ASPHALT SET FOR CORNER;

THENCE SOUTH 72 DEGREES 39 MINUTES 04 SECONDS WEST, FOR A DISTANCE OF 84.14 FEET, TO A 5/8 INCH IRON ROD SET FOR CORNER;

THENCE SOUTH 87 DEGREES 43 MINUTES 28 SECONDS WEST OF A DISTANCE OF 5.55 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 45 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 130.00 FEET, AN ARC LENGTH OF 102.10 FEET, (CHORD BEARS NORTH 69 DEGREES 46 MINUTES 32 SECONDS WEST, 99.50 FEET TO A 5/8 INCH IRON ROD SET FOR CORNER AT THE POINT OF TANGENCY OF SAID CURVE TO THE RIGHT;

THENCE NORTH 47 DEGREES 16 MINUTES 32 SECONDS WEST, FOR A DISTANCE OF 46.14 FEET TO THE POINT OF BEGINNING AND CONTAINING WITHIN THESE METES AND BOUNDS 7.1050 ACRES (309,483 SQUARE FEET) OF LAND AREA.

TOGETHER WITH ABUTTERS RIGHTS OF INGRESS AND EGRESS TO AND FROM WESTHEIMER ROAD, A PHYSICALLY OPEN STREET.

TRACT II
ALL THOSE CERTAIN EASEMENT RIGHTS CREATED BY EASEMENT, RESTRICTION AND OPERATING AGREEMENT DATED JULY 26, 1982, BY AND BETWEEN FEDERATED STORES REALTY, INC., ET AL, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS, UNDER HARRIS COUNTY CLERK'S FILE NO. H559341, AS AMENDED BY THAT CERTAIN FIRST AMENDMENT TO EASEMENT, RESTRICTION AND OPERATING AGREEMENT WEST OAKS MALL DATED AS OF JANUARY 2, 1991, BY AND BETWEEN WEST OAKS ASSOCIATES, LTD., ET AL, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. N363366, AS FURTHER MODIFIED BY THAT CERTAIN DECLARATION MADE BY WEST OAKS ASSOCIATES, LTD. DATED AS OF MAY 30, 1996, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. R363964, AS ASSIGNED BY MERVYN'S LLC TO MDS TEXAS REALTY I, LP, BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION AGREEMENT DATED AS OF SEPTEMBER 2, 2004, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. X030148, AS FURTHER ASSIGNED BY MDS REALTY I, LP, TO WOM OUT PARCEL, LP, BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION OF OPERATING AGREEMENT DATED AS OF AUGUST 5, 2005, FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF HARRIS COUNTY, TEXAS UNDER COUNTY CLERK'S FILE NO. Y663789, AS FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2005, UNDER CLERK'S FILE

Exhibit "A" Legal Description                    Page 21 of 22

NO. Y779116, FURTHER ASSIGNED BY ASSIGNMENT OF RECIPROCAL EASEMENT AGREEMENT FILED FOR RECORD ON SEPTEMBER 21, 2006, UNDER CLERK'S FILE NO. Y779118 ALL IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

NOTE: The Company does not represent that the above acreage or square footage calculations are correct.

PARCEL III:

ALL THOSE CERTAIN RIGHTS AND BENEFITS CREATED BY SUPPLEMENTAL AGREEMENT DATED _____, 2006 BETWEEN HOCL WEST OAKS MALL, LP AND IE OF A WOM JCP, LP, RECORDED UNDER _____ IN THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS.

Exhibit "A" Legal Description                    Page 22 of 22

## EXHIBIT "B"

SMT Borrowers

IPOFA WOM PL 1, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 2, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 3, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 4, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 5, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 6, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 7, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 8, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 10, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 11, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 12, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 13, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 14, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 15, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, Virginia 23235

IPOFA WOM PL 16, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 17, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 18, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 19, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

IPOFA WOM PL 20, LLC
Attn: Investor Services
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235

# EXHIBIT J

Official Form 1 (4/07)

| United States Bankruptcy Court<br>Eastern District of Virginia | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**IPofA West Oaks Mall, LP** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec./Complete EIN or other Tax ID No. (if more than one, state all)<br>**20-3405509** | Last four digits of Soc. Sec./Complete EIN or other Tax ID No. (if more than one, state all) |
| Street Address of Debtor (No. and Street, City, and State):<br>**10800 Midlothian Tunrpike, Ste 309**<br>**Richmond, VA**<br>ZIP Code **23235** | Street Address of Joint Debtor (No. and Street, City, and State):<br>ZIP Code |
| County of Residence or of the Principal Place of Business:<br>**Chesterfield** | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>ZIP Code | Mailing Address of Joint Debtor (if different from street address):<br>ZIP Code |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): | |

| Type of Debtor<br>(Form of Organization)<br>(Check one box) | Nature of Business<br>(Check one box) | Chapter of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☑ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities,<br>check this box and state type of entity below.) | ☐ Health Care Business<br>☑ Single Asset Real Estate as defined<br>in 11 U.S.C. § 101 (51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☐ Other | ☐ Chapter 7<br>☐ Chapter 9<br>☑ Chapter 11<br>☐ Chapter 12<br>☐ Chapter 13    ☐ Chapter 15 Petition for Recognition<br>of a Foreign Main Proceeding<br>☐ Chapter 15 Petition for Recognition<br>of a Foreign Nonmain Proceeding |
| | **Tax-Exempt Entity**<br>(Check box, if applicable)<br>☐ Debtor is a tax-exempt organization<br>under Title 26 of the United States<br>Code (the Internal Revenue Code). | **Nature of Debts**<br>(Check one box)<br>☐ Debts are primarily consumer debts,<br>defined in 11 U.S.C. § 101(8) as<br>"incurred by an individual primarily for<br>a personal, family, or household purpose."    ☑ Debts are primarily<br>business debts. |

| Filing Fee (Check one box) | Chapter 11 Debtors |
|---|---|
| ☑ Full Filing Fee attached<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must<br>attach signed application for the court's consideration certifying that the debtor<br>is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must<br>attach signed application for the court's consideration. See Official Form 3B. | Check one box:<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☑ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>Check if:<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed<br>to insiders or affiliates) are less than $2,190,000.<br>Check all applicable boxes:<br>☐ A plan is being filed with this petition.<br>☐ Acceptances of the plan were solicited prepetition from one or more<br>classes of creditors, in accordance with 11 U.S.C. § 1126(b). |

| Statistical/Administrative Information | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| ☑ Debtor estimates that funds will be available for distribution to unsecured creditors.<br><br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid,<br>there will be no funds available for distribution to unsecured creditors. | |

Estimated Number of Creditors

| 1–<br>49 | 50–<br>99 | 100–<br>199 | 200–<br>999 | 1000–<br>5,000 | 5001–<br>10,000 | 10,001–<br>25,000 | 25,001–<br>50,000 | 100,001–<br>100,000 | OVER<br>100,000 |
|---|---|---|---|---|---|---|---|---|---|
| ☑ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

Estimated Assets

| ☐ $0 to<br>$10,000 | ☐ $10,001 to<br>$100,000 | ☐ $100,001 to<br>$1 million | ☐ $1,000,001 to<br>$100 million | ☑ More than<br>$100 million |
|---|---|---|---|---|

Estimated Liabilities

| ☐ $0 to<br>$50,000 | ☐ $50,001 to<br>$100,000 | ☐ $100,001 to<br>$1 million | ☑ $1,000,001 to<br>$100 million | ☐ More than<br>$100 million |
|---|---|---|---|---|

Official Form 1 (4/07)                                                                                          FORM B1, Page 2

| **Voluntary Petition**<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>**IPofA West Oaks Mall, LP** |
|---|---|

**All Prior Bankruptcy Cases Filed Within Last 8 Years** (If more than two, attach additional sheet)

| Location<br>Where Filed: **- None -** | Case Number: | Date Filed: |
|---|---|---|
| Location<br>Where Filed: | Case Number: | Date Filed: |

**Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor** (If more than one, attach additional sheet)

| Name of Debtor:<br>**- None -** | Case Number: | Date Filed: |
|---|---|---|
| District: | Relationship: | Judge: |

| **Exhibit A**<br><br>(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐ Exhibit A is attached and made a part of this petition. | **Exhibit B**<br>(To be completed if debtor is an individual whose debts are primarily consumer debts.)<br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by 11 U.S.C. §342(b).<br><br>X _____<br>    Signature of Attorney for Debtor(s)      (Date) |
|---|---|

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

    ☐ Yes, and Exhibit C is attached and made a part of this petition.

    ■ No.

**Exhibit D**

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

    ☐ Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

    ☐ Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**
(Check any applicable box)

    ■    Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

    ☐    There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

    ☐    Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Statement by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes)

    ☐    Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

           _____
           (Name of landlord that obtained judgment)

           _____
           (Address of landlord)

    ☐    Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

    ☐    Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

Official Form 1 (4/07)                                                                    FORM B1, Page 3

| Voluntary Petition | Name of Debtor(s): |
| *(This page must be completed and filed in every case)* | **IPofA West Oaks Mall, LP** |

<div align="center">Signatures</div>

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of a Foreign Representative |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct.<br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br>[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. §342(b).<br><br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>   Signature of Debtor<br><br>X _____<br>   Signature of Joint Debtor<br><br>_____<br>Telephone Number (If not represented by attorney)<br><br>_____<br>Date | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.<br><br>(Check only one box.)<br><br>☐ I request relief in accordance with chapter 15 of title 11. United States Code. Certified copies of the documents required by 11 U.S.C. §1515 are attached.<br><br>☐ Pursuant to 11 U.S.C. §1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.<br><br>X _____<br>   Signature of Foreign Representative<br><br>_____<br>Printed Name of Foreign Representative<br><br>_____<br>Date |

| Signature of Attorney |
|---|
| X  /s/ Michael E. Hastings<br>Signature of Attorney for Debtor(s)<br><br>**Michael E. Hastings 36090**<br>Printed Name of Attorney for Debtor(s)<br><br>**LeClair Ryan**<br>Firm Name<br><br>**Riverfront Plaza, East Tower**<br>**951 East Byrd Street, Eighth Floor**<br>**Richmond, VA 23219**<br>Address<br><br><br>**804-783-2003  Fax: 804-783-2294**<br>Telephone Number<br><br>**October  2, 2007**<br>Date |

| Signature of Non-Attorney Bankruptcy Petition Preparer |
|---|
| I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.<br><br>_____<br>Printed Name and title, if any, of Bankruptcy Petition Preparer<br><br>_____<br>Social Security number (If the bankrutpcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.)(Required by 11 U.S.C. § 110.)<br><br><br><br>_____<br>Address<br><br>X _____<br><br>_____<br>Date<br><br>Signature of Bankruptcy Petition Preparer or officer, principal, responsible person,or partner whose Social Security number is provided above.<br><br>Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:<br><br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person. |

| Signature of Debtor (Corporation/Partnership) |
|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br><br>The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X  /s/ Edward H. Okun<br>Signature of Authorized Individual<br><br>**Edward H. Okun**<br>Printed Name of Authorized Individual<br><br>**Manager of General Partner**<br>Title of Authorized Individual<br><br>**October  2, 2007**<br>Date |

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. §110; 18 U.S.C. §156.*

# EXHIBIT K

Official Form 1 (4/07)

| **United States Bankruptcy Court**<br>Eastern District of Virginia | **Voluntary Petition** |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**IPofA West Oaks LeaseCo, LP** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec./Complete EIN or other Tax ID No. (if more than one, state all)<br>**20-3426375** | Last four digits of Soc. Sec./Complete EIN or other Tax ID No. (if more than one, state all) |
| Street Address of Debtor (No. and Street, City, and State):<br>**10800 Midlothian Turnpike, Ste 309**<br>**Richmond, VA**<br>ZIP Code **23235** | Street Address of Joint Debtor (No. and Street, City, and State):<br>ZIP Code |
| County of Residence or of the Principal Place of Business:<br>**Chesterfield** | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>ZIP Code | Mailing Address of Joint Debtor (if different from street address):<br>ZIP Code |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): | |

| **Type of Debtor**<br>(Form of Organization)<br>(Check one box) | **Nature of Business**<br>(Check one box) | **Chapter of Bankruptcy Code Under Which**<br>**the Petition is Filed** (Check one box) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>■ Corporation (includes LLC and LLP)<br>■ Partnership<br>☐ Other (If debtor is not one of the above entities,<br>check this box and state type of entity below.) | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined<br>in 11 U.S.C. § 101 (51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>■ Other | ☐ Chapter 7<br>☐ Chapter 9<br>■ Chapter 11<br>☐ Chapter 12<br>☐ Chapter 13    ☐ Chapter 15 Petition for Recognition<br>of a Foreign Main Proceeding<br>☐ Chapter 15 Petition for Recognition<br>of a Foreign Nonmain Proceeding |

| | **Tax-Exempt Entity**<br>(Check box, if applicable)<br>☐ Debtor is a tax-exempt organization<br>under Title 26 of the United States<br>Code (the Internal Revenue Code). | **Nature of Debts**<br>(Check one box)<br>☐ Debts are primarily consumer debts,<br>defined in 11 U.S.C. § 101(8) as<br>"incurred by an individual primarily for<br>a personal, family, or household purpose."    ■ Debts are primarily<br>business debts. |
|---|---|---|

| **Filing Fee** (Check one box) | **Chapter 11 Debtors** |
|---|---|
| ■ Full Filing Fee attached<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must<br>attach signed application for the court's consideration certifying that the debtor<br>is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must<br>attach signed application for the court's consideration. See Official Form 3B. | Check one box:<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☐ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>Check if:<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed<br>to insiders or affiliates) are less than $2,190,000.<br>Check all applicable boxes:<br>☐ A plan is being filed with this petition.<br>☐ Acceptances of the plan were solicited prepetition from one or more<br>classes of creditors, in accordance with 11 U.S.C. § 1126(b). |

| Statistical/Administrative Information | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| ■ Debtor estimates that funds will be available for distribution to unsecured creditors.<br><br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid,<br>there will be no funds available for distribution to unsecured creditors. | |

Estimated Number of Creditors

| 1-<br>49 | 50-<br>99 | 100-<br>199 | 200-<br>999 | 1000-<br>5,000 | 5001-<br>10,000 | 10,001-<br>25,000 | 25,001-<br>50,000 | 100,001-<br>100,000 | OVER<br>100,000 |
|---|---|---|---|---|---|---|---|---|---|
| ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

Estimated Assets

| ☐ $0 to<br>$10,000 | ☐ $10,001 to<br>$100,000 | ☐ $100,001 to<br>$1 million | ■ $1,000,000 to<br>$100 million | ☐ More than<br>$100 million |
|---|---|---|---|---|

Estimated Liabilities

| ☐ $0 to<br>$50,000 | ☐ $50,001 to<br>$100,000 | ☐ $100,001 to<br>$1 million | ■ $1,000,001 to<br>$100 million | ☐ More than<br>$100 million |
|---|---|---|---|---|

Official Form 1 (4/07)                                                                                          FORM B1, Page 2

| **Voluntary Petition** | Name of Debtor(s): |
|---|---|
| *(This page must be completed and filed in every case)* | **IPofA West Oaks LeaseCo, LP** |

| **All Prior Bankruptcy Cases Filed Within Last 8 Years** (If more than two, attach additional sheet) | | |
|---|---|---|
| Location Where Filed: **- None -** | Case Number: | Date Filed: |
| Location Where Filed: | Case Number: | Date Filed: |

| **Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor** (If more than one, attach additional sheet) | | |
|---|---|---|
| Name of Debtor: **- None -** | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

| **Exhibit A** | **Exhibit B** |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.) | (To be completed if debtor is an individual whose debts are primarily consumer debts.) I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by 11 U.S.C. §342(b). |
| ☐ Exhibit A is attached and made a part of this petition. | X _____<br> Signature of Attorney for Debtor(s)          (Date) |

**Exhibit C**
Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?
☐ Yes, and Exhibit C is attached and made a part of this petition.
■ No.

**Exhibit D**
(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)
☐ Exhibit D completed and signed by the debtor is attached and made a part of this petition.
If this is a joint petition:
☐ Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**
(Check any applicable box)
■ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.
☐ Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Statement by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes)
☐ Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐ Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and
☐ Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

Official Form 1 (4/07)                                                                                  FORM B1, Page 3

| **Voluntary Petition** | Name of Debtor(s): |
| *(This page must be completed and filed in every case)* | **IPofA West Oaks LeaseCo, LP** |

<div align="center">Signatures</div>

| **Signature(s) of Debtor(s) (Individual/Joint)** | **Signature of a Foreign Representative** |
|---|---|

**Signature(s) of Debtor(s) (Individual/Joint)**

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.
[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. §342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
   Signature of Debtor

X _____
   Signature of Joint Debtor

_____
Telephone Number (If not represented by attorney)

_____
Date

**Signature of a Foreign Representative**

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only one box.)

☐ I request relief in accordance with chapter 15 of title 11. United States Code. Certified copies of the documents required by 11 U.S.C. §1515 are attached.

☐ Pursuant to 11 U.S.C. §1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
   Signature of Foreign Representative

_____
Printed Name of Foreign Representative

_____
Date

**Signature of Attorney**

X **/s/ Michael E. Hastings**
   Signature of Attorney for Debtor(s)

**Michael E. Hastings 36090**
Printed Name of Attorney for Debtor(s)

**LeClair Ryan**
Firm Name

**Riverfront Plaza, East Tower**
**951 East Byrd Street, Eighth Floor**
**Richmond, VA 23219**

Address

**804-783-2003  Fax: 804-783-2294**
Telephone Number

**October  2, 2007**
Date

**Signature of Debtor (Corporation/Partnership)**

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X **/s/ Edward H. Okun**
   Signature of Authorized Individual

**Edward H. Okun**
Printed Name of Authorized Individual

**Manager of General Partner**
Title of Authorized Individual

**October  2, 2007**
Date

**Signature of Non-Attorney Bankruptcy Petition Preparer**

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.

_____
Printed Name and title, if any, of Bankruptcy Petition Preparer

_____
Social Security number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.)(Required by 11 U.S.C. § 110.)

_____
Address

X _____

_____
Date

Signature of Bankruptcy Petition Preparer or officer, principal, responsible person,or partner whose Social Security number is provided above.

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. §110; 18 U.S.C. §156.*

# EXHIBIT L

Official Form 1 (4/07)

| United States Bankruptcy Court<br>Eastern District of Virginia | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**IPofA WOM Master LeaseCo, LP** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec./Complete EIN or other Tax ID No. (if more than one, state all)<br>**20-5000973** | Last four digits of Soc. Sec./Complete EIN or other Tax ID No. (if more than one, state all) |

| Street Address of Debtor (No. and Street, City, and State):<br>**10800 Midlothian Turnpike, Ste 309**<br>**Richmond, VA**<br><div align="right">ZIP Code<br>**23235**</div> | Street Address of Joint Debtor (No. and Street, City, and State):<br><div align="right">ZIP Code</div> |
|---|---|
| County of Residence or of the Principal Place of Business:<br>**Chesterfield** | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br><div align="right">ZIP Code</div> | Mailing Address of Joint Debtor (if different from street address):<br><div align="right">ZIP Code</div> |

Location of Principal Assets of Business Debtor
(if different from street address above):

| Type of Debtor<br>(Form of Organization)<br>(Check one box)<br><br>☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>■ Corporation (includes LLC and LLP)<br>■ Partnership<br>☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.) | Nature of Business<br>(Check one box)<br><br>☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>■ Other | Chapter of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box)<br><br>☐ Chapter 7    ☐ Chapter 15 Petition for Recognition<br>☐ Chapter 9         of a Foreign Main Proceeding<br>■ Chapter 11   ☐ Chapter 15 Petition for Recognition<br>☐ Chapter 12       of a Foreign Nonmain Proceeding<br>☐ Chapter 13 |
|---|---|---|

| | **Tax-Exempt Entity**<br>(Check box, if applicable)<br>☐ Debtor is a tax-exempt organization under Title 26 of the United States Code (the Internal Revenue Code). | **Nature of Debts**<br>(Check one box)<br>☐ Debts are primarily consumer debts,  ■ Debts are primarily<br>   defined in 11 U.S.C. § 101(8) as     business debts.<br>   "incurred by an individual primarily for<br>   a personal, family, or household purpose." |
|---|---|---|

| Filing Fee (Check one box)<br><br>■ Full Filing Fee attached<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B. | Chapter 11 Debtors<br>Check one box:<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>■ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>Check if:<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,190,000.<br>Check all applicable boxes:<br>☐ A plan is being filed with this petition.<br>☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b). |
|---|---|

| Statistical/Administrative Information<br><br>■ Debtor estimates that funds will be available for distribution to unsecured creditors.<br><br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|

Estimated Number of Creditors

| 1-<br>49 | 50-<br>99 | 100-<br>199 | 200-<br>999 | 1000-<br>5,000 | 5001-<br>10,000 | 10,001-<br>25,000 | 25,001-<br>50,000 | 100,001-<br>100,000 | OVER<br>100,000 |
|---|---|---|---|---|---|---|---|---|---|
| ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

Estimated Assets

| ☐ $0 to<br>$10,000 | ☐ $10,001 to<br>$100,000 | ☐ $100,001 to<br>$1 million | ■ $1,000,001 to<br>$100 million | ☐ More than<br>$100 million |
|---|---|---|---|---|

Estimated Liabilities

| ☐ $0 to<br>$50,000 | ☐ $50,001 to<br>$100,000 | ☐ $100,001 to<br>$1 million | ■ $1,000,001 to<br>$100 million | ☐ More than<br>$100 million |
|---|---|---|---|---|

Official Form 1 (4/07)                                                                                        FORM B1, Page 2

| **Voluntary Petition**<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>**IPofA WOM Master LeaseCo, LP** |
|---|---|

| **All Prior Bankruptcy Cases Filed Within Last 8 Years (If more than two, attach additional sheet)** | | |
|---|---|---|
| Location<br>Where Filed: **- None -** | Case Number: | Date Filed: |
| Location<br>Where Filed: | Case Number: | Date Filed: |

| **Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor (If more than one, attach additional sheet)** | | |
|---|---|---|
| Name of Debtor:<br>**- None -** | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

<table>
<tr>
<td><b>Exhibit A</b><br><br>(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐ Exhibit A is attached and made a part of this petition.</td>
<td><b>Exhibit B</b><br>(To be completed if debtor is an individual whose debts are primarily consumer debts.)<br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by 11 U.S.C. §342(b).<br><br>X _____<br>   Signature of Attorney for Debtor(s)      (Date)</td>
</tr>
</table>

| **Exhibit C** |
|---|
| Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?<br><br>☐ Yes, and Exhibit C is attached and made a part of this petition.<br>■ No. |

| **Exhibit D** |
|---|
| (To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)<br>  ☐ Exhibit D completed and signed by the debtor is attached and made a part of this petition.<br>If this is a joint petition:<br>  ☐ Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition. |

| **Information Regarding the Debtor - Venue**<br>(Check any applicable box) |
|---|
| ■    Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.<br><br>☐    There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.<br><br>☐    Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District. |

| **Statement by a Debtor Who Resides as a Tenant of Residential Property**<br>(Check all applicable boxes) |
|---|
| ☐    Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)<br><br>       _____<br>       (Name of landlord that obtained judgment)<br><br><br>       _____<br>       (Address of landlord)<br><br>☐    Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and<br><br>☐    Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition. |

Official Form 1 (4/07)                                                                                    FORM B1, Page 3

| Voluntary Petition | Name of Debtor(s): |
| --- | --- |
| *(This page must be completed and filed in every case)* | **IPofA WOM Master LeaseCo, LP** |

**Signatures**

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of a Foreign Representative |
| --- | --- |
| I declare under penalty of perjury that the information provided in this petition is true and correct.<br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br>[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. §342(b).<br><br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>Signature of Debtor<br><br>X _____<br>Signature of Joint Debtor<br><br>_____<br>Telephone Number (If not represented by attorney)<br><br>_____<br>Date | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.<br><br>(Check only one box.)<br><br>☐ I request relief in accordance with chapter 15 of title 11. United States Code. Certified copies of the documents required by 11 U.S.C §1515 are attached.<br><br>☐ Pursuant to 11 U.S.C. §1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.<br><br>X _____<br>Signature of Foreign Representative<br><br>_____<br>Printed Name of Foreign Representative<br><br>_____<br>Date |

| Signature of Attorney | Signature of Non-Attorney Bankruptcy Petition Preparer |
| --- | --- |
| X  **/s/ Michael E. Hastings**<br>Signature of Attorney for Debtor(s)<br><br>**Michael E. Hastings  36090**<br>Printed Name of Attorney for Debtor(s)<br><br>**LeClair Ryan**<br>Firm Name<br><br>**Riverfront Plaza, East Tower<br>951 East Byrd Street, Eighth Floor<br>Richmond, VA 23219**<br><br>Address<br><br><br>**804-783-2003  Fax: 804-783-2294**<br>Telephone Number<br><br>**October  2, 2007**<br>Date | I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.<br><br>_____<br>Printed Name and title, if any, of Bankruptcy Petition Preparer<br><br>_____<br>Social Security number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.)(Required by 11 U.S.C. § 110.) |

| Signature of Debtor (Corporation/Partnership) | |
| --- | --- |
| I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br><br>The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X  **/s/ Edward H. Okun**<br>Signature of Authorized Individual<br><br>**Edward H. Okun**<br>Printed Name of Authorized Individual<br><br>**Manager of General Partner**<br>Title of Authorized Individual<br><br>**October  2, 2007**<br>Date | Address<br><br>X _____<br><br>_____<br>Date<br><br>Signature of Bankruptcy Petition Preparer or officer, principal, responsible person,or partner whose Social Security number is provided above.<br><br>Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. §110; 18 U.S.C. §156.* |